JS 44 (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

TATIA LIPE

## DEFENDANTS

ALBUQUERQUE PUBLIC SCHOOLS
NEW MEXICO DEPARTMENT OF PUBLIC EDUCATION

**(b)** County of Residence of First Listed Plaintiff    Bernalillo
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Bernalillo
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
FOGHI LAW FIRM, LLC    505-220-5691
4351 Jager Dr. NE, Ste. K, Rio Rancho, NM 87144

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1  U.S. Government Plaintiff
- [x] 3  Federal Question *(U.S. Government Not a Party)*
- [ ] 2  U.S. Government Defendant
- [ ] 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* and One Box for Defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [x] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [x] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | 625 Drug Related Seizure of Property 21 USC 881 | 422 Appeal 28 USC 158 | 375 False Claims Act |
| 120 Marine | 310 Airplane / 365 Personal Injury – | 690 Other | 423 Withdrawal 28 USC 157 | 376 Qui Tam (31 USC 3729(a)) |
| 130 Miller Act | 315 Airplane Product Liability / Product Liability |  |  | 400 State Reapportionment |
| 140 Negotiable Instrument | 320 Assault, Libel & / 367 Health Care/ |  | **INTELLECTUAL PROPERTY RIGHTS** | 410 Antitrust |
| 150 Recovery of Overpayment & Enforcement of Judgment | Slander / Pharmaceutical Personal Injury | | 820 Copyrights | 430 Banks and Banking |
| 151 Medicare Act | 330 Federal Employers' / Product Liability | | 830 Patent | 450 Commerce |
| 152 Recovery of Defaulted Student Loans (Excludes Veterans) | Liability / 368 Asbestos Personal Injury Product Liability | | 835 Patent – Abbreviated New Drug Application | 460 Deportation |
| | 340 Marine | | 840 Trademark | 470 Racketeer Influenced and Corrupt Organizations |
| 153 Recovery of Overpayment of Veteran's Benefits | 345 Marine Product Liability / **PERSONAL PROPERTY** | | 880 Defend Trade Secrets Act of 2016 | 480 Consumer Credit (15 USC 1681 or 1692) |
| 160 Stockholders' Suits | 350 Motor Vehicle / 370 Other Fraud | **LABOR** | | 485 Telephone Consumer |
| 190 Other Contract | 355 Motor Vehicle / 371 Truth in Lending | 710 Fair Labor Standards Act | **SOCIAL SECURITY** | Protection Act |
| 195 Contract Product Liability | Product Liability / 380 Other Personal Property Damage | 720 Labor/Management Relations | 861 HIA (1395ff) | 490 Cable/Sat TV |
| 196 Franchise | 360 Other Personal Injury / 385 Property Damage Product Liability | 740 Railway Labor Act | 862 Black Lung (923) | 850 Securities/Commodities/ Exchange |
| | 362 Personal Injury – Medical Malpractice | 751 Family and Medical Leave Act | 863 DIWC/DIWW (405(g)) | 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** / **PRISONER PETITIONS** | 790 Other Labor Litigation | 864 SSID Title XVI | 891 Agricultural Acts |
| 210 Land Condemnation | 440 Other Civil Rights / **Habeas Corpus:** | 791 Employee Retirement Income Security Act | 865 RSI (405(g)) | 893 Environmental Matters |
| 220 Foreclosure | 441 Voting / 463 Alien Detainee | | | 895 Freedom of Information Act |
| 230 Rent Lease & Ejectment | 442 Employment / 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | 896 Arbitration |
| 240 Torts to Land | 443 Housing/ Accommodations / 530 General | | 870 Taxes (U.S. Plaintiff or Defendant) | 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| 245 Tort Product Liability | [x] 445 Amer. w/Disabilities – Employment / 535 Death Penalty | **IMMIGRATION** | 871 IRS—Third Party 26 USC 7609 | 950 Constitutionality of State Statutes |
| 290 All Other Real Property | 446 Amer. w/Disabilities – Other / **Other:** | 462 Naturalization Application | | |
| | 448 Education / 540 Mandamus & Other | 465 Other Immigration Actions | | |
| | | 550 Civil Rights | | |
| | | 555 Prison Condition | | |
| | | 560 Civil Detainee – Conditions of Confinement | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [x] 1  Original Proceeding
- [ ] 2  Removed from State Court
- [ ] 3  Remanded from Appellate Court
- [ ] 4  Reinstated or Reopened
- [ ] 5  Transferred from Another District *(specify)*
- [ ] 6  Multidistrict Litigation – Transfer
- [ ] 8  Multidistrict Litigation – Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 USC12111

Brief description of cause:
Discrimination based on protected disability and retaliation

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $
$1,000,000 fees costs

CHECK YES only if demanded in complaint:
JURY DEMAND:  [x] Yes   [ ] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____    DOCKET NUMBER _____

DATE
10/12/2023

SIGNATURE OF ATTORNEY OF RECORD
*Joghi Foghi*

## FOR OFFICE USE ONLY

RECEIPT # _____    AMOUNT _____    APPLYING IFP _____    JUDGE _____    MAG. JUDGE _____

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

TATIA LIPE,                          §
                                     §
**Plaintiff,**                       §
                                     §
v.                                   §          No. _____
                                     §
ALBUQUERQUE PUBLIC SCHOOLS           §
and NEW MEXICO DEPARTMENT            §
OF PUBLIC EDUCATION,                 §
                                     §
**Defendants.**                      §
                                     §

## COMPLAINT FOR DAMAGES

Plaintiff Tatia Lipe, LCSW, by her attorney Boglarka Foghi, complains against the

Defendants, Albuquerque Public Schools and the New Mexico Public Education Department,

and in support of her complaint, the Plaintiff states as follows:

### ALLEGATIONS COMMON TO ALL COUNTS

1. The Plaintiff is an individual, a licensed clinical social worker, who resides in

   Albuquerque, New Mexico. The Plaintiff was employed by the Defendant Albuquerque

   Public Schools for approximately eight years working with children with disabilities.

2. The Defendant New Mexico Department of Public Education is a governmental

   subdivision of the State of New Mexico. Through its Special Education Department, the

   Defendant administers educational programs for children with disabilities in New

   Mexico.

1

3. This Court has subject matter Jurisdiction over the Plaintiff's claims under the Americans with Disabilities Act 42 USC 12111 *et seq* ("the ADA") pursuant to 28 USC Section 1331 (federal question). This Court retains pendent jurisdiction over all remaining claims.

4. In late 2021, the Plaintiff became aware of a series of conditions and program failures that were placing special education students generally and her students specifically at risk. These conditions and failures include, without limitation of the foregoing:

   (a) The Defendant failed to follow proper protocols and suspended children from classes arbitrarily;
   (b) The Defendant failed to develop individualized education programs for students as required by federal law;
   (c) The Defendant failed to perform necessary behavioral assessments;
   (d) The Defendant allowed students to skip classes and yet still participate in extracurricular activities such as sports;
   (e) The Defendant failed to provide reasonable accommodations and modifications for students and;
   (f) The Defendant failed to assist students with their transition needs.

Sub-paragraphs (a)-(f) will hereafter be referred to "the Defendant's Harmful Policies."

5. The Plaintiff began painstakingly documenting the Defendant's Harmful Policies in September of 2021. The Plaintiff repeatedly brought the Defendant's Harmful Policies to the attention of her superiors and her colleagues and was rebuffed. One colleague colorfully advised the Plaintiff that she was "an ant going up against a lion."

6. In February of 2022, the Plaintiff elevated the matter with a formal complaint to Defendant Department of Public Education, case number 2122-14.

7. On April 14, 2022, the Defendant (Department) confirmed the accuracy of the Plaintiff's allegations about the Defendant's Harmful Practices. A true and correct copy of the Complaint Resolution Report ("the Report") filed on that date is attached hereto as Exhibit "A." The Report provides a wealth of detail about specific instances that support the Plaintiff's allegations against Defendant Albuquerque Public Schools.

