# EXHIBIT 5

**Excerpts of Annittra Atler Deposition**

Friday, September 5, 2025

(The deposition proceeded at 10:37 a.m. as follows:)

ANNITTRA ATLER,

was called as a witness and, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MS. FOGHI :

Q. Thank you. Good morning. I'm attorney Boglarka Foghi on behalf of Ms. Lipe, the plaintiff. Would you please state your name?

A. Annittra Atler.

Q. What do you do, Ms. Atler?

A. I'm the senior director for the office of innovation for the Albuquerque Public Schools.

Q. How long have you been the senior director?

A. This is my second year, starting my second year.

Q. Prior to having this position, what did you do?

A. I was the associate superintendent for special education for these kids for two years.

Q. And what were the dates of that position?

A. That would be July 1st of 2022, yep.

Q. All right. Prior to working as the associate superintendent what did you do before that job?

A. I was, seven years, as the district specialist for

special education. So I supported schools in the south valley, all the schools that fed into Rio Grande and West Mesa and Atrisco Heritage. Prior to that I was a principal.
Q. How many years total have you been in education?
A. Twenty-nine-and-a-half years.
Q. Very good, thank you.
A. With APS and another five --
Q. Could you please describe your responsibilities as the associate superintendent?
A. Yes. So as the associate superintendent, I was in charge of overseeing 17,000 students, 200 district employees. Oversaw the executive directors in charge of compliance, those were my direct reports, compliance-related services and curriculum and development. So those were my direct reports.
Q. Specifically as it pertains to special education, let's talk about that aspect of your job as associate superintendent, what would that have entailed as it pertains to that group of people?
A. That looks really at compliance, looking at curriculum development, inclusion. I mean, it really is holistically making sure we look at the evaluation section, making sure we're in compliance with state rules and regulations and with IDDA.

my client's caseload?

A. We did. I believe so.

Q. And those communications, would those have been by email?

A. If there were any. I believe there were.

Q. Okay. Have you provided those emails to counsel sitting next to you?

A. Anything that was requested was provided.

Q. Anything that was requested?

A. Yes, that we had, yes. You should have them.

Q. Okay. Did you ever communicate with Mr. Griego, Justin Griego regarding my client's caseload?

A. Those were all --

MS. KILGORE: Excuse me, the phone is ringing over here.

(Brief recess taken.)

Q. (BY MS. FOGHI) Did you -- so you indicated that you acted as support with respect to the caseload aspect, but with respect to any accommodation requests, were you the person who had final decision-making on whether an accommodation should be given or not?

A. No, I never even sat in on any of the ADA meetings. That was not my role.

Q. Okay. All right. Were you aware that Mr. Griego and Ms. Bernadette Lucero-Turner opposed my client's remote

work request?

MS. KILGORE: Objection; form of the question.

Q. (BY MS. FOGHI) Were you aware?

A. I was made aware in the meeting.

Q. Okay. Are we talking about the September 21st meeting?

A. I couldn't tell you what meeting that was. I just know that Ms. Lipe brought that up during a meeting with the union representation.

Q. Okay. Were you aware of the Gonterman Report that was issued in this case?

A. Yes.

Q. Okay. Were you aware that you were identified as the person who denied the accommodations?

A. I did read that, yes.

Q. Okay. What -- any particular comment you wish to make on that?

A. I was not part of the ADA meeting. I wasn't part of any of those recommendations. APS has a very formal process, and so I was not part of the meetings, was not part of denying her her request.

Q. So why do you believe that in that Gonterman Report you were identified as the person who would deny the accommodation?

A. I, I don't know. I know it was said by somebody

else that I did that, so I don't know why that person would make that, would say that.
Q. Do you have a copy of any written denial of Ms. Lipe's accommodation request that you would have been a part of?
A. I do not.
Q. Were you interviewed in 2023 by an external investigator, his name was Tim, well Tim Gonterman?
A. Yes.
Q. In connection with the complaint?
A. Yes.
Q. And was this interview conducted in your official capacity?
A. Yes, it was.
Q. Were you aware that the interview was recorded and transcribed?
A. Yes.
Q. Were you asked to provide information regarding my client's performance?
A. I don't remember. It was a, a holistic kind of interview.
Q. Okay. Did you ever make any statements about my professionalism?
A. I couldn't say specifically. Could you be specific as to what you're specifically relating to?