8.  The Plaintiff's superiors were embarrassed by the Report; felt inconvenienced by the required progress audits; and embarked on a campaign of retaliations and harassment against the Plaintiff. The acts of harassment and retaliation which occurred throughout the rest of 2022 through March of 2023 include, without limitation of the foregoing:

    (a) Isolating the Plaintiff from her colleagues and co-workers and preventing her from professionally collaborating with colleagues;
    (b) Opposing the Plaintiff's efforts to obtain medical leave to which she was entitled for military service-related disabilities including chronic hip back and neck pain, inflammation, and fibromyalgia. The Plaintiff was diagnosed as requiring surgery.
    (c) Forcing the Plaintiff to come into work while she was suffering from the condition;
    (d)  Being unfairly berated and castigated for not filling out notes; not seeing students; not making progress toward goals despite having been directed that she should not work because she was on leave;
    (e) Being professionally defamed as irresponsible and nonfeasant by Bernadette Lucero Turner, Director of Related Services, in recorded meetings taking place during March of 2023 in front of HR, senior union reps, and other senior staff, and in emails sent contemporaneously to all her professional colleagues;
    (f) Offering the Plaintiff no accommodation for her pain and discomfort while she was on the job.

Sub-paragraphs (a)-(f) will hereafter be referred to as "the Defendant's Acts of Harassment."

9.  The Plaintiff, as the Defendant's (School's) agents were at all times aware, is a military veteran with service-related disabilities. Foreseeably, indeed, almost inevitably, the Defendant's Acts of Harassment aggravated the Plaintiff's preexisting condition causing her further severe pain and suffering.

10. As a direct and proximate result of the Defendant's Acts of Harassment, the Plaintiff has suffered pain (physical and mental), stress, and humiliation. Her career has been shattered, and she has been rewarded for eight years of faithful service to the Defendant and to her students by being rendered a pariah and falsely branded a malingerer despite dispositive evidence of her disabling medical condition.

## COUNT I – AMERICANS WITH DISABILITIES ACT

11. The Plaintiff realleges paragraphs 1-10 as if fully set out herein.

12. The Defendant (School) has violated Title I of the ADA [42 USC 12112 (b) (5) (A) by failing to make reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual (e.g. the Plaintiff) with a disability who is an applicant or employee unless such covered entity demonstrates that the accommodation will impose an undue hardship on the employer's operations. No such demonstration can be made by the Defendant in this case.

13. The Defendant has discriminated unlawfully against the Plaintiff through the Defendant's Acts of Harassment.

14. The Defendant's acts of discrimination have deprived the Plaintiff of career opportunities and have inflicted anguish, pain, and suffering on the Plaintiff.

15. The Defendants have acted with malice and/or reckless indifference toward the Plaintiff's rights and in wanton violation of the ADA. Under the ADA this justifies punitive damages against the Defendant as well as the reasonable fees and costs of the Plaintiff incurred herein.

16. The Defendant Department of Education, during the course of the investigation of Case No. 2122-14, became aware of the discrimination and harassment by Defendant School against Plaintiff.  As overseer of the Defendant Albuquerque Public Schools, the Defendant Department knew or should have known of the violations of the Americans

4

with Disabilities Act, but took no action to protect and defend Plaintiff or to correct the violations.

17. The Defendants had actual notice of this claim pursuant to NMSA 41-4-16 (B).

## COUNT II – NEW MEXICO WHISTLEBLOWER PROTECTION ACT

18. The Plaintiff realleges paragraphs 1-10 as if fully set out herein.

19. The Defendant (School) has violated NMSA 10-16C-3 (A) & (B) by engaging in the Defendant's Acts of Harassment in direct retaliation for the Plaintiff's report of the Defendant's Harmful Policies, both to the Defendant and to third parties.

20. The Plaintiff has been damaged by the Defendant's unlawful retaliatory acts by sustaining damage to her career, physical pain, mental anguish, aggravation of pre-existing military-related disabilities and the loss of income and opportunities.

21. The Plaintiff is entitled to her actual damages; special damages; double her lost pay and payment of all reasonable fees and costs incurred by the Plaintiff herein.

22. The Defendant Department of Education, during the course of the investigation of Case No. 2122-14, became aware of the discrimination and harassment by Defendant School against Plaintiff. As overseer of the Defendant Albuquerque Public Schools, the Defendant Department knew or should have known of the violations of the New Mexico Whistleblower Act, but took no action to protect and defend Plaintiff or to correct the violations.

23. The Defendants (School and Department) had actual notice of this occurrence pursuant to NMSA 41-4-16 (B).

## COUNT III – DEFAMATION

24. In the March 2023 meeting and contemporaneous emails, the Defendant (School) published allegations to third parties including all of the Plaintiff's colleagues and senior staff falsely contending that the Plaintiff had neglected her duties and her students.

25. The verbal allegations were slanderous, and the emails were libelous as a matter of New Mexico law.

26. The allegations were of and concerning the Plaintiff; they were false; and they were injurious to the Plaintiff.

27. The allegations were libelous and slanderous per se in that they facially exposed the Plaintiff to ridicule and contempt for the neglect of her duties and her students.

28. The Plaintiff has sustained reputational injury, anguish, humiliation, and the loss of employment prospects as a direct result of the Defendant's defamatory communications.

## COUNT IV – BREACH OF CONTRACT

29. The Plaintiff realleges paragraphs 1-10 as if fully set out herein.

30. Under the Plaintiff's contract of employment, she was unambiguously entitled to paid leave for her serious medical condition.

31. The Defendant breached the Plaintiff's contract by interfering with her leave and requiring her to come to work by attending on-line meetings and threatening disciplinary action if she failed to attend while she was suffering from her serious medical condition.

32. As a proximate result of the Defendant's breach of contract, the Plaintiff has incurred

pain, suffering, stress, anguish, medical complications (including aggravation of

preexisting military-related symptoms) and reduced income.

WHEREFORE the Plaintiff prays:

(a) As to Count I for all damages flowing from the Defendants' breach of the ADA as

well as for exemplary damages and reasonable attorney's fees and costs recoverable

therein;

(b) As to Count II for all damages flowing from the Defendant's breach of the

Whistleblower's Protection Act, as well as for reasonable attorney's fees and costs

recoverable therein;

(c) As to Count III for all actual and consequential damages flowing from the

Defendant's libelous and slanderous communications;

(d) As to Count IV for all actual and consequential damages flowing proximately from

the Defendant's breach of contract;

(e) For any other or further relief that this Court may deem just and proper.

Respectfully submitted,

FOGHI LAW FIRM, LLC

*/s/ Boglarka Foghi*___
Boglarka Foghi, Esq.
4351 Jaeger Dr. NE, Ste K
Rio Rancho, New Mexico 87144
(505) 220-5691
Fax: (505) 213-0122



**STATE OF NEW MEXICO**
**PUBLIC EDUCATION DEPARTMENT**
**300 DON GASPAR**
**SANTA FE, NEW MEXICO 87501-2786**
**Telephone (505) 827-5800**
**www.ped.state.nm.us**

KURT STEINHAUS, ED.D.
SECRETARY OF EDUCATION

MICHELLE LUJAN GRISHAM
GOVERNOR

**NEW MEXICO PUBLIC EDUCATION DEPARTMENT**

**SPECIAL EDUCATION DIVISION**

**Complaint Resolution Report**

**Case No. 2122-14**

**April 14, 2022**

> **This Report requires corrective action.  See pages 24-29.**

This complaint was filed with the Special Education Division (SED) of the New Mexico Public Education Department (PED) on February 7, 2022, under the federal Individuals with Disabilities Education Act (IDEA) and the implementing Federal Regulations and State Rules governing publicly funded special education programs for children with disabilities in New Mexico.[1] The SED has investigated the complaint and issues this report pursuant to 34 C.F.R. § 300.152(a)(5) and 6.31.2.13(H)(5)(b) NMAC.

### *Conduct of the Complaint Investigation*

The PED's independent complaint investigator's investigation process in this matter involved the following:

- review of the complaint and supporting documentation from complainant;
- review of the District's responses to the allegations, together with documentation submitted by the District at the request of the PED's Complaint investigator;
- review of the District's compliance with federal IDEA regulations and state NMAC rules;
- interview with Principal at District high school and Complainant;

---

[1] The state-level complaint procedures are set forth in the federal regulations at 34 C.F.R. §§ 151 -153 and in the state rules at Subsection H of 6.31.2.13 NMAC.

EXHIBIT "A"

- questionnaires filled out by District case managers; and
- research of applicable legal authority.

### *Limits to the Investigation*

Federal regulations and state rules limit the investigation of state complaints to violations that occurred not more than one year prior to the date the complaint is received. 34 C.F.R. § 300.153(c); 6.31.2.13(H)(2)(d) NMAC. Any educator ethics issues, or any alleged ADA or Section 504 disability discrimination issues, are not within the jurisdiction of this complaint investigation and, as a result, were not investigated.

### *Issues for Investigation*

The following issues regarding alleged violations of the IDEA, its implementing regulations, and State rules, are addressed in this report:

1. Whether the District failed to comply with disciplinary procedures for students with disability-related behavioral needs, in violation of 34 C.F.R. § 300.530(e) and 6.11.2.11(B) NMAC;

2. Whether the district failed to properly develop and implement the Individualized Education Programs (IEP) in violation of 34 C.F.R. §§ 300.320-300.328, 6.31.2.10(D) and 6.31.2.11(B) NMAC:
   a. by delaying or not conducting Functional Behavior Assessments;
   b. by not implementing Behavior Intervention Plans;
   c. by not providing accommodations and modifications; and
   d. by not addressing transition needs; and

3. Whether the District's actions and/or omissions towards students with disability-related behavioral needs resulted in a denial of a free appropriate public education (FAPE) to these students in violation of 34 C.F.R. § 300.101 and 6.31.2.8 NMAC.

### *General Findings of Fact*

**Introduction**

This State Complainant involves systemic issues related to the special education students at a particular high school in the District (the High School). The Complaint named three specific special education students (Students A, B, and C) and alleged violations that impacted those three

students and other students with disabilities at the High School. To conduct the investigation, SED reviewed a random record sample of special education students as well as the records of the three students identified in the complaint. The findings address both the review of issues raised for the three students, as well as information related to systemic issues.

### Student A

1.  Student A was a fourteen-year-old in the 9th grade who was identified as eligible for special education on the basis of a specific learning disability.

2.  At a September 22, 2021, IEP meeting, the IEP team recommended an FBA due to Student A's behaviors such as threatening to violently hurt peers, open defiance of teacher directives, leaving class whenever the student desired, lack of motivation in completing classwork, tardiness, and off-task behavior.

3.  A new FBA was recommended because "teachers are reporting that the BIP on file is not working." Student's guardian promptly provided consent for the FBA that day.

4.  Behavior records indicated a large increase in behavior reports during the 2021-2022 school year with a total of 34 incidents at the time of the filing of the complaint.

5.  During the 2021-2022 school year, Student A received 7 days of out-of-school suspension (OSS) and 12 days of in-school suspension (ISS).

6.  Student A's guardian agreed to keep Student A at home because guardian preferred the student complete classwork at home and the High School did not provide any instruction during ISS.

7.  Student A was removed from their normal educational setting and placement and did not receive any special education for a total of 19 school days as of date of this complaint.

8.  The behaviors resulting in disciplinary action for Student A had been similar throughout the school year. Student A was repeatedly removed from school or placed in ISS due to defiance of school personnel, profane or abusive language, and disrespectful behavior.

9.  By October 29, 2021, Student A's suspension totaled 11 days. The District did not conduct a Manifestation Determination Review (MDR) at that time.  After this date, Student received additional disciplinary suspensions due to behaviors such as disruptive conduct, defiance of school personnel, and use of a prohibited electronic device.

10. Student A's behaviors impeded Student's learning. The IEP team recommended creating a BIP on December 10, 2021, which focused on developing coping and self-advocacy skills while targeting behaviors such as aggression and lack of engagement in class. There is no evidence that a new FBA was completed for Student A before development of this BIP.

11.    Although a new BIP was developed on December 16, 2021, the BIP and its behavioral interventions continued to be ineffective in addressing Student A's behaviors and Student made no progress on IEP goals.

12.    An IEP progress report for the first semester of the 2021-2022 school year showed that Student A was making minimal progress towards IEP goals due to absences and disciplinary incidents.

13.    Student A was suspended an additional 3 days of out-of-school suspension and 4 days of in-school suspension before this complaint was filed on February 7, 2022.

14.    A MDR was not convened for Student A until February 18, 2022.

15.    At the MDR meeting, the team determined that Student A's conduct was a direct result of the District's failure to implement the IEP. Although Student had previous FBAs and BIPs, they were not effective in determining the cause of behaviors and developing a plan to address those negative behaviors.

16.    On March 8, 2022, a new FBA was completed for Student A and, on March 11, 2022, a new BIP was created. The new BIP concentrated on addressing the target behavior of Student A being disruptive during class instruction.

17.    It was reported that Student A has attended school sporadically since the week of March 21-25.

18.    Student A's IEP contains multiple, post-secondary goals.  Student A has not made progress toward those goals, which are of questionable appropriateness for the student.


**Student B**

19.    Student B was a fifteen-year-old in the 9th grade who was identified as eligible for special education on the basis of a specific learning disability.

20.    Student B's lack of educational progress was apparent in the progress report which stated that Student B was not working on assignments and continued to have difficulty expressing needs.

21.    At a September 10, 2021, IEP meeting for Student B, the IEP team recommended conducting an FBA to determine target behaviors and appropriate interventions. Student was chronically absent for a significant portion of the day. Student B's parent provided consent to the FBA on the day of the IEP meeting.

22.    During the first semester of the 2021-2022 school year, Student B displayed a pattern of avoiding core academic courses by hiding in a school bathroom until lunch.

23.    The September 10, 2021, IEP did not adequately address Student B's behavioral needs.

24.    The IEP accommodations such as social work check-ins and staff avoiding confrontation with Student B in front of other students had no tangible impact in reducing Student B's absences in school.

25.   The District attempted some intervention to address B's attendance issues, including an attendance agreement, parent communication, and issuing a progress report at the end of the first semester. The interventions were not effective.

26.   Student B accumulated absences that total 84 days and 258 periods for the current school year as of March 31, 2022, and failed English 09, Algebra I, and Biology I for the first semester.

27.   Student B's absences and the failure to conduct the FBA and address absences impeded Student's progress toward IEP goals.

28.   Student B has not been cited for any disciplinary incidents during the 2021-2022 school year.

29.   Another IEP meeting was held on February 2, 2022, for Student B; it was again agreed that an FBA was needed.

30.   An FBA still had not been conducted even though consent was received on September 10, 2021.

31.   The initial FBA data collection started on February 2, 2022, the same day as the IEP team meeting. The focus was on the target behavior of Student B not attending class on a regular basis.

32.   During an interview, Student B reported to staff developing the FBA that Student avoided attending class due to a "high level of anxiety in regard to going to school."

33.   On March 8, 2022, the District determined that a BIP was needed and, on March 14, 2022, the IEP team met with Student B and parent to discuss the BIP and its implementation.

34.   It was reported that Student B recently stopped attending school altogether.

**Student C**

35.   Student C was a sixteen-year-old student in the 11th grade who was identified as eligible for special education on the basis of other health impairment.

36.   Student had significant behavior issues and had FBAs and BIPs which were not effective resulting in numerous suspensions and failing grades.

37.   Student was often late for class or frequently sent out of class for not engaging in classroom instruction. When Student attended, they were disruptive, used inappropriate language and distracted peers.

38.   Student refused to complete work and was failing all classes.

39.   Student C had behavior-related IEP accommodations and modifications such as clearly defined limits, frequent reminder of rules, re-direction to task, and seated near instructor.

40.   The accommodations for Student C included provision of class notes and modified assignments. The accommodations and modifications were not consistently implemented

and Student C would become frustrated, disengage, skip class, and stop doing the required work because Student was overwhelmed.

41. When some of the teachers implemented accommodations and modifications as required by the IEP, Student C's attendance improved as did their academic performance. Other teachers were resistant to implementing the accommodations and modifications.

42. At an October 12, 2021, IEP meeting, the IEP team recommended a triennial reevaluation (or Multidisciplinary Evaluation Team Evaluation) for Student C and discussed how staff were collecting data for an FBA.

43. At another IEP meeting on December 2, 2021, the IEP team reviewed the FBA and recommended a BIP. On December 8, 2021, Student C's case manager and head teacher, without the input or involvement of the IEP team, developed a BIP and shared it with the rest of the student's teachers. The target behavior addressed in the BIP was Student C's tendency to arrive to class late and not actively participate in learning.

44. Since the BIP was implemented, Student C has had 22 disciplinary referrals. There was no information regarding the effectiveness of the BIP or the High School's next steps to address Student C's negative behaviors.

45. On January 27, 2022, a Social-Emotional Evaluation was completed. The evaluator reviewed behavioral data and concluded that classroom interventions had not resulted in positive behavioral outcomes for Student C. The evaluator recommended "more intense and individualized interventions."

46. No changes to the BIP were made in response to the evaluator's recommendations. Instead social work services were added to the Student's IEP services.

47. Following the IEP meeting, Student C accumulated another 19 disciplinary incidents for disruptive conduct, defiance of school personnel, and skipping class.  Student C has had a total of 54 disciplinary in the 2021-2022 school year.

48. Parent asked the District to do more to support Student C, including starting the BIP and providing social work services to Student C's IEP earlier in the school year.  The District had mentioned a different setting in a Social Emotional Support classroom (SES) for Student C but had not done anything to follow up on this.

49. On March 18, 2022, the District held a MDR in which it was determined that Student C's behavior was not a manifestation of their disability and that Student C's conduct was a result of the District's failure to implement their IEP.

50. At a March 31, 2022, IEP meeting, the IEP team recommended placement of Student C in a more structured program with additional social-emotional supports.

51. Since that report, there has not been a follow up IEP or revision of the BIP to address the evaluator's concerns.

52. At the March 31, 2022, IEP meeting, the IEP team determined that Student C needed credit recovery in English 9 S1, English 11 S1, Algebra 2 S1, US History S1, Physics S1 and

.5 of an elective credit, and was currently failing all but one class. The IEP documented that without Summer school or eCADEMY credit recovery options, Student C will need to consider extending their graduation date.

53. Student C's postsecondary goal is identified as "computer/IT field." Student C's grade point average is 1.67 and Student C has not passed many of the academic classes related to this goal.

54. In Smart ISS, which the High School started after this complaint was filed, Student C was able to get some class work done and worked well with praise in the very small, highly structured environment of Smart ISS where there was 1 special education instructor to 2 students. Student C had frequent breaks, immediate feedback, social emotional support when needed, clearly defined limits, redirection to task, regular check ins, focus on behavioral support, chunking information, building good teacher and student rapport, supervision during transitions, and constant communication.

55. At the March 31, 2022, IEP, the IEP team agreed that Student C should be placed in a SES classroom, but there was not a classroom like this at the High School.

56. Student C ran away from home and has not attended school since April 4, 2022.

**Systemic Findings of Fact**

57. A total of thirty-three students were randomly sampled from special education students who attended the High School. Three of the students were students named in the complaint. The remaining thirty students were randomly sampled on age, gender, disability, and graduation track.

58. There were 17 males and 13 females in the sample with disability categories of specific learning disability, autism, emotional disturbance, other health impaired, intellectual disability and other. The sample included students who were on the standard track for graduation as well as ability and modified track.

59. Sixteen students from the thirty-three students sampled were earning D or F grades in one or more classes. Many of the students needed credit recovery to stay on track for graduation.

60. It was reported that disciplinary infractions were inconsistently applied. Student B, who was failing classes, was allowed to participate in cheerleading which was against school policy. Another report was that one teacher would yell or curse at student and excluded student from class because student was not engaged.

61. On February 1, 2022, the High School created a Dean of Student Support who oversees attendance for all students. This role was meant to centralize the functions for monitoring student attendance.

62.    During an interview with the Principal on March 30, 2022, it was reported that the High School had taken some proactive measures to address the issues contained in the state complaint.

63.    In March 2022, after this state complaint was submitted, the High School created another ISS option – *i.e.*, "Smart ISS" for special education students to receive specialized instruction from a licensed special education teacher. The High School's traditional ISS model consisted of a staff person who oversaw student completion of assignments or receipt of related services.

64.    Principal indicated when a special education student was failing academic courses, the High School would intervene by emailing and communicating with parents, issued D & F grade reports, and developed academic and graduation plans.

65.    Principal also indicated for special education students displaying a lack of school attendance, the High School intervened by conducting an IEP meeting to address the issue and crafted an attendance plan for the student if necessary. Positive behavior supports were used in which a student may earn points to earn awards for their improvements in attendance.

66.    Based on a review of the records provided, these steps were not consistently implemented.

**Progress Notes**

67.    At the end of the first semester, progress reports were issued which contained information on the level of progress a special education had made in attaining their annual IEP goals.

68.    For a majority of the students, progress was being made on all goals.

69.    In some instances where no progress was reported, a new IEP had recently been completed, so progress on the new goals could not be determined.

70.    For seven students, it was noted that the students were not making progress on all goals.

71.    Comments on progress notes included: "inconsistent, frequent absences, met some but not all goals, limited progress, some not all goals worked on, progress on some but not all goals, did not work on 1 goal, minimal progress, frequent absences."

**FBAs and BIPs**

72.    Two of the sampled students, Students A and C, had significant behavior incidents resulting in disciplinary action of in school suspension (ISS) or out of school suspension (OSS).

Complaint Resolution Report – C2122-14 – Page 8

73. One other sampled student was suspended for three days for fighting, no other incident was listed for this student.

74. Six students in the sample had a functional behavior assessment (FBA) completed and a behavior intervention plan (BIP).

75. For two students, Students B and C, the District failed to conduct an FBA that was part of an IEP even though consent was received. The District did not conduct FBAs until months after consent was provided. In both instances, the students are no longer attending school.

76. The BIPs implemented for three of the students in the sample had limited effectiveness.

77. There is some evidence of inadequate training for staff on implementation of these two BIPs and that some teachers, for various reasons, including too many students, were resistant to implementing the BIPs.

78. Since the filing of the complaint, a behavior analyst had been working with the High School on completing a new FBA and BIP for Students A and C. The analyst was to provide a report about the FBAs and BIPs for these two students. It is unclear if the report was completed.

**Attendance**

79. The sample records provided a log of daily absence history for each student as well as absence history by school year.

80. Attendance records indicated that 15 students had less than 90% attendance.

81. Three students had frequent absences of more than 50 unexcused absences. Two of the students also had behavior incidents resulting in suspension and were failing one or more classes.

82. One student, Student B, consistently missed classes in the morning. It was reported that Student would remain in the bathroom rather than attend class. Student was failing these morning classes.

83. Recently, a person has been hired whose primary task was to monitor attendance. It was not explained how that attendance information would be used to address chronic absenteeism with special education students.

**Accommodations and Modifications**

84. IEPs for each student in the sample were examined to assess the provision of accommodations and modifications.

85. While there were accommodations and modifications listed on the IEPs of each of the student's files, it could not be determined if the appropriate accommodations and modifications were included on the IEP and were consistently applied.

86. The majority of students were attending classes, making progress on their goals, passing their classes, having no disciplinary issues, and on track to graduate.

87. Students A and C were not provided their needed accommodations and modifications. These two students were having attendance and behavior issues resulting in disciplinary action and failing grades. These accommodations and modifications for Student A and C's behavioral and academic needs were either not implemented or were ineffective in addressing those needs.

88. It was reported that some teachers were providing needed accommodations and modifications to all students and were implementing the IEPs, but other teachers were resistant to implementing student IEPs.

89. Although annual IEP meetings were held, there was evidence of extended time passing before interim IEP meetings or other required meetings were held to address ongoing issues.

**Disciplinary Procedures**

90. The investigation reviewed the District's policies and procedures regarding discipline of students with disabilities. A review of the sample records also found students who were subject to multiple disciplinary penalties such as out of school suspension and in school suspension.

91. The High School did not have consistent procedures or guidance for determining when there was a disciplinary change in placement for a special education student which would require a manifestation determination review.

92. The High School's current practice was that the case manager had the sole responsibility to monitor attendance and determine whether a change in placement had occurred or if an IEP meeting should be convened. In at least two instances of sampled students, the MDR was significantly delayed.

93. If a case manager did not refer a special education student to the IEP team upon exceeding 10 days of out of school suspensions, then the MDR was delayed or might not occur because no other administrator or special education staff were responsible for triggering this IDEA disciplinary protection.

94. The High School had two choices for students placed in ISS. The student could attend the ISS class where a paraeducator, not a certified teacher, supervised students. Special education students placed in ISS would not receive any of their specialized instruction or

special education services while in ISS. The other option was to keep their child at home instead of having their child attend ISS.

95.    While OSS was included in the ten school days towards a disciplinary change in placement, ISS was not always counted in reaching that threshold.

96.    Two students in the sample reached the threshold of ten days of school missed because of discipline. Student C missed 11 days of instruction and Student A missed 19 days of instruction.

97.    Student A's behaviors resulting in disciplinary action were similar throughout the 2021-2022 school year when Student was repeatedly removed from school. The similarity of the student's misconduct and temporal proximity were criterion by which the District should have been alerted to the need for an MDR.

98.    Student C's pattern of behaviors were initially spread across various types of misconduct such as fighting, general disruptive conduct, defiance of school personnel, excessive tardies, and possession of obscene materials. By February 2022, these behaviors coalesced around skipping class altogether due to the student's frustration with learning in class.

99.    Recently, the school has implemented a new Smart ISS system where the teacher was a certified teacher and students received instruction and special education services and supports. That program was not in effect with the issues outlined in this complaint.

**Transition Needs**

100.    All 33 students' files that were reviewed had transition plans.

101.    While the transition plans for some of the students were appropriate, especially for the ability and modified track students, the majority of transition plans for the students in the sample were inadequate because the plans were not individualized for the specific student.

102.    The instructional steps in the transition plans were not based on student's interests, nor were they realistic or achievable given some of student's abilities and disabilities.

103.    Many of the transition plans had the same stock instructional steps for each student. Almost all of the transition plans reviewed listed the steps to take the Accuplacer or ACT or make a college visit and fill out college applications and FAFSA forms for all students even if the student did not want to attend college or any post-secondary school and was interested in the military or immediate employment.

104.    Many transition plans suggested taking the ASVAB even if student had not expressed any interest in the military.

105.    All of the students were to register with vocational rehabilitation services (DVR) and most were to contact the disability coordinator for their post-secondary school.

106.    The plans encouraged students to take classes in their interest areas, but there was nothing in the proposed course list about what classes might be relevant to their transition goals.

107.    A few of the plans provided students with an opportunity to experience what their future employment might be by observing or talking to someone in their chosen field. These opportunities were few and far between in the transition plans reviewed.

108.    Transition plans must take into consideration the interests of the student, but a student who struggled in school with a 1.6 GPA might have difficulty being successful in a career as an engineer or a nurse. The transition plans should have explored other opportunities for the students to find employment in an area of interest; that was not done in the transition plans reviewed.

109.    Interest surveys and learning styles were determined for the students but there was limited follow-up with that information.

110.    A review of the students' future employment considerations often changed between 9th and 12th grade, but the 12th graders should have had more specific plans and steps that needed to be accomplished before they graduated.

111.    There were nine seniors in the sample reviewed. It did not indicate on the IEPs or PWNs that any of these students may be entitled to services until the age of 21 if they had not graduated with a regular high school diploma. Since that information was not listed anywhere on the IEPs or PWNs, it is not clear if that option about continuing eligibility was shared with parents and the student. Some of the seniors were struggling and might not be able to meet the graduation requirements before the end of this school year.

112.    The transition plans were also silent on the responsibility for the instructional steps outlined. It was unclear whether the tasks listed were to be completed by the school, parent, or student.

113.    A careful review of the seniors' transition plans raised concerns about the sufficiency and effectiveness of their plans. Although not all nine seniors are described below, these examples demonstrate the type of plans that were developed:

   a.    One senior was interested in cosmetology as a career. The transition plan listed taking the PSAT, ASVAB, Accuplacer or ACT, and visiting a college campus. The student's goal in math mentioned cosmetology and there was a career readiness goal that was not specific to Student's stated interest. A goal for student to be employed as a cosmetologist was listed because that was student's stated interest. There was no follow up about how this goal would be accomplished. This lack of specificity was common for the majority of the transition plans reviewed. The student was also encouraged to take classes in interest area, but no classes were listed on the proposed schedule for the 21-22 school year that reflected student's interest area or would prepare student for success with future plans.

       There were no steps related to preparing student for interest and future career in cosmetology.

b. Another senior wanted to be a phlebotomist. This student had a 1.6 GPA and was to enroll in a vocational program to earn phlebotomy certification. There was no plan or discussion documented about whether this goal was reasonable or achievable, and what other options would be viable given student's interests and abilities. The other steps outlined were take the Accuplacer or ACT, visit college, complete application, and FAFSA.

c. Another senior wanted to own a small business. Student had a 1.64 GPA and was in credit recovery for two classes. This plan included taking the PSAT and ASVAB, but there was no mention by student of interest in military. The rest of the transition plan were the standard objectives with no exploration of the obligations and benefits of owning a small business

d. One senior wanted to be a writer but was failing English and creative writing. The transition goal stated, "Upon completion of a vocational training program, student will be competitively employed as a writer."  The IEP was held in November of 2021, but there was no change to the transition plan. The student's dream job was a firefighter, yet the transition plan was silent on any tasks or plans for student to explore or pursue this career. The plan included the standard steps listed on the majority of the transition plans.

e. A senior expressed interest in joining the army or possibly attending a vocational school. This student had a 1.62 GPA and needed credit recovery classes. Student had taken practice ASVABs, however, the transition plan did not include taking the actual ASVAB, instead student was to take the Accuplacer. Student expressed no interest in college, yet the transition plan included completing college applications and the FAFSA.

114.    There were similar concerns noted in many of the transition plans for the younger students.

### ***Discussion and Analysis***

#### *Issue No. 1*

**Whether the District failed to comply with disciplinary procedures for students with disability-related behavioral needs, in violation of 34 C.F.R. § 300.530(e) and 6.11.2.11(B) NMAC.**

Local educational agencies have the authority to suspend a student with a disability subject to certain procedural requirements. 34 C.F.R. § 300.530; 6.11.2.11 NMAC. One such requirement is if a child's disciplinary removals constitute a "change in placement," then the LEA must convene

a Manifestation Determination Review meeting to assess whether the child's behavior is related to their disability. 34 C.F.R. § 300.530(e); 6.11.2.11(B) NMAC.

A disciplinary change in placement occurs when a child is removed from school for more than 10 consecutive school days OR the child is subject to a series of removals that constitute a pattern because: (1) there were more than 10 school days of removal; (2) the child's behavior is similar to previous incidents resulting in removal; and (3) there were additional factors such as the length, time, and proximity of the removals. 34 C.F.R. § 300.536; 6.11.2.11(G) NMAC.

It is the responsibility of the LEA to determine whether a change of placement has occurred on a case-by-case basis. *Id.* Whether an in-school suspension should be counted as part of the days towards a change in placement depends on the unique circumstances of each case as well as continuation of the student's participation in the general curriculum, receipt of IEP services, and participation with nondisabled peers. 71 Fed. Reg. 46715; *Dear Colleague Letter* 68 IDELR 76 (OSERS/OSEP 2016), footnote 29.

Within 10 school days of any decision to change the placement of a special education student, the LEA must convene a MDR meeting. 34 C.F.R. § 300.530(e)(1); 6.11.2.11(B)(2) NMAC. The MDR team must review all relevant information about the student and decide whether: (1) the student's conduct in question was caused by or had a direct and substantial relationship to the student's disability; or (2) the conduct in question was a direct result of the administrative authority's failure to implement the IEP. 34 C.F.R. § 300.530(e)(1); 6.11.2.11(B)(2) NMAC. If the MDR team determines that the student's behaviors were a manifestation of their disability, then an IEP team meeting must be convened to either conduct a functional behavior assessment or modify an existing behavior intervention plan. 34 C.F.R. 300.530(f); 6.11.2.11(C) NMAC.

Both Students A and C were subject to both OSS and ISS because of behavioral infractions. ISS, as described by the District, should have been counted in the ten-day window to trigger the MDR. Student A was suspended and removed from his regular educational setting for 11 days and Student C for 19 days without an MDR. During the time that students were in the traditional ISS that existed before the complaint was filed, they did not receive any educational services, including special education. The District, however, failed to consider the ISS in determining whether there was a change of placement and did not provide educational services to those students once they were beyond the time for an MDR.

Student A's behaviors resulting in disciplinary action were similar in type and proximity which also should have triggered the need for an MDR. 34 C.F.R. § 300.536(a)(2)(ii) & (iii). However, no MDR was held for either student at the time the 10 days threshold was reached. When a MDR

was belatedly held for Student A on February 18, 2022, the team determined that Student A's behaviors were the result of a failure to implement Student's IEP. Similarly, when a MDR finally was conducted for Student C, the team determined that Student C's behaviors were the result of a failure to implement their IEP.

The District did not comply with the IDEA and state rule requirements with respect to both Students A and C whose placements were changed through a series of disciplinary removals exceeding 10 days. 34 C.F.R. § 300.536(a)(2)(i). In both cases, the District failed to consider its traditional ISS as a removal that could trigger a change of placement and failed to conduct a MDR as required by the IDEA. These failures deprived Students A and C of their procedural safeguards and access to appropriate education required by their IEPs. Moreover, these examples indicate that there is a problem with implementation of disciplinary procedures at the High School, which is resulting in non-compliance with the IDEA.

**As to Issue No. 1, the District is cited. Corrective Action is required.**

*Issue No. 2*

**Whether the District failed to properly develop and implement the Individualized Education Program (IEP) in violation of 34 C.F.R. §§ 300.320-300.328; 6.31.2.10(D) and 6.31.2.11(B) NMAC: (a) by delaying or not conducting Functional Behavior Assessments; (b) by not implementing Behavior Intervention Plans; (c) by not providing accommodations and modifications; or (d) by not addressing transition needs.**

*Functional Behavior Assessment*

A functional behavior assessment ("FBA") is the process by which an LEA determines why a student engages in behaviors that impede their learning and how the student's behavior relates to their environment. LEAs are strongly encouraged to conduct an FBA for any special education student who exhibits problem behaviors before said behaviors result in disciplinary action. 6.31.2.11(F)(1) NMAC. Failure to timely conduct a functional behavior assessment may contribute to a denial of a free appropriate public education ("FAPE") if the IEP alone does not adequately address the student's needs. *S.S. v. Bd. of Educ. of Harford Cty.*, 498 F. Supp. 3d 761 (D. Md. 2020), *appeal dismissed sub nom. S.S. by & through T.S. v. Bd. of Educ. of Harford Cty.*, No. 20-2260, 2021 WL 2102576 (4th Cir. Jan. 12, 2021). The omission of an FBA may constitute a serious procedural violation if understanding the root causes of problem behaviors is necessary for addressing them in the IEP. *L.O. v. New York City Dep't of Educ.*, 822 F.3d 95, 112–14 (2d Cir. 2016).

All three named students provide examples of the problems with FBAs at the High School.  On September 10, 2021, Student B's IEP team agreed that an FBA would be conducted.  The District did not conduct an FBA for Student B until the process was started on February 2, 2022.  Meanwhile, during the months when the FBA was not done, Student B was spending school days in the school bathroom and missing out on their education. Student B recently stopped attending school altogether.

Similarly, the IEPs for Students A and C provided for an FBA to be completed for both students and consents was promptly provided in September 2021.  Consent to conduct an FBA of Student C was provided by the parent on September 7, 2021.  The FBA was not completed until December 2, 2021.  During this period Student C was cited for 21 disciplinary incidents.  Consent to an FBA of Student A was provided by the guardian on September 21, 2021.  The FBA was not completed until March 2022.  During this time, Student A also continued to accumulate further days of suspension.

A behavior analyst recently begun to work at the High School by conducting FBAs and developing BIPS for Students A and C.  However, before this, although there were indications from case managers that the interventions being used as part of BIPs were ineffective, there was no support like this provided to students or staff until after this complaint was filed.  Furthermore, this effort appears to have been too little too late as Students A, B, and C have stopped attending school.

**As to Issue 2a, the District is cited.  Corrective Action is required.**

*BIP Implementation*

A Behavior Intervention Plan (BIP) is a set of intervention strategies that are used to address behaviors that impede a student's learning. 34 C.F.R. § 300.530(f); 6.31.2.11(F)(1) NMAC. It is based on the results of a FBA and the BIP includes a description of the problem behavior, a hypothesis as to why the behavior occurs, and interventions such as positive behavioral supports and services.

A review of the student records demonstrated repeated concerns about BIPs not being effective. Six students had FBAs and/or BIPs. In three of those files, the students were not attending classes or failing classes or being suspended for behavior. Three students had an FBA completed and a BIP developed, but they continued to experience significant difficulties which impacted their ability to receive FAPE and make progress.  Three students are a significant proportion of the sample which would indicate that the District was either not obtaining the needed information

during the FBA or not developing and implementing appropriate BIPs. After this complaint was filed, the District began to work with a behavior analyst that could assist the District in conducting, developing, and implementing appropriate FBAs and BIPs.

For Student A, the District had to develop multiple BIPs in the 2021-2022 school year because the BIPs were not effective. Student A continued to be suspended from school and was failing all classes. The MDR held belatedly in March 2022 determined that Student A's behaviors were, in part, due to the District's failure to implement the IEP which led to a recommendation of developing a new BIP for Student A. Even without the MDR, a meeting to determine issues with the implementation of the BIP and development of an effective BIP should have been held.

For Student C, a BIP was created on December 8, 2021. A Social-Emotional Evaluation was then issued on January 27, 2021. In preparing the report, the social work evaluator reviewed Student C's behavioral data and concluded that classroom interventions had not produced positive gains in behavioral outcomes for Student C. The evaluator recommended "more intense and individualized interventions." These recommendations were not incorporated into the Student C's BIP. Taken together, the mixed results of the behavioral interventions for Students A and C demonstrated a lack of proactively addressing the behavioral needs of these students.

***As to Issue 2b, the District is cited. Corrective Action is required.***

***Accommodations and Modifications***

An Individualized Education Program (IEP) is required to provide accommodations and modifications that will enable a special education student to make educational progress. 34 C.F.R. § 300.320(a)(4); 6.31.2.11(C)(2)(e). Accordingly, an LEA must give serious consideration in deciding how to modify a regular education program to accommodate a student with a disability. *D.E.R. v. Bd. of Educ. of Borough of Ramsey,* No. CIV.A.04-2274(DRD), 2005 WL 1177944, at *7 (D.N.J. May 18, 2005).

A review of the student record sample and case manager questionnaires shows that the effectiveness of IEP accommodations or modifications varied among the sample as evidenced in the different levels of educational progress achieved by each student. Students with high absence rates, disciplinary infractions or failing grades were indicators that should have triggered an IEP meeting to determine how to address those issues.

Student C's case demonstrates the problems facing students with disabilities who do not have their accommodations and modifications consistently implemented. When Student C was in

Complaint Resolution Report – C2122-14 – Page 17

Smart ISS, where he consistently received the support required by the IEP, Student C reportedly did well. For Student C, there was evidence that the failure to consistently implement his accommodations and modifications negatively impacted **Student C**'s ability to receive a FAPE. There was insufficient evidence to conclude that the District had failed on a systemic basis in terms of accommodations and modifications.

***As to Issue 2c, the District is cited as to Student C only. Corrective Action is required.***

***Transition Needs***

Transition services are a coordinated set of activities for a child with a disability that:

1. Is designed to be within a results-oriented process, that is focused on improving the academic and functional achievement of the child with a disability to facilitate the child's movement from school to post-school activities, including postsecondary education, vocational education, integrated employment (including supported employment), continuing and adult education, adult services, independent living, or community participation;

2. Is based on the individual child's needs, taking into account the child's strengths, preferences, and interests; and includes:
   i.   Instruction;
   ii.  Related services;
   iii. Community experiences;
   iv.  The development of employment and other post-school adult living objectives; and
   v.   If appropriate, acquisition of daily living skills and provision of a functional vocational evaluation.

34 C.F.R. § 300.43.

Transition services may be special education or related services if that is needed for a student to receive FAPE. Transition skills can include a wide range of services to meet an individual student's need. Those transition services "must be made on the basis of the child's individual's needs, taking into account the child's strengths, preferences and interests." 71 Fed Reg. 46, 579 (2006). The hearing examiner in *District of Columbia Public Schools*, 115 LRP 40497 (SEA DC 2015) held that a transition plan that listed a student's career interests without a specific plan to achieve the student's job goals was deficient. Transition goals must be appropriately ambitious, yet realistic

and achievable and should consider strengths, weaknesses, and interests of the student. *Shaw v. District of Columbia*, 119 LRP 3897 (DDC 2019). OSEP encourages IEP progress reports to include transition goals. *Letter to Pugh*, 69 IDELR 135 (OSEP 2017). There must be measurable transition goals included and updated in annual IEPs. In addition to a measurable goal, there must be information about how that goal would be accomplished, including those responsible for implementation and services needed to achieve that goal. *Questions and Answers on Secondary Transition*, 57 IDELR 231 (OSEP 2011).

It is the responsibility of the District, not the parent to outline the responsibilities for implementation of the transition plan. *Gallup-McKinley County Schools*, 108 LRP 21191 (SEA NM 2007). A district cannot delegate the development and implementation of a transition plan to the parents or student. *In re Child with Disabilities*, 21 IDELR 624 (SEA CT 1994). The IEP team, in developing the transition plan, must consider the student's future plans when developing goals and the services needed for the student to achieve that transition plan. The transition plan on the IEP cannot be a standardized list of instructional steps for student, but must be individualized and include the date, frequency, amount, location, and how long services will be provided. 34 CFR § 300.320 (a)(7). "Stock" goals and services were an insufficient transition plan. *Jefferson County Board of Education v. Lolita S.*, 64 IDELR 43, 581 F App'x 760 (11th Cir., 2014, unpublished).

While some of the transition plans, particularly for the ability and modified track students, were appropriate, the majority of the transition plans were insufficient, The transition plans included stock plans such as taking the Accuplacer or ACT, visiting colleges and completing applications and the FAFSA, even if the student was not interested in college. Transition plans must be ambitious, but also achievable and the plans should prepare the student for the next steps post high school. The transition plans reviewed were not individualized or focused on the student's strengths, weaknesses, and interests, but instead were a listing of what the student wanted to be with a stock list of instructional steps that rarely deviated from student to student. There was no consideration of student's abilities or what steps would need to happen for the student to achieve future goals, if that was possible, given student's stated job preference. In some cases, the stated job preference for an individual might be unobtainable because of the student's abilities. In those instances, rather than explore other job opportunities in their interest areas, the transition plan listed the stated job with the standard steps. If there were measurable transition goals listed, often the goals might mention the student's future plans, but nothing else was provided about what needed to happen to accomplish student's goal.

For one senior, the transition plan listed the student's intended career of being a small business owner with no opportunity outlined on the plan for student to understand what that career

entailed. In another, the student's goal was to join the military; but the plan included practicing the ASVAB without completing the actual test.

Another student's goal was to be a writer, but student was failing English and creative writing. That student's stated dream job was a firefighter, yet there was nothing on the transition plan or goals or services about achievement of that career interest.

The transition plans were silent on the amount of transition services to be received or who was responsible for provision of those services. The course listings included required courses for graduation but did not include courses or specialized instruction to prepare the student for future success or provide the student with an opportunity to explore career options and interests. In most instances, the transition plan simply stated the student will take courses in areas of interest. However, the plans did not list what course would be beneficial for student with those future plans. The transition plans listed proposed required courses and instructional steps, but no indication of who was responsible to ensure the steps were being completed. The inclusion of outside agencies, such as DVR, in the development of transition program was appropriate, but those agencies were not intended to take the place of the district in developing and implementing appropriate transition plans. The IEPs and PWNs should have included options for those students who continued to be eligible for special education but were struggling and might not meet graduation requirements as planned. Appropriate transition plans were required under the IDEA. Many of the transition plans reviewed were inadequate to meet the purpose of IDEA transition services. This failure was a procedural violation of Part B of IDEA.

***As to Issue No. 2d, the District is cited. Corrective Action is required.***

<u>Issue No. 3</u>

**Whether the District's actions and/or omissions towards students with disability-related behavioral needs resulted in a denial of a free appropriate public education (FAPE) to these students in violation of 34 C.F.R. § 300.101 and 6.31.2.8 NMAC.**

A student eligible for special education is entitled to a free appropriate public education (FAPE). 34 CFR § 300.101; 6.31.2.8 NMAC. School districts are obligated to provide FAPE for each student eligible in their district. The substantive legal standard for determining whether a District has offered a student FAPE is whether an IEP is reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances. *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 197 L. Ed. 2d 335 (2017). A failure to timely conduct a functional behavior assessment may contribute to a denial of a free appropriate public education ("FAPE") if the IEP alone does not adequately address the student's needs. *S.S. v. Bd. of Educ. of Harford*

Complaint Resolution Report – C2122-14 – Page 20

*Cty.*, 498 F. Supp. 3d 761 (D. Md. 2020), *appeal dismissed sub nom. S.S. by & through T.S. v. Bd. of Educ. of Harford Cty.*, No. 20-2260, 2021 WL 2102576 (4th Cir. Jan. 12, 2021). Failure to properly address attendance issues of a special education student may deny them a FAPE. *Middleton v. D.C.,* 312 F. Supp. 3d 113 (D.D.C. 2018). Procedural violations can also rise to the level of a denial of FAPE. The court in *J.L. v. Mercer Island School District*, 55 IDELR 164, 110 LRP 60810, 592 F3d 938, 951 (9th Cir. 2010), held that a procedural violation may be a denial of FAPE when it results in the loss of an educational opportunity, infringes on parents' opportunity to participate in the development of the IEP or deprives the student of an educational benefit. *Id.* at 953.

There were repeated failures by the High School in development and implementation of IEPs. While there were instances with a number of files where transition plans were not properly developed, with the students who are not seniors, these procedural errors can be remedied and do not rise to the level of a denial of FAPE. However, while many of the students appear to have appropriate IEPS and have made progress on their goals, there are some specific students (Students A, B and C) where the repeated failures resulted in substantive and procedural violations that resulted in the denial of FAPE.

In the case of Student A, the delay in the MDR and inappropriate BIP and repeated suspension caused Student to miss significant instructional time. Student was failing classes because Student was not in class. Student A made minimal progress on goals because of frequent absences. There were concerns that not all teachers provided the accommodations and modifications in the IEP. While there may be other non-educational issues that may have impacted on this Student's performance, the lack of progress and procedural violations would indicate a denial of FAPE.

With Student B, the FBA was delayed for approximately five months. During that period, Student B accrued unexcused absences that totaled 84 school days and was failing most, if not all classes this school year which prevented Student's B's progress towards meeting her IEP goals. The failure to timely conduct the FBA and develop an appropriate BIP which was required by Student B's IEP was a material deviation from the IEP. Therefore, the IEP for Student B was not reasonably calculated to allow Student to make progress and was both a procedural and substantive denial of FAPE.

Similarly, Student C was denied FAPE because of the failures to develop an IEP that allowed Student to make progress. Student's repeated infractions which resulted in suspension and the delays in the MDR and revisions of the BIP resulted in the loss of an educational opportunity for the Student.

Complaint Resolution Report – C2122-14 – Page 21

*As to Issue No. 3, the District is cited. Corrective Action is required.*

### *Summary of Citations*

| IDEA/State Rule Provisions Violated | Description of Violation | Indicator |
|---|---|---|
| 34 C.F.R. § 300.530(e) and 6.11.2.11(B) NMAC | The District failed to comply with disciplinary procedures for students with disability-related behavioral needs | 4 |
| 34 C.F.R. §§ 300.320-300.328 and 6.31.2.10(D) and 6.31.2.11(B) NMAC | The District failed to properly develop and implement the Individualized Education Program (IEP) by delaying or not conducting Functional Behavior Assessments, not implementing Behavior Intervention Plans, not providing Accommodations and Modifications, and not addressing Transition Needs. | 1, 2, 13, 14 |
| 34 C.F.R. § 300.101 and 6.31.2.8 NMAC | The District's actions and/or omissions towards the Student resulted in a denial of a free appropriate public education (FAPE) to the Student. | |

### *Required Actions and Deadlines*

**By April 21, 2022**, the District's Special Education Director must assure the SED in writing that the District will implement the provisions of this Corrective Action Plan (CAP). The SED requests that the District submit all documentation of the completed corrective actions to the individual below, who is assigned to monitor the District's progress with the Corrective Action Plan and to be its point of contact about this complaint from here forward:

Dr. Elizabeth Cassel
Corrective Action Plan Monitor
Special Education Division
New Mexico Public Education Department
300 Don Gaspar Avenue
Santa Fe, NM 87501
Telephone: (505) 490-3918
Elizabeth.Cassel@state.nm.us

The file on this complaint will remain open pending the PED's satisfaction that the required elements of this Corrective Action Plan are accomplished within the deadlines stated. The District is advised that the SED will retain jurisdiction over the complaint until it is officially closed by this agency and that failure to comply with the plan may result in further consequences from the SED.

Each step in this Corrective Action Plan is subject to and must be carried out in compliance with the procedural requirements of the IDEA 2004 and the implementing federal regulations and State rules. Each step also must be carried out within the timelines in the Corrective Action Plan. If a brief extension of time for the steps in the Corrective Action Plan is needed, a request in writing should be submitted to the Corrective Action Plan Monitor. The request should include the case number, the date for the proposed extension, and the reason for the needed extension. The SED will notify the parties of any extension granted.[21]

**Please carefully read the entire CAP before beginning implementation. One or more steps may require action(s) in overlapping timeframes. All corrective action must be completed no later than November 11, 2022 and reported to the SED no later than November 23, 2022.** All documentation submitted to the SED to demonstrate compliance with the CAP must be clearly labeled to indicate the state complaint case number and step number.

*Corrective Action Plan*

| Step No. | Actions Required by District | Complete Actions By | Documents Required to be Submitted to PED SED | Document Due Date |
|---|---|---|---|---|
| 1. | Within 7 working days of issuance of this CAP, the District Special Education Director, High School Principal, and High School Special Education Coordinator/Lead shall meet with the PED SED EA assigned to the District and the PED CAP Monitor to review the Complaint Resolution Report, the Corrective Action Plan, and any other measures that the District plans to take to ensure that the violations are corrected and do not recur. The District Director has the discretion to include other District administrators or personnel in this meeting. The District Director shall be responsible for setting up this meeting with SED. | April 21, 2022 | Notes from meeting prepared by District. | April 28, 2022 |
| 2. | The District shall designate one person responsible at the High School to determine when a removal (out of school suspension, in school suspension, and any other type of disciplinary removal from regular school classes) is a change of placement and to ensure that when a special education student is subject to removal from the school or classes, all disciplinary processes are timely followed and all notices and forms are completed correctly and in a timely matter. | April 21, 2022<br><br><br><br><br><br>Beginning May 15, 2022, through November 11, 2022 | The District must provide the name of that person and a description of the procedures that will be used.<br><br>The District shall provide monthly reports to PED containing a list of all students identified as having a change of placement due to behavior/discipline and | April 28, 2022<br><br><br><br><br><br>First of each month |

| Step No. | Actions Required by District | Complete Actions By | Documents Required to be Submitted to PED SED | Document Due Date |
|---|---|---|---|---|
| | | | information about MDRs that were conducted. | |
| 3. | The District shall provide training to the High School administrators, High School special education lead, and High School special education staff and related service providers on the following topics:<br>• Disciplinary removals, change in placement, MDR requirements, and services to be provided when a student is removed;<br>• FBAs and BIPs;<br>• Individualization of Accommodations and Modifications and monitoring implementation and effectiveness; and<br>• Transition Planning, Assessments, and Services<br>This training shall be provided to the High School staff at the beginning of the 2022-2023 school year.<br>The District shall provide this training through an independent person with expertise in special education requirements who is approved by NMPED. | April 25, 2022<br><br><br>May 10, 2022<br><br><br>September 10, 2022 | Qualifications of Independent Trainer for approval<br><br><br>Agenda for training and materials for training<br><br><br>Provision of Training – Attendance report | April 25, 2022<br><br><br>May 10, 2022<br><br><br>September 20, 2022 |

Complaint Resolution Report – C2122-14 – Page 25

| Step No. | Actions Required by District | Complete Actions By | Documents Required to be Submitted to PED SED | Document Due Date |
|---|---|---|---|---|
| 4. | The District shall participate and cooperate with PED in an audit of select student files to review | As requested. | Files and records requested by auditors | As requested by auditors. |
| | • Disciplinary practices for compliance with the IDEA (to include changes in placement, use of ISS and OSS, and MDRs);<br>• FBA development and BIP implementation;<br>• Accommodations & Modifications; and<br>• Transition plans and services, including progress monitoring. | August 15, 2022 | Audit Report | August 15, 2022 |
| | The High School's students who will be reviewed shall be the following:<br>• All students with disabilities with 25 days or more in absences for the 2021-2022 school year who are failing 1 or more class;<br>• All student with disabilities who have received 5 of more days of in-school suspension and/or out of school suspension, or a combination of both types of suspension; and<br>• A random sample of at least 10% of students with disabilities other than the students identified above or used in the sample reviewed | | | |

Complaint Resolution Report – C2122-14 – Page 26

| Step No. | Actions Required by District | Complete Actions By | Documents Required to be Submitted to PED SED | Document Due Date |
|---|---|---|---|---|
| | by the Complaint Investigator. The audit will be conducted over the summer before the training required in Step 3 and recommendations for additional training from the audit will be addressed at that training. The District shall meet with the PED and auditors to review the report at the conclusion of the audit. For those students whose review indicates a need for revisions to the IEP, the District shall ensure that IEPs for those students are conducted within one month from the date of the report. Plans for the audit shall be discussed at the meeting required by Step 1 of this CAP. | | | |
| 5. | The District shall provide compensatory education services to Students A, B, and C if the students are willing to complete their education. The District shall notify the parent/student in writing of this Complaint Resolution Report and of the requirements for compensatory education within two weeks from the date of the issuance of this report. The parent/student shall have two weeks to respond to the District indicating the acceptance or rejection of the compensatory education award. | April 26, 2022  June 3, 2022 | Letter sent to parents with information about CRR and compensatory education services.  IEP meeting held or IEP amendment developed with plan for compensatory services that included parent/guardian OR written confirmation of lack of response or rejection of compensatory services by parent/guardian. | April 28, 2022  June 10, 2022 |

Complaint Resolution Report – C2122-14 – Page 27

| Step No. | Actions Required by District | Complete Actions By | Documents Required to be Submitted to PED SED | Document Due Date |
|---|---|---|---|---|
| | Each student shall be awarded 24 hours of compensatory education to consist of one-on-one tutoring on a schedule that is agreed upon by the student, parent, and District. The subject of the compensatory education services shall be based on the IEP team's assessment of the areas in which student most needs assistance and can consist of services to assist the student to transition back into school. The compensatory education services can consist of specialized instruction or related services. The compensatory education may be used over the summer months but must be completed by the beginning of the 2022-2023 school year.<br><br>The plan for the compensatory services should include the parents or guardians and student and can be developed through an IEP team meeting or an IEP amendment without a meeting based on the parent or guardian's preference. | September 30, 2022 | Documentation of provision of compensatory education services | October 7, 2022 |
| 6. | If Students A, B, and C return to school or otherwise wish to access an education from the District, the District shall conduct FIEP meetings for those students with an independent Facilitator approved by NMPED and paid for by the District. The FIEP meetings shall be held as | November 11, 2022 | Copy of FIEP documents – invitation, FIEP, PWN, and other related documents | November 18, 2022 |

| Step No. | Actions Required by District | Complete Actions By | Documents Required to be Submitted to PED SED | Document Due Date |
|---|---|---|---|---|
| | soon as possible once the District has notice of the student's intention to access their public education at the District.<br><br>The District shall notify the parent or guardian for Students A, B, and C of this requirement of the CRR in the letter sent in Step 5. | | | |

This report constitutes the New Mexico Public Education Department's final decision regarding this complaint. If you have any questions about this report, please contact the Corrective Action Plan Monitor.

Investigated by:

/s/

Michael W. Gadomski
Independent Complaint Investigator

Reviewed by:

/s/

Debra Poulin, Esq.
Chief Counsel, Special Education Division

Reviewed and approved by:

*Deborah L. Dominguez Clark*

Deborah Dominguez-Clark
Director, Special Education Division

Complaint Resolution Report – C2122-14 – Page 29