IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

TATIA LIPE,
Plaintiff,

v. No. 1:23-cv-00899-GBW-JMR

ALBUQUERQUE PUBLIC SCHOOLS et al.,
Defendants.

---

# Appendix A – Corresponding Yellow-Highlighted Chambers Copies of Already-Filed Deposition Designations

| Appendix | Deposition | Transcript Pages |
|---|---|---|
| 1 | Annittra Atler | 50 |
| 2 | Linda Elliott | 38 |
| 3 | Socorro Rodriguez | 26 |
| 4 | Stephanie Avila | 78 |
| 5 | Angelique Torres | 29 |
| 6 | Bernadette Lucero-Turner | 33 |
| 7 | Antoinette Romero | 63 |
| 8 | Rosita Moya-Herrera | 54 |
| 9 | Yvonne Garcia | 18 |
| 10 | Justin Griego | 67 |
| 11 | Bonnie Anderson | 38 |

Each appendix contains a cover sheet followed by Plaintiff's yellow-highlighted deposition designations for the identified deponent.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

TATIA LIPE,
Plaintiff,

v.

No. 1:23-cv-00899-GBW-JMR

ALBUQUERQUE PUBLIC SCHOOLS et al.,
Defendants.

---

# APPENDIX A-1

## PLAINTIFF'S YELLOW-HIGHLIGHTED DEPOSITION DESIGNATIONS OF ANNITTRA ATLER

Plaintiff submits this yellow-highlighted deposition-designation material as part of Plaintiff's corrective submission. Plaintiff preserves all designations, counter-designations, objections, completeness arguments, evidentiary positions, and rights under Doc. 256, the Federal Rules of Civil Procedure, and the Federal Rules of Evidence.



Attached deposition-designation PDF pages: 50

MARICOPA REPORTING

# Annittra Atler

**Date:** September 5, 2025

**Case:** Lipe v. Albuquerque Public Schools, et al
**Case Number:** 1:23-CV-00899-GBW-JMR

Maricopa Reporting, Inc.
Phone: (480) 597-4744
scheduling@maricopareporting.com
https://www.maricopareporting.com/

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

NO: 1:23-CV-00899-GBW-JMR

TATIA LIPE,

Plaintiff,

-vs-

ALBUQUERQUE PUBLIC SCHOOLS and
NEW MEXICO DEPARTMENT OF PUBLIC EDUCATION,
Defendants.

DEPOSITION OF ANNITTRA ATLER

FRIDAY, SEPTEMBER 5, 2025
10:30 a.m.
Gateway Financial Services,
6000 Uptown Blvd. NE,
Albuquerque, New Mexico 87110

PURSUANT TO THE NEW MEXICO RULES OF CIVIL PROCEDURE, this Deposition was:

TAKEN BY: BOGLARKA FOGHI, ESQ.
ATTORNEY FOR PLAINTIFF

REPORTED BY: CHRISTINE J. ROYBAL, CCR, RPR, CSR
CCR No. 50
Maricopa Reporting
Santa Fe, New Mexico 87501
480-597-4744

A P P E A R A N C E S

For the Plaintiff:

FOGHI LAW FIRM, LLC
5065 Corrales Rd., P.O. Box 944
Corrales, New Mexico 87048
(505) 220-5691
foghilaw@yahoo.com

BY: BOGLARKA FOGHI, ESQ.

For the Defendants:

CUDDY & McCARTHY, LLP
1701 Old Pecos Trail
Santa Fe, New Mexico 87502
(505) 888-1335
kkilgore@cuddymccarthy.com

BY: KAREN KILGORE, ESQ.

I N D E X


| WITNESS: | Page/Line |
|---|---|
| Annittra Atler | |
| Deponent Signature/Correction Page | 47:1 |
| Certificate of Completion of Deposition | 48:1 |
| Exhibit 3 Albuquerque Public Schools Investigation Report | 13:6 |
| Exhibit 5 Newsletter | 31:11 |
| Exhibit 6 Synergy Caseload | 34:15 |
| Exhibit 7 MaxCapture Scheduling and Provider Time Tracking User Guide | 35:6 |
| Exhibit 11 Staff Sign-in/Sign-out Sheet | 17:19 |

# I N D E X

All Witnesses: Page

Examination by Ms. Foghi 4:7
Examination by Ms. Kilgore 43:24
Examination by Ms. Foghi 45:5

Friday, September 5, 2025

(The deposition proceeded at 10:37 a.m. as follows:)

ANNITTRA ATLER,

was called as a witness and, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MS. FOGHI :

Q. Thank you. Good morning. I'm attorney Boglarka Foghi on behalf of Ms. Lipe, the plaintiff. Would you please state your name?

A. Annittra Atler.

Q. What do you do, Ms. Atler?

A. I'm the senior director for the office of innovation for the Albuquerque Public Schools.

Q. How long have you been the senior director?

A. This is my second year, starting my second year.

Q. Prior to having this position, what did you do?

A. I was the associate superintendent for special education for these kids for two years.

Q. And what were the dates of that position?

A. That would be July 1st of 2022, yep.

Q. All right. Prior to working as the associate superintendent what did you do before that job?

A. I was, seven years, as the district specialist for

special education. So I supported schools in the south valley, all the schools that fed into Rio Grande and West Mesa and Atrisco Heritage. Prior to that I was a principal.

Q. How many years total have you been in education?

A. Twenty-nine-and-a-half years.

Q. Very good, thank you.

A. With APS and another five --

Q. Could you please describe your responsibilities as the associate superintendent?

A. Yes. So as the associate superintendent, I was in charge of overseeing 17,000 students, 200 district employees. Oversaw the executive directors in charge of compliance, those were my direct reports, compliance-related services and curriculum and development. So those were my direct reports.

Q. Specifically as it pertains to special education, let's talk about that aspect of your job as associate superintendent, what would that have entailed as it pertains to that group of people?

A. That looks really at compliance, looking at curriculum development, inclusion. I mean, it really is holistically making sure we look at the evaluation section, making sure we're in compliance with state rules and regulations and with IDDA.

Q. Would that also involve keeping track of caseloads that are assigned to respective social workers?
A. Those were assigned to the executive directors. They were in charge of keeping track of all of the caseloads.
Q. So executive directors during this time period that's relevant in this case, who would have been the individual that would have been the ultimate authority on caseload assignment?
A. That would be Bernadette Lucero-Turner.
Q. Okay. Your position as the associate superintendent, how did that factor into as far as responsibilities to personnel management?
A. As it relates to -- I think we are looking -- are you speaking...
Q. General.
A. General. So all of that really relied on my executive directors and who they were supervising. So as we look at 17,000 students and providing services and supports for them, it really kind of trickles down. So I did not have to do general personnel supervision, but I could provide supports and direction for my, for my employees.
Q. Got it. Did you ever have an opportunity to work with Justin Griego?
A. I did, to support, not directly, but as a support.

Q. Okay. And what support did you provide to Justin?
A. Guidance regarding caseload management and parent concerns for Volcano Vista.
Q. Okay. So I just asked you a few moments ago about caseload management and you indicated that that would have ultimately been assigned and responsibility of Bernadette Lucero.
A. Uh-huh.
Q. What a caseload management support did you give Justin Griego?
A. He asked for guidance regarding Ms. Lipe being out and how to -- parent concerns that were coming up. So that, I was CCd on some of that guidance.
Q. So I'll go back to that specific discussion, but tell me how you have come to know my client, Ms. Lipe. This is the first time you're meeting her?
A. This is the first time. I have never met her in-person before.
Q. Okay. So tell me how you heard of Ms. Lipe.
A. My first interaction with Ms. Lipe was I think probably a few weeks into the job in July/August and she asked for me to sign her verification of hours completed for her principal licensure.
Q. Okay. But you never met her in person?
A. Never met her in person, no.

Q. Did you assist her with that request?
A. I responded to her request. I didn't feel like I could assist her because I didn't have any documentation to show what had been completed. So I wasn't comfortable signing off on something I couldn't verify.
Q. Did you ask her to provide you with information?
A. Yes.
Q. Did she ever provide it?
A. No, she didn't.
Q. So there were no personal interactions with her. Were you ever -- did you ever act as her supervisor?
A. No, I didn't.
Q. Did you ever act as her colleague?
A. I guess in a sense of being with APS, yes.
Q. But you certainly would not have been her subordinate?
A. No.
Q. Okay. Prior to the complaint that was filed in this matter, would you -- did you ever supervise her directly?
A. No.
Q. Did you ever observe Ms. Lipe working with students?
A. No, I did not.
Q. Okay. Did you participate in any meetings or

discussions regarding her request, ADA or FMLA regarded-- regarding, ADA and FMLA request?

A. Yes, I did.

Q. Which meetings did you participate in specifically?

A. Specifically, I believe it was a fall meeting with the union and with HR. I believe that was like a November --

Q. I believe September 2022, correct?

A. Correct.

Q. Is that -- well, when did you first become aware of the request for the ADA accommodation that was made by Ms. Lipe?

A. I can't remember.

Q. And what role did you play in the interview when you had the interview with ADA, what was your role in that interview?

A. As a support for the, for my executive director and for the team as a whole.

Q. Did you ever communicate with Ms. Bernadette Lucero regarding the accommodations?

A. I don't believe so, because I wasn't made aware of all of the exact accommodations until that meeting. I was not aware of anything before.

Q. Did you ever communication with Ms. Lucero about

my client's caseload?
A. We did. I believe so.
Q. And those communications, would those have been by email?
A. If there were any. I believe there were.
Q. Okay. Have you provided those emails to counsel sitting next to you?
A. Anything that was requested was provided.
Q. Anything that was requested?
A. Yes, that we had, yes. You should have them.
Q. Okay. Did you ever communicate with Mr. Griego, Justin Griego regarding my client's caseload?
A. Those were all --
MS. KILGORE: Excuse me, the phone is ringing over here.
(Brief recess taken.)
Q. (BY MS. FOGHI) Did you -- so you indicated that you acted as support with respect to the caseload aspect, but with respect to any accommodation requests, were you the person who had final decision-making on whether an accommodation should be given or not?
A. No, I never even sat in on any of the ADA meetings. That was not my role.
Q. Okay. All right. Were you aware that Mr. Griego and Ms. Bernadette Lucero-Turner opposed my client's remote

work request?
MS. KILGORE: Objection; form of the question.
Q. (BY MS. FOGHI) Were you aware?
A. I was made aware in the meeting.
Q. Okay. Are we talking about the September 21st meeting?
A. I couldn't tell you what meeting that was. I just know that Ms. Lipe brought that up during a meeting with the union representation.
Q. Okay. Were you aware of the Gonterman Report that was issued in this case?
A. Yes.
Q. Okay. Were you aware that you were identified as the person who denied the accommodations?
A. I did read that, yes.
Q. Okay. What -- any particular comment you wish to make on that?
A. I was not part of the ADA meeting. I wasn't part of any of those recommendations. APS has a very formal process, and so I was not part of the meetings, was not part of denying her her request.
Q. So why do you believe that in that Gonterman Report you were identified as the person who would deny the accommodation?
A. I, I don't know. I know it was said by somebody

else that I did that, so I don't know why that person would make that, would say that.

Q. Do you have a copy of any written denial of Ms. Lipe's accommodation request that you would have been a part of?

A. I do not.

Q. Were you interviewed in 2023 by an external investigator, his name was Tim, well Tim Gonterman?

A. Yes.

Q. In connection with the complaint?

A. Yes.

Q. And was this interview conducted in your official capacity?

A. Yes, it was.

Q. Were you aware that the interview was recorded and transcribed?

A. Yes.

Q. Were you asked to provide information regarding my client's performance?

A. I don't remember. It was a, a holistic kind of interview.

Q. Okay. Did you ever make any statements about my professionalism?

A. I couldn't say specifically. Could you be specific as to what you're specifically relating to?

Q. One moment, please. Let me go back to the -- went out of line a little bit, so I have to go back to this maybe.
Okay. I'll go ahead and show you what we have previously marked as Exhibit No. 3.
(Exhibit 3 marked.)
Q. (BY MS. FOGHI) If you can take a brief look at Exhibit 3, that would be great.
MS. KILGORE: Hang on, she's getting her glasses out.
MS. FOGHI: I had to run out and buy some this morning, so I know the feeling.
THE WITNESS: What happened to my eyes, it is terrible.
Q. (BY MS. FOGHI) Okay, thank you.
So if you could please turn to Page 6, March 31, 2023, Page 6, 7 and a small portion on the top of Page 8 contains the interview summary.
MS. FOGHI: Karen, if you need, we gave a copy to Mr. Griego. We gave a copy to you, so there should be two.
MS. KILGORE: Here is 3, I got it, I got it. It was stapled and stuck.
Q. (BY MS. FOGHI) Okay. If you don't mind, take a few minutes to review 6, 7 and top of Page 8 and then we'll resume the questions.

A. Uh-huh.
Q. Thank you.
Ready?
A. Yes.
Q. So in the course of this investigation, March 31, 2023, you participated in the interview with Mr. Gonterman which was an audio-recorded interview, correct?
A. Yes.
Q. And specifically, you were asked to provide a detailed knowledge of the events surrounding the complaint made by my client toward Mr. Griego and Ms. Turner, correct?
A. Correct.
Q. Okay. You had made several statements to the investigator, and as a summary, and, of course, correct me if I'm wrong, but we're speaking about your perspective specifically as it is outlined in Paragraph 2 which begins with, "Ms. Atler was asked to detail..." You discussed concerns that you have about the number of days that my client was absent that you felt was inconsistent.
A. Correct.
Q. Elaborate on that for me. What documents did you review in order to make that statement?
A. So that conversation was related to the meeting, as it mentions, with Jessica Rivera from HR, and, with Ms. Lipe and her union representative. During that meeting

it was brought up that the intermittent FMLA was not intermittent, and that there were days where it was ten days, 11 days at a time. That was part of the conversation that was had during that meeting.

Q. So under federal law my client has a right to take FMLA, correct?

A. Absolutely.

Q. How much time can she take under FMLA?

A. It is outlined in her FMLA leave, the intermittent FMLA.

Q. It doesn't have to be taken all at once, correct?

A. Absolutely does not.

Q. Were you aware of my client's medical concerns and conditions that required her to take FMLA?

A. I was made aware in the meeting. I don't ha- -- I wasn't privy to her leave or her ADA request. I was not part of that.

Q. When you met with HR what documents did the HR representative provide you with that made you make the statement to the investigator that you felt that her absence, what she stated and what was actual was inconsistent?

A. I never met with HR directly regarding her leave. As I mentioned, it was during that meeting.

Q. Well, during that meeting, and I'm going to go

ahead and ask you specifically, maybe you can just read it into the record, starting with the second paragraph, starting with Ms. Lipe. If you can read that into the record, please.

A. "Ms. Atler was asked to detail her knowledge of events surrounding the complaint made by Ms. Lipe toward Mr. Griego and Ms. Turner. She advised that she was asked to join a meeting with Mr. Griego regarding the responsibility of Ms. Lipe and her student caseload. Jessica Rivera and a union representative were also present. Ms. Lipe was not consistent in her absences, intermittent FMLA and it was unclear when she was present to meet the responsibilities of her job."

Q. Okay, we can stop there. So if she -- if it was unclear, as you, as you have stated, when she was present, when she was present to meet the responsibilities of the job, I'm assuming that there is a sign-in/sign-out sheet that every single person who reports to work has to adhere to, correct?

A. That would be a question for Mr. -- not necessarily, no. That would be a good question for Mr. Griego.

Q. Okay. Well, the question was asked, and Mr. Griego confirmed that there was, in fact -- there was, at the time, now there is a QR code, but at the time, there

was, in fact, a sign-in and sign-out sheet. So you made the statement about "inconsistent"?

A. Yes.

Q. Based on what?

A. Based on looking at caseloads for students, what was reported to me.

Q. By who?

A. By Mr. Griego, Ms. Turner, Ms. Bernadette Lucero-Turner as to needing help with caseloads, hours being met for students.

Q. Okay. You also indicated during this interview that did you not believe that the school was aware of when Ms. Lipe was present at school and when were her actual days off; is that correct?

A. That is correct.

Q. Okay. So I find that to be somewhat interesting considering that there was a policy in place. And I will show you what I'm now marking as Exhibit No. 11.

(Exhibit 11 marked.)

Q. (BY MS. FOGHI) I'd like you to take a look at this document.

MS. KILGORE: Thank you.

Q. (BY MS. FOGHI) Is this a document you have ever seen?

A. No.

Q. Okay. Could you identify, could you tell me what that document looks like for the record?
A. Staff sign-in staff sign-out sheet.
Q. The very first line on that page is dated February 11, 2022, correct?
A. Correct.
Q. And the individual listed there signing out is Antoinette Romero?
A. Correct.
Q. Do you know who Antoinette Romero is?
A. I do not.
Q. Okay. What is the reason for her signing out?
A. "Work from home."
Q. Thank you.
Is it your understanding and in your official capacity in this job that working from home specifically for social workers was not permitted?
A. That is correct.
Q. What was the reason that that was not permitted?
A. APS policies.
Q. So if Ms. Antoinette Romero is a social worker at APS, then would you agree with me that APS is violating its own policy?
A. Or -- either APS or the employee, yes.
Q. Okay. Do you have a copy of the policy you're

referencing when you say that social workers are not permitted to work from home? Do you have a copy of that?

A. I do not.

Q. Well, if it is a policy --

A. It is probably on APS website, the working from home policy. It is APS, not just social workers, it is APS employees.

Q. Okay. So would you be able to provide that to counsel?

THE WITNESS: They can ask for it.

MS. KILGORE: We'll work on that.

MS. FOGHI: That would be great, thank you.

THE WITNESS: It would be the policy --

MS. KILGORE: From 2022.

MS. FOGHI: Correct. When my client was there, yes.

MS. KILGORE: And, again, it is sign-in/sign-out policy, or...

MS. FOGHI: No. Working remotely, specifically. That -- she is indicating that there is a policy in place.

MS. KILGORE: Sorry, just want to make sure I got it right.

Q. (BY MS. FOGHI) Are there any emails between you and Ms. Bernadette Lucero arranging remote work for other related staff members?

A. Not that I can remember.
Q. So if I were to produce to you emails that exist, which are arranging for other related service members to work from home, you'd be surprised to see it?
A. I, I can't remember. I don't remember any of that, yeah.
Q. Well, the reason I'm asking is because you had just indicated that it doesn't just apply to social workers; it is a general rule of thumb?
A. Right, yes.
Q. So there's emails that exist between you and Ms. Lucero where you're arranging for remote work for related staff. Would that mean that you, yourself, are violating your own policy?
A. It would depend on the situation.
Q. Well, I want you to elaborate on that. Now we're talking about exemptions, exclusions, exceptions. I'd like to know when that policy did not apply.
A. I would like to see the emails of what you're talking about specifically --
Q. Sure. We'll produce those emails.
A. -- and then we can go from there.
Q. Sure. We're going to go ahead and pull those up. So I will come back to that while we're searching for the email in the interest of time.

The other thing that I found within this interview that is somewhat puzzling, you know, you were asked, I believe, to also review some emails that were exchanged, and specifically in the paragraph on Page 7, second paragraph, it begins with, "Ms. Atler advised that she received that internal whistleblower complaint from the school, that Ms. Lipe was soliciting students to see her in her private practice." Do you recall having that conversation?

A. The conversation?

Q. Yes.

A. Yes.

Q. Okay. Did you ever find any information to support that allegation that she was soliciting?

A. No, we did not.

Q. Okay. You also indicated that Ms. Turner was cautious about her emails. That's what you indicated to the investigator, that Ms. Turner was cautious about her emails because she knew Ms. Lipe had filed a complaint against her, correct?

A. Correct.

Q. And you advised that the emails from my client had a defensive tone to them and it was ve- -- and it was very difficult in the meetings?

A. That's correct.

Q. Can you elaborate on what you meant by "defensive

tone" first?
A. That's the one when met with her in, as we indicated, early in the fall regarding her leave. There was a defensive tone, so -- and I believe in one of the meetings she said, "I'm done," and hung up, and the meeting was concluded.
Q. And it was a phone conversation?
A. She was on, on Zoom, yes, or Google Meets.
Q. You described my client as being aggressive.
A. I felt she was aggressive during that meeting, yes.
Q. You also indicated that she was difficult to follow during the interview?
A. That's correct.
Q. What was difficult about following her during the interview?
A. Her, her comments jumped around. So they weren't linear in matters, and they were -- they did jump around.
Q. So you made a statement, as well, that you felt that if you were a parent of a student seeing Ms. Lipe that you would have major serious concerns?
A. I did, I did say that. And that was in relation to her consistency with seeing students. As a parent with a student of an IEP, if my student wasn't receiving their services I would have a concern.

Q. So let's talk about that. "Consistency with seeing students." Because this is a very, very serious statement to make, that someone who is taking care of children and their needs that you would comment on their stability, their ability, their aggressive nature. I mean, we're talking about something that doesn't align with what you would you expect from someone working in that capacity.

A. I think we're talking about two different things. First we were just talking about the meeting.

Q. Sure.

A. What I just mentioned was in alignment with her, her serving students, which is the IEPs are federal law. As we mentioned earlier, in my capacity, I need to look at compliance for students and the state, the law does not care what happens, we're required to fulfill those services. So if we have social work services for students that are not being fulfilled, that is a concern and we have to --

Q. So tell me what specifically you relied upon to make those comments. I'd like for you to tell me what documents you reviewed, what emails you reviewed, just speaking to ABC, that's not, that's not okay. I'm speaking specifically about evidence that you relied upon.

MS. KILGORE: Hang on just a second. Objection to the form of the question.

MS. FOGHI: Sure.

Q. (BY MS. FOGHI) Go ahead.
A. Are you going to restate?
Q. What document did you rely upon when you made these very serious statements about my client?
A. As I said those are two different --
Q. Then break them up into two.
A. There is the first one and I think I've already answered that one. It was my own sitting in on the meeting and being able to interact and listen to those interactions. That's the first part. The second part was looking about providing services and supports with looking at the students' IEPs, parent concerns regarding IEP minutes not being met. Those are the documents that were looked at and discussed.
Q. Okay. And those documents, have you provided those to counsel?
A. I don't have access to those documents.
Q. Who has access to those documents?
A. APS would have access to those documents.
Q. Okay, and that's something that we ask it be produced if it has not already been produced.
A. Are you asking for the documents from the caseload of students that she was --
Q. What I'm asking for is the concern that you mentioned that you looked at IEP minutes. So those would be

contained in documents --
A. Right.
Q. -- pertaining to specifically my client's involvement and the minutes that would be reflected.
A. That would be the individual student IEPs that were on her caseload at the time.
Q. Uh-huh. What would she have --
MS. KILGORE: Just to interrupt for one second, you and I can discuss exactly what it is we need to look for.
MS. FOGHI: Sure, that sounds good.
Q. (BY MS. FOGHI) When a social worker inputs their minutes, and we're specifically talking about these IEP minutes, how would they do that, what platform would they use to do that?
A. IEP minutes are, social workers are part of team to decide how many minutes they need, what it looks like.
Q. Okay.
A. So that is annually during their IEP and social workers are required to do progress toward goals which are reported every grading period.
Q. So you would have reviewed both of those things?
A. Those are on the same documents.
Q. Oh, on the same documents?
A. Yes.

Q. What documents specifically, if you recall, did you feel that, within these IEP minutes that you reviewed, lead you to the conclusion that she was not meeting the requirements?

A. That would have been done by Ms. Turner, Ms. Lucero-Turner, and the social worker liaison when they are staffed to do that work.

Q. Okay. The comment about my client's stability that you indicated that you felt that in this paragraph on Page 7, Paragraph 2, you added that, as I have mentioned before, that if she was a parent of a student that you'd have major concerns. And you had concerns with her stability and ability to address student concerns. Let's talk about my client's stability; what did you rely upon to make that statement?

A. Her ability to be --

Q. Stability.

A. The stability was also her ability to be at work, the stability to maintain her work schedule to meet the students' needs.

Q. So it is really not her stability in terms of her emotional mental state, is not what you meant?

A. It is not -- I don't, I don't know her. I don't interact with her.

Q. Correct. Correct. But that's why I'm surprised

to see this because you have never met her, correct?
A. No.
Q. You had one conversation with her?
A. I had more than one because it was interaction with her wanting to get the principal sign-off. So there were, there were more than one.
Q. Okay. Were you aware that while -- well, were you aware that Ms. Lipe had been on FMLA in the past?
A. I was not aware.
Q. Okay. Were you aware that she was expected to respond to emails during her most recent FMLA leave?
A. I was not aware.
Q. Okay. In this interview on Page 7, Paragraph 3, it states, "Ms. Atler was advised that Ms. Lipe complained that she was sent emails and expected to respond while on intermittent FMLA." You were made aware of this?
A. Emails are sent out as a whole group. So when Ms. Lipe is out, she's still part of the social work email group. I couldn't quote how many social workers there are but I think we have close to at least 100. She's, she's in that group. She's not expected to respond to emails.
Q. Okay. So she's not expected to respond?
A. No. No.
Q. Is she expected to attend meetings while she's on FMLA?

A. No.

Q. Were you aware that she has never been on continuous FMLA? Were you made aware of that? Did you ever review her file to determine if she had taken FMLA in the past?

A. No.

Q. Were you aware of any complaints filed against my client?

A. I did have -- received the internal whistleblower complaint that came through.

Q. Okay. Were you aware of any complaints that may have been filed against my client?

A. No.

Q. Are you, yourself, a licensed mental health professional?

A. No, I'm not.

Q. Did you review any medical or performance records besides what we've already talked about?

A. No.

Q. Have you ever personally observed Ms. Lipe working directly with students?

A. No.

Q. Have you ever communicated with administrators, other administrators or HR about her caseload specifically?

A. Only when we needed to move.

Q. Only when you needed to move?
A. Uh-huh.
Q. What about job performance?
A. No.
Q. Okay. Did you participate in any meetings that addressed removing students and reassigning students?
A. It was an email.
Q. Okay. Did you, yourself, instruct anyone to remove students from her caseload?
A. Yes.
Q. Who did you instruct?
A. That would be Mr. Griego and Mr. Lucero -- Ms. Lucero-Turner.
Q. Do you know when you instructed them?
A. I believe it was -- I can't tell you exactly. I want to say it was January, February.
Q. Of 2022?
A. Of 2023.
Q. 2023. And again, the reasons for those instructions, if you can restate that for the record, is why you felt that her caseload needed to be reassigned?
A. To support Ms. Lipe while she was out on leave. She mentioned in the fall that she was unable to get the progress toward goals in. So to best support her, and support students, that was done.

Q. Did you, did this, did this get documented in any shape or form?

A. Documented the movement?

Q. Yes.

A. I couldn't speak to that. That wasn't, I didn't make the changes.

Q. But they would be in an email, any reassignments?

A. I don't know. I didn't make that. That wasn't --

Q. How many students on average are assigned to a social worker?

A. It depends on their service level.

Q. Specifically the service level that my client had.

A. I don't know what her service level was.

Q. Were you aware that APS had approved Ms. Lipe to work remotely in April of 2021?

A. No.

Q. Were you aware that APS approved Ms. Lipe to work remotely in April of 2022?

A. No.

Q. So if that approval was given, once again, based on your previous statement, that would be a violation of the policy?

A. I think, again, it depends on if it was through ADA or how that was, that was approved. If it is an ADA accommodation that's very different than regular FMLA.

Q. Okay. How much do you know, or can talk to me about remote work authorizations?
A. I don't know very much. We didn't do very much. Couldn't speak to it.
Q. Okay. How familiar are you with APS newsletters?
A. Specifically which one are we speaking about?
Q. Well, I will show you a couple of them.
A. There are several.
Q. No problems. I will show you what I have marked as Exhibit No. 5.
(Exhibit 5 marked.)
A. Thank you.
MS. FOGHI: I think I gave an extra copy to someone. No, I'm good, I got it.
Q. (BY MS. FOGHI) Take a look at the document and tell me if you recognize it.
A. I do not.
Q. Okay. You've never seen this?
A. I have not.
Q. Are you aware of the systems that are being utilized for input of data such as Synergy and MaxCapture?
A. Yes.
Q. Can you tell me the difference between the two?
A. Synergy is our local database, for APS. MaxCapture is used to document student time, but it is not

required. Also, MaxCapture, at the time, was not open for district administrators or supervisors to have access to.

Q. So, really, the document that we would utilize would be Synergy?

A. Yes, that would be the first --

Q. And that would be mandatory?

A. Synergy carries the IEPs and that is where we house all of that information.

Q. Okay. So Synergy would be local, mandatory. MaxCapture, optional?

A. We need -- they use that to track and also for billing.

Q. Okay.

A. So it will say on there the MaxCapture audits within that newsletter. It -- social work, the liaison, and the executive directors do use MaxCapture to go through to do the billing.

Q. Were you aware that the newsletter in front of you, Exhibit 5, which contains November and December 2023, that it gave instructions to social workers about providing remote services. Were you aware that that document would contain that?

A. I was not.

Q. Would it surprise you, would it surprise you if I told you that it does contain information about providing

remote services?
MS. KILGORE: Objection. If we can look at it.
MS. FOGHI: Sure.
THE WITNESS: What page are you --
Q. (BY MS. FOGHI) Let me go ahead and draw your attention to -- I will try to count the page, but it's, November 2023 is the document, and Page No. on Exhibit 5 would be 8, Page No. 8. It is a social, school social worker newsletter. If you can just look at the first little section there that says -- I can't read that.
A. "During the asynchronous learning time"?
Q. Learning time. Yes, thank you.
A. So "asynchronous" is referring to any school days where students are, were, where we're out of school. So that's where we refer to synchronous or asynchronous.
Q. And it states that as soon as it is safe to travel to your school site, please do so.
A. Yes. And that goes along with teachers as well, that the APS policy for snow days and remote work for all APS employees.
Q. Okay. Have you produced emails, notes, and communications in this case to counsel? Were you requested to produce documents to counsel?
A. Uh-huh.
Q. Have you produced everything that you've been

asked to produce?
A. Yes.
Q. Are there any documents that you referenced that we talked about today or have referenced today that may not have been produced to counsel?
A. No.
Q. Besides what I have discussed with you that we'll talk about?
MS. KILGORE: Right. And I think that we definitely want to have the opportunity to follow up on that.
MS. FOGHI: Thank you.
Q. (BY MS. FOGHI) Let me show you what I have now marked as Exhibit 6.
(Exhibit 6 marked.)
Q. (BY MS. FOGHI) Take, just take a look at this and tell me if you are able to identify, recognize, give me any commentaries on what you believe this document is.
A. If I recognize it -- what is the question?
Q. Can you tell me what this is?
A. It looks like it is Synergy caseload.
Q. Okay, so this would go, this would be something that would have to do with Synergy, correct?
A. That is correct.
Q. Specifically, it appears that this is a special

education therapist user guide, so to speak, this Synergy, correct?
A. Yes.
Q. Okay. Let me show you what I have marked as Exhibit 7.
(Exhibit 7 marked.)
Q. (BY MS. FOGHI) Do you recognize Exhibit 7?
A. I do not.
Q. If you turn to Page 2 it appears that this would be the MaxCapture scheduling and provider time tracking user guide, correct? But you don't use these and you're not familiar with this?
A. I'm not familiar with MaxCapture in detail.
Q. Okay, no problem.
Were you aware that my client participated in the CVS Administrative Leadership Development Program?
A. No.
Q. Is one of your duties as superintendent to sign off on intern hours for candidates?
A. It can be one, but not necessarily, no.
Q. So it can be one?
A. It can be.
Q. When you say it can be one, that's very confusing because who would the person go to sign off on intern hours?
A. Generally, it is the person that they interned

under. And so it will say, when they sign off, who can verify those hours.

Q. But ultimately, somebody supervises that person as well, correct?

A. Correct.

Q. Does the PED regulations require that associate superintendents sign off on the intern hours?

A. No.

Q. Okay. So if I showed you that document it would surprise you to see that?

A. Yes, because I didn't do it.

Q. Okay. Have you ever signed off on other intern hours in the past?

A. My intern hours, yes.

Q. Your own intern?

A. I had an intern, an intern that was directly under me the summer before, yes.

Q. Okay. Have you signed off on intern hours for other interns that were not working necessarily underneath you?

A. Yes, there were two within her cohort, and those were, I was able to verify with the people that they were interning with that those hours were completed and correct.

Q. So what criteria would distinguish my client from the other interns whose hours were approved and signed off

on?
A. I didn't have any verification that the intern hours were completed.
Q. Were you aware that she had attempted to seek internship and was denied that opportunity?
A. I was not aware. That was before me.
Q. Okay. Did you attend the PTG meeting on January 11th, 2023?
A. For?
Q. The progress towards goals meeting in 2023.
A. For who?
Q. For Tatia.
A. I don't believe so. I can't remember, no.
Q. Okay. So let me go ahead and play Exhibit 12, I believe is where we are now. I'm going to go ahead and briefly play an audio?
MS. FOGHI: Which we will provide the link, Karen, to the audio to you and also to the reporter, they do have it, if you need it carbon copied along with the court reporter.
MS. KILGORE: We definitely want it as a specific Exhibit --
MS. FOGHI: I understand.
Q. (BY MS. FOGHI) Let's go ahead and play that recording, please.

MS. KILGORE: What's the date?
MS. FOGHI: It is January 11th, 2023.
A. This is the --
Q. (BY MS. FOGHI) Progress toward goals meeting?
A. For...
Q. Guess we'll find out. For Tatia. That's the only person I'm interested in.
A. She had a lot of progress towards goals for students on her caseload, so that's what I'm asking.
Q. No problem.
(Playing video/audio.)
MS. KILGORE: Was the voice speaking Ms. Lipe and Ms. Lucero in there, too?
(Playing video/audio.)
Q. (BY MS. FOGHI) Do you recognize that voice?
A. Ms. Lipe.
(Playing video/audio.)
Q. (BY MS. FOGHI) Do you recognize your voice on that recording?
A. I do.
Q. Okay.
MS. KILGORE: Wait a minute. I didn't. You're so quiet, and that -- I was wondering.
MS. LIPE: There's more. There's more. There's more.

MS. KILGORE: Okay.
MS. FOGHI: So the recording, you know, we can spend all day listening to recordings, which we're not going to do, I'm --
MS. KILGORE: Of course. And I'm not trying to control that. That was not Ms. Lucero talking?
MS. FOGHI: That was Ms. Lucero talking, and also Ms. Atler is talking. The union rep is talking.
MS. LIPE: Jerry Thorne, Jessica Romero --
Q. (BY MS. FOGHI) So the date of this meeting, and again, you'll get copies --
MS. LIPE: I also have --
Q. (BY MS. FOGHI) -- this was January 11, 2023. Were you aware that my client was on --
MS. FOGHI: You have to pause it when I'm talking.
Q. (BY MS. FOGHI) Do you, do you know that my client was on FMLA leave when this meeting occurred?
A. No.
Q. You were unaware of that?
A. Yes.
Q. But isn't that something you should have been made aware of as the superintendent of the schools that you're talking to a person who was on leave?
A. That is up to the, their supervisor. With that many employees I leave it up to, it would be Mr. Griego, who

is at the school, then Ms. Lucero, who is above him. So with that, with the breadth of the job, I need to count on the people underneath to help us keep that, keep that in line.

MS. KILGORE: Mr. Thorne was there?

Q. (BY MS. FOGHI) The union rep was there, yeah. The union rep was present at that meeting?

A. Yeah, uh-huh.

Q. Would you say -- and again, we can continue playing this, and we can continue playing portions of this that are relevant -- well, it is all relevant, but, you know, any other portions. But would you agree with me or disagree with me that, on this, when you hear my client speaking, does she sound aggressive to you?

A. In that, in that time, no, she did not.

Q. Does she sound defensive to you?

A. In that time, no.

Q. Does she sound unstable to you?

A. In that portion, she does not.

Q. Okay. Do you have any portion that you can direct me to or do you have available to you where you can demonstrate to me that you have documentation supporting evidence of my client's instability and aggressive nature, because I have yet to see that.

A. Only my interaction with her in the fall meeting,

as I mentioned earlier.

Q. Okay. How many times do you think in that meeting did she state that she was on FMLA leave?

A. I don't know.

Q. Okay. Would it surprise you if I told you that three times in that meeting she kept saying, "I'm on leave, I'm on leave"?

A. No. And I don't believe she had to -- if she was out, she didn't need to accept the meeting. I think we worked around anybody's schedule. I think that was also not a required meeting.

Q. Okay. Did you or any other administrator that you know of ever inform her that there would be consequences if she failed to appear?

A. Not that I'm aware of, no.

Q. In your interview with RCI, do you remember that interview?

A. No, I do not. Is that different from Mr. Gonterman.

Q. That would be Exhibit 3. If we can go back to that exhibit.

A. So it is the same?

MS. KILGORE: Well, it may or not be the same as interview we were looking at a minute ago, but this is RCI.

Q. (BY MS. FOGHI) I'm referring to No. 3, if you

have it in front of you.
Were you aware that that meeting was recorded?
A. Yes.
Q. Okay. And you stated in that interview that we talked about previously that my client raised her voice. Did you say she was agitated, raised her voice, and eventually hung up?
A. I said that just earlier today. I don't believe it was in this. I could look through and see.
MS. KILGORE: Are we on a page? Here we go, Page 16 where your interview starts.
A. Uh-huh, looking through. My exact words were that "She was escalated to the point where she left the meeting."
Q. (BY MS. FOGHI) Okay. She left the meeting. So because this interview was done by phone, leaving the meeting means I hang up the phone?
A. If it's a Google Meet, yes. Well, it was a Google Meet so she clicked --
Q. Clicked off and left the meeting.
Would you agree that compelling an employee to attend a meeting while on protected leave is prohibited under federal law?
MS. KILGORE: Objection; lack of foundation.
Q. (BY MS. FOGHI) Are you aware of the details and intricacies involved with FMLA leave?

A. Yes.

Q. Okay. So are you able to tell me if you have any knowledge of what that leave requires an employer to do with respect to an employee who is on leave?

A. If an employee is on leave, they are on leave. So we can't, we don't require them to attend meetings, to do work, any of that.

Q. Correct. Okay. One moment, please.

So for the record, we're going to conclude the interview unless there's anything that you would like to add?

A. No, ma'am.

Q. I will provide you the emails that I referenced that are really significant in this matter. We don't have that particular email with us today, we have so much documentation in this case.

MS. FOGHI: But we will provide it to you, Karen, and then of course please share it with Ms. Atler.

MS. KILGORE: Yes. I mean, I do have a follow-up question.

MS. FOGHI: Yes, please, of course. Sorry, I never asked.

MS. KILGORE: Don't worry.

EXAMINATION

BY MS. KILGORE :

Q. What were the circumstances of that meeting that we just heard the recording on?

A. The circumstances on this meeting, or that meeting?

Q. Yes.

A. I think it was deciding on providing progress towards goals for students on the caseloads.

Q. Do you know that whether or not Ms. Lipe was required to attend a meeting on that day?

A. Not, I don't know how that was set up, no.

Q. Okay. So do you know whether Ms. Lipe requested the meeting?

A. I'm not aware if she requested it.

Q. You just, you just don't know what the circumstances were surrounding the setup of the meeting and the content of the meeting?

A. Correct. And with, the same with this one. I think the content that we're talking about this meeting, I don't know who set that up.

Q. Okay. And so you -- did you personally require Ms. Lipe to attend this meeting?

A. No.

Q. Do you know if anyone else at APS required

Ms. Lipe to attend this meeting?
A. No.
MS. FOGHI: One follow-up question as well, based on this.

EXAMINATION

BY MS. FOGHI :
Q. Are you aware that another provider has already completed the progress toward goals in December that were due? So the question I would have is if the progress toward goals was completed why was the meeting even being held?
MS. KILGORE: Sorry, could you repeat that?
Q. (BY MS. FOGHI) Sure. So the meeting in January had to do with progress toward goals, the meeting we're speaking of?
MS. KILGORE: Toward goals.
Q. (BY MS. FOGHI) PTG, yes. Were you aware that had already been discussed, documents had already been shared, provided back in December of 2022?
A. No. I think the original meeting in the fall was how these were going to be completed, so.
Q. And again, would it surprise you if I told you that in December this was already done, so the meeting in January was completely unnecessary when my client was on FMLA.
MS. KILGORE: Objection; lack of foundation.

Q. (BY MS. FOGHI) And is it your testimony today that you met in the fall of 2022?
A. With Ms. Lipe?
Q. Yes.
A. Correct.
Q. When did you meet with Ms. Lipe?
A. What was the date that we said earlier? I don't have the exact date. That was when we discussed meeting with her with HR and with her union rep.
MS. LIPE: January.
Q. (BY MS. FOGHI) Okay. That would have been the recording in January of 2023, not in the fall of 2022?
A. I think we're talking about two separate things.
Q. It is the only one I'm aware of.
A. Okay. We talked about earlier the fall meeting when we met with Ms. Lipe and, and the union rep when she hung up the phone.
Q. Is that what you're referring to?
A. That's what I'm referring to. This is another meeting that you're referring to.
MS. FOGHI: Well, thank you. I appreciate your time. Thank you for being here.
(Deposition concluded at 11:34 a.m.)

TATIA LIPE V. APS, ET AL.,

DEPONENT SIGNATURE/CORRECTION PAGE

If there are any typographical errors to your deposition, indicate them below:

PAGE LINE
_____________ Change to ___________________________________
_____________ Change to ___________________________________
_____________ Change to ___________________________________
_____________ Change to ___________________________________

Any other changes to your deposition are to be listed below with a statement as to the reason for such change.

PAGE LINE CORRECTION REASON FOR CHANGE
_____________________________________________________________
_____________________________________________________________
_____________________________________________________________
_____________________________________________________________
_____________________________________________________________
_____________________________________________________________

I, ANNITRA ATLER, do hereby certify that I have read the foregoing pages of my testimony as transcribed and that the same is a true and correct transcript of the testimony given by me in this deposition on SEPTEMBER 5, 2025, except for the changes made.

___________________________ ____________________________
Date signed ANNITRA ATLER

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

NO: 1:23-CV-00899-GBW-JMR

TATIA LIPE,

Plaintiff,

-vs-

ALBUQUERQUE PUBLIC SCHOOLS and
NEW MEXICO DEPARTMENT OF PUBLIC EDUCATION,
Defendants.

CERTIFICATE OF DEPOSITION

I, CHRISTINE J. ROYBAL, CCR, RPR, CSR, DO HEREBY CERTIFY that on SEPTEMBER 5, 2025, the Deposition of ANNITTRA ATLER was taken before me at the request of, and sealed original thereof retained by:

FOGHI LAW FIRM, LLC
5065 Corrales Rd., P.O. Box 944
Corrales, New Mexico 87048
(505) 220-5691
foghilaw@yahoo.com

I FURTHER CERTIFY that copies of this Certificate have been mailed or delivered to all Counsel, and parties to the proceedings not represented by counsel, appearing at the taking of the deposition.

I FURTHER CERTIFY that examination of this transcript and signature of the witness REQUESTED by the witness and all parties present. On ____________, a letter was mailed or delivered to KAREN KILGORE, ESQ. regarding obtaining signature of the witness, and any corrections, if any, were appended to the original and each copy of the Deposition.

I FURTHER CERTIFY that the recoverable cost of the original and one copy of the deposition, including exhibits, to BOGLARKA FOGHI, ESQ. is $___________.

I FURTHER CERTIFY that I did administer the oath to the witness herein prior to the taking of this Deposition; that I did thereafter report in stenographic shorthand the questions and answers set forth herein, and the foregoing is a true and correct transcript of the proceeding had upon the taking of this Deposition to the best of my ability.

I FURTHER CERTIFY that I am neither employed by nor related to nor contracted with (unless excepted by the rules) any of the parties or attorneys in this case, and that I have no interest whatsoever in the final disposition of this case in any court.

________________________________________
CHRISTINE J. ROYBAL, CCR, RPR, CSR
CCR No. 50
License Expires: 12/31/25

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

TATIA LIPE,
Plaintiff,

v. No. 1:23-cv-00899-GBW-JMR

ALBUQUERQUE PUBLIC SCHOOLS et al.,
Defendants.

---

# APPENDIX A-2

## PLAINTIFF'S YELLOW-HIGHLIGHTED DEPOSITION DESIGNATIONS OF LINDA ELLIOTT

Plaintiff submits this yellow-highlighted deposition-designation material as part of Plaintiff's corrective submission. Plaintiff preserves all designations, counter-designations, objections, completeness arguments, evidentiary positions, and rights under Doc. 256, the Federal Rules of Civil Procedure, and the Federal Rules of Evidence.



Attached deposition-designation PDF pages: 38

MARICOPA REPORTING

# Linda Elliott

**Date:** April 10, 2026

**Case:** Lipe v. Albuquerque Public Schools, et al.
**Case Number:** 1:23-cv-00899-GBW-JMR

Maricopa Reporting, Inc.
Phone: 480-597-4744
scheduling@maricopareporting.com
https://www.maricopareporting.com/

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

TATIA LIPE,

Plaintiff,

V. No. 1:23-cv-00899-GBW-JMR

ALBUQUERQUE PUBLIC SCHOOLS, et al,

Defendants.

DEPOSITION OF LINDA ELLIOTT
April 10, 2026
9:00 a.m.
VIA ZOOM VIDEOCONFERENCE

PURSUANT TO THE NEW MEXICO RULES OF CIVIL PROCEDURE, this Deposition was:

TAKEN BY: Boglarka Foghi, Esq.
Attorney for Plaintiff

REPORTED BY: Barbara Jean Morgenweck, RPR,
NM CCR#526
MARICOPA REPORTING, INC.
1480 E Bethany Home Rd. Suite 115
Phoenix, AZ 85014

A P P E A R A N C E S

On behalf of the Plaintiff:

Boglarka Foghi
FOGHI LAW FIRM, LLC
5065 Corrales Rd.
P.O. Box 944
Corrales, NM 87048
505-220-5691
foghilaw@yahoo.com

On behalf of the Defendant:

Natasha A Martinez-Wesenberg
WIGGINS, WILLIAMS & WESENBERG
A Professional Corporation
1803 Rio Grande Blvd. NW
Albuquerque, NM 87104
505-764-8400
nwesenberg@wwwlaw.us

Karen Kilgore
CUDDY & MCCARTHY, LLP
1701 Old Pecos Trail
P.O. Box 4160
Santa Fe, NM 87502
505-988-4476
kkilgore@cuddymccarthy.com

Also Present:

EXAMINATION INDEX

| | PAGE: |
|---|---|
| LINDA ELLIOTT: | |
| Examination by Boglarka Foghi | 4 |

INDEX TO EXHIBITS

| EXHIBIT: | DESCRIPTION | PAGE: |
|---|---|---|
| Exhibit 1 | 9/12/21 Email | 9 |
| Exhibit 2 | 4/14/22 Cover Letter | 24 |
| Exhibit 3 | State of New Mexico PED | 24 |

LINDA ELLIOTT,

Having first been duly sworn, testified as follows:

EXAMINATION

BY MS. FOGHI:

Q. Thank you. Good morning, Ms. Elliott.

A. Good morning.

Q. I am Boglarka Foghi. I represent Tatia Lipe, who is the plaintiff in the action that we are present for with respect to APS. She is present on the line with us I believe. And today we're conducting your deposition. What you would like -- what I would like for you to be aware of in the process of this deposition is I will be asking you a series of questions and also sharing some documentation with you for your review. Please take the time always to answer a question and to review what you need to review. What is important to notice is that if there are objections that are raised during the course of this deposition as I question you, we always have to make sure that we allow the person to ask the question before a response is given so that there is no confusion and difficulty for the court reporter to take down the information. Okay? So you will often hear objections. Unless Ms. Wesenberg tells you not to respond to the

question, and she can tell you that herself, you're permitted to respond unless you explicitly hear her say, please do not answer that question, okay?
A. Okay.
MS. FOGHI: Is there anything else you wanted to add, Natasha?
MS. WESENBERG: No, I think that's fair.
MS. FOGHI: All right. Shall we begin?
BY MS. FOGHI:
Q. Ms. Elliott, good morning.
A. Good morning.
Q. Would you please state your full name for the record?
A. Linda Judith Elliott.
Q. Ms. Elliott, could you please tell me how you are currently employed?
A. Currently I am an ESDS, which stands for exceptional student district support.
Q. Is that with APS?
A. Yes.
Q. How long have you been in this particular position?
A. 14 years.
Q. So would it be fair for me to say that back in September of 2021, you would have held the same

position?
A. Yes.
Q. Can you please tell me what was your role with the school social workers during this time period?
A. I was a supervisor. I completed their PDP and supported them when they had questions and needed assistance.
Q. Ms. Elliott, what sort of background do you have -- let me go ahead and ask my question again. I know you have been with APS now for quite a long time. Can you please tell me a little bit about your background and what ultimately led you to take this position?
A. I have been -- was a special education teacher for 34 years. I retired, got my admin license, came back to the district. I was an assistant principal at a social emotional program at Montezuma and then took this position after four years of being in that position, so, yes, I have been with the district for 50 years.
Q. Wow. Very impressive.
A. Thank you. That is why have I these little --
Q. There is a lot to be done for those. Don't

worry.
Ms. Elliott, with respect to the social worker and being their supervisor, you indicated that you would basically act as their support system, correct?
A. Correct.
Q. Could you tell me, when do you recall having meeting Tatia Lipe for the first time?
A. I don't recall meeting her for the first time. I corresponded with my group via email about their professional development plan. I also was part of the IC for the social workgroup, and Tatia was part of that group as well, so I probably met her and saw her during the IC meeting.
Q. Do you recall Tatia coming to you or communicating with you, I should say, regarding ongoing concerns that she had with respect to students at Volcano Vista?
A. Yes.
Q. Can you please describe what your recollection is of those concerns that she expressed?
A. My recollection are several phone calls that she made to me asking for support.
Q. What was the needed support that she expressed?

A. She expressed a need in communicating with the administrator of the school.
Q. Who was the administrator of the school at the time?
A. I don't remember.
Q. Were there already discussions or any kind of planning at that time for a meeting with administration to address her concerns?
A. Well, I didn't remember that, but I know by the exhibit that I was provided that there -- I went to Ms. Bernadette Turner Lucero to ask that she get involved because the conflict seemed to be with the principal, and so I felt like someone kind of above me needed to address that.
Q. Now this conflict that you mentioned that you understood that to be with the principal, can you elaborate on that? What specifically was the conflict?
A. I can't. I remember that Tatia was frustrated and wanted some support in communicating.
Q. Do you recall her reporting to you at some point that she had unexpectedly been pulled into a meeting that involved Mr. Sedillo, Griego and Dr. Jewell and a head teacher?
A. I don't recall.

Q. Would reviewing an email back in September the 12th, would that help to your recollection?
A. I did review that. It did not help. You know, that has been a number of years ago. I did not recall the specifics of the incident. What I recall is that I asked -- I requested that Bernadette kind of jump in to support Tatia.
Q. All right. I am going to go ahead and pull up exhibit. I am going to mark it as your Exhibit No. 1 for purposes of this deposition. It is a relatively big document, and for the court reporter, we can do it one of two ways. I can either introduce the entire document or I can selectively pick the pages, whatever is better for you, Barb, and then scan them and send them to you that way, whatever you prefer.
(Discussion off the record.)
(Exhibit No. 1 was marked for identification.)
MS. FOGHI: I am going to draw your attention to page -- let's see, I believe it starts on page 34.
A. Okay.
Q. But specifically what I am going to draw your attention to, it's labeled at the bottom as Exhibit 4. If you see the very bottom, it's a

student concern, page 1 of 35, is how it's labeled at the bottom. Do you see that? And it's the September 12, 2021, email.

A. Does it start with "Concerns"?

Q. It starts with "Follow-up and additional information" from Tatia Harris Lipe to Linda Elliott and Bernadette Lucero Turner is copied on it, and it begins with "Good afternoon."

A. I have that.

Q. Would you please take a look at this email and if you don't mind reading that into the record for us.

A. (As read) "I wanted to let you know that I received a text from one of the head teachers on Friday afternoon. It was after school, so I was just about to leave, but she asked if I could come to Room E225. I assumed it was to support a student. To my surprise, I walked into a meeting. Present were the principal, the newly hired AP Justin Griego, Dr. Jewell, dean of students for 9th grade, and both head teachers. I'd like to discuss the details of the conversation from that meeting if possible. I can be reached anytime. My cell number is" -- and states her cell number.

Q. Thank you. So as you read this email, I know

it has been quite a number of years now, do you have a recollection of having received this email?

A. No, I don't recall that. What I recall is reaching out to Bernadette Lucero Turner and I was booked with IEPs and asked her if she could please reach out.

Q. Okay. The email address that is reflected on this communication to you, is that your current or was that at the time your valid email address?

A. Yes.

Q. It looks like Ms. Lucero Turner was copied on this communication as well, correct?

A. Correct.

Q. Do you recall whether she ever responded to your request to get involved?

A. I don't recall.

Q. Let me go ahead -- first, let me withdraw for just a moment, withdraw that question. With respect to this email, do you recall ever having responding to this email?

A. I don't recall.

Q. So the -- in the email it appears that my client is referencing that she had received a text from a head teacher on Friday, which would have been the 10th of September 2021. Would that be a correct

assumption if this email was Sunday, September 12th?
A. Yes.
Q. With respect to Bernadette Lucero Turner, you indicated that you don't recall whether or not she got involved, correct?
A. I do believe that Bernadette -- I don't know if she was involved in this specific incident, but I do know that Bernadette did respond to Tatia's issues.
Q. Let me go ahead and now draw your attention to the email dated September 13, 2021. On the bottom of the page, it's labeled as again Exhibit 4, page 16 of 35. Do you see that? It's titled "Concerns," and it is also from Tatia Harris Lipe to you with Bernadette Lucero Turner copied.
A. Does it say, "Concerns, lack of understanding."
Q. Yes.
A. Yes, I see that.
Q. Thank you. I don't know if you have had an opportunity to review this particular email prior to starting the deposition, but if you have not, I'd like for you to just take a few moments to review this, please.
A. Okay.

Q. Does this refresh your recollection?
A. Honestly, no.
Q. It appears -- and again, how would you -- I can't speak to what it is. I am asking you if you could summarize for us what you believe this September 13, 2021, email appears to be?
MS. WESENBERG: Foundation.
BY MS. FOGHI:
Q. Go ahead.
A. Did someone say something?
Q. She said objection, foundation, but you can go ahead and answer.
A. Thank you. My understanding of this email is that she was questioning the social worker's role and how that was addressed by admin and she was trying to clarify.
Q. It appears that in her concerns if she is outlining basically a lack of understanding regarding the role of social workers, as you mentioned, as well as limitations that she felt like there were certain limitations and failure to include or notify IEP team members assigned to work with students when incidents arose involving special education students, correct?
A. Correct.
Q. It also appears that she mentioned concerns

about unilateral decisions being made by deans, correct?
A. Correct.
Q. Now this particular email was very detailed. It appears that my client has outlined a summary of events, and she also included several dates ranging from August, looks like the 12th of 2021, through, it looks like September 10th of 2021, which would have been the date of that surprise meeting, correct?
A. Correct.
MS. WESENBERG: Form.
BY MS. FOGHI:
Q. Again, after reviewing this, I know it has been awhile, but you don't recall the contents of this email, correct?
A. No. The only thing I recall is that she was upset.
Q. Did you ever tell my client that you had spoken to Bernadette Lucero Turner and that the next steps would be to assess -- to make -- have a meeting to address these issues?
A. Yes.
Q. Do you know whether or not that meeting ever took place?
A. I don't. I am not positive. I think that it

did. I think that it was a phone conversation, but I am not certain.

Q. Okay. Let me go ahead and in that same packet, I am going to show you -- give me one moment, please. The very bottom of the page that I am referring to now, page 20 of 35, and it says, "Invitation clarification of roles, Tuesday, September 14, 2021, 8:00 a.m. to 9:00 a.m."

Do you see that document?

A. I don't see that.

Q. So that would be -- I am looking at the bottom page, page 43 of the actual packet is where you would see the meeting.

MS. WESENBERG: They are just out of order. It jumps from 18 to 22, but she is telling you that later on, the last date of this document.

THE WITNESS: Okay. (As read) "You have been invited to the following event, Tuesday, September 14th."

Is that correct?

BY MS. FOGHI:

Q. That is correct.

A. I see that.

Q. Thank you. Ms. Elliott, it looks like this was generated by you, and you had sent this out to my

client, you sent it out to Ms. Turner, Justin Griego, and it looks like Sedillo, correct?

A. Correct.

MS. WESENBERG: Form.

BY MS. FOGHI:

Q. Did you generate this document to create the meeting?

A. I would say, yes.

Q. Okay.

A. Do I recall? I do not recall that, but honestly, I did.

Q. No problem. Was this meeting arranged in response to the concerns that my client brought up to you?

A. Yes.

MS. WESENBERG: Foundation.

BY MS. FOGHI:

Q. At the time that these concerns were brought up to you, did they appear to be isolated concerns, or did they appear to be or whatever you understood them to be? Did you understand them to be an isolated concern or an ongoing concern that my client was expressing regarding the students?

MS. WESENBERG: Form.

THE WITNESS: I'm not sure if they were

isolated or ongoing. What I remember is that Tatia seemed to have frequent complaints about the administration.
BY MS. FOGHI:
Q. Did you understand her complaints to involve continuing issues affecting specific students?
A. I think it was both specific and general.
Q. What do you recall to be the specific complaint or complaints?
A. The only thing that I can recall, and that is partially because I just read it, was the role of the social worker and notification of IEPs.
Q. What would have been the general concerns?
A. Communication with admin.
Q. If those same student related issues later continued and became a part of the PED complaint, would that have been consistent with what she had already brought to your attention in September of 2021?
MS. WESENBERG: Form, foundation.
THE WITNESS: I am not sure.
BY MS. FOGHI:
Q. APS leadership, is it your understanding that student related concerns were brought to their attention through you previously, not just through my

client but through others?
MS. WESENBERG: Form, foundation.
THE WITNESS: No.
BY MS. FOGHI:
Q. Do you believe that it was only my client who brought up concerns? There was no one else that brought up concerns?
MS. WESENBERG: Foundation.
THE WITNESS: Are you speaking globally or social workers specifically?
BY MS. FOGHI:
Q. Social workers specifically.
A. I think she brought that up to the instructional council, the union, which would be separate from admin.
Q. Okay. Did you participate in the September 13th meeting?
A. I don't recall.
Q. Do you recall having communicated with my client by text message?
A. Yes. What I recall is that she would call fairly frequently, and I believe she would also text, although I would have to reread that to remember the details.
Q. Sure. I will go ahead and draw your

attention to the text messages between you and her. If you could please turn to page 39. It begins on page 39, and I believe it goes on for at least three to four pages. I am looking now. Looks like three pages of text messages. Take a look at those text messages and let me know once you have pulled them up and had an opportunity to review them.

A. Okay. I am going to grab my glasses.

Q. No problem.

A. Okay. Yeah, I do recall the school was quite new to me. I did not know the admin, and that is why I requested Shelly Henderson, who had had the school previously, to meet to assist.

Q. Okay. So looking at these text messages, it appears that you were communicating with her beginning on September 8, 2021. It looks that like she had reached out to you and she indicated to you that she spoke to you last week regarding a situation and that since then, things have gotten worse. That is the start of the message to you on September 8, 2021.

Do you see that?

A. Yes.

MS. WESENBERG: Form.

BY MS. FOGHI:

Q. So let's -- and I'm assuming that you recognize these text messages, correct?

A. Correct.

Q. Ms. Elliott, with respect to that initial text message September 8, 2021, it appears that she references having spoken to you the week prior. So do you recall having that conversation the week prior to September 8, 2021, with her?

A. I recall having several conversations with her. I can't recall if it was specifically prior to this. Tatia would reach out with her complaints frequently.

Q. Again, the complaints that you are indicating that she reached out to you frequently about, they were a mix of complaints, correct, meaning they had to do with students, but they also had to do with it -- it also had to do with administration and the way that they were doing things, correct?

A. Correct.

Q. Okay. It appears in this very first text message that you had spoken to Bernadette the day prior, which would have been September 7th, and you also indicate here that "The situation is most likely intimidating and our next step is a meeting. She agreed."

What did you mean by "the situation is most likely intimidating"?
A. Well, I think.
MS. WESENBERG: Objection.
THE WITNESS: Of admin. I think she -- I am guessing. I don't recall for sure, but I would say intimidating was because she was the social worker and she was in a conflict with administration.
BY MS. FOGHI:
Q. The nature of the conflict with administration, again, just for the record, in your recollection had to do with what?
MS. WESENBERG: Foundation.
THE WITNESS: Had to do with apparently in reviewing -- I don't recall, but in reviewing -- obviously, I can read so I am aware that there was a conflict with the surprise meeting with being also invited as a social worker to an IEP. I would say that is what it was about.
BY MS. FOGHI:
Q. Did you ever hear from my client with respect to the conversation that she would have had with Dr. Jewell? Did she ever talk to you about that?
A. I am guessing that she did, but I don't recall.

Q. You had spoken also to Shelly, correct? What is Shelly's last name?
A. Henderson.
Q. What was her role at the time?
A. She had the same role that I had, but she did not -- she did not -- she had actually that school. I supervised social workers, but it was not my school.
Q. I believe you indicated that you do not have specific recollection as to whether or not you ever saw Tatia in person, correct?
A. What I recall, I said, is that I saw her in person at the IC Union meeting.
Q. Okay. Tell me about what that meeting was about?
A. The IC Union meeting is a conversation about a group of social workers that meet to discuss their frustrations with the district.
Q. What I would like to do next, and we may need just a moment, is I am going to send you a document in just a moment. I will send it to Karen. I will send it to the court reporter, and I will send it to Natasha all at once.
MS. KILGORE: I think, Boglarka, just to interrupt before you get back on, I have not received

anything yet from you.

MS. FOGHI: Previously, you did not get the attachment? Okay. No worries. Let me resend that to you again.

MS. KILGORE: Thank you.

MS. FOGHI: Of course. This document just went out, so let me go ahead and send you -- that's very strange, Karen, because --

MS. WESENBERG: I think the one this morning, Boglarka, the 217 was just sent to me.

MS. FOGHI: No, I sent it separately to Karen, and I sent it to KKilgore@CMC.law, correct?

Now it looks like it was delivered, but I will send it again. Let me know if you got it. It says "delivered," so. The beauty of emails and text messages.

MS. KILGORE: Yeah. I sure don't see it.

MS. FOGHI: Let me know when you do receive it. I am going to put you all on mute for just a minute until you do receive this document.

MS. WESENBERG: I got the new cover letter from CRR.

MS. KILGORE: I guess I got something from you. I did too. I got the cover letter. I did not get the other thing, but no need to delay on that.

MS. FOGHI: All right. Let me go ahead and show you what I am going to mark as your Deposition Exhibit No. 2.

(Exhibit 2 was marked for identification.)

BY MS. FOGHI:

Q. If you could please take a look at the April 14, 2022, letter, and just take a glance at it if you don't mind.

A. You're asking me to do that?

Q. Yes, please.

A. Where is that document? Is that in what I already have?

Q. I believe Ms. Wesenberg is going to send it to you.

A. Okay, so it will be emailed.

MS. WESENBERG: It should be in your inbox now.

THE WITNESS: No.

BY MS. FOGHI:

Q. Can I ask you all for a two-minute recess?

(A recess was taken from 9:39 a.m. until 9:41 a.m.)

(Exhibit 3 was marked for identification.)

BY MS. FOGHI:

Q. So what I would like for you to do is take a

look at the document that I just sent over and, for the record, if you can describe what it is that you're seeing on the exhibit?

A. So what I see is a memo from the State of New Mexico on February 7th, Special Education Division for the New Mexico Public Ed Department received a formal complaint against the Albuquerque school district submitted by Ms. Lipe alleging systematic violations of IDA for students attending Volcano Vista High School. MPD has completed an investigation of the complaint and issued the complaint resolution of report with this letter.

Q. In this letter it also indicates that this report requires a corrective action plan, correct?

A. Correct.

MS. WESENBERG: Objection, form, foundation.

BY MS. FOGHI:

Q. Were you aware that this PED complaint was initiated?

A. Yes.

Q. Can you tell me a little bit about your recollection with respect to that PED complaint?

A. I don't recall other than I do know there was a corrective action and we had to respond to that appropriately.

Q. What was the corrective action plan?
A. I don't recall.
Q. When you said you had to respond to that appropriately, do you recall what the response was?
A. I do not.
Q. Let me go ahead and show you -- I emailed it already to your counsel and to Ms. Kilgore and to the court reporter, 29-page document that you will see New Mexico Public Education Department Special Education Division Complaint Resolution Report. Once you receive it, please let me know.
A. Okay. I just received it.
Q. Okay, thank you. Take just a moment or two to glance over this document.
A. How much of this do you want me to review?
Q. It is extensive. I don't expect you to go through all these pages sitting here today, but my question for you is could you please for the record tell me what document you are looking at?
A. Sure. I am looking at the details of the corrective action and the expectations for Albuquerque Public Schools.
Q. What is the date on this document?
A. Let me go back up. The date is April 14, 2022.

Q. And on pages 24 through 29, please correct me if I am wrong. It indicates on this letter that "this report requires corrective action. Please see pages 24 to 29."

Is that correct?

MS. WESENBERG: Foundation.

THE WITNESS: I am getting to page 24.

BY MS. FOGHI:

Q. Well, at the very top. The cover page of this document, page 1. Do you see under the date?

MS. WESENBERG: Same objection.

THE WITNESS: Going back up. I was trying to get to page 24, so I am going back up.

Can you ask me that question again?

BY MS. FOGHI:

Q. No problem. Under the date April 14, 2022, what is indicated in the box?

MS. WESENBERG: Foundation.

THE WITNESS: This report requires corrective action.

BY MS. FOGHI:

Q. Now within -- thank you. Within this document, if you could just glance over on page 3 followed by page 4 and so on and so on, it addresses individual student issues and outlines them in this

letter as student A, student B, student C, and it goes -- it just continues on, correct?

A. Correct.

Q. The corrective action that was basically directed at APS that begins on page 24, as far as you know, was the corrective action followed?

MS. WESENBERG: Form, foundation.

THE WITNESS: As far as I know. I would say yes. We are diligent about following corrective action. I can say that in general. This isn't the only one we have ever received, and we take them very seriously.

BY MS. FOGHI:

Q. Do you recall having received this particular document?

A. I don't recall.

Q. I'd like to go back briefly to -- what I am doing now is the document -- keep it on the forefront of your mind, because I am cross referencing this PED complaint and the corrective action that you just reviewed with the September 13, 2021, email that was previously shown to you, and I believe that would have been -- it's page 16 of 35, and I am referencing, I believe Exhibit 2 was the summary of events email that came from Tatia Lipe to you

directly with Bernadette Lucero Turner copied. Can you go back to that chain of emails?
A. The original document that I had?
Q. Yes, the one that begins with "concerns," September 13, 2021.
A. What page did you say?
Q. If you just go back to that email, this email here, the September 13, 2021?
A. What page is it?
Q. Well, it contains three pages. That email is three pages long and it is Tatia Lipe's summary of events.
Do you see that?
A. What page in the document are those emails?
Q. Page 16 of 35, on the bottom. But if you need the specifics on the exhibit, I am looking at what is on my exhibit. Let's see, it would be -- I believe it starts on page 34 to 39. I hope that helps you.
A. I am getting to page 34. Okay, the email on Sunday the 12th, and then there is the concerns and.
Q. Yes?
A. Concerns.
Q. Concerns. I want you to look at the email September 13, 2021.

Do you see that?
A. Yes.
Q. That email was addressed to you as we have already established, and in this email it appears that my client summarizes events and goes into detail with respect to her concerns about not just the administration but specific students, correct?
MS. WESENBERG: Form, foundation.
BY MS. FOGHI:
Q. So this -- these concerns apparently, it appears, and please correct me if I am wrong, they were detailed in this email by Tatia Lipe to you and Bernadette Lucero, the same concerns that are now addressed as part of the corrective action plan issued by the State, correct?
MS. WESENBERG: Form, foundation.
THE WITNESS: You know, I am not sure. The lack of understanding is very open ended.
BY MS. FOGHI:
Q. What is the lack of understanding? You're talking about the concerns?
A. Correct.
Q. So what -- what I would like for you to do is just take a look at the dates that she has outlined in this email, and specifically she starts off with

8/12, principal was emailed requesting assistance guidance in regard to concerns, and then she says, "see email. No response from Mrs. Sedillo."

Do you see that?

A. I see 8/12, then I see 8/24, contacted Dr. Jewell.

Q. Correct. So this email, it appears that was addressed to you outlined specifics of her concerns, correct?

A. Correct.

MS. WESENBERG: Foundation.

BY MS. FOGHI:

Q. Hence the reason we can assume that the title of her email, "Concerns," outlines exactly what it is that she felt needed to be brought to your attention, correct?

A. Correct.

MS. WESENBERG: Same objection.

BY MS. FOGHI:

Q. It also appears that on the third page right after her signature line, she attached five specific attachments to this "Concerns" email. Do you see the reference to the five attachments?

A. Yes.

Q. These five attachments, can you please tell

us what it appears to be?
MS. WESENBERG: Foundation.
THE WITNESS: Emails to the principal to Dr. Jewell, follow-up after Friday, and one to the culinary arts teacher.
BY MS. FOGHI:
Q. And there's also one to Zuili email, following directives of Jewell.
Do you see that?
A. Yes.
Q. Do you ever recall receiving and reviewing the contents of this Requested Concerns email?
A. I don't recall.
Q. Let me direct you back to the PED complaint. If you could go to page 2 under "Findings."
A. Page 2 under Findings, General Findings of Fact, is that where you want me?
Q. Yes. Could you please take a look at the introduction of the General Findings of Fact and read the introduction into the record for me?
MS. WESENBERG: Form, foundation.
THE WITNESS: (As read) "Introduction. Complainant involves systematic -- systemic issues related to the special education students at a particular high school in the district. The

complaint named three specific special education students and alleged violations that impacted those three students and other students with disabilities at the high school. To conduct the investigation, SED reviewed a random record sample of special education students as well as the records of the three students identified in the complaint. The findings address both the review of issues raised for the three students as well as information related to the systemic issues."

BY MS. FOGHI:

Q. Thank you. And following that statement, it outlines student A, student B, and student C, and the issues and concerns, correct?

A. Correct.

MS. WESENBERG: Form, foundation.

BY MS. FOGHI:

Q. On page 7 of this report, it appears that there was a systemic findings of fact.

Do you see that?

A. Yes.

Q. Do you recall without having to go through each and every one of them, do you recall what those systematic findings were?

A. I don't recall.

Q. Your recollection or not being able to recall, is that because this is something that happens frequently and there is just too many of these problems that are being brought up and raised or what is the reason that you don't have a recollection?

MS. WESENBERG: Form.

THE WITNESS: Because of the time that has taken place since this occurred.

BY MS. FOGHI:

Q. Fair enough. Okay. I don't have any further questions for you, Ms. Elliott. Thank you for your presence today. I don't know if Ms. Wesenberg has any follow-up questions for you.

MS. WESENBERG: I do not. Ms. Elliott, you're free to go.

THE WITNESS: Okay. Thank you.

MS. WESENBERG: Read and sign. You can send it to me. We will do a four-to-a-page E-tran, please.

MS. FOGHI: Same here, Barb.

(At 9:57 a.m. the matter was completed)

WITNESS' SIGNATURE/CORRECTION PAGE

If there are any typographical errors to your Deposition, please indicate them below.

PAGE/LINE

______________________Change to____________________

______________________Change to____________________

______________________Change to____________________

______________________Change to____________________

Any other changes to your Deposition are to be listed below with a statement as to the reason for such change.

PAGE/LINE CORRECTION REASON FOR CHANGE

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

I, Linda Elliott, do hereby certify that I have read the foregoing pages of my testimony as transcribed, and that the same is a true and correct record of the testimony given by me in this Deposition on April 10, 2026, except for the changes made.

____________________ ______________________

Date Signed Linda Elliott

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

TATIA LIPE,

Plaintiff,

V. No. 1:23-cv-00899-GBW-JMR

ALBUQUERQUE PUBLIC SCHOOLS, et al,

Defendants.

REPORTER'S CERTIFICATE

I, Barbara Jean Morgenweck, CCR # 526, DO HEREBY CERTIFY that on April 10, 2026, the Deposition of Linda Elliott, was taken before me at the request of and sealed original thereof retained by:

Boglarka Foghi
FOGHI LAW FIRM, LLC
5065 Corrales Rd.
P.O. Box 944
Corrales, NM 87048
505-220-5691
foghilaw@yahoo.com

I FURTHER CERTIFY that copies of this Certificate have been mailed or delivered to all counsel, and parties to the proceedings not represented by counsel, appearing at the taking of the Deposition:

Natasha A Martinez-Wesenberg
WIGGINS, WILLIAMS & WESENBERG
A Professional Corporation
1803 Rio Grande Blvd. NW
Albuquerque, NM 87104
505-764-8400
nwesenberg@wwwlaw.us

I FURTHER CERTIFY that examination of this transcript and signature of the witness was REQUESTED by the witness and/or all parties present. On

_______, 2026, a letter was mailed or delivered to Natasha Wesenberg regarding obtaining signature of the witness, and corrections, if any, were appended to the original and each copy of the Deposition.

I FURTHER CERTIFY that the recoverable cost of the original and one copy of the Deposition, including exhibits, to Boglarka Foghi is $___________.

I FURTHER CERTIFY that I did administer the oath to the witness herein prior to the taking of this Deposition; that I did thereafter report in stenographic shorthand the questions and answers set forth herein, and the foregoing is a true and correct transcript of the proceeding had upon the taking of this Deposition to the best of my ability.

I FURTHER CERTIFY that I am neither employed by nor related to nor contracted with (unless excepted by the rules) any of the parties or attorneys in this case, and that I have no interest whatsoever in the final disposition of this case in any court.

_______________________

Barbara Jean Morgenweck,
NCRA, RPR
New Mexico CCR #526

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

TATIA LIPE,
Plaintiff,

v. No. 1:23-cv-00899-GBW-JMR

ALBUQUERQUE PUBLIC SCHOOLS et al.,
Defendants.

---

# APPENDIX A-3

## PLAINTIFF'S YELLOW-HIGHLIGHTED DEPOSITION DESIGNATIONS OF SOCORRO RODRIGUEZ

Plaintiff submits this yellow-highlighted deposition-designation material as part of Plaintiff's corrective submission. Plaintiff preserves all designations, counter-designations, objections, completeness arguments, evidentiary positions, and rights under Doc. 256, the Federal Rules of Civil Procedure, and the Federal Rules of Evidence.

Appendix 3

Attached deposition-designation PDF pages: 26

MARICOPA REPORTING

# Socorro Rodriguez

**Date:** December 8, 2025

**Case:** Lipe v. Albuquergue Public Schools, et al.
**Case** #:1:23-CV-00899-GBW-JMR

Maricopa Reporting, Inc.
https://www.maricopareporting.com/
Phone: 1-844-667-8366
scheduling@maricopareporting.com

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

NATASHA LIPE,
Plaintiff,
vs. NO. 1:23-CV-00899-GBW-JMR
ALBUQUERQUE PUBLIC SCHOOLS, et al.,
Defendants.

ZOOM DEPOSITION
OF SOCORRO RODRIGUEZ
December 8, 2025
VIA ZOOM

11:00 a.m.

PURSUANT TO THE NEW MEXICO RULES OF CIVIL PROCEDURE, this deposition was:

TAKEN BY: BOGLARKA FOGHI
ATTORNEY FOR PLAINTIFF

REPORTED BY: PAUL BACA, CCR #112
MARICOPA COURT REPORTERS
SANTA FE, NM

A P P E A R A N C E S

For the Plaintiff:

FOGHI LAW FIRM LLC
PO Box 944
Corrales, New Mexico 87048-0944
505-220-5691
BY: BOGLARKA FOGHI
foghilaw@yahoo.com

For the Defendants:

CUDDY & McCARTHY LLP
PO Box 4160
Santa Fe, New Mexico 87502-4160
505-988-4476
BY: MARY KAREN KILGORE
kkilgore@cmc.com

Also Present:

Tasha Lipe

I N D E X

Examination By:

Page

Ms. Foghi -------------------------------- 4

EXHIBITS

(No Exhibits Marked)

(Whereupon, the witness was sworn.)

SOCORRO RODRIGUEZ,

after having been first duly sworn under oath,

was questioned and testified as follows:

EXAMINATION

BY MS. FOGHI:

Q. Would you please state your full name for the record?

A. Socorro Rodriguez.

Q. And could you please tell me where you are currently employed?

A. Albuquerque Public Schools.

Q. Do you have any knowledge of why Ms. Lipe requested remote work?

A. It was right after we had to report back from the COVID remote work, which would have been around '22, if I am not mistaken.

Q. And what was the reason for her request for her accommodation?

A. She was requesting ADA accommodation to work remote -- continue working remote.

Q. Okay. Do you know the reason she provided for that request?

A. She had multiple medical conditions that she would benefit from.

Q. Okay. Now, going back, and I will come right back to this issue because that is what we are discussing with you in particular.

Can you tell me a little bit about your training and experience as it pertains to the ADA related position that you have?

A. So I do have to abide by policies and procedures for APS. Also I have taken trainings through NMSPA in which they have reviewed ADA accommodations, policies, procedures.

Q. Okay. All right. So going back to Ms. Lipe, she requested to continue working remotely. And was a decision made as to that request?

A. She was given other options, I believe, in lieu of remote work.

Q. Okay. Can you please tell me how many people during this time period were given the accommodation to work remotely?

A. As far as teacher capacity, I don't believe that there is -- because I believe social workers fall under the teacher negotiated agreement, I would say I don't have anybody working remotely as far as teacher-wise.

Q. Okay. So Tasha would have been related

services provide- -- a related-services provider. Were there any other related-services providers during that time period?

A. These are looked at case-by-case. So off the top of my head, I could not tell you.

Q. But were there any, as far as you remember?

A. As far as related services?

Q. Yes.

A. I would say that there is some, yes.

Q. During the time period when Ms. Lipe requested that accommodation, were there any other related-services providers who were given the opportunity to work remotely?

A. I would say there were some. They are looked at case-by-case.

Q. In this situation were you the person who looked at Tasha Lipe's case to determine if she was someone that you would grant an accommodation to?

A. Again, that is not my decision. I would go off of the supervisors -- well, these are reviewed with supervisors that are directly supervising the individual to see if -- and, again, case-by-case given their medical disabilities. There are many factors, disabilities, ADA

accommodations as far as we review medical documentation provided to us, and these are reviewed directly with supervisors, taking into consideration the job description as well.

Q. In this particular case with respect to Ms. Lipe, who made the decision to deny her request?

A. Supervisors.

Q. Who in particular? Who was the supervisor?

A. I believe I had a site supervisor and a district supervisor that indicated that this was not in -- something that they could work with.

Q. Can you name the individuals that you are referring to?

A. I don't recall last names. I do remember site supervisor was Justin and district supervisor was Bernadette.

Q. Okay. So they would have been the one that would have made the decision not to allow this accommodation?

A. They had indicated that this was not something that they could accommodate.

Q. Okay. Do you recall having a conversation with my client over the phone with respect to her specific situation and request?

A. Yes.
Q. And do you remember the nature of that conversation, what Tasha may have told you?
A. I remember to some extent, yes.
Q. Please tell me what you remember.
A. I do remember that in our conversation she had requested that she would be looking into remote work, and I had indicated, as me being the ADA coordinator, I wanted to explore other avenues just in case that was not something that could be facilitated to her, that she come in with other options that -- to give her time to think about it instead of just saying if the -- if during the meeting they could not accommodate that she be blindsided, like, didn't have the time to explore other accommodations.
So I did ask her what other things would you consider if remote work was not an option.
Q. And what did she tell you?
A. I remember her saying she really wanted remote work. She was wanting to explore that avenue.
Q. Okay. Do you remember receiving or having seen a doctor's note from my client that specifically addressed the remote request only

during periods of her flare-ups as opposed to full time?

A. I don't recall.

Q. Okay. So you do not remember ever having seen that letter and passing that on to the supervisors?

A. I don't remember exactly right now what the letter entailed.

Q. Okay. But regardless of all of that, that information would have been decided by the higher-ups, not by you?

A. Again, the recommendation is highly considered, yes.

Q. Highly considered.

My question is a simple one. I am not asking for whose opinion is highly considered. I am asking for who was the individual that ultimately made the decision not to allow her to work remotely during periods of her flare-ups?

A. Supervisors.

Q. Not one but several and you mentioned Griego and you mentioned Bernadette Lucero-Turner, am I correct?

A. Correct.

Q. Is there anybody else?

A. No.
Q. Is FMLA -- is FMLA considered under the ADA Act an accommodation?
A. Yes.
Q. Okay. Would you agree with me that FMLA, Family and Medical Leave Act, it is not exactly an accommodation. In fact, would you agree with me that it is a separate federal law providing unpaid job protected leave?
A. Can you repeat the question?
Q. FMLA, Family and Medical Leave Act. Would you agree with me -- well, you stated that in your opinion it is an accommodation.
Would you agree with me that FMLA is a separate federal law that provides unpaid leave, job protected unpaid leave?
A. My understanding of FMLA is that it could be paid leave as well, that is why I considered it an option. If they have accruals, they could utilize that as FMLA. That is why I believe this is an option.
Q. Okay. And FMLA is 12 weeks, correct?
A. To my understanding, yes.
Q. So to your understanding, but if your role is -- if your particular job description and role is

being a part of the ADA section of the institution, isn't this something that would be important to really understand the distinction of what FMLA is?

A. Yes. To my understanding is that FMLA intermittent leave is not fully utilized, they can continue extending it out. So that is why, again, I can -- my belief is that this would be an option.

Q. Okay. This process of requesting leave by anyone, is this -- would you consider this to be an interactive process?

A. Yes.

Q. And describe to me what you mean by interactive process.

A. Where both the employee and the supervisors engage in exploring accommodations for which the employee will be able to fulfill their central job functions.

Q. Was Tasha Lipe provided any of these alternatives?

A. What I do recall is that she -- she was given FMLA. And then we also discussed, I believe it was heat and cooling where she was -- I am trying to recall. She was wanting to be able to have control over these heat and air conditioning, which we did talk about as well.

Q. I guess the question I have is -- yes, thank you for letting me know what you talked about.
But in terms of what was actually done in order to assist her, can you elaborate on that?
A. Again, I had referred her out to look into FMLA. I also talked about if she could consider making appointments before or after school as another option, and those were the things that we talked about.
Q. Okay. The heaters and air conditioners that were discussed, did others have that accommodation provided to them, heaters and air conditioners?
A. Yes. I've had others who bring their personal heating devices or fans to help mitigate or control or umbrellas as such, or things that we discuss.
Q. Do you-all provide those things as an accommodation or do you let the individual handle that?
A. For the most part. If they can't, they don't have access to a thermostat, yes, they are allowed to bring their personal.
Q. With respect to the verifications that you signed off on in this case, do you remember having

signed a documentation called a verification?
A. Verification, can you elaborate as far as what verification of what.
Q. Well, were you asked to provide and produce documents in this case?
A. I believe so, yes.
Q. As part of that production you have to sign something called a verification that had to be notarized that stated that these documents are provided by you, they have been reviewed by you, they are accurate and so on.
Were you producing some documents that complied with that?
A. I believe so, yes.
Q. Do you remember what you produced?
A. I do not.
Q. Okay. In your verification one of the things that you indicated was that documentation that allowed others to work remotely, those documents existed, but they were not in an e-mail electronic form, they were in paper form and that they would be provided and supplemented.
Do you remember stating that?
A. Again, I am going to ask Ms. Kilgore to answer that question.

Q. Well, you are the one being deposed, it is not Ms. Kilgore. So you have to answer the question because you verified documentation that has been provided here. You put your signature on it before a Notary. I am asking you, what documents did you provide and why have we not received documentation that you claim exists only in paper form.

MS. KILGORE: Objection, form of the question. I am not sure that that is what she said, but go ahead and ask her what she provided or whatever, but I object to that question, form.

MS. FOGHI: No problem.

Q. (By Ms. Foghi) What documentation did you provide in this case as part of the discovery request?

A. I don't recall, honestly, what I submitted.

Q. Are there documentation that exists in this case that has not been provided to us as of yet?

A. As far as what?

Q. Any documentation you were asked to provide?

MS. KILGORE: Are you asking if Ms. Rodriguez has provided me with everything she

has that's been requested?

Q. (By Ms. Foghi) I will ask more directly.

In your interrogatories, in the interrogatories that have been provided in this case, you indicated as an answer to the interrogatory that you did not have records electronically, but you do have them in paper form.

A. I have as part of the ADA enacted for each individual, I have medical documentation, I have what the accommodations were as part of their ADA file. So, yes, I would have, but I would have to go through every employee to come up with specifics so --

Q. So that has not yet been supplemented. We don't have that information that we had requested.

Are you aware of that?

A. If that is the case, then, yes.

Q. Are you able to provide those and produce them to me?

A. I would have to go through one-by-one to find out the answer to your questions.

Q. Okay. All right. I will ask you after this to continue to be responsive to the request.

Now, with respect to your training, FMLA training, tell me what type of training you have

received.
A. Again, as far as FMLA, that is not my role.
Q. Okay. Do you have any training in FMLA?
A. I would say no.
Q. Okay. Tell me the extent of the training that you have received an ADA accommodations.
A. It is strictly in ADA.
Q. Okay. But you are clearly aware, I think you testified to this, that you do know of related-services providers who had received accommodation to work remotely?
A. Again, these are reviewed case-by-case so --
Q. That was not my question. That was not my question.
My question for you was not whether they were reviewed case-by-case. I think we can all agree that it has to be reviewed case-by-case.
My question to you is, are you aware of other related-services providers who received the accommodation to work remotely during the time period that my client was with APS?
A. Yes.
Q. Thank you.

And you are able to provide me with that documentation if I ask you to, correct?

MS. KILGORE: Are you talking about for other employees?

MS. FOGHI: Correct. Who received the accommodation to work remotely when my client was denied that accommodation. That is my question.

A. Again, I would have to look, look at all the files to determine.

Q (By Ms. Foghi) Sure. And I can follow up with Ms. Kilgore. I definitely need you to go ahead and do that.

Do you remember participating in an investigation in this case?

A. No.

Q. Do you remember being interviewed as part of an investigation in this case?

A. I don't recall.

Q. Okay. Do you remember speaking to a gentleman by the name of Mr. Barrera?

A. Not specifically on this case.

Q. Okay. So would it surprise you if I showed you a document where you were giving a statement to an investigator by the name of Mr. Barrera who authored a report called The Barrera

Report?

MS. KILGORE: Yeah. Her answer was that she does not.

MS. FOGHI: That she does not remember.

MS. KILGORE: She doesn't -- she didn't deny being interviewed by him, she just couldn't remember if it was in this case.

Q. (By Ms. Foghi) Okay. What else do you recall or can tell me specific to this case involving Ms. Lipe?

A. That is what I remember.

Q. So the only thing you remember is her one request that she made to allow for remote work post-COVID as a result of her flare-ups, correct?

A. Correct.

Q. And that that decision was passed on to Justin Griego and Bernadette Lucero-Turner, correct?

A. Correct.

Q. And that decision to deny her was made by those two people, correct?

A. Correct.

Q. And you had nothing to do with that decision?

A. I gave insight as far as, you know, if there were no remote work, what other options could

we look at, which, again, I thought intermittently would be good in this scenario.

She had multiple medical conditions that I might, and in my personal opinion when you have flare-ups, the last thing you want to do is work. You want to tend to yourself, and that was what I was conveying to her. If she had multiple medical conditions, she wanted to make sure that she was able to tend to herself instead of working.

Q. Correct. And that is where the doctor's note became a significant part of consideration recommending that she be allowed to work remotely during flare-ups, correct, in order to take care of herself?

A. Correct.

Q. Okay. Would it surprise you, Ms. Socorro, if I told you that others believe that you have made this decision to deny her request?

A. Again, I am in an interactive process. I heavily ask the supervisors because they work directly with the employee to tell me if they can or cannot work with the request from -- again, the way I see medical documentation provided to my office is a recommendation. It is an interactive process between employee and supervisor to see what they can

and cannot work with.
Q. You are sort of the intermediary, correct?
A. I'm sorry?
Q. You are sort of in the middle?
A. Correct.
Q. Okay. Getting back to the FMLA itself, is it your testimony today that FMLA is not an ADA accommodation or that, or if it is an ADA accommodation?
How do you understand FMLA to be?
MS. KILGORE: Objection, form of the question.
Q (By Ms. Foghi) Do you regard FMLA to be an ADA accommodation?
A. I see it as an option to be able to not only safeguard their job but also to allow them to take time off to tend to their medical condition.
Q. All right. So that is your understanding of FMLA?
A. Correct.
MS. KILGORE: Objection. Mischaracterizes her answer.
Q (By Ms. Foghi) Well, go ahead and restate your answer about your understanding about FMLA and ADA?

A. It protects your job and also gives you the ability to be off of work to tend to your medical needs whether it be medical or to attend to appointments.

Q. Okay. The job that you are currently holding is the same job that you held during the time that Ms. Lipe was working with the school?

Do you have the same job today as you had back in 2021, 2022?

A. Yes.

Q. Okay. I think you mentioned you have been in this position now for five years?

A. Correct.

Q. Okay. Do you have to continue to undergo training with respect to your job?

A. It is ongoing, yes.

Q. How often do you have trainings?

A. I would say a couple of times a year.

Q. Okay. And what is the extent of that training?

A. Understanding any updates or changes to ADA.

Q. Okay. Do ADA meeting minutes exist?

A. I don't know.

Q. When you have gatherings to discuss ADA

requested accommodations, are there minutes kept of those meetings?

A. I don't know. I am not -- I don't know what the host keeps or not. That is not something that I am privy to.

Q. Well, what do you do? When you are sitting down meeting with, for example, my client, do you take notes, do you record it, what is the process that you utilize?

A. I think I kept some notes, I am not too sure.

Q. You have those available?

A. I will look into that.

Q. Okay. So your notes and other things that need to be supplemented, you will look into those. Okay.

MS. FOGHI: I don't believe -- let's see, just a moment, please. I don't think I have anything else. Thank you for your time and Ms. Kilgore has an opportunity to follow-up if she has anything.

MS. KILGORE: I don't have any follow-up, at this time.

MS. FOGHI: Okay. Thank you very much. I appreciate you coming early as well.(Proceedings concluded at 11:42 a.m.

WITNESS SIGNATURE/CORRECTION PAGE

If there are any typographical errors to your deposition, indicate them below:

PAGE/LINE

______________ Change to __________________________________

______________ Change to __________________________________

______________ Change to __________________________________

______________ Change to __________________________________

Any other changes to your deposition are to be listed below with a statement as to the reason for such change.

PAGE/LINE CORRECTION REASON FOR CHANGE

__________________________________________________________

__________________________________________________________

__________________________________________________________

__________________________________________________________

__________________________________________________________

__________________________________________________________

I, SOCORRO RODRIGUEZ, do hereby certify that I have read the foregoing pages of my testimony as transcribed and that the same is a true and correct transcript of the testimony given by me in this deposition except for the changes made.

_____________________________
SOCORRO RODRIGUEZ

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

NATASHA LIPE,
Plaintiff,
vs. NO.
1:23-CV-00899-GBW-JMR
ALBUQUERQUE PUBLIC SCHOOLS, et al.,
Defendants.

CERTIFICATE OF COMPLETION

I, Paul Baca, CCR #112, DO HEREBY CERTIFY that on December 8, 2025, the Deposition of SOCORRO RODRIGUEZ was taken before me at the request of Boglarka Foghi, and the sealed original thereof was retained by:

FOGHI LAW FIRM LLC
PO Box 944
Corrales, New Mexico 87048-0944
505-220-5691
BY: BOGLARKA FOGHI

I FURTHER CERTIFY that copies of this certificate have been mailed or delivered to the following counsel and parties not represented by counsel appearing at the taking of the deposition:

CUDDY & McCARTHY LLP
PO Box 4160
Santa Fe, New Mexico 87502-4160
505-988-4476 BY: MARY KAREN KILGORE

I FURTHER CERTIFY that examination of this transcript and signature of the witness was requested by the witness and all parties present.

I FURTHER CERTIFY that the cost of the original and one copy of the deposition to BOGLARKA FOGHI is $__________.

I FURTHER CERTIFY that I did administer the oath to the witness herein prior to the taking of this deposition; that I did thereafter report in stenographic shorthand the questions and answers set forth herein, and the foregoing is a true and correct transcript of the proceeding had upon the taking of this deposition to the best of my ability.

I FURTHER CERTIFY that I am neither employed by nor related to any of the parties or attorneys in this case and that I have no interest in the final disposition of this case in any court.

________________________

PAUL BACA, RPR, CCR
Certified Court Reporter #112
License Expires: 12-31-2025

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

TATIA LIPE,
Plaintiff,

v.

No. 1:23-cv-00899-GBW-JMR

ALBUQUERQUE PUBLIC SCHOOLS et al.,
Defendants.

---

# APPENDIX A-4

## PLAINTIFF'S YELLOW-HIGHLIGHTED DEPOSITION DESIGNATIONS OF STEPHANIE AVILA

Plaintiff submits this yellow-highlighted deposition-designation material as part of Plaintiff's corrective submission. Plaintiff preserves all designations, counter-designations, objections, completeness arguments, evidentiary positions, and rights under Doc. 256, the Federal Rules of Civil Procedure, and the Federal Rules of Evidence.

Appendix 4

Attached deposition-designation PDF pages: 78

# Stephanie Avila

**Date:** April 7, 2026

**Case:** Lipe v. Albuquerque Public Schools, et al.
**Case Number:** 1:23-cv-00899-GBW-JMR

Maricopa Reporting, Inc.
Phone: 480-597-4744
scheduling@maricopareporting.com
https://www.maricopareporting.com/

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

TATIA LIPE,

Plaintiff,

V. No. 1:23-cv-00899-GBW-JMR

ALBUQUERQUE PUBLIC SCHOOLS, et al,

Defendants.

DEPOSITION OF STEPHANIE AVILA
April 7, 2026
9:00 a.m.
VIA ZOOM VIDEOCONFERENCE

PURSUANT TO THE NEW MEXICO RULES OF CIVIL PROCEDURE, this Deposition was:

TAKEN BY: Boglarka Foghi, Esq.
Attorney for Plaintiff

REPORTED BY: Barbara Jean Morgenweck, RPR,
NM CCR#526
MARICOPA REPORTING, INC.
1480 E Bethany Home Rd. Suite 115
Phoenix, AZ 85014

A P P E A R A N C E S

On behalf of the Plaintiff:

Boglarka Foghi
FOGHI LAW FIRM, LLC
5065 Corrales Rd.
P.O. Box 944
Corrales, NM 87048
505-220-5691
foghilaw@yahoo.com

On behalf of the Defendant:

Natasha A Martinez-Wesenberg
WIGGINS, WILLIAMS & WESENBERG
A Professional Corporation
1803 Rio Grande Blvd. NW
Albuquerque, NM 87104
505-764-8400
nwesenberg@wwwlaw.us

Karen Kilgore
CUDDY & MCCARTHY, LLP
1701 Old Pecos Trail
P.O. Box 4160
Santa Fe, NM 87502
505-988-4476
kkilgore@cuddymccarthy.com

Also Present:

EXAMINATION INDEX


| | PAGE: |
|---|---|
| STEPHANIE AVILA: | |
| Examination by Boglarka Foghi | 4 |
| Examination by Natasha Wesenberg | 60 |


INDEX TO EXHIBITS


| EXHIBIT: | DESCRIPTION | PAGE: |
|---|---|---|
| Exhibit 1 | Service Schedule | 33 |
| Exhibit 2 | 43 Page Document, Page 12 Communication from Lipe to Avila | 41 |

STEPHANIE AVILA,
Having first been duly sworn, testified as follows:
EXAMINATION
BY MS. FOGHI:
Q. Good morning. I am attorney Boglarka Foghi. I represent the plaintiff in this case, Tatia Lipe. Are you aware of the reason you're present here for the deposition?
A. Yes.
Q. Thank you. So just for the record, it looks to me Karen Kilgore is present. She is on mute. Of course, we have counsel for APS. My assistant paralegal who is also happens to be a client in this case, she is most likely going to be logging on as well. I don't see her on it right now, but I think she will be logging in.
So, Ms. Avila, today the deposition, it's a statement that basically a series of questions that I will be asking you, along with documentation that I may also be showing you throughout this deposition.
You have an attorney who is present there today who might be posing objections. If either party speaks during the deposition, we have to stop talking and allow that party to raise their concerns, their objections, whatever they might have to add in

the midst of the testimony. Just be aware of that. It's important for the court reporter to be able to take things down without interruption as one party at a time speaks in this case.

Today you are here as somebody who is essential in this matter to be deposed. I will begin with the questions when you are ready.

A. I am ready.

Q. Okay. Thank you. Ms. Avila, would you please state your full name for the record?

A. Stephanie Avila.

Q. Could you please tell me, where do you currently reside?

A. Albuquerque, New Mexico.

Q. Are you currently working for APS?

A. Yes.

Q. How long have you been working with APS?

A. September of 2018 until present.

Q. What is your current position at APS?

A. I am a school social worker.

Q. During 2022 and the 2023 school year, what was your position at APS?

A. School social worker.

Q. Okay. What degrees do you have that make you a social worker?

A. I have a Bachelor's of Arts Anthropology from UC Berkeley and Bilingual Bicultural Clinical Social Work degree from New Mexico Highlands University. If that education is not sufficient, I also have a license.
Q. So that is -- I was going to ask you: What is your license?
A. I currently am a licensed clinical social worker.
Q. Thank you. Did you possess that license in 2022/2023?
A. No.
Q. When did you get that license?
A. My goodness. Based on memory, 2025, I believe. That I cannot guarantee without having to check my paperwork, but it was after the 2022/2023 school year.
Q. Can you please describe your day-to-day job? Tell me what your day-to-day employment is like.
A. My apologies. I got water down my throat. Usually what I do is I arrive. I check my calendar for the day to see if I have any meetings with students. I check my schedule for the day. I have a list of students I see on specific days of the week. I check to see if any of my students are absent.

Then I go through. I do have, for my own use, suggested times that I see specific students. So my goal is to always follow ISDEA, I pull students during their special education learning time. School social work is intended to support their access to their special education learning.

Q. Prior to your starting this position at APS in September of 2018, did you have any experience in the field of social work?

A. I worked for Children's Youth and Family Department from approximately September 2017 to September 2018.

Q. So approximately, you had approximately one year experience in the field before you started with APS, correct?

A. Yes.

Q. Okay. Did you also serve as a union rep?

A. In 2022 to 2023, I served a volunteer position of a union rep.

Q. What did that involve?

A. What that usually involves is having a meeting where any new members can come and share their concerns. With all that information we attend related and service provider or ancillary provider -- union meetings so it would be representative for the

speech language pathologists, for the counselors, OT, PT, nurses, all those come together from the whole district and we discuss the concerns our new members have brought to us, and we take that to the person in charge of us, and they take it to the president, and then we are also asked to participate in a general meeting where the union president disseminates information, access to share information with our union members.

They sometimes they say, Oh, we want to get a survey done. Please encourage your union members and your role group to participate. We want to get a full idea of what their view is. So we would take that back to our union members. We would share that information via email. We would host meetings and we did provide our contact information in case anyone had concerns that they wanted to send us a quick email. And then weekly, I made sure to get the information that the union was sending us and send it out to the role group. My best intention was always to send it on a Friday. Sometimes things happen and they would send it after my duty days, so I would send it on a Monday, just the way the workday would end up working out. I am not sure if you're aware, but school days vary. The workday varies depending

on location, so schools get to set their own bell schedule. So the union had quarters, did their thing. They informed us our job was to disseminate that information.

Q. Okay. What kind of scheduling or service delivery issues came up most often from school social workers?

A. Just varies. I definitely encountered students who don't want to leave their room to participate in social work, so for students who have done that more than twice, I will bring activities to them. So maybe I will support them in using self-regulation skills --

THE COURT REPORTER: Requesting clarification.

THE WITNESS: While trying to read or strategies that a student can use to initiate class work.

BY MS. FOGHI:

Q. So I think you have answered. You're answering the question about what kind of practical issues come up with the students. What kind of issues come up with social workers versus students?

A. So if a social worker is required to attend a mandatory meeting, they may not be able to see a

student that day. If a social worker is being asked to participate in an IEP, which is an annual, generally, an annual meeting where the IEP team comes together to discuss a student's progress, such as, new goals, potentially suggest either an increase or a decrease in social work service time. So if that comes up, then you may not get to see your scheduled students at that time. If there is a specific training that you are being required to participate in, then you would not be available that day to provide social work services, and of course, if you are out on, for example, sick leave, like if you have a personal health appointment, you may not be available that day to see the student.

Q. Okay. So I think that you did answer a few additional questions for me, all in one, but let me follow-up with, were there any issues that ever were raised with respect to documentation when these meetings were held, specific documentation?

MS. WESENBERG: Objection. You can answer.

THE WITNESS: I'm sorry. I don't understand the question. Do you mean like for a mandatory meeting?

BY MS. FOGHI:

Q. Any kind of meeting?

A. Oh, well, it is standard practice, you go in when you're back, and you note, the provider was absent, or provider was unavailable, and in the details, you can put for -- since activity outcome plan activity was, for example, intended to see a student. Outcome would be provider was absent and unable to meet with student. Plan would be meet with student to make up service time missed.

Q. Now with respect to school schedules, because I think you mentioned that all schools had a different schedule, how were those handled, the issues that would come up with school scheduling?

MS. WESENBERG: Form.

(The court reporter read back the last question.)

THE WITNESS: So this does vary by grade level. For example, in kindergarten through fifth grade, we do have recess. We have what are called pull outs or push outs, which can vary depending on the school preference, and then the typical learning time and the special education learning times, so for kinder through fifth, it would be my responsibility to work with the special education teachers to find out when the student will be with them and then that would be the student's availability for me to provide

services. So I would be managing -- the caseload would be working with the special education school staff to determine the student's appropriate availability and then create a schedule based on that.

BY MS. FOGHI:

Q. Okay. Now I want to just have you clarify for me, how is the student's absence treated versus providers non-performance?

MS. WESENBERG: Objection, form. You can answer, Stephanie.

THE WITNESS: When a student is absent, we are not required to make up that time; however, if a student has continued absences, so for example, in high school if I have a student who always misses first period, they always come to third or fourth and maybe even have a special education class third or fourth, then I am going to adjust my schedule to see them when they're going to be onsite.

BY MS. FOGHI:

Q. So in a small amount or minimal amount of absence is something that you would handle, but if it's a repeated or continued absence, that is a different story, correct?

A. Correct. Also in high school you may have

students who are half-day students, especially the seniors. They're only onsite for half the day, so if you schedule to meet with that student when they are offsite or they don't have classes, then that's not an effective offer of social work services.

Q. Now with respect to providers non-performance, so if a provider is not performing up to par, how is that treated?

MS. WESENBERG: Objection, form.

Stephanie, just to be clear, you can answer after my objection unless I specifically tell you not to, so if you hear me say, objection, form, and I don't say, Stephanie, don't answer that, just disregard what I am saying and go about answering the questions.

THE WITNESS: Thank you. I must admit I am a little confused by the question. So would it be okay if I answer the way I understand the question?

BY MS. FOGHI:

Q. Yes, please do.

A. So if a provider -- or when a provider is absent or unavailable to provide services, it then becomes the provider's responsibility to make up the service time. To make up the service time usually entails trying to see the student on another day than

you would normally see them. It becomes a little bit more complicated at the high school level because in high school they have different schedules based on the day of the week. So if you usually pull a student, say, during fourth period, there are three days of the week that you couldn't pull a student during fourth period. The other two days it's the opposite schedule, you have one, three, five and seven, so even if the student is there, it wouldn't really be an option unless you completely change their schedule.

Q. That was my next question. Is pulling the student when you're trying to make up the time that you have missed, students can't just be pulled -- right -- from any class. It has to be during the certain time period, correct?

MS. WESENBERG: Objection, form.

THE WITNESS: It depends on their IEP. So, for example, if a student has an individualized education plan specifically to support their English language learning, then that is the only class you can pull them from. If the student has additionally math goals to support their mathematical development, then you could also pull during math class. So it depends specifically on the student's IEP what

classes you can pull them from.
BY MS. FOGHI:
Q. Okay. Now let's talk about your involvement and actual specific knowledge of my client, Tatia. When was the first time you met my client, Tatia Lipe?
A. November 2022.
Q. And can you explain the context? How did you meet her? What was the context that you met her in?
A. I was with a student and with the social liaison, Jessie Macfarland, and that was the first time I remember meeting your client face-to-face.
Q. Okay. What was your impression of my client when you first met her face-to-face?
A. What kind of impression are you looking for?
Q. Your impression of her. It is not for me to say what my impressions are. I am asking you, when you first met Tatia at the school in November of 2022, tell me the context in which you met her and what were your impressions of her as you met her?
A. Okay. Physically she was well dressed. She had a beautiful pair of shoes on. In terms of engagement, I think your client wanted to, if I remember the subject matter, to discuss the students that I would be working with. We had a student with

us, and I did not feel comfortable having discussions about case transfers or student staffing while a student was present such because of things like HIPAA, I just thought the social worker needed to take the lead.

Q. Were you involved at this point in time with her students or any of her students?

A. That was my first time meeting students. My first student and my first day onsite.

Q. Would have been November of 2022?

A. Yes, I don't have the specific date in my memory right now, but I have it via email.

Q. So that was the first time that you would have been meeting with a student, correct?

A. That the student was present.

Q. Whose student were you meeting with? Was that a student assigned to my client or was that a student that was given and assigned to you?

MS. WESENBERG: Form, foundation.

THE WITNESS: It was explained to me that these were not my students, that I was there in a support position and to make it clear to any students I met with that this was an effort to support them and to support your client and that I was not in charge of the student.

BY MS. FOGHI:
Q. Okay. So what was your understanding of how you were going to support my client?
A. My understanding, I was there to provide support by helping make up minutes, and I was only to do that if your client was not onsite.
Q. So was there ever a time that you can recall when you might have been in a meeting regarding my client's students at any point in time with, let's see, would have been with, I believe, Mr. Macfarland, Jessie Macfarland? There may have been someone else present at that meeting. Do you recall ever attending a meeting with Jessie Macfarland, yourself, and possibly my client where she was basically told that she needed to go to Mr. Griego versus discuss the matter between all of you that pertained to a student? Do you recall that meeting?
MS. WESENBERG: Objection, form.
THE WITNESS: I'm sorry. First, I would like to clarify, Jessie Macfarland is a woman, and she goes by she, her, and Ms. instead of Mr. Second --
BY MS. FOGHI:
Q. No problem. Go ahead.
A. Second, I would like to share that I do not recall an in-person meeting. I recall receiving an

email.
Q. Tell me about the meeting. Tell me about the email you received, that you recall.
A. From my memory without anything in front of me, this is an email exchange, and Ms. Jessie, your client, and Justin Griego were all involved, and it was recommended that we contact Mr. Griego, I believe, but I don't remember an in-person meeting.
Q. During this time period, and I will jump back and forth a little bit because we're still talking about November of 2022, were you also working for the academy online program?
A. The academy K through 8 is an online school that is a member of APS and, yes, I was working for the academy K through 8.
Q. Now as you mentioned to me you met with Tatia for the first time and your goal and objective and what you understood your role to be was to provide assistance to my client in the event that she was unable to meet her minutes, correct?
MS. WESENBERG: Form.
THE WITNESS: Close. I was not there to be an assistant to your client. I was there to insure students received their service minutes per their IEP.

BY MS. FOGHI:
Q. Right, so my question wasn't that you were the assistant to my client. My question was you were providing assistance in the event that the service minutes were not met, correct?
A. Correct.
Q. Can you please explain to me how a social worker actually gets access to students during the school day?
A. That varies based on the social worker.
Q. Well, how do you understand it to be, can you speak about when you say "varies based on social worker," how does that vary based on social worker? Why does it vary?
A. I would be happy to explain. I have worked with students from -- at APS from preschool all the way to seniors in high school. Depending on the level of student ability and depending on their functional behavioral assessments or behavior intervention plans, I may need to go to the classroom to escort the student into a session with me. If I have a runner, which is a term I used to describe students who do not want to be in the classroom, but don't necessarily want to come to the social worker and they would rather go out and play in recess or

find a teacher they enjoy, rather go spend time there, those are students that I will personally go pick up and bring them to me. That is usually my preference because when I am meeting a student for the first time, it gives me a chance to say, Hello. I do have -- there are some people who will send a render,(ph), which is a student aid in high school levels a note and ask a student aid to go fetch a student for the social worker. I don't feel comfortable with that process because for me there is always a little bit of a HIPAA violation. You don't need to know, but if you have introduced yourself as a social worker and you're sending a student to get another student, then it's clear you're meeting with a student social worker, so primarily, I would prefer to call, and say, Hi, is the student in today? If they are, then I will go get them.

Q. What would make it difficult for you to have access to a student? What would be an example of that?

A. If the student is on an assembly schedule, so it is a school-wide event. If there is a school-wide event, the student is unavailable, and I will not pull them during an assembly, which is intended to be a school-wide process, or if they are on a field

trip. So they're not onsite and cannot pull a student if they are going somewhere local for class field trip.

Q. But for any other reason you have the ability to pull the student from the class, correct? Unless it interferes with assembly or field trip or simply that the student is not there, correct?

A. Are you asking for in person or online?

Q. Let's talk about in person, first. Then we can talk about online as well.

A. Sure. So assembly, field trips, student absence, class party -- right -- sometimes there are things like student led conferences. I can't pull a student from that. They are part of the conference. Parent/teacher conferences. If we have an asynchronous learning day, depending on the setup for my school, I may not be able to meet with them, but I could provide asynchronous learning opportunities for a student.

Q. That would be in person, right?

A. Yes.

Q. How is online different?

A. Well, online, we have a system called co guardian, so it is a little more challenging online. In person if a student is present for first or second

period, they're generally going to be there all day. If unless you have a half-day, you know, senior or a student who has a class at a different school, and then they are on a bus and gone. Online if my student has logged on to attend classes, sometimes you may have an 8th grader who goes to first, second, fifth, seventh, it's a little bit more challenging online because a student can be present for their favorite teacher, leave for the next, come back for the next favorite teacher, so it definitely it's more active in terms of a student being online.

Q. Okay. How do class schedules affect whether student can be pulled? Would it be the same answer you just provided, class schedule? Does a class schedule have any bearing on whether a student can be pulled if you needed them?

A. Well, going back to my earlier question, yes, if the student is in a general education class or for high school language an elective, I am not going to pull them. You can't.

Q. Okay. Would you pull a student if there was a school-wide event?

A. No.

Q. Okay. How do teacher concerns or academic demands affect whether a student can be seen?

A. Well, if a student is taking a test, for example, one of the beginning of year, middle of year, or end of year testing, which is meant to determine and assess how much a student has progressed or maybe they haven't progressed, these are things I am not allowed to interrupt if they are state sponsored testing events or school-wide testing events. These are handled differently based on the school which does involve talking to teachers and staff. At the academy, K through 8, we have designated days that are considered testing days for specific grade levels, and on those days for that grade level, you cannot pull because it can interfere with the test results.

Q. Now unavailability of a student -- right -- the word "unavailability" can come from many different -- it can be interpreted many different ways. In this situation as it comes to social work, how would you define unavailability of a student?

A. A student is unavailable, I usually explain school-wide testing. If a student is unavailable due to school-wide testing or assembly schedule or on a trip, so I try my best to always define unavailable in my MaxCapture note.

Q. Does the time have to be made up if a student

is unavailable?

A. If it's something from the school or the State, no, because those things are not common. You get your three testing, beginning of year, middle of year, end of year -- right -- the assembly schedule, they usually send that out so, for example, if it's a long assembly schedule, there are specific time changes, so then talk to the teacher and say, hey, I know it's a shorter class period than usual, can I pull them during a class period even if the time has changed, right? So your assembly schedule can sometimes really affect the day. Now if the class is now shorter than 30 minutes, you're supposed to see your student for 40, it's not going to work.

Q. So for example, let me give you another example. If there is a fire drill happening at school. I guess you guys call it ALICE drills, unplanned drills that come up, would that be something that in your opinion would be -- would make the student unavailable?

A. It would, but a social worker who has good or who has any rapport with the school will usually be emailed. School staff know when ALICE drills are happening and they know when fire drills are happening. They are two different things.

I did have at least one ALICE drill at Volcano Vista, so I can say that I did put unavailable due to ALICE drill or unavailable due to fire drill, and then I helped my students process the experience when I was able to do so.

Q. What if a student is seeing a nurse? Would that render the student unavailable?

A. That depends. Is the student seeing a nurse for medical need? Is the student experiencing anxiety, in which case they can come with me, get a sensory break, listen to some calming music, participate in self-regulation strategies to help them manage. That varies. I will offer the student to come with me if they want to with the understanding they can go back to the nurse if they want to after, but I do not take a student from the nurse. I give them the option. Do you want to come with me? It is a quiet room. Nobody is vomiting. There is no blood in my room. Just come with me for half an hour and we can just do some self-regulation strategies or listen to some calming music, and if you're not feeling well, we will come right back.

Q. Can you tell me what is asynchronous learning?

A. So asynchronous learning as a phrase, it is a

definition that has evolved over time. Would you like to know what it meant in 2022?

Q. Yes. Thank you.

A. In 2022, asynchronous learning meant that we were being encouraged to provide materials to students that they could engage in social emotional learning while not present on campus.

Q. Okay, what does it mean today?

A. Usually, it is very similar except that if a student doesn't complete it because we did bring up equity concerns. Not all students across the entire district have access to Chromebooks, have access to the internet, participate in Google classrooms, have families who know how to use technology. There are a lot of barriers which could affect a student's ability to engage in asynchronous learning in Albuquerque Public Schools, especially because we no longer have the same funding we did where I believe -- and I believe in 2022, we were still helping students with internet hot spots, but we didn't have enough for every student to have an internet hot spot, so there were equity concerns brought up. They were like, well, if you don't have access to a printer, can you print out material and send home? If you send a video, who knows if they have internet?

So today asynchronous learning we are being asked to provide material and services. If a student does not complete it on their own, then we offer it the next week. So they still get the opportunity to engage in person with the material if they didn't get to complete it asynchronously.

Q. What are the difference between core classes, core classes versus elective periods?

A. So electives is that is the fun stuff; woodworking, mechanics, yoga, swimming, PE, weight lifting, art, music, learn to play piano and play the guitar. Electives are the, quote, unquote, fun stuff.

Core classes typically are some type of math, some type of English, usually a science, and depending if they're in middle school or high school, some type of social studies or history. It could also be a government class or like a class on law and ethics, depends on the school.

Q. Getting back to the students and pulling the students out of class as needed as we previously discussed, would it be inaccurate to suggest that a school social worker can always pull a student on demand?

A. Well, I would say most times, yes, if you

have already communicated the window of time with a teacher.

Q. This is not communicating the window of time. This is on demand, so say?

A. Just show up?

Q. Just show up. Is that proper or not proper?

MS. WESENBERG: Objection, form.

THE WITNESS: I honestly would say that depends because some teachers have a very strict classroom schedule and their students require consistency. I have actually had IEPs where they request that a student be notified of any schedule changes one or two days ahead of time because they do not handle change well. And that could lead to significant behavioral outbursts by a student, so me personally, if I have a student who can't handle changes or who has a significantly more difficult day, then I would not go to that classroom and to that teacher and just demand to see them, come with me, because that is not in the best interest of the student.

BY MS. FOGHI:

Q. I guess the answer or the question that I am asking you is on demand, would it be accurate for me to, as a summary of what you just stated, is it your

testimony that you can pull a student on demand without notice if you yourself as a social worker if you were familiar with the teacher and you knew that teacher would be okay with it?

A. That's pretty close. I also have had teachers just message me and say, hey, can you come get my student? I think they need a break.

Q. So on demand is possible, is that what your testimony is, that you could hypothetically on demand walk in and pull a student? Is that something in your understanding that would be allowed?

A. Yes. I don't know. I honestly, I have principals who have smoothed the way for me. They will say, we haven't had a social worker for eight weeks. If Stephanie shows up, please let her take a student during special ed learning time.

Q. I understand if there is commentary with that. My question is the on demand?

A. It is just really tough for me to say that, because it's not how I would practice, and I don't do that, so I would just be really uncomfortable just walking in and taking a student.

Q. Are there some classes that social workers are not allowed to schedule students? Are there particular classes that would prohibit you as a

social worker from making a schedule with a student?
A. Yeah, all the electives.
Q. So during electives, you cannot schedule a student?
A. You're not supposed to.
Q. Do they -- have you seen it done?
A. Yeah.
Q. Okay. If someone wanted to determine whether student services were actually missed, what would they need to review?
A. MaxCapture.
Q. Are you familiar with utilizing MaxCapture?
A. Yes.
Q. Okay. Tell me in what context you use MaxCapture?
A. I use MaxCapture to create a calendar of services and to document the services as well as to manage my caseload and document the work that I put into students that are not always direct services.
Q. Okay. So is that why provider notes would matter exactly for that reason, or is there any other reason why your notes would matter?
MS. WESENBERG: Objection, form, foundation.
THE WITNESS: Could you repeat the question?
BY MS. FOGHI:

Q. I will just ask the question simply, why would provider's notes matter?

A. Well, they matter for a variety of reasons. It is a documentation of efforts to meet with the students. It is a documentation of collaboration with school staff. It's a documentation of creating progress towards goals, which is considered indirect service time. It is a documentation of our participation in IEPs, which do count towards service time, and we also do bill Medicaid, and APS does receive funding to reimburse when we use the proper billing codes, i.e., direct service time versus indirect. So indirect service time does not get billed. If the provider is absent, APS isn't going to get any billing for that, but it also is a way to document the effort we are making to provide services to students.

Q. So on the same token as I have asked you about provider notes, which you just answered, what would be the reason that service documentation would matter? Would it be the same?

MS. WESENBERG: Objection to form.

THE WITNESS: Yeah, I think it would be the same. You're documenting services you offered to a student, the activity you've planned, whether the

student was engaged. It's very helpful not just for billing purposes, but also historical notes so, for example, if I am meeting with a student and they have had social work for four years, theoretically, I could run a report and see how have the social workers consistently been engaging with the student, have there been a period of high absences? The better reason though is if you switch schools, so if you switch school sites, you can run a report on your student to see where they started maybe in August, where they are now and it helps you then navigate how you're going to move forward with a student.

BY MS. FOGHI:

Q. What about IEP wording, why does IEP wording matter?

MS. WESENBERG: Same objection.

THE WITNESS: IEP wording matters because it should be specific, measurable, achievable, relevant and time specific. That's the training we have been provided for IEP goals that we're supposed to be writing. They should be all of those, and they need to be targeted individually for each student based on their social and emotional needs, and at the high school level, I do think IEP goals should be written in collaboration with students, talking to them, is

this still something you want to work on, do you find this valuable? Do you feel like you met your goal? So self-reflection is often a piece I include for high school students.

BY MS. FOGHI:

Q. I am looking away from the camera because I am going to be sending your attorney an exhibit that I would like for you to take a look at. I labeled it as your Exhibit No. 1, if that is okay for the court reporter?

(Exhibit 1 was marked for identification.)

MS. FOGHI: Natasha, I sent it to both you and Karen.

MS. WESENBERG: There is nothing attached so it is just titled Exhibit 1, then it has your signature line and that is it.

MS. FOGHI: I didn't send it. I am sending it to you again. Let me make sure this time it is included, and Karen, okay. Did you get it?

MS. WESENBERG: I did.

MS. FOGHI: I would like to mark this as Plaintiff's Exhibit No. 1 in Ms. Avila's deposition. I would like for you to take a look at the document and see if you can tell me if you can identify this document, Ms. Avila.

MS. WESENBERG: I am in the process of sending it. She doesn't have it yet.

MS. FOGHI: Sorry, I thought you guys were next to each other. While we're waiting, in the interest of time, I'm going to ask if you have received it, and if not, I will just continue with questions and you alert me when you have it in your email.

THE WITNESS: Got it.

BY MS. FOGHI:

Q. You have it?

A. Yes.

Q. If you could please take a look at the document that has been sent to you labeled as Exhibit 1, Plaintiff's Exhibit 1, can you please tell me if you recognize this document?

MS. WESENBERG: Objection, form, foundation.

THE WITNESS: I recognize page 1.

BY MS. FOGHI:

Q. How do you recognize page 1?

A. So page 1 is what I would call a service schedule.

Q. Why is the service schedule important?

MS. WESENBERG: Form, foundation.

THE WITNESS: This is a specific special

education service schedule which determined the services a student requires. It's usually created by an IEP team. I am looking at -- it doesn't look like I can see a grade level, so usually when you see two service schedules like this, so there is one on top that says instruction. It has a list and then there's one about mid-page down, see service supposed to be a 9th to 10th grade service schedule. So particularly only see two when a student is moving between grades, but usually it's between eighth to ninth grade, or fifth to sixth grade.

You don't usually see two service schedules on the same page unless there is a major movement, which would imply a progression IEP, so I am not sure why they have two. I see one says -- it must be ninth to tenth grade. I am not seeing any major changes between the top and the bottom, so they may have just printed it out as a whatever reason.

BY MS. FOGHI:

Q. Okay. Would it be accurate for me to state that this reflects basically time spent with the students?

A. No. This isn't ideal. Ideally, the IEP team has discussed a student's needs and so, for example, related service SLP release would be speech language

pathologist 360 minutes a semester. For example, a student's absences would affect whether they actually received 360 minutes a semester, but this is instructions for school staff. This is what they're supposed to be offering the student.

If a student has a chronic absenteeism, that could affect whether they actually receive that 360 minutes of SLP a semester.

Q. Let me go ahead, so let me ask you this: Would IEP follow this?

A. The IEP --

MS. WESENBERG: Form.

THE WITNESS: Sorry. This is an IEP document. The IEP team is to follow this to the best of their ability.

BY MS. FOGHI:

Q. And that is according to law, correct, with respect to IEP?

MS. WESENBERG: Objection, foundation.

THE WITNESS: I said this is individualized education plan. This is, to my understanding, a legal document of what the school is providing to support a student's growth.

BY MS. FOGHI:

Q. What is the minimum amount of time in your

understanding that a social worker should provide per semester to a student?
A. Depends on the student's need.
Q. Is there a minimum?
A. I assume some social workers go as low as 60-minutes, but if a student has only one hour in a semester, the question that I always ask is, does the student actually need social work? Would the student better benefit from supplemental aids and services?
Q. With respect to social work, is there an -- assuming that the student requires it, is there a minimum amount of time per semester that needs to be provided that you understand?
A. I have to do a little bit of math to understand what 270 actually looks like. Do you mind if I do a little math?
Q. Not at all.
A. So 270 minutes a semester, there is approximately 18 weeks in a semester, so if a student has 270 minutes a semester divided by 18 weeks, that is about 15 minutes a week.
Q. Would the provider decide what is -- when to do these minutes, when to fulfill these minutes? Would that be up to the provider?
A. One moment. So given the IEP team decision

and discussion, so IEP team which involves the school social worker come together and they propose a goal and they propose the time they believe they need to meet that goal or to teach that goal to a student. Fifteen minutes a week is incredibly small. I have seen people say, Oh, I actually provided a 30-minutes every other week, so that it is not a weekly check-in, it's an every other week check-in. I have seen that as an example. For me, this raises a big flag if we're 15 minutes a week then we should be having a discussion, are we -- do we have the skills needed to function without social workers, and that would be an IEP team discussion.

Q. But the individual provider can determine how these minutes are allocated, correct. So as the provider I can decide if I want to do 30 minutes every week or if I want to do 15 minutes twice a week wouldn't that be up to me as the individual provider?

A. I mean, your schedule should be consistent enough to support a student's engagement in the special ed classroom, but also then there may be some ethical considerations. If we have an IEP goal, is it realistic that you can teach it in 15 minutes every week? Is the goal achievable if you're only offering 15 minutes a week? If it is half an hour

every other week, does the student really need social work? These are discussions to be had with a clinical supervisor. So you could have those discussions if you're not sure. Technically, I have also seen some students who at the beginning of the semester they really struggle, so you can do 45 minutes at the beginning of the semester for the first couple of weeks, then touch base with them, technically, you could at the end of the semester, but again, if a student is capable of functioning accessing their education for two months without seeing a social worker, then it really begs the question: Is it an appropriate use for the student to have social work minutes?

Q. With respect to the allocated minutes as a social worker, wouldn't you be following IEP and IDEA guidelines? Isn't that important to follow those guidelines?

MS. WESENBERG: Objection, form.

THE WITNESS: Of course.

BY MS. FOGHI:

Q. So 15 minutes may be enough depending on the student; isn't that accurate?

MS. WESENBERG: Objection, form, foundation.

THE WITNESS: The student is at a maximum

service schedule. They are in a special ed setting approximately 71 percent of the time depending on the results of their evaluations. The student may not benefit from 15-minute check-ins. The student may not be -- I wouldn't know because I cannot read the rest of their IEP, but is the student capable of absorbing what you're hoping to teach them in a 15-minute session? That would be a question I would ask.

BY MS. FOGHI:

Q. Uh-huh. But if the IEP team makes that decision that 15-minutes is sufficient, would you disagree with that if that is what the team decision was or is?

A. Did the social worker recommend 15 minutes a week or did the team recommend 15 minutes a week?

Q. I guess that's a good question. If the social worker recommends it, can it be followed? Can the recommendations of the social worker be taken into account?

A. They always should be taken into account because the social worker is a professional.

Q. Thank you.

A. But it is an IEP team decision and I have gone into IEPs where people do not agree with my

professional opinion. And at the end, once it's finalized, that's what you follow.

Q. Exactly. Exactly. Okay, thank you. So let me go ahead and show you what I have sent over to counsel, and I am labeling now as Plaintiff's Exhibit No. 2.

(Exhibit 2 was marked for identification.)

BY MS. FOGHI:

Q. If you could please take a look at that document. It's a longer document, but I will direct you specifically to the page that's relevant here. I think it begins on page 12, once you receive it. Let me know when you have received it.

A. I believe I have received it. 43-page document?

Q. It is -- let's see, how many pages this is. Yes, it is. It's 43 pages, and if you could go to page beginning on page 12. Let me know if you are able to identify what this document appears to be to you.

A. This document appears to be a communication from your client to myself.

Q. Can you review it for a few minutes? I believe it begins on page 12, spend a couple of minutes reviewing that communication so that I can

then follow-up with you.
A. Do you want me to stay on page 12?
Q. Just begin on page 12, and just review the relevant portions of the communication between you and my client.
A. This is a request to meet from your client to me.
Q. All right. Do you recall receiving that request?
A. I believe this was my first day onsite. I was being staffed by Jessie Macfarland.
Q. Okay. But you do recall receiving this request from my client, correct?
A. I see that a message was sent. I don't remember this specific communication. I remember that was a very busy morning that Jessie was introducing me to students and showing me where things were onsite.
Q. Do you recall ever having the meeting with Tatia that day or subsequently?
A. No. I do recall that I think that was the day that I met her. She approached us, and us, I mean myself, Ms. Jessie and a student. That was the day we met in person for a few moments in the hallway, and I was focused on the student.

Q. Okay. So did you ever have a conversation with Tatia that day that you recall?

A. No, I don't think I did.

Q. Why would you meet with a student -- why would you pull a student when you knew that Tatia was present onsite?

A. Ms. Jessie, the social worker liaison, pulled the student.

Q. It was you that pulled the student?

A. No, I didn't pull the student. Ms. Jessie pulled the student to introduce me. She had been working or meeting the student for several weeks at that time. I don't know how long, but Ms. Jessie was familiar with the student and so she was introducing me to the student so we could engage in some getting to know you.

Q. This particular student we're speaking of was a student that was assigned to my client, correct?

A. Well, I wasn't -- she wasn't my student in that I was not going to write progress towards goal. I was not going to participate in IEP team discussions. I was there to provide minutes only when your client was not present.

Q. You were going to provide minutes when my client was not present. On that particular day when

Ms. Macfarland pulled the student, my client was present, correct, as far as you know?

MS. WESENBERG: Objection, foundation.

THE WITNESS: I saw her face-to-face.

MS. WESENBERG: We have been going for about an hour. I just received an email from your next deponent, Ms. Torres. She was scheduled at ten, so she is asking if we have any estimate of when she will be needed.

MS. FOGHI: Let's -- if we could have another 15 minutes, I think that would be sufficient. I will try to get through it. I do understand it was scheduled for an hour, so.

BY MS. FOGHI:

Q. Ms. Avila, there is an email, and I will guide you through it -- guide you to that email in this packet that basically shows that you were covering IEP in progress towards goals in this particular case as it pertains to my client and her students. Do you recall that?

A. I was notified by Ms. Jessie that the progress towards goals were completed for all the students on the day I got there, so I did not write progress toward goals before November 3rd. Those I was told were completed. Ms. Jessie was part of

those progress towards goals. I don't know a hundred percent who wrote them or the dates they used to write them. I was just told not to worry about that because that is not my responsibility. My responsibility was to meet service minutes and support a student's growth toward their IEP goals.

Q. I will get back to the email, again, just because of the timing issue here, I'd like to continue with some of the questions and we will get back to this email. Can you explain how semester based service minutes work in your practice?

A. In my practice or in general?

Q. Well, you can -- let's talk about it in general.

A. In general, semester based practice for a school social worker is that from August to December, from January to May. Those are the two-semesters that you have to provide services. The IEP goal that you're working on starts on the day of the IEP, so for example, if you have an IEP in January, then you have one IEP a year, which would be two semesters to work towards that goal, and that would involve you try a variety of different approaches engaging the student, collaborating with school staff to help a student grow towards that goal because the goal is

always going to be specific, measurable, achievable, relevant, and time specific.

Q. Okay. When minutes are written on a semester basis, what does that mean for providers scheduling?

A. So when minutes are written on a semester basis, you have 18 weeks to meet the minutes. That's in there to give you a little bit of flexibility, so for example, let's refer back 270 minutes a semester, that's 15 a week. You could do 15 a week, but with that level of special education services for a 10th grader, I would hope a social worker can take into account a student's abilities, and determine whether 15 minutes a week is appropriate or half an hour every other week because you want to make sure a student is absorbing the information and engaging and practicing their skills. So I divide by 18 whatever the number, maybe it's a 20-minute session. Maybe it is more, maybe it is less. You always multiply by 18 meant to be weekly because theoretically a student that needs social work, it's a tier-three service that means they're going to be missing learning time so it has to be of value and it has to be relevant to the student's engagement in their learning environment.

Q. Let me go ahead and direct you back to

page 11 of Exhibit No. 2. If you could please review page 11 and tell me if you can identify it for us.

A. This appears to be an email from your client to the school social worker liaison, Jessie Macfarland, myself, Bernadette Lucero, who was not just in charge of all the social workers, but she was my direct boss, and Justin Griego. So from this communication, it looks like your client was making changes in MaxCapture to account for students who do not always go to her office when she calls for them, so what I am seeing in these two sentences is that the schedule is fluid. It's not a stable schedule and there are adjustments as needed.

Q. Go ahead and turn to page 14, and please let me know if you can identify that document.

MS. WESENBERG: Objection, foundation.

THE WITNESS: This is an email from March of 2023.

BY MS. FOGHI:

Q. Can you please read that email into the record?

A. This is an email from myself to Mr. Griego, your client, Ms. Macfarland, the social worker liaison, and Ms. Lucero.

Q. What is the date?

A. November 3rd, 2022.
Q. So that would have been your first day on the job, correct?
A. Yeah. So this is a questioning email.
Q. Go ahead. What is -- can you read it into the record, please.
A. Good morning, Mr. Griego -- good morning, Mr. Griego and Ms. Harris Lipe, please let me know when would be a good time to meet to discuss students and caseload. I will do my best to be flexible and will happily participate in either a Google meet or in-person staffing. As previously mentioned in emails from Tatia and Jessie, I will be covering district program students in E Hall. I will be covering progress towards goals and attending IEP meetings. Do I need to send an email to SPED data and move the students to my caseload. I have the following students identified as participating in district programs in E Hall. It appears I have a list from 1 to 10, and the names are blacked out.
Q. Are you able to recall this particular email that you had sent?
A. I recall having questions.
Q. Is that email something that has your name on it and has your email address on it?

A. Yes.
Q. Let me go ahead and move on. Can you please tell me how you became involved in covering students that were associated with my client? And we're going to have to move quickly on these because of the time. How did you?
A. I was instructed to do so.
Q. Who instructed you to do so?
A. Bernadette and Jessie.
Q. Do you know the reasons why you were given this instruction?
MS. WESENBERG: Objection, foundation.
THE WITNESS: I was informed there were service minutes that needed to be met for students.
BY MS. FOGHI:
Q. Okay. What kinds of responsibilities did you understand this to include for you?
A. So in a previous email, which is not this one, I was able to state that I would be covering district program students so those are not students in the class category sessions and I am asking, what are we doing?
Q. Okay. Was it your understanding that my client was not meeting her service minutes?
A. My understanding is that there were service

minutes that needed to be met. I don't know why service minutes needed to be met. I just knew they needed to be met, and I was instructed to show up and support students getting their minutes met.

Q. Were there any other social workers for whom you were providing the service for besides my client?

A. Oh, yes, I have done this before.

Q. Okay. So Tatia was not the only one that required that you were assigned and asked to assist with the service minutes being provided and met?

A. It was a different school year.

Q. What -- so in terms of providing the service minutes, what did you have to do to make sure those minutes were provided?

A. I had to review the IEP, determine how many minutes they're supposed to receive on a weekly basis, so that is the number divided by 18. That tells me how many minutes the students need a week, and then provide those minutes. It was a different situation. That person was offsite, so those became my students.

Q. How many students did you have on your caseload at -- during this time period, 2022/2023?

A. I couldn't tell you.

Q. Do you have an estimation? I don't need an

exact number. Was it more than ten?

A. Yes, significantly more than ten. I think I was sitting in the maybe 30 range, 30 and up. I don't remember exactly.

Q. Did the coverage also include IEP meetings, meaning the service minutes, did they also include IEP meetings?

A. For this situation or previously for this situation, for the district programs student, it did involve participating in IEP meetings to support IEP team discussions.

Q. Can you explain to me the meaning of a PTG and the difference how you would describe in your role PTG and IEP coverage?

A. So PTGs are something that is created and reported to families on a student's ability and progress towards the IEP goal that has already been written, so for example, you collaborate with school staff. You might do an observation to push in and say are we generalizing skills? You talk to the student, depending on their comprehension skills. You engage in self-reflection, do you feel that you're meeting the school. Does this still work for you? Do you think we're going to want to change your goal in the future? So progress towards goal is a

collaborative effort which requires reviewing service notes, meeting with school staff, talking to the students. So in this case, the progress towards goal for district students. These are things that would be right here, what we're referring to is December progress towards goals. So I theoretically because in a previous email I didn't see here, they said I would be covering the district program students. So that means December progress towards goals were mine, my responsibility, so potentially that would be eight weeks of meeting with students and supporting their growth, and with eight weeks of experience, I could write a well written progress towards goals. So, yeah.

Q. While you were meeting with students during this time period, 2022/2023, is it your recollection that my client was present onsite while you were meeting with her students or was she not there during the times that you were meeting with her students?

MS. WESENBERG: Objection, foundation.

THE WITNESS: I don't recall physically seeing your client for months. I didn't know where her office was. The school would just let me know she was onsite and reach out to Jessie, and say, Okay, do you know if she is onsite today? For the

district program, students prior where it said, like, today is Stephanie's first day. She is going to be covering the district program students. So I met with those students because I was told to.

BY MS. FOGHI:

Q. Why is it that you never collaborated with my client and in discussing the students that you were working with that were actually my client's assigned students?

A. Well, in this message here, I asked when would be a good time to meet to discuss students and caseload, and I offered to do virtual or in person, so this is after your client reached out and said, hey, I want to meet. This was after she wanted to do a staffing in person while a student was with me, which I didn't engage with because Jessie was there and I don't -- Jessie and Bernadette were above me in the hierarchy range, so I let them take the lead there. But in this case, I was like, Hey, let me know when is a good time. I don't remember being able to have all parties commit to a day and time so we could do the in person or Google meet staffing.

Q. So it is your recollection and understanding that this collaborative effort that she was trying to arrange for -- Tatia was trying to arrange for, in

fact, never happened, correct? The discussions never happened?

A. I don't -- I couldn't say that they actually ever happened despite my offer to also participate in collaboration.

Q. You yourself did not meet with Tatia; is that correct?

A. I don't recall that ever happening. I did attempt to schedule a time. I was waiting to hear back.

Q. You do understand that the students that you were asked to provide service minutes for, you do understand that those students were my client's students, correct?

MS. WESENBERG: Form, foundation.

THE WITNESS: I think I, in emails, it says I am covering, I am not supposed to be in charge of, but specifically to district programs students needed consistency and stability, and so those it appeared I was going to be doing progress towards goal and attending IEP meetings.

BY MS. FOGHI:

Q. Did you regard them to be your students at this point when you were asked to provide the service minutes needed? Did you regard these students to be

your students?

A. Not necessarily. I specifically asked, Do I need to send an email to SPED data and move these students to my caseload so that question is saying, are these my students? I didn't write the words, are these my students? But when a student is on your SPED data caseload, they're yours. So this is me seeking clarity, are these my students?

Q. Did you get the clarity you needed?

A. I don't remember. I'd have to search for an email.

Q. Okay. Well, in your understanding without an email, what transpired as you were providing these additional needed service minutes, did you regard these students to be your students?

A. No, because I was told I was supporting them getting their service minutes, and the reason I don't necessarily think of them as mine and also why I was seeking clarity is because if you are doing progress towards goals and attending IEP meetings, they're yours, and should be on your caseload. But I am asking, are they on my caseload because there is a spreadsheet. I don't know if you know about the spreadsheet, but the spreadsheet has a list of all the students. Every time you provided services you

were supposed to add your minutes and it did some fun math, like, service minutes total per semester, minutes provided by your client, minutes provided by me, so the ideal is that you get to zero. So we don't over serve and we don't under serve, but we're supposed to meet their minutes on a semester basis.

So in November, we were looking at this spreadsheet, which had the minutes from the IEP, the minutes documented by your client, and then any minutes I added were added to it, so the formula kept a running tally of how many minutes were owed per student.

Q. So one final question for you, again, because of timing, this went longer than I anticipated. So if we are looking at 18 weeks to provide minutes and you are now two months into the semester, okay, you have 18 weeks total, you're two months now into a semester, how is the determination made as to the minutes provided and the minutes not met if you're already two months into the semester?

A. So there might be a little bit of a misunderstanding. There were two months left so November and December. So approximately eight weeks you take away Thanksgiving, so approximately seven weeks to do 18 weeks worth of work.

If the student started off with zero minutes provided. From my understanding MaxCapture notes where we document did we meet with the student? Did we have an activity? Was there an outcome? Was there a plan? Was the student absent? So that the numbers come from there in terms of what was provided in August, September and October, so the three months worth of the semester that services could have been provided. I don't know what they were or were not. I don't have that access in MaxCapture. I know that I had approximately seven to eight weeks to cover instead of 18.

Q. Correct.

A. So theoretically if a student needed 270-minutes a semester, maybe they had received -- this is completely hypothetical, instead of 270 divided by 18, it would be 270 divided by eight, however many weeks were left in the semester, which drastically changes the service offered.

Q. Correct. In your understanding the students were provided that service, were they able to meet those minutes if there was only seven to eight weeks to cover?

A. Well, that was the goal. I can't tell you if I got everybody to 0. I can't tell you if your

client got everybody to 0, because I wasn't clear on what day she would be present. She doesn't report to me, so it is not like your client would say, Ms. Stephanie, I am on campus today. I never got emails like that. So I just focused on the district program students in an earlier email they said, Stephanie is covering the district program students. So that is what I focused on.

Q. Did you expect to receive any emails from Tatia; is that something that you were looking for?

A. I have no idea.

Q. She was not reporting to you, correct?

A. No, she wasn't reporting to me. It says here on the email you showed me, I would see the following students only if your client is not present, and they are requesting support. If either student expresses suicidal ideation, the school follows district protocol.

Q. Sorry, Natasha, I think I have one more page in the same document that I would like for her to go to and let me get to that page, so it would be Exhibit No. 2, and then we're done.

A. I have Exhibit No. 2. What page?

Q. Give me one second please. Page Number 8. If you could please go to Page Number 8, and please

tell me if you are able to identify this particular document.
A. I am seeing an email.
MS. WESENBERG: Objection, foundation.
THE WITNESS: It does not include me as an email recipient.
BY MS. FOGHI:
Q. So you don't see your name on page 8?
A. I see it in the text, but not in a to.
Q. You are referenced in the text in what capacity?
MS. WESENBERG: Objection, foundation.
THE WITNESS: I appear to see the email thread sentence saying, (as read) "Lastly, could you please add Stephanie Avila to your calendar access next week as she will begin covering Volcano Vista High School every week on Thursday and Friday. Thanks again, Jessie."
BY MS. FOGHI:
Q. All right. Were you aware of the content of this email?
A. No, I did not know this email existed.
Q. All right. I don't have anything further. Thank you.
MS. WESENBERG: Ms. Avila, I have a couple

questions for you.

EXAMINATION

BY MS. WESENBERG:

Q. First and foremost, I want to look at what Plaintiff's counsel marked as Exhibit 2. To be clear for the record, you don't have any knowledge nor have you been asked any questions about the other 30 something pages in this exhibit beyond the specific emails that she pointed out to you, correct?

A. Correct.

Q. You mentioned earlier an interaction that you had with Plaintiff on the first day that you were on campus, correct?

A. Correct.

Q. Prior to encountering her in the hall, were you aware of whether or not she was on campus?

A. I don't remember any information about whether she was going to be on campus or not.

Q. Had you encountered her at any point on campus or seen her face-to-face on campus prior to the time that you encountered her in the hall with Ms. Jessie and the student?

A. No, I had no reason to be at Volcano Vista High School at any point prior to that day.

Q. But on that day, did you see Tatia at any

time prior to encountering her in the hall?
A. I don't believe so.
Q. So is it fair to say that you had no personal knowledge as to whether or not she was present prior to meeting her in the hall that day?
A. I would say that's correct.
Q. You mention that you were walking with a student at that time, correct?
A. I believe so, yeah.
Q. Did you personally observe the student's reaction to the interaction that Ms. Lipe had struck up between you, the student, and Ms. Macfarland?
A. Yeah, the student had a very clear physical response to the situation.
Q. What was that clear physical response that you observed as you interpreted it?
A. From my own observation, the student appeared to cringe away from the situation.
Q. Do you have any understanding or belief as to why that was?
A. I suspect it was the tone of voice. Ms. Lipe appeared to be having very strong emotions, and her voice was a little bit raised and the student just kind of of like pulled away. So I thought it was best to put the student into the classroom where I was.

We just moved away from the situation.
Q. So you and the student exited the area and Ms. Lipe and Ms. Macfarland stayed somewhere else having a conversation?
A. It was pretty brief. Ms. Jessie wasn't far behind me because she had the key to the door.
Q. So because of the student's physical reaction to the perceived tone or aggression or intensity of the encounter, you immediately moved the student away from the area, correct?
A. I did encourage the student to go over here or kind of situation.
Q. When you took over on those days, the Thursdays and Fridays to fill in for the service minutes, what was your understanding as to the status of the minutes for Ms. Lipe's students?
A. My understanding was that on Thursdays and Fridays my goal was to provide as much social work as possible to help these students meet their IEP service minutes.
Q. Was it your understanding that they were behind in their minutes at that point?
A. Yes.
Q. Did you have any understanding as to how significantly behind they were?

A. Yes. They were behind significantly, and they needed -- they needed somebody there to meet with students and provide those minutes. On a weekly basis, I needed to be present.

Q. Can you remind the jury what time of year that was?

MS. FOGHI: Did you just say remind the jury?

MS. WESENBERG: Yes.

THE WITNESS: I was being asked to be there for November and December, so it was the last two months of the semester, more than half of the semester had already passed, so there was a time crunch, a time pressure to help these students get their minutes met by December, the end of December.

BY MS. WESENBERG:

Q. And when you were meeting with the students, did they ever communicate to you whether or not they had been seeing Ms. Lipe?

A. Yes, I did have several students tell me that they didn't know who Ms. Lipe was. They weren't aware they had social work. I did have one student who stated they saw her in August.

MS. FOGHI: I object to the testimony here. I understand that we don't follow strict rules here for rules of evidence, but I would object as to

foundation. I would object based on hearsay about what other students have told her.

MS. WESENBERG: You can continue, Ms. Avila.

THE WITNESS: I documented my concerns in an email, but I had several students tell me they didn't know they had social work and they didn't know who Ms. Lipe was, and I had one student said he hadn't seen her in months.

BY MS. WESENBERG:

Q. That was in November, correct?

A. Correct.

Q. As you pointed out earlier, that's actually three months because the school year starts in August September October, and then in early November you personally spoke to students who reported that they'd either not ever seen Ms. Lipe or hadn't seen her in quite some time, correct?

A. Correct.

Q. So did that corroborate in your mind the accounting that had been done as to the fact that service minutes were significantly behind?

A. Yes.

Q. As to Exhibit 1 that you were shown by Plaintiff's counsel earlier, did you prepare this document?

A. Exhibit 1?

Q. I can share my screen with you if that's easier.

A. Sorry, are you referring to the IEP service page?

Q. Yes, I believe that's what she marked as Exhibit 1.

A. Because I notice there was a second page with an email of that being said.

Q. Right. And I will get to that in just a moment, but in general, did you draft this document on page 1 of Exhibit 1?

A. I don't believe so, but it's hard to say because I blocked out the date of initiation. So it says 022720. If that ends in 22, then no, I did not do this. If that ends in 23, I don't know the name of the student, so I couldn't say if it was or wasn't something I created.

Q. Are you the custodian of records for the Albuquerque Public Schools that would maintain these documents and be able to authenticate these documents?

A. No.

Q. Page 2 of Exhibit 1 includes an email from Ms. Atler to Ms. Baca. Do you see yourself anywhere

on page 2?
A. No.
Q. And you're not even a part of that, nor were you asked about it by Plaintiff's counsel, correct?
A. Correct.
Q. On Exhibit 2, you were pointed to, I believe it was page 14.
A. Page 14?
Q. Sorry, let's go back to page 11.
A. I am on page 11.
Q. Plaintiff's counsel had shown you this exhibit, and I think you went back to clarify later on, it -- is it correct that there are two distinctions, that you were going to be handling district students in one way and other students in another? Can you clarify that for us?
A. So I was on page 11 from Jessie. She suggested, "I think having Stephanie provide support for the district program students for the remainder of the semester to provide makeup time and continued service including any IEPs and progress towards goals at the end of the semester."
So this is coming from someone who would be above me. They're telling me district program. I am seeking clarity in the other email.

Q. In this email, the top portion has what appears to be Ms. Lipe responding to Ms. Macfarland, which you are cc'd on regarding other issues. Does this represent to your recollection the totality of that conversation, or did Ms. Lipe ever send an additional email in agreement with the plan?

A. There was an additional email in agreement with the plan.

Q. You were personally a recipient of that email?

A. Yes.

Q. We're going back to page 14, Plaintiff's counsel showed you earlier. I'd like to clarify once you get to the portion with the first list of students you have: "I have the following students identified as participating in the district programs in E hall." There are ten students listed there, although, their names are redacted, correct?

A. Uh-huh.

Q. Then there is a second list of: "I will see the following students only if Tatia is not present and they are requesting support. If either student express suicidal ideation, the school will be following district protocol," and there is two students listed there, correct?

A. Yes.

Q. So is it your understanding that the first subcategory here was for the district kids that you were assigned that you were just going to be taking for the rest of the semester and then the lower portion is for the students that would only be engaged with in the event that Ms. Lipe was unable to present to the school and provide minutes?

A. Yes, so it says restating what Ms. Jessie had stated earlier which is that I would be responsible for progress towards goals and IEP meetings for the district program kiddos that attend specifically and then attempting to clarify if they were going to be on my caseload or not.

Q. Then the two at the bottom are the ones that you would be covering for only in the event that Ms. Lipe was unable to attend in person to deliver her service minutes?

A. Correct.

Q. And I believe you already testified with Plaintiff's counsel earlier that Ms. Lipe never informed you personally when she would be in or out, correct?

A. That's correct.

Q. Were you provided with during this transition

period, where you were assigned to support these students who were behind on service minutes on the Thursdays and Fridays that Ms. Lipe was going to be out, were you ever provided with a copy of her schedule indicating, you know, the way that she had scheduled her day to see various kiddos?

A. I was informed that I was going to have Google calendar access, and later on I was provided screenshots of the Thursday and Friday Google calendar schedule.

Q. Did you make any observations of those calendars as to how they were scheduled and the actual feasibility of the scheduling?

A. I was a little surprised at some of the choices. So for example, there was about a three and a half hour block on one of the mornings where no students were being seen, and then the afternoon, it was back to back students, so if you called to pull a student as soon as one student leaves, by the time the student gets there, it could be as much as 5 to 10 minutes, so I had trouble following schedule exactly because it just time-wise it was hard to get students to show up exactly at the five-minute mark and have the other student out the door. It was just -- it didn't seem like it was conducive for student

services.

Q. So are you trying to say a 30-minute block of time was made presumably to give 30 service minutes, however, that is actually not likely doable if within that 30 minutes you're having to either go get the student, bring them back to your class, call for the student, bring them back to your class, use the restroom, have any kind of disturbance, anything like that. Is that what you're trying to say?

A. Yeah. It just would have been very, very challenging to time everything perfectly, because it was like student, student, student, student. There was no break time, there was no water time, there was no -- I need to go get a student or the student walks slowly or what have you, no buffer space between kiddos.

Q. Okay. I think that is all the questions that I have for you this morning, Ms. Avila. Thank you for your time.

MS. FOGHI: I do have a few follow-up questions.

EXAMINATION

BY MS. FOGHI:

Q. Ma'am, with respect to your personal observations, I believe you indicated going back to

the student in the hallway when you were walking with the student and you describe the student's reaction or what you perceived to be a student's body language. That's based on your personal observation, correct?

A. Yes. I was there. I used my eyes and I noticed a change in body language during that situation, so I moved to focus on the student.

Q. That would have been your very first day on the job, correct?

A. Yes.

Q. Now --

A. No, my first day at VVHS, not my first day on the job.

Q. Correct. That's fine. Do you know at that point in time on that day when you had that observation and you commented on it, did you have any knowledge of my client's involvement in terms of the amount of time, the length of time, that she has been spending, for example, with that student, how long she has been dealing with that student, how many years she has been seeing that student?

A. I would not be able to tell you how many years she has seen that student. There was a Google sheet with how many minutes had been documented of

service that semester. That would be the only reference I would have in terms of that connection.

Q. Okay. Now with respect to service minutes not being met, service minutes would be documented, correct, so we have evidence of what the service minutes provided are in this case, correct?

A. Yes.

Q. Your direct supervisor was Bernadette Lucero Turner, correct?

A. Correct.

Q. So any assignments, arrangements that would be made as it pertained to my client's students would have been directed by her, correct?

A. Well, Ms. Turner would tell me what to do and I would do it.

Q. You would follow her directive?

A. Yes.

Q. Now going back to the exhibit that we looked at, page number 9 of the second exhibit. Take a look at that page, please, and if you could just tell me what you understand this page particularly to be addressing, page 9 of 43?

A. Okay. So page 9 is an email thread.

MS. WESENBERG: Objection, foundation.

THE WITNESS: It involves Jessie Macfarland,

your client and Bernadette Lucero Turner.
BY MS. FOGHI:
Q. Who is the email -- this particular email that I am referencing on October 26, 2022, would have been from Ms. Bernadette Lucero, correct?
MS. WESENBERG: Form, foundation.
THE WITNESS: It appears to be so.
BY MS. FOGHI:
Q. And what do you -- how would you summarize the content of this email on October 26, 2022?
MS. WESENBERG: Objection, form, foundation. She is not the person that wrote this. She is not even on the string. You're asking her to read in somebody else's words.
THE WITNESS: My understanding after reviewing an email that someone else wrote is that your client would notify Justin Griego whether she would need coverage and then Justin Griego or Jessie would communicate with me, Stephanie, on that day one of us would follow the calendar. This is October 26th.
BY MS. FOGHI:
Q. Okay. All right. I don't have anything further. Thank you.
MS. WESENBERG: We will read and sign. You

can send it to me. We will take four-to-a-page electronic copy.

MS. FOGHI: Same here.

(At 11:17 a.m. the matter was completed)

WITNESS' SIGNATURE/CORRECTION PAGE

If there are any typographical errors to your Deposition, please indicate them below.

PAGE/LINE

______________________Change to____________________

______________________Change to____________________

______________________Change to____________________

______________________Change to____________________

Any other changes to your Deposition are to be listed below with a statement as to the reason for such change.

PAGE/LINE CORRECTION REASON FOR CHANGE

_____________________________________________________

_____________________________________________________

_____________________________________________________

_____________________________________________________

_____________________________________________________

I, STEPHANIE AVILA, do hereby certify that I have read the foregoing pages of my testimony as transcribed, and that the same is a true and correct record of the testimony given by me in this Deposition on April 7, 2026, except for the changes made.

____________________ __________________________

Date Signed STEPHANIE AVILA

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

TATIA LIPE,

Plaintiff,

V. No. 1:23-cv-00899-GBW-JMR

ALBUQUERQUE PUBLIC SCHOOLS, et al,

Defendants.

REPORTER'S CERTIFICATE

I, Barbara Jean Morgenweck, CCR # 526, DO HEREBY CERTIFY that on April 7, 2026, the Deposition of STEPHANIE AVILA, was taken before me at the request of and sealed original thereof retained by:

Boglarka Foghi
FOGHI LAW FIRM, LLC
5065 Corrales Rd.
P.O. Box 944
Corrales, NM 87048
505-220-5691
foghilaw@yahoo.com

I FURTHER CERTIFY that copies of this Certificate have been mailed or delivered to all counsel, and parties to the proceedings not represented by counsel, appearing at the taking of the Deposition:

Natasha A Martinez-Wesenberg
WIGGINS, WILLIAMS & WESENBERG
A Professional Corporation
Nwesenberg@wwwlaw.us
Karen Kilgore
CUDDY & MCCARTHY, LLP
1701 Old Pecos Trail
Santa Fe, NM 87502
kkilgore@cuddymccarthy.com

I FURTHER CERTIFY that examination of this transcript and signature of the witness was REQUESTED by the witness and/or all parties present. On _______, 2026, a letter was mailed or delivered to Natasha Wesenberg regarding obtaining signature of the witness, and corrections, if any, were appended to the original and each copy of the Deposition.

I FURTHER CERTIFY that the recoverable cost of the original and one copy of the Deposition, including exhibits, to Boglarka Foghi is $___________.

I FURTHER CERTIFY that I did administer the oath to the witness herein prior to the taking of this Deposition; that I did thereafter report in stenographic shorthand the questions and answers set forth herein, and the foregoing is a true and correct transcript of the proceeding had upon the taking of this Deposition to the best of my ability.

I FURTHER CERTIFY that I am neither employed by nor related to nor contracted with (unless excepted by the rules) any of the parties or attorneys in this case, and that I have no interest whatsoever in the final disposition of this case in any court.

_________________________
Barbara Jean Morgenweck,
NCRA, RPR
New Mexico CCR #526

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

TATIA LIPE,
Plaintiff,

v.

No. 1:23-cv-00899-GBW-JMR

ALBUQUERQUE PUBLIC SCHOOLS et al.,
Defendants.

---

# APPENDIX A-5

## PLAINTIFF'S YELLOW-HIGHLIGHTED DEPOSITION DESIGNATIONS OF ANGELIQUE TORRES

Plaintiff submits this yellow-highlighted deposition-designation material as part of Plaintiff's corrective submission. Plaintiff preserves all designations, counter-designations, objections, completeness arguments, evidentiary positions, and rights under Doc. 256, the Federal Rules of Civil Procedure, and the Federal Rules of Evidence.



Attached deposition-designation PDF pages: 29

# Angelique Torres

**Date:** April 7, 2026

**Case:** Lipe v. Albuquerque Public Schools, et al.
**Case Number:** 1:23-cv-00899-GBW-JMR

Maricopa Reporting, Inc.
Phone: 480-597-4744
scheduling@maricopareporting.com
https://www.maricopareporting.com/

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

TATIA LIPE,

Plaintiff,

V. No. 1:23-cv-00899-GBW-JMR

ALBUQUERQUE PUBLIC SCHOOLS, et al.,

Defendants.

DEPOSITION OF ANGELIQUE TORRES
April 7, 2026
11:35 a.m.
VIA ZOOM VIDEOCONFERENCE

PURSUANT TO THE NEW MEXICO RULES OF CIVIL PROCEDURE, this Deposition was:

TAKEN BY: Boglarka Foghi, Esq.
Attorney for Plaintiff

REPORTED BY: Barbara Jean Morgenweck, RPR,
NM CCR#526
MARICOPA REPORTING, INC.
1480 E Bethany Home Rd. Suite 115
Phoenix, AZ 85014

A P P E A R A N C E S

On behalf of the Plaintiff:

Boglarka Foghi
FOGHI LAW FIRM, LLC
5065 Corrales Rd.
P.O. Box 944
Corrales, NM 87048
505-220-5691
foghilaw@yahoo.com

On behalf of the Defendant:

Natasha A Martinez-Wesenberg
WIGGINS, WILLIAMS & WESENBERG
A Professional Corporation
1803 Rio Grande Blvd. NW
Albuquerque, NM 87104
505-764-8400
nwesenberg@wwwlaw.us

Karen Kilgore
CUDDY & MCCARTHY, LLP
1701 Old Pecos Trail
P.O. Box 4160
Santa Fe, NM 87502
505-988-4476
kkilgore@cuddymccarthy.com

Also Present:

EXAMINATION INDEX

PAGE:

ANGELIQUE TORRES:

Examination by Boglarka Foghi 4

INDEX TO EXHIBITS

| EXHIBIT: | DESCRIPTION | PAGE: |
| --- | --- | --- |
| Exhibit 3 | Caseload | 7 |

ANGELIQUE TORRES,

Having first been duly sworn, testified as follows:

EXAMINATION

BY MS. FOGHI:

Q. Thank you for being here. Would you please again state your full name for the record?

A. Angelique Torres.

Q. Ms. Torres, could you please tell me what you currently do for a living?

A. Social worker for APS.

Q. How long have you held that position?

A. Three-years.

Q. Do you know when your start date was with APS?

A. No. Right after I had my son in 2022, so February of 2022. 2023, I apologize. He was born in 2022.

Q. So you started with them in February of 2023?

A. Yes.

Q. What did you do prior to starting with APS?

A. I worked for the State.

Q. In what capacity?

A. Vocational rehab counselor.

Q. What sort of degrees, certifications do you possess?

A. I hold a master's degree in social work, a bachelor's degree in human service with a concentration in addiction and various other certifications.
Q. When you started with APS in February of 2023, was your role as a social worker?
A. Yes.
Q. And how did you end up -- did you apply for the position, or were you sought out for the position?
A. I applied.
Q. Who did you interview with when you applied for this position?
A. Two people that no longer work here.
Q. Okay. How did you come to be assigned to Volcano Vista specifically?
A. I got offered the job, and I asked where there were openings, and she said I have a high school opening at Volcano, that's where we will put you. I said, Okay.
Q. Got it. Prior to -- and you mentioned you worked for the State prior to this as a vocational rehabilitation counselor; is that what it was?
A. Yes.
Q. Prior to working for the State, did you hold

any other positions as a social worker?
A. No.
Q. When you were hired and put into specifically Volcano Vista High School, were you told why you were being assigned to Volcano Vista High School?
A. No, just that it was an open caseload that they needed to cover.
Q. What did you understand your role would be when you arrived?
A. To see kids individually based on their IEP needs and goals, or groups, depending on what they really need.
Q. Were you brought in to take on student related responsibilities?
A. What do you mean?
Q. Well, tell me what exactly you did. Give me sort of your -- when you arrived and you started your job, tell me what they gave you, what did APS give you? Did they give you a caseload? Did they give you a set of students that you needed to work with? What exactly was given to you?
A. I came in they gave me training on the basic tools that we use every day, like Synergy and MaxCapture. When they assigned me to school, they said, Go, see kids. And I said, Okay.

Q. What did you understand about who would decide which students you would be working with?
A. I didn't have any understanding of that. I was brand new social worker. I was told, Here are your kids. I said, Okay.
Q. You were provided a list of kids?
A. Yes.
Q. How many kids were you provided; do you recall?
A. I think I split a caseload with Stephanie Avila. I am pretty sure I covered maybe 12 kids. It was a very small caseload.
Q. So what I am going to do is I will jump right to an exhibit here. Give me one second, please, because I've got to get my bearings. We're all over the place today. Give me one moment, please. I need to see if I have to email this to your counsel or not. I am going to show you what I am going to now mark as our Exhibit No. 3. I am going to send this to counsel, and then they will forward it to you.
(Exhibit No. 3 was marked for identification.)
A. You're being kind of cryptic. What are you sending?
Q. Oh, it's an exhibit. So as I do your

questions -- can you hear me?
A. Yeah. You are using jargon like that, it doesn't mean anything to me. Tell me what you're trying to do.
Q. Well, I am sending your counsel, who is sitting in on behalf of APS. I am sending her a document which I am going to then have her email to you for you to review, look at and identify. That's part of the deposition. That's all I am doing right now is sending it to her so she can look at it open it and send it on to you.
Let me know when you have received it, Natasha. Natasha, did you receive it? You're on mute.
MS. WESENBERG: Yes, I did. I just reviewed it and sent it off.
MS. FOGHI: Okay.
BY MS. FOGHI:
Q. Ms. Torres, just let us know when you've received it.
A. Okay.
I received it and opening it now.
Q. Specifically, what I would like to do is have you go to the second page of this exhibit, and you can take a look at that page and tell me if you are

able to identify what this document appears to be?
MS. WESENBERG: Objection, foundation.
BY MS. FOGHI:
Q. You can answer, Ms. Torres.
A. It says caseload.
Q. And does this have your name above this caseload, the top portion of this document? Does it say Angie, middle initial V, Torres?
A. Yeah.
Q. Would this have been an accurate reflection of the cases you were assigned, specifically 26 students?
A. I don't remember. It was four years ago, so if I pulled the record, possibly, but I split a caseload with Stephanie, so yeah, it could be.
Q. So looking at the top-right corner, it says the year 2022/2023, the top portion has your name on it, obviously student's names are blacked out, it's 26 of them listed. Underneath, we have Stephanie Avila's load which reflects that she would have had 7 -- one, two, three, four, five, six, seven students assigned.
Do you see that?
MS. WESENBERG: Objection, foundation.
THE WITNESS: Yeah.

BY MS. FOGHI:
Q. Now let me go ahead and show you, and counsel already has our previous Exhibit No. 2, if you could please email that over to Mrs. Torres, that would be great. Let me know once you've received that.
A. What do you want me to do with this document?
Q. Take a look starting on page 4, 5, 6 and 7, so 4 through 7, take a look at those emails starting with page 4. Does this appear to be an email that you would have sent on February 23, 2023, to Bernadette Baca?
A. Okay, yeah. Now what?
Q. So while I will ask the questions, then you can answer them. February 23, 2023, you indicated this is your first school -- first day at school at this particular school; is that correct?
A. Yeah.
Q. Page 5, you're communicating -- now again, this came from Nicole. On behalf of Nicole, I don't know how it is pronounced, Nagy, or not sure how to pronounce her last name, but it's addressed to you, subject is ATF Union. Do you recall having a meeting with respect to following up with this email?
MS. WESENBERG: Objection, form, foundation. You can answer.

THE WITNESS: Yeah, this lady was assigned as my mentor, and she was helping me navigate a new job.
BY MS. FOGHI:
Q. Page 6 is an email that you received from Adam Kish and this is pertaining to him being your clinical supervisor. Was he acting as your clinical supervisor?
A. He was.
Q. You were provided a schedule, correct?
A. Yes.
Q. Did you work that particular schedule Mondays, Wednesdays, and Thursdays as outlined in this email?
A. Yes.
Q. Okay. Now with respect to my client, Tatia Lipe, did you ever have an opportunity to meet her?
A. No.
Q. Did you ever see her on campus?
A. No.
Q. Did you ever communicate with her in any shape or form including emails?
A. No.
Q. Did you have an understanding -- were you aware -- I should rephrase, that you were actually taking over her students?

A. I was aware that there was a previous social worker that worked there, and I was covering student.
Q. So you were told that she was a previous social worker?
A. Just that she was having her cases covered, not that she was a previous worker. Otherwise, just that there was somebody in that place, and now you are covering those students.
Q. Were you ever -- okay, so you were never told why the cases were being covered?
A. No.
Q. The students that you were provided were given to you directly from management, right, so APS, your clinical supervisor provided you with the list of these students?
A. No, APS did, yes, they provided via Synergy on those caseload lists that you see there.
Q. So tell me a little bit about how you -- you know, your initial meetings and encounters with students, for example, on this sheet that you have 26 of them listed, tell me sort of your job as -- and give me an example, with a student what would you have done as your first day meeting with that student?
A. My very first day is working on rapport, so I

introduce myself, tell them I am a social worker, let them know why I am there, they're not in trouble, what social workers actually do, that I have good snacks in my room, and you know, the things that I can help them out with during the day should they be feeling anxious or otherwise.

Q. Okay. Did any of the students ever enquire as to why you would be stepping in?

A. No.

Q. So not a single student asked you, where is Tatia?

A. No.

Q. Were you aware that Tatia Lipe was still working at APS during this time period? Were you aware of that?

A. No.

Q. Were you given any specific information about the reassignment of these students besides saying, Hey, here are these students. This is what you're going to be handling. Were you given any specifics as to each student and their needs?

MS. WESENBERG: Objection, form.

THE WITNESS: Review their IEP. That's all that I need on specifics. Every kid has an IEP that outlines their needs and their goals, and I base my

goals and my services on their IEPs.
BY MS. FOGHI:
Q. Were you expected to begin working with them immediately upon assignment?
A. No. I had a small grace period where I had a couple of trainings with my social worker liaison. She told me how to use the systems, how I was going access different things. I had like sexual harassment training. I had how to place like a -- kids that may become dangerous, how to place and hold, and different safety trainings, and then I was asked to step in. When I did get to the school, I sent an email to my liaison, do I see kids now? She said, yep. That is what I did.
Q. Were you given any records to review?
A. Just Synergy and their IEPs to review.
Q. Explain to me Synergy. What is your understanding of the Synergy systems?
A. Synergy is our home for all things student so I can find all information about the student that I need within Synergy including their demographics, their IEPs, their historical documents, any history that I need to know, discipline, attendance.
Q. Okay. In Synergy, are you able to look at the social worker that had been working with these

kids, their notes and their input?
A. No. I can only see an IEP, so the only thing I can see from a previous social worker would be the goal that they had maintained for that student.
Q. And in this particular case, I mean looking at the 26 students that were assigned to you, did each of the students have a listed goal?
A. Yes.
Q. Did you see who would have put those goals there, who would have been the social worker that would have put those goals there, was that reflected?
A. Yeah, on each APS should be reflected with a signature and whoever assigned that goal.
Q. Were you aware that Ms. Lipe would have been the one that would have put those goals in for those students?
A. I was aware that.
MS. WESENBERG: Form, foundation.
THE COURT REPORTER: (Request to not talk over.)
BY MS. FOGHI:
Q. Now you can answer.
A. From any social worker that worked with them previously could be listed on an IEP, so it wasn't really like my business on who wrote the goal. I

just knew that there was a goal.
Q. What about MaxCapture, are you familiar with MaxCapture?
A. Yes.
Q. Were you using MaxCapture at this time?
A. Yes.
Q. Were you inputting your own notes into MaxCapture?
A. Yes.
Q. Were you able to see the notes that had been prepared with respect to these students in MaxCapture?
A. No.
MS. WESENBERG: Form.
THE WITNESS: I can only see my own notes.
BY MS. FOGHI:
Q. So you're not able to access other social worker's notes. So how would you have known with all the students that you were assigned, or I should say reassigned, how would you have known what the needs of these students were or their progress -- I guess it's a two-part question. How would you have known anything about the student besides looking at the IEP and whatever the goals were that were set out? How would you know what were the needs of and goals for

the student without knowing what the prior social worker had discussed with them or felt like they needed?

A. As a brand new social worker, your job is to go in and build a rapport with the student and basically interview them, see what they're like, what do they need, how are they doing in school, who are their friends? Maybe do a couple of observations on them inside of their classrooms, speak with their teachers to get a general idea of the student and their behaviors, and then meet with them individually or in a group and get to know your students so that you get to know their needs.

Q. But isn't your job to follow the IEP?

A. Yes.

Q. So with respect to my client again, I am going to focus in on that, and I know you have answered in part already. You said that you have never met her, never met her prior to this or subsequent to the filing of this case, you have never communicated with her?

A. I don't believe so.

Q. You really had absolutely no knowledge of where she was and what she was all about?

A. I was a brand new social worker. I just got

a new job.
Q. Volcano Vista, how many social workers were there that you recall?
A. I came on as a new social worker. There was one that was already working there. She helped me kind of get acclimated, and then I met Stephanie, so total three of us. She wasn't there -- Stephanie wasn't there all the time.
Q. And among the social workers that you discussed, the three that would have included you and Stephanie, who was not there all the time, who would have been the other social worker?
A. There wasn't another social worker. It was just us at that time.
Q. So it was you, it was Stephanie?
A. And then Antoinette Romero. She was the other social worker assigned to the school.
Q. Is it your testimony today that Antoinette Romero never discussed with you the fact that Ms. Lipe was a social worker actively working at APS?
A. That is fact.
Q. Is it your testimony today that Ms. Romero never discussed Ms. Lipe with you?
A. That is correct.
Q. Did you ever learn since the -- you know, you

have been subpoenaed here today to provide your statement, did you ever learn that Ms. Lipe was in fact a social worker working actively on the cases that were provided to you, the 26 students?
A. No.
Q. If you did not review the service notes, records or scheduling details yourself, how would you independently know whether or not my client was still working with students?
A. That is not my job to know.
Q. Whose job would it be?
A. My job is only to see the students and meet them where they're at, not my concern about other professionals.
Q. Okay. You would have been working there on February 28, 2023, correct?
A. Yes.
Q. Is it your testimony today that on February 28, 2023, you did not see or meet Tatia Lipe?
A. That's correct.
Q. You never participated in any conversations with APS in regards to Tatia Lipe?
A. I did not. I didn't recognize the name when I was subpoenaed here. I honestly sent the request

to spam because I didn't recognize the name or why somebody would be reaching out to me.

Q. Okay. Is it also your testimony today that you were never told by any member of APS why the students were being reassigned to you?

A. That is correct.

Q. It was their position that they needed service minutes met and you were needed, correct?

A. Yes.

Q. Can you please explain how student assignments and caseload changes are reflected in the APS system?

MS. WESENBERG: Form, foundation. You can answer.

THE WITNESS: Caseload changes? It depends. So there is a group called SPED data and you have to email them upon receiving like a student, a new transfer student, an IEP notification of some sort for a new kid. You email them the student ID number. You say, Hey, I need them put on my caseload, and then they add them to your caseload, or when you -- when I came in as a new employee, they said, Here is your caseload. That came directly from sped data, and that was it.

BY MS. FOGHI:

Q. Okay. Did you ever have students moved from your caseload to another provider's caseload?
A. Only when they transferred from one school to another, like they're going to sixth to seventh grades, something like that.
Q. What APS records or systems would reflect that if there was a change in the assignment?
A. Probably just Synergy. It would say a different name listed under the child.
Q. So with respect to Synergy, give me your description of Synergy versus MaxCapture.
A. Synergy is a document hub. It houses all of our information about the student, phone calls, home, demographics, related student data, all of -- anything related to the student is in Synergy. MaxCapture is just a documentation hub so any time I see a student, I put a note in MaxCapture, and that's it.
Q. When you received this assignment, what personal knowledge did you have, if any, about why a particular student may or may not have been seen. If service minutes were needed, which is why you came on board, what information did you rely upon with respect to this idea that service minutes were not being met and that you needed to assist?

A. Nobody said service minutes weren't being met. They just said, These students need a social worker. These are now your students.

Q. What operational duties did you begin taking on for those students once you got the students?

A. Can you define operational for me? I'm sorry.

Q. I guess you could tell me just what was your goal? So you sat down with a student, you looked at the goals that were set forth. You looked at the IEP record, and you based basically your follow-up steps, I guess, or whatever you needed to do, based upon those two things? Is that what you relied upon?

A. Yes, I go through their documentation thoroughly. I meet with the student. I talk to them open and to see if they're willing to talk to me right away. Sometimes it takes some time to build rapport, but I also rely on communicating with their teachers and they're trusted adults to learn who that student is and what they need because their teachers are with them all day.

Q. So besides looking at those two documents, the goals and the IEP, there was no other records that you would have reviewed in order to assess their needs, correct?

A. No, Ma'am. We have to go all the way through Synergy and go through all of their historical docs to get clear information about the student that can include different assessments that the child may have had, where they stand in State testing, how often they're there at school, if they're absent, you know, a lot, or if they're there all the time. There is a lot of documentation within Synergy to review before you take on a student.

Q. Was there any flexibility in the semester based minutes that you have to put in; were you provided any flexibility?

A. No, I was told, these are their service minutes, meet them as needed, and that was it.

Q. How you met those minutes, was that up to you?

A. Yes, because it's per semester basis, so it's either I meet with them individually or in a group, based on what the week looks like and how they're maintaining in class.

Q. Give me one second, please.

At any point in time as you reviewed information, the specific notes as it pertained to any one of the reassigned students, any one of the 26 that I see on the list, did you look at any documents

that would have bared the name of my client as the prior social worker?

A. Probably.

MS. WESENBERG: Form, foundation.

BY MS. FOGHI:

Q. Did you have any -- did you put any emphasis on any of the notes, comments, suggestions that may have been put in by Tatia Lipe?

MS. WESENBERG: Form, foundation.

THE WITNESS: What do you mean, suggestion?

BY MS. FOGHI:

Q. So, you know, you have the progress towards goals that were listed. You had information historical information about the student, but I am assuming that in the detailed notes that a provider would have and placed in the record with respect to each of these students, would you have reviewed those detailed notes from the prior provider?

MS. WESENBERG: Objection.

THE WITNESS: The only notes that I review are the ones that are applicable in Synergy so it's going to be, again, assessments, actual documents that are vetted by APS. I do not have access to personal notes by other providers.

BY MS. FOGHI:

Q. All right. So lastly, when you started, I believe your first day would have been on the 23rd of February based on the email chain. Do you recall when your interview took place with APS?

A. Probably in a couple weeks prior. It was quite a long interview process and it took a long time to get into APS.

Q. Do you recall the person that interviewed you or the persons that interviewed you?

A. I believe it was Bernadette and Jessie.

Q. During this interview with Bernadette and Jessie, is it your testimony today that at no point in time were you told that you would be taking over the caseload of another social worker?

A. That is correct.

Q. All right. I don't have anything further.

MS. WESENBERG: I don't have anything for you either, and you are free to go.

THE WITNESS: Thank you.

MS. WESENBERG: We will read and sign, and I will do the same, same four-to-a-page, E-Tran.

MS. FOGHI: Same here. Thank you, Barb.

(At 12:06 p.m. the matter was completed)

WITNESS' SIGNATURE/CORRECTION PAGE

If there are any typographical errors to your Deposition, please indicate them below.

PAGE/LINE

______________________Change to____________________

______________________Change to____________________

______________________Change to____________________

______________________Change to____________________

Any other changes to your Deposition are to be listed below with a statement as to the reason for such change.

PAGE/LINE        CORRECTION    REASON FOR CHANGE

_____________________________________________________

_____________________________________________________

_____________________________________________________

_____________________________________________________

_____________________________________________________

I, Angelique Torres, do hereby certify that I have read the foregoing pages of my testimony as transcribed, and that the same is a true and correct record of the testimony given by me in this Deposition on April 7, 2026, except for the changes made.

____________________      __________________________
Date Signed               Angelique Torres

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

TATIA LIPE,
Plaintiff,
V. No. 1:23-cv-00899-GBW-JMR
ALBUQUERQUE PUBLIC SCHOOLS, et al.,
Defendants.

REPORTER'S CERTIFICATE

I, Barbara Jean Morgenweck, CCR # 526, DO HEREBY CERTIFY that on April 7, 2026, the Deposition of Angelique Torres, was taken before me at the request of and sealed original thereof retained by:

Boglarka Foghi
FOGHI LAW FIRM, LLC
5065 Corrales Rd.
P.O. Box 944
Corrales, NM 87048
505-220-5691
foghilaw@yahoo.com

I FURTHER CERTIFY that copies of this Certificate have been mailed or delivered to all counsel, and parties to the proceedings not represented by counsel, appearing at the taking of the Deposition:

Natasha A Martinez-Wesenberg
WIGGINS, WILLIAMS & WESENBERG
A Professional Corporation
Nwesenberg@wwwlaw.us

Karen Kilgore
CUDDY & MCCARTHY, LLP
1701 Old Pecos Trail
Santa Fe, NM 87502

kkilgore@cuddymccarthy.com

I FURTHER CERTIFY that examination of this transcript and signature of the witness was requested by the witness and/or all parties present. On ________, 2026, a letter was mailed or delivered to Natasha Wesenberg regarding obtaining signature of the witness, and corrections, if any, were appended to the original and each copy of the Deposition.

I FURTHER CERTIFY that the recoverable cost of the original and one copy of the Deposition, including exhibits, to Boglarka Foghi is $____________.

I FURTHER CERTIFY that I did administer the oath to the witness herein prior to the taking of this Deposition; that I did thereafter report in stenographic shorthand the questions and answers set forth herein, and the foregoing is a true and correct transcript of the proceeding had upon the taking of this Deposition to the best of my ability.

I FURTHER CERTIFY that I am neither employed by nor related to nor contracted with (unless excepted by the rules) any of the parties or attorneys in this case, and that I have no interest whatsoever in the final disposition of this case in any court.

____________________________
Barbara Jean Morgenweck,
NCRA, RPR
New Mexico CCR #526

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

TATIA LIPE,
Plaintiff,

v.

No. 1:23-cv-00899-GBW-JMR

ALBUQUERQUE PUBLIC SCHOOLS et al.,
Defendants.

---

# APPENDIX A-6

## PLAINTIFF'S YELLOW-HIGHLIGHTED DEPOSITION DESIGNATIONS OF BERNADETTE LUCERO-TURNER

Plaintiff submits this yellow-highlighted deposition-designation material as part of Plaintiff's corrective submission. Plaintiff preserves all designations, counter-designations, objections, completeness arguments, evidentiary positions, and rights under Doc. 256, the Federal Rules of Civil Procedure, and the Federal Rules of Evidence.

MARICOPA REPORTING

# Bernadette Lucero-Turner

**Date:** December 8, 2025

**Case:** Lipe v. Albuquergue Public Schools, et al.
**Case** #:1:23-CV-00899-GBW-JMR

Maricopa Reporting, Inc.
https://www.maricopareporting.com/
Phone: 1-844-667-8366
scheduling@maricopareporting.com

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

NATASHA LIPE,

Plaintiff,

vs. NO. 1:23-CV-00899-GBW-JMR

ALBUQUERQUE PUBLIC SCHOOLS, et al.,

Defendants.

ZOOM DEPOSITION
OF BERNADETTE LUCERO-TURNER
December 8, 2025
VIA ZOOM

2:41 p.m.

PURSUANT TO THE NEW MEXICO RULES OF CIVIL PROCEDURE, this deposition was:

TAKEN BY: BOGLARKA FOGHI
ATTORNEY FOR PLAINTIFF

REPORTED BY: PAUL BACA, CCR #112
MARICOPA COURT REPORTERS
SANTA FE, NM

A P P E A R A N C E S

For the Plaintiff:

FOGHI LAW FIRM LLC
PO Box 944
Corrales, New Mexico 87048-0944
505-220-5691
BY: BOGLARKA FOGHI
foghilaw@yahoo.com

For the Defendants:

CUDDY & McCARTHY LLP
PO Box 4160
Santa Fe, New Mexico 87502-4160
505-988-4476
BY: MARY KAREN KILGORE
kkilgore@cmc.com

Also Present:

Tasha Lipe

I N D E X

Examination By:

| | Page |
|---|---|
| Ms. Foghi ------------------------------ | 4 |

EXHIBITS

| Plaintiff's | Description | Page Introduced | Page Marked |
|---|---|---|---|
| Exhibit 9 | Report, 9-21-22 | 10 | 10 |
| Exhibit 10 | Ancillary Memo | 18 | 18 |

THE COURT REPORTER: On the record at 2:41.

(Whereupon, the witness was sworn.)

MS. FOGHI: Good afternoon. So really quickly as a preliminary matter, there is going to be documents that I need to show her, which I am not quite sure how we are going to do that with you, you know, appearing from a different location and not from where Ms. Kilgore is.

Karen, what are your thoughts on that?

MS. KILGORE: I don't know. Bernadette, can you receive e-mails or see documents on a screen?

THE WITNESS: Absolutely. I can do one or the other.

MS. FOGHI: What e-mail would I send the documents to?

THE WITNESS: I would probably prefer that you send them to my personal e-mail versus my school one. But if you want to send it to my school one, you can do that as well. I can see it on my phone.

MS. FOGHI: I can send it to your phone.

THE WITNESS: Okay. So the e-mail address is Bernadette.lucero@gmail.com pretty easy.

MS. FOGHI: All right. So we can start

and hopefully we will make it work. And if it becomes difficult, then we will just go ahead and do it another day, whatever we have to do.

THE WITNESS: All right.

MS. FOGHI: Okay. So, Bernadette, let me just message you the first one. I will copy you as well, Karen.

So Bernadette with two Ts, right?

THE WITNESS: That is correct.

MS. FOGHI: Okay. Thank you.

MS. KILGORE: Meanwhile, thank you, Ms. Lucero-Turner, for taking your kids in your class to a different classroom and teacher so that we could start a little bit earlier than planned today. Thank you.

BERNADETTE LUCERO-TURNER,
after having been first duly sworn under oath,
was questioned and testified as follows:

EXAMINATION

BY MS. FOGHI:

Q. Okay. So let's start with preliminary. I did send you the first exhibit, but we can begin with the deposition.

Ms. Lucero, would you please state your full name for the record?

A. Bernadette Renee Lucero-Turner.
Q. Okay. And could you please tell me how you are currently employed and in what capacity?
A. I am a seventh grade ELA -- I'm sorry, sixth, seventh and eighth grade ELA teacher at St. Mary's Catholic School in addition to being a seventh grade social studies teacher.
Q. Okay. And how long have you been at this school in this position?
A. I am going on my third year.
Q. Okay. When did you have an opportunity to, for the first time, hear about my client, Tasha Lipe?
A. As far as me having -- me being deposed this time?
Q. No, before. When was the first time that you met Tasha?
A. Gosh, I don't remember. I believe she filed a grievance against me and I think that was the first time I had had any kind of indication she was a social worker at APS.
Q. When was the formal grievance filed against you?
A. I don't have the date, I'm sorry.
Q. What was nature of the grievance?

A. It had something to do with her asking for mileage to take her daughter to a charter school. Something about her daughter being bullied at school and she somehow expected us to pay for mileage to take her daughter to a charter school. I don't know. I don't remember. Something to do with that.

Q. Okay. So it had to do with mileage, she filed a grievance against you.

Is it because you denied her request?

A. I had never -- I actually don't believe I have ever met her. I think I met her at the grievance. And I was not her immediate supervisor, at the time.

And she -- the grievance was not -- it was not -- she was not found to be -- the grievance wasn't found in her favor, because I don't believe she had ever spoken to me prior to that grievance. So it was a very odd situation.

Q. All right. So let me -- I will try to refresh your recollection, but the grievance you are referencing actually had nothing to do with mileage for her daughter.

The grievance that she filed against you had to do with her being moved out of the school. So it had nothing to do with mileage, it had to do

with her being moved out of the school, specifically Valley High School.

A. But there was something to do there about mileage as well. If you go back and look at the grievance, it was something that had to do with mileage as well. It wasn't a one-part grievance. It had multiple issues in it. And, again, I was not her supervisor at the time. I had never met her.

Q. Okay. Had you worked at Tony Hillerman?

A. No, I have never worked at Tony Hillerman.

Q. Okay. When she was moved from Valley High to Tony Hillerman, you don't recall that grievance being made against you for the decision to have her moved?

You don't remember that?

A. I mean, there were multiple issues with the grievance. And, like I said, the only -- I mean this was -- I don't -- if you have the grievance in front of you, you should have the date. It has been awhile. I have not been with APS for almost three years and that was even a few years before that. So you are really kind of taxing my memory at this point.

Q. That is okay. I will try to see if I can pull up some e-mails for you.

But, again, to refresh your recollection, the grievance that I am referring that had to do with issues at Valley High, specifically with Arnold Cordova.

Does that refresh your recollection?

A. No, it does not.

Q. Okay. Let me go ahead and for starters, let me show you what I have marked and sent over, and I think it is Exhibit 8.

A. Let me pull that up.

Q. (By Ms. Foghi) Okay. Take a look at this document.

A. Okay.

Q. It is titled Meeting for Tasha Harris Lipe, 9-21-2022. Take a few minutes to review this, please.

A. (Witness complies.)

MS. KILGORE: And did you send it to me, too?

MS. FOGHI: I did.

It is Exhibit 9. And I did copy you on the document, Karen. Let me resend it to you again. I will properly label it as Exhibit 9. And I will just send it straight to you but she already has it in front of her.

MS. KILGORE: I do have it marked as Exhibit 8.

THE COURT REPORTER: That is all right. No problem. It is Exhibit 9. We have it on the record.

Q. (By Ms. Foghi) So just take a few minutes to review this, please.

A. (Witness complies.) Okay.

Q. Can you please tell me where you were employed when this report is dated, 9-21-2022.

(Exhibit marked, 9.)

A. I was working at Albuquerque Public Schools.

Q. Okay. And you, at that time, worked with my client, Tasha Lipe, correct?

A. Well, I oversaw related services, yes.

Q. Justin Griego?

A. Yes. Justin was the assistant principal at Volcano Vista at the time.

Q. Jerry Thorn?

A. Jerry was the representative for ATN.

Q. Socorro Rodriguez?

A. And I believe she was with the ADA office, I believe.

Q. Okay. And Callie Marvin?

A. I believe they were both -- well, Callie Marvin was human resources, I think, if I remember correctly.
Q. Okay. So a few references here are made on this particular document that reference specifically you. And who would have been the person to make decisions about requested leave?
Do you remember this particular meeting?
A. Honestly we had so many meetings and so many e-mails, I am not 100 percent sure I remember this specific one. But I remember the discussions were around the same thing that was in this document.
Q. Okay. And in this document it specifically states in Paragraph Number 5 highlighted in red, "Bernadette told Justin the time off is left up to you."
A. Who is you?
Q. I am asking you to explain that.
A. I don't -- I don't remember. I mean, I assume this was recorded or something. So I don't remember what the specific of this was, to tell you the truth.
Q. Okay. Well, let me ask you just a blanket question, so to speak.

What is it that you do remember as it pertains to Ms. Lipe? And then, you know, I have documents with your name all over them. So my question is because your memory does not necessarily go back to that time frame or there was too much going on, I am not sure, can you tell me what it is you do recall as it pertains to my client?

A. So I remember that Ms. Lipe wanted to be able to work from home. And we asked her to go through the formal process of requesting that through the ADA office.

But I do remember with social workers it was difficult to grant them that time to work from home because a lot of what they do is crisis intervention at the school.

What I do remember is we worked very, very hard to try very hard to do what we could for Tasha. We were trying to be as accommodating as possible within the boundaries of the job and the law. And it seemed like every time we did something, she kind of moved the rules on us a little bit.

And I remember constantly having to problem solve because even though she was -- we were trying to work with her, things would get, would change or get complicated and we had to keep a

balance of helping her as much as we could and still getting -- certain that the child services were being provided at Volcano Vista.

That is the gist of what I recall. And, you know, there was no -- we were not angry about it, we were not upset about it, we were just trying our very best to ensure that we were doing right by children and making sure that those kids were getting seen and that any crisis was getting done.

I believe we even sent social out to Volcano Vista to help because we were trying to do what was in the boundaries of what we were allowed to do.

Now the call, if I am not mistaken, was made from the ADA office. And I know at the time after COVID a lot of people were requesting to work from home, but with social workers we really needed them at the school because they needed to be there in the event that there were crises.

Q. Okay. So there was a time, we all remember, during COVID where everybody was remote.

Do you recall that?

A. Yes, of course.

Q. Children were remote?

A. Correct.

Q. Social workers were remote?
A. Correct.
Q. Teachers were remote, correct?
A. Correct.
Q. And life continued, correct?
A. Correct.
Q. Are you talking to somebody or are you actually --
A. No, I am seeing, the custodian just opened the door.
Q. I just want to make sure you don't have to go. After COVID passed and my client requested accommodation due to her flare-ups, are you saying that no other social worker was working remotely during that time when she was requesting accommodations for medical reasons?
A. I don't remember that, I'm sorry. And I know you are kind of implying that I forget things, but it was a long time ago. I don't remember.
Q. Well, do you have access to documentation to review?
A. No, not at APS. I am a teacher now, I am not an administrator.
Q. Did you keep records of anything yourself personally?

A. Anything that I had because it was personnel issues, are with APS. No, of course not. I would not keep that private confidential information with me at this time.

Q. Who would have been responsible for making the decision to not allow her the accommodation? Who was the ultimate authority, because I have conducted several depositions to date and my question for you is, who was the person that ultimately said, No, we are not going to provide you with this accommodation?

A. I don't know. I don't remember because I know we were all in the meetings. I very clearly stated that we needed to have somebody there in the event that there was crisis. But I think it was Socorro that did it, but I could be wrong. I don't remember. I'm so sorry. I am not trying to be difficult, I just don't remember.

Q. Okay. So if you say Socorro was the one, would it surprise you if I told you that she stated that it was actually you that made that decision?

A. It could have been. Like I said, we were in the meetings together.

Q. Okay.

A. I mean, again, I have my reasons, you

know, we have a -- if you look at Volcano Vista it is a huge school. We had to have enough people there to ensure that the children's needs were being met. And I stand behind that but I don't really remember. I am sorry, I don't. If she said it was me and either way, what I am saying is we needed people, social workers on site. That is what I am saying.

Q. Okay. So with respect to anything that may have occurred while you were working for APS there would have been recorded interviews, correct?

A. Are you talking about Tasha recording? She was very clear she was always recording us, or are you talking about us, like, Socorro writing up the paperwork and request to work from home FMLA.

Q. Any recordings. Were any of the meetings recorded by either you or anyone besides my client?

A. I know Tasha was -- well, besides your client, like, video recording or handwriting, what are you talking about?

Q. Actual recording, a device that would be used to record a meeting.

A. No.

Q. Okay.

A. I -- Tasha always said that she was

recording no matter where we were. So I never knew it was true or not, but she always said. I am not aware that we were recording anything other than maybe Tasha was. I did not record anything.

Q. One of the things that you just mentioned to me was about having somebody available in -- when there is a crisis, correct?

A. Correct.

Q. So let me go ahead and show you what I am marking now as Exhibit Number 10.

MS. FOGHI: And I am e-mailing it both to you and to Karen.

MS. KILGORE: Thank you.

MS. FOGHI: Of course.

Q (By Ms. Foghi) Okay. Let me know when you have received it.

A. I have it.

MS. FOGHI: Karen, let me know when you receive it.

MS. KILGORE: I have not just yet, but I will. I just got it. Ancillary Memo.

MS. FOGHI: Yes.

Q. (By Ms. Foghi) Ms. Lucero, are social workers considered to be part of an ancillary staff?

A. They are.

(Exhibit marked, 10.)
Q. (By Ms. Foghi) Take a look at the memorandum that has just been labeled now as Exhibit Number 10 and tell me if this contradicts your position.
A. It does not.
Q. Where do you read that social workers are or are not part of the ancillary staff.
A. So I am not saying that they are not part of the ancillary staff, I am saying that this does not cover everything that a social worker does.
Q. Let's go to the paragraph that begins with, In short.
"In short, ancillary providers must also be used to support service to students with disabilities. This activity must be entered daily on a related service log. If a school wants" --
MS. KILGORE: And that is only.
MS. FOGHI: Sorry?
MS. KILGORE: I think you said the sentence reads, "Ancillary providers must only be used."
MS. FOGHI: Correct.
MS. KILGORE: You skipped that word.
MS. FOGHI: Correct. Okay.

Q. (By Ms. Foghi) "If a school wants the service of a social worker, for example, to work with general education students, that position would have to be funded through the school's budget and reported at a non-special education position code. Just to be clear ancillary providers include speech therapists, occupational therapists, physical therapist, social workers, adaptive PE teachers, et cetera."

Do you ever recall receiving or looking at this document?

A. Yes, of course.

Q. Do you agree with this document?

A. So I do, for -- but there is something in here you are not construing and I think what you are saying is that she does not need to be involved in crisis. But there are more crises than crisis teams.

Q. Okay.

A. And so that is where you are confused.

I'm sorry, hold on just a minute.

There are a lot more crises that are involved than just a crisis team log.

Q. Go ahead and elaborate. What else constitutes a crisis?

A. Suicide protocol.
Q. Okay. What else?
A. A student that is having some sort of meltdown that needs to see their social worker and that could include just about anything.
Q. Okay. Now, you had mentioned earlier that you worked really hard, that you all worked really hard to help Tasha?
A. Yeah, in which -- yeah, we were able.
Q. Well, tell me what you did that you would consider to be working hard for her benefit? Elaborate that for me.
A. She was given FMLA and she said she needed -- this again, I would need the documentation because I don't have it. So I am just being a little bit general on this.
And we were allowing her to go home when it was necessary. And then there is documentation through e-mails. She kept kind of changing the rules on us. So, we -- she would go home, she would say she would go home and then sometimes she would not tell us she was going home. Sometimes the kids were not getting seen. It was a very complicated situation because, you know, our -- we have an obligation to our special ed students to ensure that

their services are being given.

And so I know at one point we sent some social workers out there to help her. She said that they should not be allowed to help her because they were not part of their caseloads. So we were trying to, always, to try to troubleshoot anytime there was a problem and allow her to take FMLA when needed. But, again, it kept becoming more convoluted and complicated. So every time we tried to help, it changed into a different issue.

Q. Where is this documented, all of these efforts you made to help her? Show me someplace where these efforts that you talk about are documented because I have not seen anything is why I am asking you.

A. Well, there is no need for you to get upset or angry with me, I am just simply telling you there was communication. I had e-mail, after e-mail, after e-mail. I don't have any of that right now, because, these are personnel issues and I am no longer an Albuquerque Public School employee.

Q. I know that.

A. You can get as angry as you need to become but I am just simply saying that it became a very difficult situation. We tried to work with it and

it just became more complicated and more complicated. I know that it started out as one thing and by the time it ended it was a completely different thing.

Q. Okay. So a few things. I am not upset, I am doing my job. I advocate for my client. So if my tone to you seems as though I am upset with you, I don't know you. I have absolutely no reason to be upset with you personally, but I do have a right to be upset for my client.

So me advocating for her doesn't mean that I am upset with you, I just expect you to answer the questions to the best of your ability. And if you don't know the answer, then say, "I don't know the answer."

But I believe that what we must do at this point because there are going to be documents that I need to premark and have them sent over to you in advance so you can review documents in preparation for another deposition that I am going to have to do with you, I think that might be our best bet.

I can certainly cover as much as I can until I am able to, at which point I will ask you to make yourself available for another afternoon so that that way I can send over to you recordings and

exhibits that I would like for you to have in front of you and Ms. Kilgore so we can continue having the discussion.

A. I want to make it clear, though, I am a teacher at a school that does not have substitutes. We have just a couple of them. So I really need to be allowed to give testimony when I am not in class.

Q. Okay.

A. This is my job right now and I do not have substitutes. So if we can work with that, I need you to be aware of that.

Q. Okay. Well, you know, and Ms. Kilgore can tell you how the rules of what we can do and what we can't do as attorneys.

If I issue a subpoena, you have to comply with the subpoena regardless of your job.

So I am happy to work with you in some respect as long as it is suitable for my schedule and as long as it is also suitable based on time, because, I know that you're generally working until 3:30 and it all depends on if a court reporter is available at 3:30.

So there is other factors besides, "I am a teacher, I don't have any substitutes."

My response is I am very sorry to hear

that, but that has no bearing whatsoever on the job I have to do.
A. I understand that, but I am asking it to be a consideration.
Q. Absolutely.
All right. So getting back to a comment that you made where you stated that my client bends the rules and moves things around.
I would like for you to elaborate on specifics of that statement.
A. I'm sorry, did I actually say bends the rules?
Q. I believe you said she moves -- I think you said she moves the rules as she sees fit was exactly what you said.
A. If I said that, I am not clear.
Q. We can go back and reread it.
A. We started out with FMLA and we tried to work within the boundaries of that FMLA, and things kept getting more complicated. You know, I would send people out to help because we wanted to ensure that the kids could be seen and then we would not hear from her, or she -- I know she made the argument that she was the only one that was supposed to see the kids because of confidentiality, but yet,

they were not being seen.
And so we were trying to help and work within that situation. And, again, things just kept getting complicated. We kind of find a solution for one thing and then there would be another issue.
And I remember that because I was very, very much in the space that I was trying to ensure that students got their services. And yet, knowing that she was taking that FMLA, so if was kind of one of those situations where I was trying very, very hard to ensure that we all did as we needed to for as much as we could do.
Q. Did you participate in the Barrera interview?
A. I don't recognize what that is.
Q. Okay. Did you participate in any meetings with Dr. Bannerman?
A. Regarding Tasha?
Q. Of course. That is the reason I'm here today.
A. Gosh. I don't have a recollection of that.
Q. Okay. Are you also familiar with the systems used by APS, Synergy and MaxCapture?
A. Yes, I am.

Q. Tell me about what your understanding is with respect to each of those systems.

A. Well, Synergy is our, our documentation, so you can find your IEPs in there, your parent contacts, your documentation.

MaxCapture is where the ancillary staff puts in usually their notes and the minutes that they see the students.

Q. Okay. How far can you go back in this Synergy system, for example, to access information? Do you know if there is a limitation of what you can and cannot do?

A. Well, if I understand the question correctly, I don't have access to Synergy or MaxCapture at this time.

Q. I know that. Back in the day when you were there.

A. So, are you asking me if I could go into the systems?

Q. Yes.

A. I didn't truly understand MaxCapture just because I did not use it in my day-to-day job. I mean, I understood what it was for. If you ask me to go in and use it, I couldn't do it because I was not an ancillary staff.

Synergy I had some edit access but normally I was just looking at things because I did not actually normally run those type of meetings.

Q. Okay. All right.

MS. FOGHI: What I am going to do, Karen, and I think it is probably for the best being that she is -- Ms. Lucero is from a different location.

I think it will be important for you to be -- for her to be near you as I forward, there is going to be audio, hearings as well as other documents, and I feel that it would be important for her to be by you in order for us to wrap that up, so to speak.

So that is my proposal to do that, because there is quite a bit of recordings that I want you to hear, that you participated in, and interviews that you have also actively participated in. So that would be my proposal. We can discuss the date and time right now.

MS. KILGORE: Do you have those to provide through me or otherwise today or tomorrow?

MS. FOGHI: I can provide them to you for sure within the next couple of days.

MS. KILGORE: Okay. That is not a concern then.

MS. FOGHI: Okay. Perfect.
MS. KILGORE: I will leave it up to, Bernadette, then, to talk about availability.
MS. FOGHI: Okay. So go ahead and open up the calendar and let's see what date we are going to complete this.
Q. (By Ms. Foghi) Do you have ability on the 22nd of December?
A. I do.
Q. Are you out of school by then?
A. Yes, we are.
Q. Okay. So can we go ahead and schedule this, say, for 11:00?
A. Where?
Q. Well, you will go to Ms. Kilgore. We can do it by Zoom, but you would have to be next to Ms. Kilgore.
MS. KILGORE: Right, we can work through that, Bernadette.
THE WITNESS: All right.
Q (By Ms. Foghi) Okay. So we will schedule --
MS. FOGHI: And make sure Mr. Baca is available because I would like for you to complete the --

THE COURT REPORTER: No problem. Anything for you guys.

Q. (By Ms. Foghi) So we will do December 22nd and let's plan on 11:00 to 1:00.

A. Okay.

Q. Okay. And then I will make sure that Ms. Kilgore gets all of the documentation, recordings, any paperwork in advance of that.

We will premark them to continue on with the numbers that we are already at. I think the next one that we would be on would be Exhibit Number 11 would be the next exhibit. Okay.

MS. FOGHI: Karen, you are good with all of that?

MS. KILGORE: I will make sure that I can be.

MS. FOGHI: Okay. Sounds like a plan. I am glad that you at least made yourself available for part of all of this. And we will just continue once the logistics of it are easier for you as well.

(Proceedings adjourned at 3:20 p.m. to resume December 22, 2025 at 11:00 a.m.)

WITNESS SIGNATURE/CORRECTION PAGE

If there are any typographical errors to your deposition, indicate them below:

PAGE/LINE

____________ Change to ______________________________

____________ Change to ______________________________

____________ Change to ______________________________

____________ Change to ______________________________

Any other changes to your deposition are to be listed below with a statement as to the reason for such change.

PAGE/LINE CORRECTION REASON FOR CHANGE

__________________________________________________

__________________________________________________

__________________________________________________

__________________________________________________

__________________________________________________

__________________________________________________

I, BERNADETTE LUCERO-TURNER, do hereby certify that I have read the foregoing pages of my testimony as transcribed and that the same is a true and correct transcript of the testimony given by me in this deposition except for the changes made.

_________________________
BERNADETTE LUCERO-TURNER

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

NATASHA LIPE,

Plaintiff,

vs. NO.1:23-CV-00899-GBW-JMR

ALBUQUERQUE PUBLIC SCHOOLS, et al.,

Defendants.

CERTIFICATE OF COMPLETION

I, Paul Baca, CCR #112, DO HEREBY CERTIFY that on December 8, 2025, the Deposition of BERNADETTE LUCERO-TURNER was taken before me at the request of Boglarka Foghi, and the sealed original thereof was retained by:

FOGHI LAW FIRM LLC
PO Box 944
Corrales, New Mexico 87048-0944
505-220-5691
BY: BOGLARKA FOGHI

I FURTHER CERTIFY that copies of this certificate have been mailed or delivered to the following counsel and parties not represented by counsel appearing at the taking of the deposition:

CUDDY & McCARTHY LLP
PO Box 4160
Santa Fe, New Mexico 87502-4160
505-988-4476
BY: MARY KAREN KILGORE

I FURTHER CERTIFY that examination of this transcript and signature of the witness was requested by the witness and all parties present.

I FURTHER CERTIFY that the cost of the original and one copy of the deposition to BOGLARKA FOGHI is $__________.

I FURTHER CERTIFY that I did administer the oath to the witness herein prior to the taking of this deposition; that I did thereafter report in stenographic shorthand the questions and answers set forth herein, and the foregoing is a true and correct transcript of the proceeding had upon the taking of this deposition to the best of my ability.

I FURTHER CERTIFY that I am neither employed by nor related to any of the parties or attorneys in this case and that I have no interest in the final disposition of this case in any court.

________________________

PAUL BACA, RPR, CCR
Certified Court Reporter #112
License Expires: 12-31-2025

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

TATIA LIPE,
Plaintiff,

v.

No. 1:23-cv-00899-GBW-JMR

ALBUQUERQUE PUBLIC SCHOOLS et al.,
Defendants.

---

# APPENDIX A-7

## PLAINTIFF'S YELLOW-HIGHLIGHTED DEPOSITION DESIGNATIONS OF ANTOINETTE ROMERO

Plaintiff submits this yellow-highlighted deposition-designation material as part of Plaintiff's corrective submission. Plaintiff preserves all designations, counter-designations, objections, completeness arguments, evidentiary positions, and rights under Doc. 256, the Federal Rules of Civil Procedure, and the Federal Rules of Evidence.



Attached deposition-designation PDF pages: 63

MARICOPA REPORTING

# Antoinette Romero

**Date:** September 5, 2025

**Case:** Lipe v. Albuquerque Public Schools, et al
**Case Number:** 1:23-CV-00899-GBW-JMR

Maricopa Reporting, Inc.
Phone: (480) 597-4744
scheduling@maricopareporting.com
https://www.maricopareporting.com/

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

NO: 1:23-CV-00899-GBW-JMR

TATIA LIPE,

Plaintiff,

-vs-

ALBUQUERQUE PUBLIC SCHOOLS and
NEW MEXICO DEPARTMENT OF PUBLIC EDUCATION,
Defendants.

DEPOSITION OF ANTOINETTE ROMERO

FRIDAY, SEPTEMBER 5, 2025
9:00 a.m.
Gateway Financial Services,
6000 Uptown Blvd. NE,
Albuquerque, New Mexico 87110

PURSUANT TO THE NEW MEXICO RULES OF CIVIL PROCEDURE, this Deposition was:

TAKEN BY: BOGLARKA FOGHI, ESQ.
ATTORNEY FOR PLAINTIFF

REPORTED BY: CHRISTINE J. ROYBAL, CCR, RPR, CSR
CCR No. 50
Maricopa Reporting
Santa Fe, New Mexico 87501
480-597-4744

A P P E A R A N C E S

For the Plaintiff:

FOGHI LAW FIRM, LLC
5065 Corrales Rd., P.O. Box 944
Corrales, New Mexico 87048
(505) 220-5691
foghilaw@yahoo.com

BY: BOGLARKA FOGHI, ESQ.

For the Defendants:

CUDDY & McCARTHY, LLP
1701 Old Pecos Trail
Santa Fe, New Mexico 87502
(505) 888-1335
kkilgore@cuddymccarthy.com

BY: KAREN KILGORE, ESQ.

I N D E X


| WITNESS: | Page/Line |
| --- | --- |
| Antoinette Romero | |
| Examination by Ms. Foghi | 54:25 |
| Examination by Ms. Foghi | 58:10 |
| Certificate of Completion of Deposition | 61:1 |
| Exhibit 9 Text Messages | 25:22 |
| Exhibit 11 Staff Sign-in/Sign-out Sheet | 32:7 |
| Exhibit 13 Audio Recording (Retained) | 15:18 |
| Exhibit 14 Audio Recording (Retained) | 31:11 |
| Exhibit 15 Document Packet | 34:6 |

I N D E X

All Witnesses: Page

Examination by Ms. Foghi 5:6
Examination by Ms. Kilgore 51:4
Examination by Ms. Kilgore 57:19

Friday, September 5, 2025

(The deposition proceeded at 11:41 a.m. as follows:)

ANTOINETTE ROMERO,

was called as a witness and, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MS. FOGHI :

Q. Good morning, Ms. Romero. I'm attorney Boglarka Foghi and I represent Tatia Lipe. Thank you for being here today. Are you aware of why you are here today?
A. Yes, I am.
Q. Okay. Have you ever had your deposition taken before?
A. Yes.
Q. Can you tell me the circumstances?
A. It was an investigation with CYFD.
Q. Okay. Did it have to do with APS?
A. Not Albuquerque Public Schools, if that's what you're referring to.
Q. Was it personal?
A. No.
Q. Was it in your capacity -- in your capacity as a social worker?
A. Yes, it was.
Q. Is that the only time that you've been deposed?

A. Yes.
Q. I will be asking you a series of questions, providing documents for your review. If you don't know the answer to a question, simply state that you're unaware or don't know the answer. If you need to take a break as well please let us know.
A. Okay.
Q. Okay, so let's start with your full name please for the record.
A. Antoinette Romero.
Q. Okay. What is your current position at APS?
A. School social worker.
Q. How long have you been at APS?
A. About 23 years.
Q. What school are you specifically working with?
A. Currently, I am at Volcano Vista High School.
Q. How long have you been there?
A. Since about 2018.
Q. And prior to Volcano Vista where were you employed?
A. I was at West Mesa for about three months, two months maybe.
Q. Did you depart that school on good terms?
A. Yes.
Q. As a social worker at APS, specifically at

Volcano Vista, what are your primary responsibilities?
A. It is to see the students, to address their IEP goals, to support them academically.
Q. Did you work with Ms. Lipe at Volcano Vista High School?
A. Yes, I did.
Q. And for what period of time did you work with her?
A. I'm thinking it is between 2019 to 2022.
Q. Was that the first time you met her?
A. No.
Q. When did you get to know Ms. Lipe?
A. I didn't get to know her I met her once and that was in a training.
Q. Do you know what year that was?
A. Probably 2019, maybe 2018.
Q. Okay. Can you describe your professional interactions with my client?
A. Ms. Lipe made me uncomfortable because I was quite aware previous to her coming to Volcano Vista that she was the type that records people just to get them in trouble or to sue.
Q. Okay, let me stop you, hold on, because that's one statement I'm going to follow-up on.
A. Okay.
Q. "She is the type that records people." So I want

you to tell me, specifically point to an incident where she was recording people.
A. The thing is, is most people were already aware. I had been warned two years previous to Volcano Vista that she was just someone that you wouldn't trust, that you would be uncomfortable around because she always had to be right, or she was always interacting negatively with other people.
Q. Okay. So she made you feel uncomfortable because she would often record people and then you followed that up by saying, "And sue people."
A. Yes.
Q. Who has she sued based on your knowledge? Hold on, I have to finish my question.
A. Uh-huh, you're right.
Q. Besides this case, tell me what other lawsuits you are aware of that she had initiated?
A. I actually was not aware of what lawsuits, these are just things that people would say.
Q. So you're basing your comment on other people's hearsay. You're basically making a comment, an extremely derogatory comment that you're basing, based on other people?
MS. KILGORE: Objection. She clarified that she heard at the very beginning.
MS. FOGHI: Okay. All right.

Q. (BY MS. FOGHI) Were you ever my client's supervisor?
A. No.
Q. Okay. Were you ever my client's subordinate?
A. No. I don't think so, no.
Q. Were you all on the same level?
A. What does that mean?
Q. Tell me your educational background.
A. I have a Master's in school social work, I have a Bachelor's in school psychology. I have over 35 years in multiple jobs experiences. I have experience with CYFD, I have personal therapeutic experience as a clinician in an office, I have been a school social worker for over 23 years.
Q. What was the -- was there a level designation to your job at Volcano Vista as a social worker?
A. No.
Q. So your job was you were just a social worker?
A. Yes.
Q. Just like Tatia was a social worker?
A. I was also a clinical supervisor.
Q. Okay. But you were not her supervisor?
A. No.
Q. Okay. Did you ever participate in any meetings or discussions regarding my client's ADA and FMLA requests?

A. No.
Q. Were you ever asked to provide information regarding my client's performance or conduct?
A. No.
Q. Okay. When my client first started working with Volcano Vista you made negative statements about her to others at the school, correct?
A. Yes.
Q. And the statements that you would have made to others included what you just told me?
A. It was about that she would personally record without people's knowledge.
Q. Okay. Do you know the law in the state of New Mexico as it pertains to recording?
A. Yes.
Q. She has every right to do that if she chooses to.
A. Yes.
Q. Did you ever make comments about my client's professionalism, I would say, because character you've already commented on. Professionalism?
A. No.
Q. Okay. Do you think that Tatia did a good job at her job as a social worker?
A. No.
Q. Okay. Tell me why.

A. She did not see students. She was never there at the school. She spent most of her time by herself in her office using APS equipment to come up with a lawsuit. And the only reason I know that is because she was the one talking about how she was going to bring APS down.

Q. Okay. You seem extremely agitated?

A. No, I'm not.

MS. KILGORE: Objection.

Q. (BY MS. FOGHI) Any particular reason why -- you're -- today, not very -- you don't seem very comfortable.

A. I actually don't feel well, and I have been sick for five days.

Q. That's good to know. I appreciate you telling me that. I hope you feel better.

Identify the people that made these comments to you about Tatia being the type to file lawsuits and to record people.

A. So I have held multiple jobs at APS and I cannot name anyone specific. I know that I worked at summer school and people were talking about her. I didn't even know who she was until I asked somebody specifically, but that was like five -- five years ago.

Q. Okay. So nobody can be identified?

A. It was one person I interned that absolutely did

not want her interning her.
Q. Sorry, say that again.
A. There was one person that I interned that did not want anything to do with Tatia.
Q. Who is this person?
A. Her name was Brandi Aceves.
Q. Spell her last name.
A. A-C-E-V-E-S.
Q. Why did Brandi, in your knowledge, not want anything to do with my client?
A. Well, it was not necessarily a conversation, she said she was uncomfortable, that she was aware she recorded without personal knowledge and that she was very unprofessional, and did not do her job at the school she was at.
Q. But again, your personal knowledge. I don't care about Brandi. Your personal knowledge.
A. My personal knowledge, I don't know. I did not know anything about Tatia at that point. I only know what I have heard.
Q. Did you ever have a meeting with Dr. Bannerman?
A. Yes, at one time.
Q. And did any of those meetings have to do with the report that Tatia made against you based on your conduct?
A. At the time, I really wasn't aware of, it's about

my conduct. We were being -- all three of us were disciplined for gossip or talking or being unprofessional.

Q. Who were the three people disciplined?

A. Myself, Tatia, and Rosita Moya.

Q. What was the nature of the discipline?

A. I don't know if it was necessarily discipline versus a talking-to and plan how to maintain professionalism.

Q. Who spoke with you?

A. Dr. Bannerman. And it was not necessarily individually, it was with the three of us.

Q. Did Dr. Bannerman ever direct you to stop discussing Ms. Lipe with others?

A. Not necessarily, because I wasn't discussing Ms. Lipe with others.

Q. If -- well, you indicated to me, and this is the first time I'm meeting you, that you had all these people telling you about her nature, about her filing lawsuits, about her recording people. Did you tell others at the school that very same information?

A. I told one person.

Q. Who did you tell?

A. I told Rosita.

Q. And who is Rosita?

A. She was the third social worker that was hired at

Volcano Vista.

Q. Okay, following the meeting that you had with Dr. Bannerman that had to do with this behavior and professionalism, did you ever apologize to my client?

A. Maybe for saying that I shouldn't have told Rosita that she recorded.

Q. Okay. In that meeting did you acknowledge your statements about my client were inaccurate?

A. No.

Q. Did you ever acknowledge in your meeting that your statements were inappropriate?

A. No.

Q. In the months that followed that meeting and that discipline, so to speak, with Dr. Bannerman, you and Ms. Lipe regularly had lunch together, right?

A. No.

Q. Oh, you did not?

A. Not for the first two years. Not when Rosita was there.

Q. Did you -- and we'll take a brief minute here, but -- so you said you did not regularly have lunch with her?

A. No.

Q. Did you communicate with her regularly?

A. Yes.

Q. How did you communicate with her?

A. It depends what year you're talking about. There was a year when Rosita was next door to me, and when Rosita was moved, Tatia was then moved next door to me. So we spoke after -- we spoke more after Rosita left Volcano Vista.

Q. The nature of your communication, how did you guys speak, in person?

A. At school. We talked when we were at school.

Q. What I'm going to do now is I'm going to play an audio recording and I'm going to mark as Exhibit -- is it 12 or 13?

MS. KILGORE: That doesn't mean we have 12 exhibits, right?

MS. FOGHI: I'm going in order of ones that we have not yet labeled. So, we're going to go now to Exhibit 13.

(Exhibit 13 marked.)

Q. (BY MS. FOGHI) And I'm going to play an audio recording, which is the, Bannerman, Dr. Bannerman meeting. And turn up the audio please.

A. Okay.

MS. KILGORE: Do we have a date?

(Playing video/audio.)

Q. (BY MS. FOGHI) So that interview with

Dr. Bannerman, first I think we should establish when the date of that interview is. Do you recall when the date of that interview with Dr. Bannerman was?

A. I really don't. I realize it was probably soon after Tatia started after Volcano Vista.

Q. I will try to get that date, but you heard some of the interview. Do you recognize the voice on that interview?

A. Yes.

Q. Would that be the voice of Dr. Bannerman?

A. Yes.

Q. I'm going to continue with the interview, and then I will have you, you know, obviously tell me that that's your voice and all that kind of stuff and then the date. Hopefully we'll give you that date before this is finished.

MS. LIPE: I have it right here.

MS. FOGHI: Karen, there's just too much paper.

MS. KILGORE: Totally.

(Off the record.)

Q. (BY MS. FOGHI) So the exhibit I'm -- audio recorded No. 13 is November 13, 2019. We're meeting with -- promptly scheduled to address these issues, so go ahead, please.

(Playing video/audio.)

Q. (BY MS. FOGHI) Okay.

MS. KILGORE: Could I ask, was Rosita at the meeting, too?
MS. LIPE: Yes.
MS. FOGHI: Okay. It's a very good question because when she said this is about the two of you, I thought it was only you and Ms. Romero, I didn't know Rosita was there as well.
MS. LIPE: It was -- the assistant principal was there, Bernadette Lucero-Turner was there, it was Michelle Trimble Allen, Bernadette, Dr. Bannerman, the three of us. I think that was it.
MS. KILGORE: Okay. Dr. Bannerman, Bernadette Romero, Rosita --
MS. LIPE: Michelle Trimble Allen.
MS. FOGHI: Obviously Rosita and Ms. Romero and my client?
MS. KILGORE: Okay.
MS. FOGHI: Okay, continue, please 1, 2, 3, 4, 5, 6 people.
Q. (BY MS. FOGHI) In that comment, and we're going to resume the recording, you accept ownership, she said do you accept ownership of things you've done?
A. Uh-huh.
Q. Go ahead, please.
(Playing video/audio.)

MS. KILGORE: It is okay, because it is still not you and you --
MS. FOGHI: It is not opening properly. This is so irritating, actually.
MS. LIPE: Yeah.
MS. FOGHI: How long is the recording?
MS. LIPE: This one, this part is not --
MS. KILGORE: This part?
MS. LIPE: This has -- I can explain if you want to know.
MS. KILGORE: We need the whole thing as the exhibit.
MS. FOGHI: Why don't we replay it if it is able to open, and just listen as long as we can recognize the voices and identify the voices.
MS. KILGORE: Good idea.
(Playing video/audio.)
Q. (BY MS. FOGHI) Did you recognize your voice on that recording?
A. I didn't, actually, but I can hear the conversation.
MS. LIPE: Actually --
Q. (BY MS. FOGHI) We can go back.
A. I know I'm in that meeting, I don't know which is my voice. I can hear hers.

Q. Well, she asked you do you agree --
A. Yes.
Q. -- that you had made a comment. I'm assuming she's talking about three people, those three people could have been you, Tatia, and Rosita?
A. Uh-huh.
Q. All right. Did you continue to spread rumors despite being instructed to cease and desist?
A. No.
Q. Did -- were you interviewed as part of an internal investigation concerning my client?
A. Yes.
Q. Do you recall when you were interviewed?
A. I think in '22, maybe early '23.
Q. Do you recall what you said to the interviewer at that time about my client?
A. Probably not word-for-word.
Q. Give me a summary of what you believe you might have said about Tatia. What do you believe you may have said about Tatia?
A. I don't know. I just answered his questions.
Q. I'm going to redirect you to Plaintiff's Exhibit No. 2, and that is the February 7, 2023 investigation that was done by Investigator Barreras.
MS. FOGHI: Do you have a copy of that to give to

her?

Q. (BY MS. FOGHI) And if you can please turn, I will -- just had your page in my hand and I lost it. If you can please turn to Page No. 15. And if you don't mind, just review that interview which is Page 15, Page 16, and three-quarters of Page No. 17.

A. Okay.

Q. All right. So what I would like to do briefly, I know you reviewed it and I'm going to get right back to this exhibit. I want to go back to the recording that we just played because there's additional excerpts of this that I'd like to play when you're ready.

MS. KILGORE: Same -- same recording?

MS. FOGHI: Same recording.

MS. KILGORE: After what we just listened to? Same day or but not immediately following?

(Playing video/audio.)

Q. (BY MS. FOGHI) That would be your voice on the recording?

A. Uh-huh.

Q. Okay.

MS. KILGORE: You have to say yes or no.

A. Yes.

Q. (BY MS. FOGHI) So getting back to this report that has previously been labeled as Exhibit 2. I believe

you've had an opportunity to review your recorded interview?
A. Uh-huh, yes.
Q. In that interview, once again, you -- this is now fast forward we're in 2023, and at this point, you've known my client for about 4-to-5 years, correct?
A. Yes.
Q. And you indicated to the interviewer that the other social workers, I assume you're speaking about Ms. Lipe and Rosita, that they were quote toxic. This is on Page 15 and under your recorded interview, Paragraph No. 4?
A. Yes.
Q. And this comment about them being toxic, what did you base that comment on?
A. My own experience.
Q. Well, tell me about your experience. I'd like to know what made your experience toxic.
A. First of all, having and knowing at all times that someone is recording you is very stressful. You can't go into a meeting comfortably and really talk about students or have real meetings because my -- just interacting with Ms. Lipe, it is all about how she can catch someone doing something wrong. If she does not like something, if she's not in control, she loses her mind. On the first day that she walks into Volcano Vista and we are splitting our caseload -- there was no need to split a caseload -- she

walked in and she went ahead and split the caseload with the three of us. Nevermind I was there the year previously. The right, therapeutic thing to do is to actually cease to keep my caseload because I have already created a rapport. I noticed instantly she was extremely upset that she was not able to do our caseload. After that year, every year after, Ms. Lipe insisted on splitting our caseload. It wasn't until the last two years I said this should be a collaborative team and it is not up to her. That was for the last year because I was tired of the conflict pushback and her having to run things that I just asked administration to do it. I didn't care what students there were, we should have been able to work as a team.

On another occasion, which was, which was, I think, in '22 at the end of the school year, I had actually been told that she sat there in a meeting cutting up slits of paper with student names and throwing them in a can. I kept that information to myself. Two days later, I get a chat message, which I can probably pull up out of my phone that she wants to do a drawing. I have no idea what she means by "drawing," so I -- she coerces me into stepping outside of my office, has a can in her hand with all of the students' names in it and starts shoving it in my face to pick the names out of the can. I refuse to split cases like that. I asked her to sit down to discuss the students. She started

dancing down the hallway yelling that she was going to call administration. And there was a witness teacher.

Q. Okay. Who was responsible for splitting up the caseloads?

A. As a team, the two of us should have been mature enough to both do it.

Q. Well, with all due respect, you clearly were not mature enough if you allowed her to split the caseload and now you're complaining about it.

MS. KILGORE: Objection.

Q. (BY MS. FOGHI) Were you able to split the caseload yourself?

A. I did discuss it with her, and yes, we did split the caseload the last three years. I just put my foot down and didn't let her pick and choose the students she wanted.

Q. So the idea that Dr. Bannerman said, you know, put things behind you, move on, clean slate, or else discipline will face you, you clearly did not give that any regard because you continued with your toxic behavior.

MS. KILGORE: Objection; form.

Q. (BY MS. FOGHI) You clearly have an issue with my client.

MS. KILGORE: Objection.

Q. (BY MS. FOGHI) Do you have an issue with my client?

A. As long as I don't have to work with her, I have no issue.

Q. Well --

A. I know.

Q. But you did work with her for quite a number of years, and we'll get to that further.

So let's talk about my client's request specifically. Were you involved in any conversations with respect to her request to take leave?

A. No.

Q. Okay. Did you know that she was going to take leave?

A. No.

Q. Do you know she had medical conditions?

A. Only because she told me.

Q. Okay. As far as the way that you-all handled your basically arriving at the work site, at the school, did you have a sign-in/sign-out sheet?

A. We always had sign-in and sign-out sheets.

Q. Is it mandatory to sign in and sign out when you come?

A. Absolutely.

Q. Okay. And that's something that you have to do daily, correct?

A. Yes.

Q. Are you aware if is this something that Ms. Lipe had to do, as well?
A. Yes.
Q. Have you ever communicated with administrators or HR about my client's caseload?
A. Repeat that question.
Q. Have you ever communicated with administration about my client's caseload?
A. No.
Q. Okay. How about her job performance?
A. No.
Q. Did you ever witness or participate in any discussions about removing and reassigning students to another social worker?
A. No.
Q. Okay. Did you exchange text messages with my client during this time period between -- let's go to 2021 to 2023 when she was at Volcano Vista?
A. Yes.
Q. Let me show you what I have marked as Plaintiff's Exhibit No. 9.
(Exhibit 9 marked.)
Q. (BY MS. FOGHI) Take a look at, glance through them, I am not expecting you to read through all of them, but I will direct you to certain messages. Let me know when

you're ready.
A. You know, the truth is, I don't know who is who. So which one would be me?
Q. So my copy is all black, is your copy colored or black?
A. Colored.
Q. Yours is colored?
MS. KILGORE: Mine is, too. If you need to trade, but I am also interested in the dates here because I see a skip from October 12th, '21 and the next one is April 12th, 2022.
Q. (BY MS. FOGHI) Sure. So October 12th, and if you go to the second page it goes to October 22. So they are on duplicate sides.
A. Yes, two columns.
Q. And it goes on from 2021 October, and I think the last message on this is going to be January 8, 2022, which is the last page.
MS. KILGORE: These are from Ms. Lipe's phone? Cell phone?
MS. FOGHI: These text messages reflect conversations between my client and now the witness, Ms. Romero. My client -- my page, first page, she is the top and you would be -- so I don't know if you have the colored copy -- Ms. Lipe would be the black and I believe

the blue, which on mine is gray, would be Ms. Romero. So let me direct you to the very first message, October 12th, 2021. "Good morning, I have a dental appointment this morning and I didn't write an administrator. If someone is looking for me, can you please let them know I have an appointment or come in and put the time in later."

That would be Ms. Lipe writing to you -- oh, that's her. Okay, so reverse -- reverse that order. "Good morning. I have a dental appointment" -- that actually is a message that was sent by Ms. Romero. And my client responds to that, "Good morning, okay."

Do you recognize this text message, Ms. Romero?

A. I don't.

Q. Do you remember exchanging text messages with my client and specifically you having a dental appointment and asking her to cover for you?

A. No.

Q. You don't? So what I'm going to do is I'm going to subpoena your phone records, that will be the next thing I'm going to do because if you don't realize the series of text messages, which are yours --

A. I'm not saying that they are not mine, I'm saying I don't recognize. It is years ago and we're talking about a dental appointment, so...

MS. KILGORE: Objection to the form of the

threatening.

MS. FOGHI: And I -- I don't mean to be threatening, I don't mean to be. I'm just saying that if -- if you don't recognize this exhibit in its totality and you say that it is not, you cannot say definitively that this is your text message exchange with my client, that is okay.

MS. KILGORE: I don't believe she is saying that, she just said she didn't recognize, but now she said she has identified that she is in the black and Tatia Lipe is in the blue.

Q. (BY MS. FOGHI) So the first message that I'd like to, you know, without going through every single message, your counsel will have, you're asking my client to cover for you; is that correct?

A. Sounds like it.

Q. Okay. And this is a person that you regard as being toxic, being -- I don't know what the word is. I'm not going to use words that you did not say, but toxic a word that you used. You also said that you're not comfortable dealing with her, working with her, et cetera, et cetera. But yet, you are messaging her with beautiful shining stars and suns and asking her to cover for you while you're in a dental appointment?

MS. KILGORE: Objection. I do not see stars.

MS. FOGHI: I see a sun and I see a heart.

MS. KILGORE: I see a sun, later I see a heart.
Q. (BY MS. FOGHI) This is someone that you did not care for, correct?
A. Yes.
Q. This is someone you did not really want to work with, correct?
A. Yes.
Q. Because she was bossy?
A. Uh-huh.
Q. Because she was annoying, because she was toxic; am I correct?
A. It has nothing to do with those descriptions.
Q. Well, I'm asking you a question based on those messages. Let's continue.
A. Okay.
Q. You continue to then say, "I brought a plastic fork with me. LOL. I don't have an extra one. I'm sure we can find someone somewhere." To which my client responds, "I have a bunch at home, I will bring it and leave it in my car." Were the two of you having lunch together on a regular basis?
A. From my recollection after Rosita left and after our time during COVID, because we were at home for a year and-a-half, so there was a year-and-a-half I did not work directly with Tatia because a year-and-a-half of that was

during COVID. When Rosita was transferred, yes, Tatia and I became a little bit friendlier. I do believe it is important, like we had discussed in the meeting with Dr. Bannerman, and like I told her in the previous conversation that I believe in working as a team as social workers for the good of the students.

Q. Let me go ahead and direct you to Page No. 3 of Exhibit 9, October 18, 2021, 7:41 a.m. Did you send a message to my client stating, "Good morning, am I in trouble is someone looking for me? It is kind of funny, but not, because I haven't left my house."

Were you running late for work?

A. I probably was because if I sent that to her.

Q. How often were you running late for work?

A. I don't know. It would depend, because there are times I also had to go to meetings and did not go directly to the school.

Q. So your attendance record would also be part of the sign-in and sign-out sheets, correct?

A. Yes.

Q. Did you ever ask my client for help with your daughter. Do you have a daughter?

A. I have two.

Q. Okay. Did you ever ask my client to help you in any way with your children or child?

A. Not that I recall.
Q. Okay. I will get back to that one.
Did you have a call with Ms. Lipe on February 4, 2022?
A. Sorry, say that again.
Q. Do you recall having a phone conversation with my client on February 4th, 2022?
A. No.
Q. Okay. I will come back to the message regarding the daughter, but let me play for you an audio which now we're going to mark as Exhibit 14.
(Exhibit 14 marked.)
Q. (BY MS. FOGHI) Of the February 4th, 2022 call.
I will go to another question and I'll come back when she finds the recording because I can't waste time on that.
In your interview with Investigator Barreras, you indicated to him -- that was Exhibit 2 -- that social work could not be done remotely, correct?
A. Yes.
Q. And you base that comment on the social work not being able to be done remotely on what? What did you base that comment on?
A. On policies and procedures.
Q. Okay. Policies and procedures. Do you have a copy of that policy and procedure?
A. No.

Q. Okay. But you were aware --
A. It is a job description.
Q. So let me show you what we have previously marked in this case -- I'm a complete mess here. The sign-in/sign-out sheet that was previously marked as Exhibit No. 11. Would you take a look at Exhibit No. 11?
(Exhibit 11 marked.)
Q. (BY MS. FOGHI) Do you see that sign-in/sign-out sheet?
A. I do.
Q. Do you see your name on the very first line?
A. I do.
Q. What does it indicate on the line?
A. That I had worked from home.
Q. You stated five seconds ago that it was policy that you could not work from home?
A. That's right.
Q. You violated the policy?
A. No.
Q. The policy doesn't apply to you?
A. I didn't say that, but I could explain as to why I would have done that. During the year '21 and '22, it was during COVID. We were supposed to and expected to stay home. When we were released back into the school, I am assuming we could either provide at home and at work, but

after COVID we were not allowed to work from home.
Q. When did COVID end? It wasn't in 2022.
A. I don't remember.
Q. But you were working from home in 2022?
A. Okay.
Q. Are you aware of APS newsletters that exist, did you receive those?
A. Yes.
Q. And are you aware that there are instructions for social workers in that newsletter providing remote services?
A. No.
Q. Are you aware of any APS policy -- well, you just indicated that you are aware of the policy that there's no working remotely?
A. Correct.
Q. Did you personally participate in remote meetings subsequent to COVID?
A. Before?
Q. Before COVID and after COVID.
A. Never before.
Q. Never before? How about after COVID?
A. After COVID, yes.
Q. Did you participate remotely in IEPs after COVID?
A. It depends. During the time the State was mandating and the schools were rolling out the kids to come

back. When the kids were allowed to come back, but were not forced to come back, they had a choice. I chose to go in to the school and provide the services, not to do it online.

Q. Okay. Let me show you what I'm marking as Plaintiff's Exhibit No. 14. Take a look at that document.

(Exhibit 15 marked.)

Q. (BY MS. FOGHI) When you look at this packet of Exhibit 15, specifically the first page, it is -- is a shorter letter dated August 31, 2021. Do you see that at the top?

A. Uh-huh.

Q. It came from my client?

A. Uh-huh.

Q. Is that your email address?

A. Yes, it is.

Q. And there was an attachment which says, "Religious beliefs short PDF." Can you elaborate on what that document was that my client provided you with?

A. She provided me some type of template or letter to give to my daughter to help her with her job.

Q. Let me put you on Page 2. I was looking for the letter, August 31, 2021, same day. Do you recognize that letter?

A. Yes, I do.

Q. Is your daughter Noella?

A. Yes.
Q. Was this letter something that my client assisted you with on behalf of your daughter?
A. Yes.
Q. As a result of this letter, was your daughter allowed to not receive the vaccine?
A. No.
Q. Okay. What was the letter for?
A. The letter was for her to try to attempt to not have to take the vaccine.
Q. My client helped you with that?
A. Yes.
Q. And again, despite the fact that she was toxic and you did not want to be around her, she helped you with something I would say is pretty significant. Would you agree?
A. Yes.
Q. Did Ms. Lipe confide in you when she made the decision to contact the Public Education Department?
A. Ms. Lipe talked a lot.
Q. That wasn't my question.
A. And she brought up the PED. I did not understand exactly what she was talking about. I just knew that she was angry with administration and that she spoke about going to the PED.

Q. Do you know why she was angry with the administration?

A. I stopped listening her. Even though I would hear her, I really stopped listening to her. Her complaints were just constant, she never had anything good to say.

Q. But you continued to have lunch with her?

A. Not necessarily.

Q. No? Did you see the text messages that I provided you with in Plaintiff's Exhibit No. 9?

A. That could have been one lunch that. Doesn't mean lunch every day.

Q. You can spend the time after today reviewing the text messages and maybe think about that answer in a little bit more detail? So if she confided in you about PED and the concerns that she had being angry at administration, did you relay that information to the dean?

A. No.

Q. So you did not go to the dean and tell the dean that my client was complaining?

A. Nope.

Q. Did you run to anybody with any information that my client may have shared with you in confidence?

A. No.

Q. Okay. So we are having internet issues, and that's part of the problem is pulling this up, it goes in

and out. I will provide to counsel as part of this, just so you're aware that referenced interview, that recording that we mentioned previously, February 4, 2022.

MS. FOGHI: We have provided it in discovery, but I will resend it to you, Ms. Kilgore, if you'd like it again.

MS. KILGORE: I would, because I mean, I know that was the Exhibit 14.

MS. FOGHI: So that will be shared with you, but it is a recording in which Ms. Romero participated in with my client.

MS. KILGORE: So you mean --

MS. FOGHI: I don't need a part. I need that interview.

MS. LIPE: This is it.

(Playing video/audio.)

Q. (BY MS. FOGHI) You've heard a good chunk of this conversation?

A. Uh-huh.

Q. Would you agree with me that that is your conversation with my client?

A. Yes.

Q. Okay. And the statements that you made to her are statements that you -- will you verify them as being accurate?

A. Yes.
Q. Did do you stand by your statements?
A. Yes.
Q. Okay. Did you ever have any discussions with Andrew -- I don't know if I'm pronouncing his last name right, but Urquidez, U-R-Q-U-I-D-E-Z? It was the dean.
A. Okay.
Q. Did you ever conversations with the dean?
A. About what?
Q. About Tatia and the PED complaint?
A. No.
Q. Okay. So we will provide you with the audio, but your response to that question is you did not?
A. No.
Q. You do understand you're under oath?
A. I do.
Q. Okay. In preparation for this deposition today, what documents did you review?
A. I reviewed these statements, I reviewed everything that Tatia wrote about me, I think anything that had to do with me.
Q. Okay. Were you aware of the existence of the audio recording?
A. I was pretty sure she was recording at the time.
Q. All right. During the EOS interview that

happened, did you praise Justin Griego as being a good administrator?

A. According to here, it looks like I did say he was always respectful.

Q. Okay. But then you heard comments that you made about administration on this phone call?

A. The administration that she is trying to say was the current administration we worked for. The times that I am talking about in my past career actually had to do with the previous administrator, who refused to stay compliant.

Q. So you took your previous experience and when you told my client to back off and don't do anything because they will, quote, shove you out if they don't want you, you based that comment on your previous experience with another administration?

A. I do. Because I was trying to explain to Tatia, if you cannot work as a team and you cannot do what is right by the students, eventually, yes, administration usually doesn't like pushback. That's not necessarily this particular administration.

Q. Well, we are talking about this case and we're talking about Tatia's complaints and things that she felt were not being handled. We're not talking about your job, we're talking about this case.

A. That's right.

Q. And in this case, you argue with her on that recording and you tell her stop, stop doing what you're doing, stop complaining, stop making reports, stop doing the things you're doing because you will get nowhere. Is that what the summary of your comments are on this recording?

MS. KILGORE: Object to form.

You can answer, if you can.

A. When I said those things it is in reference to how she presents herself, how she talks to them, and how she approaches people.

Q. (BY MS. FOGHI) Well, that's interesting. How does she approach people?

A. I had at least three teachers come to my room -- well, no, there was at least two or three crying because she would name-call them in IEP meetings. She would call them idiots and she would call them stupid on an ongoing basis. It didn't matter if you were a staff member, or you were an administrator.

Q. Okay. But didn't you just say that she doesn't bother anybody, that -- did you not make that comment?

A. I was -- I don't know what the word is. She called me that night, it was my child's birthday, I told her multiple times I needed to celebrate with my child. She kept me on the phone for two hours with that particular recording going on and on, just baiting me. I knew she was

recording me. I finally just put an end to it. So, yeah, I was just sufficing whatever she wanted to hear. I was done with her complaints, I was done with her calling people names, I was done with her making the teachers cry.

Q. Okay. Based on that recording, my assessment of that recording is that you are the type of person, and correct me if I'm wrong, that you will stay at an employer, as you stated, 23 years on that recording, you will put up with any form of abuse just so you can keep your job. You will sit back, you will let the children be mistreated. You will let administration treat you terribly, just so you can keep your pension, you can keep your retirement, you obey the rules and you do nothing. Is that what your -- is that how you feel about your respective role in this administration?

MS. KILGORE: Objection to the form of the question times ten. Object to the summary of anyone else's intentions even a summary of the phone call.

But if you want to respond.

A. It is absolutely not true.

Q. (BY MS. FOGHI) In that recording did you say, "I have been here" -- I can replay the recording again.

A. I understood.

Q. Did you say in that recording, "I have been here for 23 years and I'm not doing any of this, because I know

what happens"?

A. I may have said that. I wanted to hang up with her, she would not let me hang up.

Q. That is not my question, and you need to answer my question.

MS. KILGORE: Well, it is a responsive answer to your question.

MS. FOGHI: All right.

Q. (BY MS. FOGHI) When did you first become aware that my client had filed a complaint against APS? And initially, it was APS and PED, now the subject of the litigation is against APS.

A. Maybe a couple weeks after that last phone call.

Q. Okay. Did you have any conversations with Tatia once you learned that she had filed the complaint?

A. I didn't have, that I recall, any conversations after that phone call that you just played. I had decided I had, I was going to separate myself from her and I didn't really want to speak to her at that point.

Q. So after that phone call in February that was the last time you had spoken to Tatia?

A. I can't say that as guarantee, but that was definitely in my head that I really wanted to refrain from having anything to do with her.

Q. That was in your head, but that might not be

reality. That was your intention, correct?
MS. KILGORE: Objection. Objection; form.
MS. FOGHI: Okay.
Q. (BY MS. FOGHI) Any text messages, exchanges between you and her after that phone call that you are aware of?
A. Not that I remember.
Q. Have you maintained the same phone number that you had back in 2021?
A. Yes.
Q. Okay. Did you preserve text messages?
A. Yes.
Q. Okay. How about emails?
A. I don't know.
Q. Did you have to -- were you ever asked to provide copies of text messages from your personal phone to your counsel in this matter?
A. No.
Q. Okay. Did APS ever ask you to provide any responsive documents in this case?
A. No.
Q. Have you deleted any messages that may be on your phone in terms of exchanges with Tatia since 2021?
A. I do not know.
Q. Did APS or counsel ever collect your phone,

device, or any anything that you may have in your possession that would be exchanges of messages between you and my client?

A. No.

Q. Okay. Have you produced -- have you been asked to produce text messages?

A. No.

Q. Have you been asked to produce emails?

A. No.

Q. Okay. Are there any additional communications, written or audio, social media, that you might have available to us that may be between you and my client?

A. No, that I'm aware of.

Q. Is there any document you wish to produce that you haven't yet produced?

A. No.

Q. One moment, please.

Would you agree with me that based on the recording we just heard, that Tatia was, clearly she was upset because she felt like the students were not being treated appropriately. Was that the -- would you agree with me that that was her expression in that audio?

MS. KILGORE: Object to form.

A. Sounded like it.

Q. (BY MS. FOGHI) Do you believe she was a good

advocate for her students?
A. No.
Q. Tell me why.
A. Because she enables.
Q. Elaborate on that.
A. She does not work with the teachers the case managers, she does not work in the best interest of the students. It is more that she enables their behavior. She would allow them to hide out in her office, ditching for hours at a time. They were a distraction and a disruption to the school, yet, she just sat there arguing with administration all the time instead of letting administration -- but that was just my observation on the outside.
Q. So that's your personal opinion; am I correct?
A. Yes.
Q. Okay. I'm going to go back to the recording, the same recording that we just played, February 4th, 2022.
(Playing video/audio.)
MS. KILGORE: Was that the end?
MS. LIPE: No, there's -- there's --
THE WITNESS: She kept me on for about two hours, just stringing me.
Q. (BY MS. FOGHI) Okay. Based on that comment, "She kept you on..." did she hold you against your will?

A. No.
Q. Tied to a chair?
A. No.
Q. No? Locked in a room?
A. No.
Q. How did she -- explain that to me.
A. I generally felt sorry for Tatia. She is her own enemy with the way she talks and interacts with people, and there was no getting -- getting her to listen. She makes it about that they were being totally noncompliant. I don't know, they are not my cases. And I do know that I do advocate, and like I have told her over and over again, choose your battles.
Q. Okay. You also advocate? Is that what you just said?
A. I do.
Q. Did you have a chance during that phone call to -- do you have free will? Do you have free will?
A. I do.
Q. Could you have hung up the phone?
A. I could have.
Q. But you did not?
A. I did eventually.
Q. You did not hang up the phone for 45 minutes. I don't know how long the conversation was, so you continued

to go on and on with your commentary instead of hanging up if you were so irritated and annoyed by her.

MS. KILGORE: Objection; form. We didn't hear the whole thing, so we don't really know what took place, but we'll definitely have the whole thing attached, I guess.

MS. FOGHI: Yes, you will. Yes, you will. Absolutely. And it is in your discovery but I will resend it to you as a link.

MS. KILGORE: Yes -- no, I meant attached to the deposition because your characterization may or may not be accurate.

MS. FOGHI: Sure. No problem. No problem.

Q. (BY MS. FOGHI) With respect to the way that you kept records as part of your job for the cases, so the children that you worked with, what system did you use?

A. MaxCapture.

Q. Okay. Was that an optional platform or a mandatory platform?

A. It is mandatory.

Q. Would it surprise you if I told that you Mr. Griego indicated to us earlier it is an optional platform?

MS. KILGORE: Object to form.

MS. FOGHI: Okay.

Q. (BY MS. FOGHI) In your mind it's a mandatory

platform?
A. We're required to document.
Q. Okay. What do you document in MaxCapture?
A. Our sessions, our interactions, our collaborations, our meetings, anything that has to do with the students.
Q. Would MaxCapture also be the platform where the cases would be listed of how many students you have assigned to you?
A. If you are keeping up your caseload. You have, you are the one that inputs the information.
Q. Okay. Who did you, who was your direct supervisor?
A. When?
Q. At Volcano Vista, during this time period, 2021 to 2023?
A. Michelle Trimble Allen was our special ed principal in '21, and Mr. Griego, I think, came between '21 and '22.
Q. So you reported to him at that point?
A. After Michelle left, Ms. Trimble.
Q. Okay. Are you familiar with Synergy?
A. Yes.
Q. Tell me about Synergy.
A. Synergy is where the student profiles are. As a

school social worker you have access to the special ed side, as well as to the student schedules, attendance. It is basically the student profile and everything, their history.

Q. Is that something you had access to as a social worker?

A. Yes.

Q. Do you utilize Synergy in any way?

A. Yes.

Q. In what way do you utilize it?

A. I use it to get the class schedules, I use it to monitor the discipline reports, I use it to monitor the grades for the students.

Q. Okay. Go ahead.

A. As well as documenting inside the Synergy, we're supposed to double document; if you talk to a parent, you're supposed to be documenting in Synergy.

Q. Okay. Have you had any complaints made against you by any parent?

A. No.

Q. Never?

A. No.

Q. How about a student?

A. No.

Q. Have you ever had disciplinary action taken against you in any of the positions that you've held in

education?
A. No.
Q. Okay. What was your caseload like during 2021 and 2023? How many cases did you have? How many children were you responsible for, I guess is the question.
A. I wouldn't remember.
Q. Approximate?
A. Probably mid-30s.
Q. Was this a normal caseload number to have or was that high?
A. I think it depends on the student, the student minutes, and the intensity of the case.
Q. Okay. Ms. Rosita was another social worker that we talked about. She eventually left, right?
A. Uh-huh.
Q. Do you know why she left?
A. I don't know.
Q. Do you keep in contact with her?
A. No.
Q. How many social workers are currently working with you now?
A. One.
Q. What is her name or his name?
A. Her name is Anya Garcia.
Q. How long has she been there?

A. Two years.
Q. Okay. All right. I don't think I have anything further. Ms. Kilgore, have any follow-up?

EXAMINATION

BY MS. KILGORE :
Q. Well, yes, yes.
Antoinette, tell me the context of that phone conversation that we heard the recording on partial -- partial recording?
A. From my recollection, I was aware that Tatia was upset. I don't think I knew at the time. She called me on the night of my daughter's birthday. She was upset, as indicated in the telephone conversation, and I think by this time I was just tired of always trying to defend myself from her and her going on and on about everything she does and how everybody else doesn't do what they are supposed to do. So at that point, I was just letting the conversation go and I did -- at some point, I did get frustrated and I just hung up. And I had made a choice at that time to try to just reduce the amount of any conversation or communication we had.
Q. Did you believe that Ms. Lipe was an effective advocate for students?
A. No.
Q. Why not?

A. Because -- well, for example, I did have a student that was transferred to me. And the only reason I know what happened with that student is because that student was extremely angry about what Ms. Lipe did to her.
Q. Was that the student that had the gender identity issues?
A. Yes.
Q. So were you referring to adverse actions taken by the APS administration against social workers when you were talking to her in that conversation?
A. Okay, you're going to have to rephrase that.
Q. Yeah, were you -- were you referring to specific adverse actions taken by APS administration against social workers?
A. I'm still not getting the question.
Q. Well --
A. Go ahead.
Q. I don't know if I can make it any simpler.
A. My mind is on the conversation.
Q. I want your mind to be on this conversation. And I'm asking, were you referring to adverse -- a negative employment action that APS had taken against social workers?
A. When they are talking about what happens if we choose to fight against compliance. Is that what you're referring to?

Q. No. I'm just talking about that conversation and when you say they are going to get you, you're never going to win, that's what I'm trying to find out about.

A. I'm basing it on APS experiences that I had at other schools, it was not specifically to this administration.

Q. Was it specific to Volcano Vista High School?

A. No.

Q. Did -- were you -- are you aware or were you referring to two questions; were you aware of any adverse action that Justin Griego had taken against any social worker at Volcano Vista High School?

A. No.

Q. Were you aware of any adverse action that the principal at Volcano Vista High School had taken against any social workers?

A. No.

Q. In your experience at Volcano Vista, were social workers, and you in particular, supported by the administration?

A. They -- they are very respectful to me if I come to them with a concern or problem.

Q. And when you -- when you have gone to the Volcano Vista High School administration with a problem, were -- was the administration responsive to the problem

that you were complaining about? Meaning, about a student, for example?

A. If I ever bring concerns they eventually come and they will talk to me about it and we'll try to come up with a plan regarding whatever it is I'm discussing.

Q. Did you have professional issues with the way that Ms. Lipe approached the Volcano Vista High School administration with respect to her students?

A. I just know that she was very aggressive when she approached them.

Q. Do you know if Ms. Lipe was recording conversations with administration?

A. I would have no idea. I have always made the assumption she records.

Q. And do you know about any adverse action that Volcano Vista administration took against Ms. Lipe?

A. No.

Q. How -- and are you aware of the circumstances around Ms. Lipe's leaving?

A. No. Actually, I'm not exactly sure why.

Q. And did you ever talk to Ms. Lipe about that?

A. No.

MS. KILGORE: I don't have any further follow-up questions.

EXAMINATION

BY MS. FOGHI:

Q. I have a very brief follow-up. So the student you mentioned earlier, the sexual identity student that had issues with sexual identity, that student was a freshman, correct?

A. Yes.

Q. So how old would that student be?

A. She's a senior this year.

Q. At that time, how old would she be as a freshman approximately? Obviously, I don't expect you to know her birthday, would she have been a freshman?

A. She would have been 12 or 13.

Q. Correct. So was that student self-harming?

A. Yes.

Q. Wasn't that the very reason why Ms. Lipe met with the parents of this student because it was a minor student who was self-harming and she felt that it was important to speak to the parents about that? Were you aware of that?

MS. KILGORE: Object to form.

Q. (BY MS. FOGHI) Were you aware the student was self-harming?

A. Yes.

Q. Okay.

A. But I'm not sure what you're referring to in

general, because I did not speak to the parents.

Q. Well, what I'm referring to is a follow-up to a remark you just made; which was, you did not appreciate the way that she handled that situation with that student?

A. Yes. And I had --

Q. What did she do that you did not appreciate?

A. One of the teachers wrote her a chat message asking for help, asking and being concerned about the behavior of that student. That particular teacher wrote in the form of "he" and "him" and called the student a different name. At that point, it is my understanding, and this comes specifically from the student, because I have never discussed this otherwise except with the student, that she screen shot the chat and she sent it to her parents in which those parents were extremely angry at what she had done.

Q. Do you have evidence of that screen shot?

A. I actually do.

Q. Would you provide it to counsel, please?

A. I will have to look for it.

Q. Okay, all right. Are there any particular protocols, procedures, policies in place that have to do with situations such as that very one, the transgender student, self-harm? What is the policy of APS as it pertains to you specifically and you, and you, social

workers when it comes to a student that has those issues.

MS. KILGORE: Object to the form of the question.

Q. (BY MS. FOGHI) When a student is one that has significant concerns such as self-harm, gender identity issues, what is the protocol in place that you have to follow?

MS. KILGORE: Same objection.

Q. (BY MS. FOGHI) Well, what is the protocol? If I'm a student that's threatening to kill myself, what do you have to do as a social worker? That's the question.

A. If you're talking about a suicide versus the fact that the child was being outed and using a "he/him" form and a different name, absolutely, you need to discuss it with the child, and you should contact the parents.

Q. You, in fact, have an obligation to report, correct?

A. Yes.

Q. All right. I have nothing further.

EXAMINATION

BY MS. KILGORE :

Q. I do -- when you say if you're talking about a child who has suicidal thoughts --

A. Uh-huh.

Q. -- you're saying in that circumstance that you should talk to the --

A. Parents, right. Now, I would call. I would never ever have screen shot and sent that to a parent's phone.

Q. And -- and -- is -- is your testimony different as to the issue of a student discussing with you as a social worker the issue of transgender?

A. The issue of transgender should be privately in the office. We have been trained that, yes, you should not be outing the student while working with them.

MS. KILGORE: I have nothing further.

EXAMINATION

BY MS. FOGHI:

Q. What are regulations according to your license? What are your obligations, do you know them?

A. Specifically --

Q. Specifically about reporting requirements.

A. My obligations would be if I'm concerned the child is going to hurt themselves, I would have the discussion with the child. I would then, if I felt like there was some type of urgency, I would contact the parents, I would offer them a same-day suicide protocol through Southwest Family Guidance, and they choose whether to, to take their child in or not, and then I have them sign a form to protect APS to make sure that the parents have written down what their choice was.

Q. Were you aware the very student we're talking

about was sent to a hospital three times due to suicidal ideations or attempts?

A. I do not. I do not know that.

Q. All right.

MS. FOGHI: Nothing further.

MS. KILGORE: Likewise.

(Deposition concluded at 1:20 p.m.)

TATIA LIPE V. APS, ET AL.,

DEPONENT SIGNATURE/CORRECTION PAGE

If there are any typographical errors to your deposition, indicate them below:

PAGE LINE

_____________ Change to ____________________________________

_____________ Change to ____________________________________

_____________ Change to ____________________________________

_____________ Change to ____________________________________

Any other changes to your deposition are to be listed below with a statement as to the reason for such change.

PAGE LINE CORRECTION REASON FOR CHANGE

______________________________________________________________

______________________________________________________________

______________________________________________________________

______________________________________________________________

______________________________________________________________

______________________________________________________________

I, ANTOINETTE ROMERO, do hereby certify that I have read the foregoing pages of my testimony as transcribed and that the same is a true and correct transcript of the testimony given by me in this deposition on SEPTEMBER 5, 2025, except for the changes made.

___________________________ _____________________________
Date signed ANTOINETTE ROMERO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

NO: 1:23-CV-00899-GBW-JMR

TATIA LIPE,

Plaintiff,

-vs-

ALBUQUERQUE PUBLIC SCHOOLS and
NEW MEXICO DEPARTMENT OF PUBLIC EDUCATION,

Defendants.

CERTIFICATE OF DEPOSITION

I, CHRISTINE J. ROYBAL, CCR, RPR, CSR, DO HEREBY CERTIFY that on SEPTEMBER 5, 2025, the Deposition of ANTOINETTE ROMERO was taken before me at the request of, and sealed original thereof retained by:

FOGHI LAW FIRM, LLC
5065 Corrales Rd., P.O. Box 944
Corrales, New Mexico 87048
(505) 220-5691
foghilaw@yahoo.com

I FURTHER CERTIFY that copies of this Certificate have been mailed or delivered to all Counsel, and parties to the proceedings not represented by counsel, appearing at the taking of the deposition.

I FURTHER CERTIFY that examination of this transcript and signature of the witness REQUESTED by the witness and all parties present. On ____________, a letter was mailed or delivered to KAREN KILGORE, ESQ. regarding obtaining signature of the witness, and any corrections, if any, were appended to the original and each copy of the Deposition.

I FURTHER CERTIFY that the recoverable cost of the original and one copy of the deposition, including exhibits, to BOGLARKA FOGHI, ESQ. is $___________.

I FURTHER CERTIFY that I did administer the oath to the witness herein prior to the taking of this Deposition; that I did thereafter report in stenographic shorthand the questions and answers set forth herein, and the foregoing is a true and correct transcript of the proceeding had upon the taking of this Deposition to the best of my ability.

I FURTHER CERTIFY that I am neither employed by nor related to nor contracted with (unless excepted by the rules) any of the parties or attorneys in this case, and that I have no interest whatsoever in the final disposition of this case in any court.

________________________________________
CHRISTINE J. ROYBAL, CCR, RPR, CSR
CCR No. 50
License Expires: 12/31/25

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

TATIA LIPE,
Plaintiff,

v. No. 1:23-cv-00899-GBW-JMR

ALBUQUERQUE PUBLIC SCHOOLS et al.,
Defendants.

---

# APPENDIX A-8

## PLAINTIFF'S YELLOW-HIGHLIGHTED DEPOSITION DESIGNATIONS OF ROSITA MOYA-HERRERA

Plaintiff submits this yellow-highlighted deposition-designation material as part of Plaintiff's corrective submission. Plaintiff preserves all designations, counter-designations, objections, completeness arguments, evidentiary positions, and rights under Doc. 256, the Federal Rules of Civil Procedure, and the Federal Rules of Evidence.

Appendix 8

Attached deposition-designation PDF pages: 54

# Rosita Moya-Herrera

**Date:** December 8, 2025

**Case:** Lipe v. Albuquergue Public Schools, et al.
**Case** #:1:23-CV-00899-GBW-JMR

Maricopa Reporting, Inc.
https://www.maricopareporting.com/
Phone: 1-844-667-8366
scheduling@maricopareporting.com

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

NATASHA LIPE,

Plaintiff,

vs. NO. 1:23-CV-00899-GBW-JMR

ALBUQUERQUE PUBLIC SCHOOLS, et al.,

Defendants.

ZOOM DEPOSITION
OF ROSITA MOYA-HERRERA
December 8, 2025
VIA ZOOM

8:12 a.m.

PURSUANT TO THE NEW MEXICO RULES OF CIVIL PROCEDURE, this deposition was:

TAKEN BY: BOGLARKA FOGHI
ATTORNEY FOR PLAINTIFF

REPORTED BY: PAUL BACA, CCR #112
MARICOPA COURT REPORTERS
SANTA FE, NM

A P P E A R A N C E S

For the Plaintiff:

FOGHI LAW FIRM LLC
PO Box 944
Corrales, New Mexico 87048-0944
505-220-5691
BY: BOGLARKA FOGHI
foghilaw@yahoo.com

For the Defendants:

CUDDY & McCARTHY LLP
PO Box 4160
Santa Fe, New Mexico 87502-4160
505-988-4476
BY: MARY KAREN KILGORE
kkilgore@cmc.com

Also Present:

Tasha Lipe

I N D E X

Examination By:

Page
Ms. Foghi ------------------------------ 6
Ms. Kilgore ---------------------------- 46

EXHIBITS

(No Exhibits Marked)

(Whereupon, the witness was sworn.)

MS. FOGHI: Thank you.

THE WITNESS: I don't know anyone here.

MS. FOGHI: Well, I am going to make a little preliminary statement so that you know what is going on.

So you are here for your deposition today. And this is a case involving my client, Tasha Lipe versus Albuquerque Public Schools.

Present with us is Karen Kilgore, who represents the Albuquerque Public Schools.

Paul Baca who is going to be basically taking the deposition. He is the transcription service that offered to be here today to record what is being said.

And a deposition is an important part of a case, because, you know, generally speaking it is sort of a discovery phase that we go through where we are trying to gain information from people that we depose.

And, of course, as we go to trial, you are someone that -- that we would utilize as a witness for my client. And anything that you say today is a recorded statement that we generally will go back to and rely upon as we go forward with the case if this

case goes forward to trial, okay?

It is a statement that you are going to make under oath. There is a process that we follow. Questions will be asked of you.

Opposing attorney may make objections and if she does, you just have to stop talking for a moment so we can place it on the record. You also have to be super careful with both of us not to talk over each other because he will only be able to take down what each of us is saying individually, not simultaneously. So always wait until the question is asked before you provide your answer.

If you don't know the answer to something, then you should simply say, "I don't know the answer to the question." And only answer the question that is being asked.

Is there anything that you would like for me to elaborate on further?

A. No, I am good to go.

Q. Okay. All right.

MS. FOGHI: Karen, is there anything I missed?

MS. KILGORE: No. I am good to go forward, too.

MS. FOGHI: Okay.

ROSITA MOYA-HERRERA,
after having been first duly sworn under oath,
was questioned and testified as follows:

EXAMINATION

BY MS. FOGHI:
Q. All right. So once again, good morning. This is Attorney Boglarka Foghi on behalf of Tasha Lipe.
Ma'am, would you please state your full name for the record?
A. Rosita A. Moya-Herrera.
Q. Okay. And where do you live, Ms. Moya?
A. In Rio Rancho.
Q. Okay. Can I call you -- what would you like for me to call you?
A. Rosita.
Q. Okay. Thank you. I just don't want to be rude. Thank you.
So, Rosita, what do you currently do for a living?
A. I actually retired at age 67, and currently since March of this year I have been working for a methadone clinic. So I work like 5:30 in the morning to 1:30 every day.
Q. Okay. So just -- I am going to go out of

line for a second here, but Tasha Lipe, who is my client, she also happens to be my paralegal. She is online with us and you can see her on the screen as well.

So just for record purposes, we now have five of us conducting the Zoom hearing.

A. Okay.

Q. Okay. All right. So tell me a little bit about your background, Rosita. What you did before you started working at this methadone clinic?

A. State employee for five-plus years under PED. Motivational interview certified. Worked with a lot of the families in the community in Sandoval County?

And then several years through APS, Albuquerque Public Schools, as a SPED social worker, and then also under PED, a truancy social worker. I did that for a couple of years.

And then Los Lunas schools, again, two, or three schools down in that area.

And then at the very end -- and then also under PED with the truancy, I did the Village schools, Santo Domingo, Cochiti, those schools.

Then I also worked as a counselor for the Cochiti, Bernalillo Public Schools, Albuquerque

Public Schools, Los Lunas schools.
Q. Okay. Wow. Well, thank you for all the hard work you have done for the kids.
A. Thanks.
Q. So, Rosita, can you please tell me how you have come to know my client, Tasha Lipe? Do you know Tasha?
A. It is in, let me see 2018. When was the pandemic? Okay.
Q. 20 --
A. In 2018 we had a horrific death in our family. Our 16-year-old grandson passed away. So during that time I went and worked for a private school and then I worked for APS, a South Valley school, a Spanish speaking school because I am also bilingual. Then I ended up at APS, Volcano Vista. That is where I met Ms. Lipe.
Q. Okay. What year would you have started at Volcano Vista?
A. 2018.
Q. And how long did you stay with Volcano Vista?
A. I was lucky to be there the whole school year, 2018, 2019.
Q. Okay. So basically one full school year?

A. Yes.

Q. So you met Tasha during that time period at Volcano Vista and basically would it be fair for me to say that you worked with her for about a year?

A. Yes, yes. She was -- yes. She was a great colleague. Very helpful, very, very helpful with everything.

Q. So elaborate a little bit for me on how you met her and the circumstances under which you met?

A. So the date of orientation at Volcano Vista, Ms. Bannerman, Dr. Bannerman did the presentation. And then right after the presentation and tell me if this is too much, but, Antoniette, I remember Antoniette was the other, so there was three of us social workers. It is a big school, a big high school.

So it was Antoinette, myself and Ms. Lipe. So right after the orientation I went up to Dr. Bannerman and introduced myself. And I said I am looking for the other social workers, and then that is when Antoinette presented herself to me. I don't know if I should go into any of that or not.

Q. Well, we can talk about it. Tell me a little bit about your interactions with Antoniette

Romero.

A. Well, I was really -- I am a woman, Hispanic, minority, all the way around, single mom, whatever.

And as a social worker, as a colleague, one of the things, you know, our ethics, our licensure, you respect each other as colleagues. So I was really -- I don't know what word to use, appalled, shocked, Antoinette presented herself to me. This is first time I am meeting her. Immediately proceeded to be very derogatory about Ms. Lipe, calling her names, saying she was a house breaker, her -- her personality, her procedure. And I am standing there looking at this lady I had never met before, and I was shocked. She was just going on and on about things that she has done, the sexual stuff, she is a whore, she is a house breaker, she is very -- she doesn't show up for work; on and on, and on, and on.

I was just shocked. And I am looking at her and I say, well, I don't know her, like I don't know you. And at my age, you know, you don't -- period, you just don't talk about people like that. I don't allow that in my home with my kids. And I was clearly shocked with Antoinette's verbiage and

her presentation for not knowing me.

So then she sent on to -- I had this real bad foot thing going on. She wanted me to walk here, go there and I am looking at her like, you are my colleague, you are not a supervisor, you are not a boss. I need to know where my office is so I can start setting myself up.

And so she walked me over there, and all the way over there, on, and on, and on. And then she did this and then she did that and then she was going here and she was sleeping with this one, she was sleeping with that one, on, and on, and on.

And I am looking at her and finally I said, You know, please don't talk to me about anyone. And she said, well, I know Mr. Astorga and I know Michelle and everybody knows me here. And all the teachers know me. And I go into their classrooms on, and on, and on.

And so we get to the room and I stopped her right there and I said, I am going to check out my room, my office. And I don't know this lady, like I don't know you, and I will be the judge of that. I'm here to do a job, not to be social, not to be critical. And woman to woman, you don't talk about people like that.

So she just looked at me and it just so happened that my office was here and hers was here (indicating). And she went into her office. And then it goes on from there.

Q. Okay. So let's talk about some of the comments that she made to you as someone that she had just met. Your expression is priceless.

A. I hate to say the words. I really don't -- I don't even know.

Q. Well, let me say this to you. It is very important that -- and I know sometimes we feel bad saying inappropriate things because it is just not appropriate to speak that way. But when it comes to, you know, any kind of legal matter, every word does matter and does count in our practice. So it is important for me to learn from you what she would have said about Ms. Lipe, someone that you had never met and this is the first time you are meeting her.

So to the best of your recollection, I would like for you to elaborate on what you recall she stated to you.

A. I wrote down some stuff. Immediately after introducing herself to me she went on to say her reputation proceeds her. Her name is Ms. Lipe. She said she is -- she is -- she is very well known

in Albuquerque Public Schools as a whore. She gets her way by always following the men around and doing whatever they need to be done. She has broken up homes before by getting involved with other men.

Nothing about work. I was talking about, what are you saying here. I can't hear this, and then that is a lot of the gist of it. She said she is always missing in action. She doesn't show up for work. Her reputation proceeds her. She is very loose was her word.

Q. All right. Thank you, thank you for the recitation of that.

So at some point you have the opportunity to meet her yourself, correct?

A. Yes. The next morning.

Q. The next day. Okay. So tell me what happens when you had a chance to meet her for the first time?

A. So I will give you a picture. So my office where my desk is at there was a long window and then the door to walk in. And I will get into that with Antoniette as well, but anyway.

So right there (indicating) Ms. Lipe walked in and then right as you walk in, my office door is there. I always had it ajar. I always had

it open because I always wanted my kids to come in. We are getting to know each other.

And we had all -- well, Antoinette had planned that we all meet because there is a MaxCapture and Synergy, and there was a printout that she got.

She wanted to assign the cases, again, trying to be the lead, you know, because she knew all the kids from there. She knew who she wanted to work there and who she did not want to work with. So she had a list and she said, Oh, we are going to meet and I am going to delegate the cases and who is going to work with what and who is going work with who. And, you know, this is all new to me with her.

So Ms. Lipe comes in and she goes, Hey, my name is Natasha, Ms. Lipe. And we introduced each other. And it is like 6:30 almost 7:00 in morning that me and her are in my office. Because me and her would always get there early, we would always staff cases, we would always talk about the cases.

This was just something me and her started from Day One. And I said, nice to meet you and then we had to wait until about 9:30, 10:00 when Antoniette finally showed up.

Q. You-all were there at the 6:30, 7:00 in

the morning and Antoniette showed up around 9:30, 10:00. And this was a daily?
A. Yes.
Q. Yet, it was her complaint Tasha is the one that shows up late or doesn't show up at all?
A. Yes, yes.
Q. Okay.
A. So she finally arrives and she pops her head into the door and me and her -- me and Tasha is sitting there going over what are we going to be doing. You're going to get cases, I am going to get cases. We are talking about work and how we are going to be available to our kids. And I said, Well, where is your office? They put her way on the other side of everybody. And they had me and Antoinette here together, Astorga's office was right there (indicating).
One of the counselor's office was right there (indicating), but they moved Tasha like way -- this was Day One, way to the other -- I am trying to think, south side of the building.
Q. Okay.
A. They moved her way up there to the other side where Michelle Allen was and all of them.
Q. Do you know why they did that? Do you

have any idea why she was moved up there?

A. No, I really don't know. I -- I have no idea. Why are you so far away from us? We all have to be meeting. I don't know the assignment of the students. I don't know if that was the availability of the office. I don't know if that was something else Antoinette coordinated or manipulated. She did that a lot.

So finally, we met, finally. So we all went into her office. It was fixed up really nice. It had a long couch that Mr. Astorga would go in and sleep, but that is another story. So he would go in there to take naps. And so she has everything set up. And, you know, of course, mine is completely empty. And so we went in there she had a round table and she sat there.

And she goes, Here is the printout. Here is your list, here is my list, here is everybody's list. This is the one I am going to go. So I said, Well, why don't we go through the whole list because, you know, Synergy, you know, MaxCapture you can printout everybody's workload.

So why are you, you know, now you are going to delegate the workload? And you're printing out this long list of kids for all three of us. So

we finally went on and me and Tasha just look at each other. And I am like, I am not going to argue. It doesn't matter. At the end of the day I'm here to provide a service to the kids give me whatever kids you want me to work with. I can work with any of them.

So that is what we did. So Antoniette made sure that she chose the kid that she wanted to work with.

Q. Okay. So tell me about the day-to-day -- so that is the beginning. Tell me sort of during that year period that you worked with Tasha, Ms. Romero, all the people that you have mentioned, tell me a little bit about your, one, your time there. So sort of give me a summary of your personal experience working with Volcano Vista.

A. The one thing that really stands out to me after working at all the other schools I worked at was the environment, the teachers, their attitude, their tones. The people with the SPED kids, specifically.

One time I remember I had this one student, I think -- well, besides being special ed, he had some deficits. One of the teachers came in and literally pushed him into my room. She was one

of the principals from the other side. And I am looking at her I am seeing what, because, like I said, I always had my door open. Antoinette always had her doors locked. Kids would come over there pounding on the door wanting to meet with her. They were in crisis.

The only time I ever saw Antoniette meet with the student was when they were in crisis. Day-to-day we had IEP meetings. We had to prep for them, we had to get everybody ready for them. We had to go into the meeting physically. That was before the pandemic, so we had to be in the IEP meeting with our presentation, all the teachers, parents, student, everybody was in there. So that was a constant and there was an IEP every day.

So the days that there weren't IEPs, I had all my students scheduled to meet with me weekly. I would give them a sheet of paper and I would say on these days, during this time you are going to meet with me. Preferably during an easy class, you know, not a core class. And I would give them a schedule, they would come in, they would meet with me and Ms. Lipe did the same.

Again Antoinette's door was also locked. She would arrive late. And the reason I know she

was late every day was because I could see her through the window. She comes in 9:30, 10:00, or I was at the main office. I had to go meet with this one. I was meeting with that one. I just -- I'm here, I am showing up, I am doing my job. That is, you know, but that was a day-to-day meeting then the pandemic hit.

Q. Okay. All right. How did things change once the pandemic hit?

A. Ms. Lipe, she was such a saver. She is computer savvy, knowledgeable, for all three of us even though she had been treated so disrespectfully, I would say, by Miss -- by Antoinette. I mean, I don't even know Antoniette's last name.

She set up everything for us. She set up everything for us. We were able to jump into the classes, she gave me an Avatar. So we were able to still attend the meetings, we were able to observe our students in their classrooms, which also became an issue for some of my students that were sent to me because Antoinette would go into their classroom and want to talk to them with all the other kids present.

And one of my girls, I remember -- and I have got everything documented. One of my girls, I

remember, said, I don't want to talk to you because it had to do with her boyfriend. It was a long story, but these kids were under my watch, and she was very intrusive all the time wanting to see what everybody else was doing. Always taking the focus from herself, now that I think about it.

But one of my students said I don't want to talk to you because these kids run away, they were taken off, they were leaving. They were already 18. And the little girl straight up told her, I don't need to talk to you. I am not going to talk to you.

But Ms. Lipe, again, you know, we were able to get into all the classes because of her, she is the one who set it up.

Q. During the pandemic when things shifted and now we are, you know, assuming everything is virtual was she still participating, Ms. Lipe, in all of the scheduled meetings?

A. Yeah, yes.

Q. Did you find her to be late?

A. No, never.

Q. Never?

A. Never, she was always -- the way me and Ms. Lipe were, you know, we preplan months in

advance. Like, if you have a doctor's appointment, if you have a meeting, if you know, you are going to be out for this or that. And with this kind of job you need to preplan. When are they having their IEP meeting? When do I have to get ready? What am I going to present? Who is going to be the parents? I had some autistic kids in my caseload. The parents were not happy with certain things that were going on. You need to be ready. So there is no I am just not going to show up, that kind of stuff.

Q. Of course.

A. Antoinette, on the other hand, we would have our supervision meetings, our -- our weekly meetings and that, and for the most part she would show up to the meeting but not be on camera or she would just not show up at all.

I remember her sitting by her kitchen. Anyway, I remember that picture. But we were always at the meetings, always that whole year, that was such a sad time, but yeah, we were always available for our students, always.

Q. Okay. In terms of the other people, other staff members, particularly, and I am not naming anybody in particular that is a general question for you regarding the staff at APS Volcano Vista. How

was Ms. Lipe treated by the other staff not in particular Antoinette Romero. We know how she treated her, but how about the others?

A. How do I say this? Our work what I observed of Ms. Lipe and myself was one-on-one with the student. We could get more with that. There were a couple of times that me and her went into the classroom to observe. There was a couple of girls they had -- they named the teachers, I forgot their names. We would go into the classroom and -- because -- and I really think it is because of Antoniette's derogatory statements and me not choosing to be on either.

We would go and you could feel that tension. When you walk in the room you could discern that whole, they didn't like us, you know, we would go in there to sit and observe. But we were there to sit and observe the kids, not chitchat.

Q. Did you feel that you were disliked?

A. Oh, yeah. Oh, yeah. She made sure she got rid of me from that school, but that is something else, yeah.

Q. Okay. So she was responsible for you ultimately leaving Volcano Vista?

A. Yes, yes.

Q. Tell me a little bit about your departure from Volcano Vista. What were the circumstances?

A. Again, it was because I was not part of the click. And I think as adults you understand what that is about. I went in, did my work, at one point Ms. Antoinette went because, you know, how the door is. She -- and this -- it is under oath. She went in there one day and she said, Oh, I was up at the main office. I can't think of the main office. It was APS. Civic -- what is it called, the Louisiana office, whatever.

So she was up there meeting with somebody. She was always up there meeting with someone. She lives right there down the street from my house in Rio Rancho, but anyway, she comes in and she says Oh, my goodness, I am really high and I am like what.

Q. This is Antoniette talking?

A. Antoniette. And I said, What are you talking about? It was like 9:00, 10:00 in the morning.

So before coming to school she told me that she would smoke marijuana, and that was her thing to do. And that she had another part-time

job. And so a lot of the time in her office she would be in her office doing her other job, coming in late and high to school. And I, again, the -- I said, Is that why your door is always shut? She said, Oh, no, Mr. Astorga likes to go in there and sleep on the couch and take his naps.

I said what? So one day I went in there and I was knocking on the door and I said, You have a student there. She proceeds to open the door and I go on about this student needs to talk to you. And he pops up from the couch and looks at me from the door and I am like, awkward, what am I doing in here. What are you doing in here. And I just left the student there. And I said well, you know, this student has been looking for you.

So a lot of the times because our offices were so close to each other I ended up having to address whatever the issues were the student was having because she was not available. And I don't know all the rules or the laws or whatever about marijuana or smoking or going to work or whatever. But I don't think it should be allowed, especially when you are working with the students that we are working with.

But so back to why I left. So I think

because she had shared so much of what she had actually been doing with me she decided to talk to all the higher ups. And said, like, Mr. Astorga, Michelle. Ms. Bannerman wasn't there anymore, there was another principal.

So they all came over to her room and were giving her balloons and saying thank you to her and you have done a great job this year. I am like what happened to the other two of us, you know, so they were giving her balloons and celebrating her and everything. And I am right next door and Ms. Lipe is over there in her office. We did not get any kind of appreciation for anything.

So I am like, okay, that is fine. And then she comes to me and she said, You are going to be moved. I am like what? Why isn't administration talking to me about that? You can't -- your contract is not going to be reinstated here, they are going to have to move you to another school. We don't have enough work for three social workers. But yet --

Q. She was not your boss, correct?

A. Correct.

Q. So where did she --

A. But she always had all the inside

information because she was always in that mix, you know, coordinating, being the orchestrator, manipulating, I don't know what word you want to use, but she was always doing that with staff.

Q. Okay. So when you say that she was in this click, so to speak, can you elaborate for me who the -- what this click -- who this click consisted of, who were the parties?

A. The SPED teachers.

Q. Okay. Of course.

A. Of course, Mr. Astorga who was always in her office. I don't know what was going on there. Michelle, Michelle Allen. I think she was like an assistant principal.

Q. Okay.

A. And there was a couple of other assistant principals because there was, like, all this staff or there was at that time. Oh, there was this guy upstairs, oh, God, what was his name? I forgot.

There was Michelle, Astorga, Allen, I think his name was actually Allen. There was all of these different teachers and a lot of them worked with the SPED kids. So whatever the list was for the SPED people and it was because she would go into their rooms, hours at a time.

Q. This is Antoinette?

A. That is Antoniette. You don't need to be in the classrooms observing students. You need to be working with them one-on-one with their behavior, whatever that is.

One time Michelle even came into my office fishing for information. I am too old for this, you know. Oh, what about Tasha, what about -- and I am looking at her like what about them, you know? I am not going there with you. That was the one and only time she ever came to try to -- it was always this, like, trying to get you to this side or that side.

And I think that is very unprofessional. You need to do your job and but, yeah, she would always come in talking about the teachers. And I am going to go to their classroom, I am going to go to the main office on Louisiana. I can't think of the name of the lady that was there at that time. She would do supervision classes and training all the time because I always had to go up there. But, yeah, that -- that is -- I don't know what to say about it. They were just always together. If she wasn't in her office it was because she was late, smoking pot at home, up at the Louisiana office, locked up in her office doing her other job.

And I don't know how she manipulated the notes because the notes had to be done within a certain amount of time with her students. I am thinking about how do you have those notes done when you are not actually seeing these kids? I don't see her see the kids. They weren't in there. And I was right next door to her.

Q. That is what I was going to ask you. You were right next to her and Ms. Lipe's office was way somewhere else. Were you able to see Ms. Lipe's office from where you were?

A. No, no.

Q. Okay.

A. But me and Ms. Lipe would park in the same area and then we would meet, like I said, usually between 6:30, 7:00 we were in the office. Hey, how is your day going to go? Are you going to have an IEP?

No, I have this. I am meeting with this kid. Here is my list of kids I am going meet with today. I already have the schedule of who is coming tomorrow.

I am going to be doing the same thing, too. And she would take off, walk down to the other end of the hallway way over there into her office.

And, like I said, later on in the day -- and this was a constant. And I kept a notebook. I have got to find it -- when she would walk in, walk out and leave and stuff like that because it was starting to effect my work when I had to start picking up her kids because we were close to each other.

Q. Okay. So when did you have to start -- when you say picking up her kids, what happened? Can you elaborate on that for me?

A. I would say August, maybe, within about a month.

Q. Okay.

A. Kids would be pounding on her door, crying, they were distressed. I have been wanting to meet with her, she is never here. She doesn't see me. I was like why don't you come in for a little bit maybe we can talk, maybe she will show up.

When was the last time you see her? I never see her. She is never available.

I wish I would have kept more detailed information about that, but at the time I just wanted to address whatever the student was going through. Some of the teachers would come, knocking,

looking for her. Again, this is always early in the morning.

Q. Okay.

A. Okay. At least through 10:00, 10:30, when she would finally show up.

Q. Okay. Now would you please describe for me Ms. Lipe's -- what you observed, as her style of work, I guess would be the first question, with respect to the style of her work. How would you describe it?

A. Impeccable. She was just -- she is so right on spot. She knows her stuff. She -- she had done SPED work before. So much of it that I would ask her, you know, so at this IEP what do you think would be a good idea.

I am an LMSW, she is an LCSW for licensure. So the supervision was always there, but very professional, very caring, very loving. Just very thorough?

If you want something done ask Tosh. She will set it up, she is very clear on all the paperwork, and document this, and document that what about this, what about that. We could always bounce off ideas with each other.

Q. Nice.

A. To this day.

Q. Okay. Were you there with her at any point in time when she got leave away from the school for a medical reason? Were you aware of any that, any of those occasions?

A. That was when I was moved to Truman Middle School the next fall and that is when -- because her medical issues continued, you know, to escalate with her. But I know that she is a veteran, so she, you know, of course, you have all of that structure, the information, you know, her doctor's appointments.

And that is when I went to Truman where Ms. Antoinette had been pushed out of there, because of her inconsistencies there. They -- what I came to find out is they had her in the back in like a trailer in the back of the school. So she was always hiding back there and she was never showing up, she was never present. That left a bad taste for everyone for me as the social worker.

They put my office like across the hallway from the principal and the counselors, and from Day One none of them approached me. I went to the same orientation. They put me into an office in a building, like -- just there was no contact with anybody there.

And little by little I would go into the counselors and I would say, hey, you know, I have this student and this, that, and they would just -- they don't want to have anything to do with social work after Antoinette was there.

Q. So once you left Truman after that first year, how long did you stay at Truman?

A. I stayed at Truman from August to December and then one of my other colleagues from Bernalillo schools came looking for me. Actually came looking for me and saved me. And took me to that other -- she said I have been looking for you. Can you come and work with us. I said, yes, get me out of here. So I went and worked with Bernalillo schools until I retired.

Q. Did you keep in touch with Ms. Lipe during this time period?

A. Yes.

Q. Are you in touch with her now?

A. I would like to be in touch with her more but with our jobs, you know, it is how are you doing, good, how are your kids, good.

Q. How were you contacted today for this deposition?

A. Ms. Lipe called me.

Q. Okay.
A. And said, have you -- has APS contacted you and I am like nobody. My job, right now is all remote. So I have my cell phone with me like attached to me, because I do all of my sessions through the phone, Zoom, that kind of stuff. Nobody ever called me from APS.
Q. So they didn't talk to you to see if you received a subpoena or anything like that?
A. No.
Q. Okay. And nobody tried to call you?
A. No.
Q. Okay. Does APS have your phone number? Do they know how to get ahold of you?
A. They should. It has still been the same number forever.
Q. And your address has not changed?
A. No.
Q. Now, with respect to -- I am going to ask you a couple more questions about your interactions. Let's talk about Mr. Astorga. Who is he?
A. At the time he was -- from where my office was, his was, like, a couple of doors, you know, that way (indicating). He was an assistant principal.

Q. Okay. Who did he have a close relationship with that you observed?
A. Antoniette.
Q. Antoinette?
A. Uh-huh.
Q. And you mentioned that he was in her office constantly?
A. Yes. It was just awkward.
Q. It was awkward.
Did you ever witness Mr. Astorga treating Ms. Lipe in an inappropriate manner?
A. No, no. He was very -- he was always in Antoinette's office. He would come, you know, because -- of course, I could see him passing through my door going into her office. And would he go in there, hours, I mean. I was like you can't be staffing cases.
And then, you know, like I said, there was a couple of times, at least one time I do remember one of the students pounding on her door. And I went in there -- and when I opened the door, she was typing at the desk and he popped up from the couch.
So I said -- so later on when me and her talked, I said what is he doing in there? What is going on? Oh, he goes in there to take a nap

because I have a couch.

Q. What a nice job, okay.

So did you ever tell Ms. Lipe all of the negative commentaries that you were told by Ms. Romero, Annette?

A. When I was there it was about a couple of -- when I was there in 2018, August, September, we all three had a meeting with Dr. Bannerman because of Antoinette. Antoinette was the one that was complaining to her and I went into the meeting, I remember it was me, Tosh, Antoinette, Ms. Bannerman, Michelle, we were all sitting in there.

And I wanted to spill the beans, I wanted to talk about everything that had been going on because it was inappropriate and Ms. Bannerman cut me off. "Save that for another time."

Q. She cut you off?

A. She cut me off. I said, well -- so then when we were walking out, going into my office and Ms. Lipe and me were talking and she goes, well, what were you going to say?

And I am like, well, this is what she has been saying about you. And I find it very demeaning, very derogatory, very disrespectful and

this is what I wanted to share in that meeting. But all that other time I never -- I just -- it is not right. It is just not professional.

Q. You never put that in writing? The concerns that you had about the inappropriate behavior, did you ever put that in any kind of an e-mail?

A. No. Someone else called me, though. I thought this deposition was already done.

Q. Okay. Who called you?

A. Someone from APS called me a year later or something, I don't remember, but it is somewhere, it is written somewhere, somebody called me.

Q. And asked you specifically about the comments that were made?

A. Everything. How Antoniette treated everyone, how -- and I said she was very demeaning, very disrespectful. I talked to someone from APS.

Q. You don't remember who it was?

A. He said he was an investigator.

Q. So it was probably part of an investigative report?

A. Yes.

Q. Could you please tell me about Bonnie Anderson, how was your relationship with her?

A. Who?
Q. Bonnie Anderson. Do you know who that is?
A. No.
Q. Okay. How about MaxCapture. Let's talk about -- you mentioned, you brought up MaxCapture and Synergy earlier.
Can you summarize and tell me what your understanding is as to what those programs are.
A. MaxCapture was where we would document all of our IEP notes and that. And you had to have everything stamped within a timely manner, get it in there.
The Synergy gave you everybody's workload you could go into anybody's list and check it out.
Q. Okay.
A. Like, Ms. Lipe has so many cases, I have so many cases, Antoniette had this many cases. That is how Antoniette printed up every -- up the whole list.
And then I remember the lines, we would make lines of you are going to take this chunk, this chunk and this chunk. And me and Ms. Lipe did not argue with her, we just said let's just get it done.
Q. Okay.
A. So we could see the kids but she had

access to all of that, too.
Q. Okay. Let me ask you, with respect to both of these programs MaxCapture and Synergy, were they very easy accessible in terms of, say, if I asked you, Rosita, can you please go in and give me information of a student that you dealt with on such-and-such a day and what you did for that student. Is that something that you can go into easily and print it out?
A. Yes, yes.
Q. Okay. So if I told you that we have had difficulty obtaining information would that surprise you?
A. Yes.
Q. Okay.
A. Yes. Because it would be reviewed as a social worker as the person assigned to that case to keep record of that, you know. And so you have your USB, and you download your cases, your notes, because, you know, every 90 days you have to update that treatment plan. Every so often you have to update that note. So what did you do in the past and you are looking that up again, you know, are we making progress, are you not making progress?
Your statistical information. Do I have

too many cases? Should we divide up the cases again. So, yeah, it is. It was easy. I mean, if I could do it, trust me at 70 years old, if I could do it --

Q. Rosita, you are not alone. I share your sentiment there. So let me ask you about Mr. Urquidez?

A. Oh, that was the one. Urquidez, he was upstairs, yeah.

Q. Tell me about him. Who is he?

A. Urquidez, Urquidez, Urquidez. Oh, God, he was like -- I would describe him like a guard, like, you know, once upon a time in my life time I was a corrections officer, but that was in my 30s.

But he was always hung over. I am just going to be honest and blunt. He was always -- you could tell he had binged, but he was always following the kids around.

That is another one she was always visiting, too, because he was upstairs right above my office. And there was really no talking to him. He was very direct. I am the authority here. I am going to go look at the kids. I am going get them. They should not be here, they should not be there.

Then he had this little room where he

would do suspensions with the kids and stuff like that. So I always had to be watching my kids in there because I did not like the way they were treated. Again, the environment there was very authoritative, I guess, would be the word. And you don't treat SPED kids like that. You don't treat any kids like that, period.

But, you know, for them to come and shove one of my kids into my office, or I can't deal with them, or that one is going to go into suspension. There was a story one time this one kid that I worked with forever.

Antoniette was trying to say that he got naked in front of her. It was a bunch of BS because that kid would never do that. He was being very sexual. And after, even when I left APS, the mom still stayed in touch with me. She put him into, like, ARCA and some other programs and stuff.

But, yeah, I really think she fabricated a lot of her stories just because she was not available and that is how she is.

Yeah, Mr. Urquidez, he was another one.

Q. So Mr. Urquidez --

A. Whatever his name is.

Q. U-R-Q-U-I-D-E --

A. I know who he is.
Q. He was the dean of students, correct?
A. I thought he was, I guess that was his title, but he was more like a security person.
Q. Okay.
A. Like a truancy.
Q. Yes, yes. Would you please describe or tell me in your professional opinion, because, you know, you guys are all in the same line of work, how -- how was Tasha as an advocate for the students?
A. Oh, my goodness, Tasha knows community resources very, very well. And as an advocate for the students she would always -- we are social workers. You meet with the parents, you meet with the teachers, you meet or try to meet with the teachers.
It is a community work. It is not, you don't go rogue like Antoinette did. You work together. It is a team job. You know how they say the village, you know, you need to bring everybody in. And there is a real serious statement in the IEP, you know, the legalities, being professional, being respectful, being available. And the parents have every right to be in those meetings, always.

Q. Were there ever complaints made that you are aware of when a parent would have been contacted that was believed to be not proper? Was there ever some kind of complaint that you are aware of?

A. I remember assignments being reassigned because the parents do not want to deal with Annette.

Q. Okay.

A. You know and they -- and the same, the same complaint everywhere was always she is never available. She doesn't know anything about my kid. She doesn't work with them.

My child says they have not seen her in such a such long, you know. And I really wish I had kept all of those kid's names. And I probably might have some in my USB there, but, yeah, then they would reassign them. And because I was the last on the totem pole kind of, you know, and her being a supervisor kind of personality, she would just give them to me.

Q. Supervisor personality but not supervisor by role?

A. No, no.

Q. Okay. Was Tasha a good social worker? I asked you about how she advocated for the kids but

was she a good social worker?
A. She is a great social worker.
Q. Okay.
A. She knows supervision. She has taken all the tests. She is -- like I said before, she is a veteran. She is a woman, you know, she cares. The sincerity and the loving and the caring that she has, yeah, she is a great social worker.
Q. Did you keep in touch with her, Tasha after she departed from Volcano Vista?
A. Since 2018?
Q. Yes.
A. We have had a relationship. She is -- again, we are not -- we are workers. So you know the extent of our relationship is like a text, hey, how are you doing, good, how are you doing. But actually socializing, meeting outside of work, outside of our homes, there is nothing like that. It is just that relationship that you're a friend, I'm here, you're a friend, I am there, you know, we know we could be there for each other.
Antoniette, never.
Q. Okay. Is there anything else that you wish to share with me, Rosita, sort of an open-ended question. But obviously you know why we are here.

Is there anything that you wish to add that you feel is important for all of us to be aware of and to know as it pertains to what you have observed, happening over at Volcano Vista as it pertains to Ms. Lipe?

A. She is a great advocate. She is consistent with her attendance with work. She is very knowledgeable with the computer. If she can help you, she will. She is always there for the students and for colleagues, you know, on that level. It is nothing personal. She is very professional with everything that she does.

And I appreciate everything that she did for us during the pandemic because she did that for all three of us. And even though the way she had been treated by so many people there, she opened that up to everybody. If it hadn't been for her, I know that I would not have been able to do my work online because not even APS offered that. That was done with us, because of her.

She is like here you could get into this classroom and that classroom. I am like you did that for Antoinette, too. She was like, yeah, we all -- because at the end of the day we had to work with our kids. And I remember Zooming into the

classrooms, watching the teacher, observing my students, going to the next classroom.

So she is very loving and caring and she is very respectful and sincere. I have never heard her say a bad thing about anybody.

Q. That was my next question for you. Besides the fact that she learned about commentaries that were made about her that were very derogatory in nature, did she treat Antoniette any differently than she would have treated anyone else there?

A. No. She always kept that professionalism, that line. How do I explain? We do a lot of eye talking without saying too much, but you could see the hurt. It hurt me. It still hurts me, because she is such a good person.

She is -- wow, she just does her job and leaves. And even when we have gotten together over the phone or we talk, it is always about her parents, you are taking care of them, she is taking care of them, you know, our, well, her young daughter. I have ten granddaughters, you know, who is graduating. It is never about they did this, they did that, never. It is always positive.

Q. Excellent.

MS. FOGHI: Well, Rosita, I don't have any

further questions of you. I really appreciate you making yourself available to us this morning.

THE WITNESS: Thank you so much.

MS. FOGHI: And, Ms. Kilgore, I am not sure if you have any follow-up questions.

MS. KILGORE: I do have just a few questions, I don't want to get us off schedule.

EXAMINATION

BY MS. KILGORE:

Q. But, Ms. Moya-Herrera, when did you work for APS?

A. For sure it was 2018, 2019. And then during the time that they had the -- then I went to Los Lunas. So during the time that they had the PED truancy jobs, so that would have been like two years of that.

Q. And when was that?

A. Oh, my God, 2016, maybe.

Q. So before?

A. It is way back then.

Q. Okay. And that was, PED truancy job was about a year?

A. I was there at least two years before that.

Q. Two years?

A. I remember I had a school up off of Katherine. I had three different schools. And then the South Valley.

Then, I went into the South Valley Spanish speaking school, that was in 2018 at the beginning of 2018. I was there for a little bit.

Q. And then went to Volcano Vista for a year?

A. Yes. That was the 2018. I remember that specifically because in May of 2018 my grandson passed away and my sister. And then I had the summer at one of the charter schools. No, or, and the South Valley one, then in August of 2018 is when I went into Volcano Vista.

Q. Okay. After Volcano Vista did you work for APS?

A. Truman Middle School.

Q. Okay. How long was that?

A. About four months.

Q. Okay. How did you leave APS, did you quit?

A. I resigned. I gave them the resignation and I went to Bernalillo Public Schools.

Q. Okay. Now, you seem to -- I think you remembered having been interviewed during an investigation, you said. Were you truthful in that

investigation?
A. I am always truthful.
Q. Okay. Let's see here. Let me just -- I'm so sorry, I am trying to keep on schedule here.
Were you ever disciplined while you were working for APS?
A. No.
Q. And what about when you worked at other, any other school districts have you ever been disciplined?
A. Never.
Q. And since 2019 that is when you went to Los Lunas in 2019?
A. Truman.
Q. Oh, Truman for four months and then Los Lunas, though, right?
A. Then I went to Bernalillo Public Schools.
Q. Okay.
A. Los Lunas was way back in the day.
Q. Okay. I put it in the wrong order, then.
A. I could put up my ERB list and it will show me all the schools I worked at.
Q. At Bernalillo Public Schools were you ever disciplined there?
A. Never. None of my schools, ever.

Q. So when did you retire?
A. I retired at age 67. What are we in 2025, like 2023, something like that.
Q. Okay. And retired, what was your -- where did you retire? From where did you retire?
A. Bernalillo Public Schools.
Q. Okay.
A. I would drive from Rio Rancho all the way to Cochiti every day to that school. And then that was affiliated with all of the Villages, a lot of the Indian population, Native Americans.
Q. Okay.
MS. KILGORE: I just needed to get that time frame set. I don't have any further questions. Thank you so much.
THE WITNESS: Again the time frame is I could get you specifics on that, it is just that is years and years of work, so, yeah.
MS. FOGHI: Thank you, Rosita.
THE WITNESS: Thank you so much.
MS. FOGHI: We appreciate you.
You can go ahead and log off. Your deposition is concluded.
THE WITNESS: Thank you so much.
MS. FOGHI: Thank you. Have a great one.

Thank you so much.

(Proceedings concluded at 9:08 a.m.)

WITNESS SIGNATURE/CORRECTION PAGE

If there are any typographical errors to your deposition, indicate them below:

PAGE/LINE

_____________ Change to ________________________________

_____________ Change to ________________________________

_____________ Change to ________________________________

_____________ Change to ________________________________

Any other changes to your deposition are to be listed below with a statement as to the reason for such change.

PAGE/LINE CORRECTION REASON FOR CHANGE

_______________________________________________________

_______________________________________________________

_______________________________________________________

_______________________________________________________

_______________________________________________________

_______________________________________________________

I, ROSITA MOYA-HERRERA, do hereby certify that I have read the foregoing pages of my testimony as transcribed and that the same is a true and correct transcript of the testimony given by me in this deposition except for the changes made.

____________________________

ROSITA MOYA-HERRERA

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

NATASHA LIPE,
Plaintiff,
vs. NO. 1:23-CV-00899-GBW-JMR
ALBUQUERQUE PUBLIC SCHOOLS, et al.,
Defendants.

CERTIFICATE OF COMPLETION

I, Paul Baca, CCR #112, DO HEREBY CERTIFY that on December 8, 2025, the Deposition of ROSITA MOYA-HERRERA was taken before me at the request of Boglarka Foghi, and the sealed original thereof was retained by:

FOGHI LAW FIRM LLC
PO Box 944
Corrales, New Mexico 87048-0944
505-220-5691
BY: BOGLARKA FOGHI

I FURTHER CERTIFY that copies of this certificate have been mailed or delivered to the following counsel and parties not represented by counsel appearing at the taking of the deposition:

CUDDY & McCARTHY LLP
PO Box 4160
Santa Fe, New Mexico 87502-4160
505-988-4476
BY: MARY KAREN KILGORE

I FURTHER CERTIFY that examination of this transcript and signature of the witness was requested by the witness and all parties present.

I FURTHER CERTIFY that the cost of the original and one copy of the deposition to BOGLARKA FOGHI is $__________.

I FURTHER CERTIFY that I did administer the oath to the witness herein prior to the taking of this deposition; that I did thereafter report in stenographic shorthand the questions and answers set forth herein, and the foregoing is a true and correct transcript of the proceeding had upon the taking of this deposition to the best of my ability.

I FURTHER CERTIFY that I am neither employed by nor related to any of the parties or attorneys in this case and that I have no interest in the final disposition of this case in any court.

________________________

PAUL BACA, RPR, CCR
Certified Court Reporter #112
License Expires: 12-31-2025

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

TATIA LIPE,
Plaintiff,

v.

No. 1:23-cv-00899-GBW-JMR

ALBUQUERQUE PUBLIC SCHOOLS et al.,
Defendants.

---

# APPENDIX A-9

## PLAINTIFF'S YELLOW-HIGHLIGHTED DEPOSITION DESIGNATIONS OF YVONNE GARCIA

Plaintiff submits this yellow-highlighted deposition-designation material as part of Plaintiff's corrective submission. Plaintiff preserves all designations, counter-designations, objections, completeness arguments, evidentiary positions, and rights under Doc. 256, the Federal Rules of Civil Procedure, and the Federal Rules of Evidence.

Appendix 9

Attached deposition-designation PDF pages: 18

MARICOPA REPORTING

# Yvonne Garcia

**Date:** December 8, 2025

**Case:** Lipe v. Albuquergue Public Schools, et al.
**Case** #:1:23-CV-00899-GBW-JMR

Maricopa Reporting, Inc.
https://www.maricopareporting.com/
Phone: 1-844-667-8366
scheduling@maricopareporting.com

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

NATASHA LIPE,

Plaintiff,

vs. NO. 1:23-CV-00899-GBW-JMR

ALBUQUERQUE PUBLIC SCHOOLS, et al.,

Defendants.

ZOOM DEPOSITION
OF YVONNE GARCIA
December 8, 2025
VIA ZOOM

1:05 p.m.

PURSUANT TO THE NEW MEXICO RULES OF CIVIL PROCEDURE, this deposition was:

TAKEN BY: BOGLARKA FOGHI
ATTORNEY FOR PLAINTIFF

REPORTED BY: PAUL BACA, CCR #112
MARICOPA COURT REPORTERS
SANTA FE, NM

A P P E A R A N C E S

For the Plaintiff:

FOGHI LAW FIRM LLC
PO Box 944
Corrales, New Mexico 87048-0944
505-220-5691
BY: BOGLARKA FOGHI
foghilaw@yahoo.com

For the Defendants:

CUDDY & McCARTHY LLP
PO Box 4160
Santa Fe, New Mexico 87502-4160
505-988-4476
BY: MARY KAREN KILGORE
kkilgore@cmc.com

Also Present:

Tasha Lipe

I N D E X

Examination By:

Page

Ms. Foghi -------------------------------- 4

EXHIBITS

(No Exhibits Marked)

(Whereupon, the witness was sworn.)

YVONNE GARCIA,

after having been first duly sworn under oath,
was questioned and testified as follows:

EXAMINATION

BY MS. FOGHI:

Q. Good afternoon.
A. Hello.
Q. Thank you for being here.
Would you please state your full name for the record?
A. Yvonne Garcia.
Q. Okay. And, Ms. Garcia, can you please tell me how you are currently employed and in what capacity?
A. I am a clinical social worker with Albuquerque Public Schools.
Q. And how long have you been holding that position?
A. 23 years.
Q. Okay. Did you have an opportunity to meet my client in your role as a social worker, Tasha Lipe?
A. Yes, we have collaborated. I was instructional chair for the Instructional Council

for Social Workers and a union rep.

Q. Okay. And do you remember when you first met her? What would have been the date when you first met her?

A. I don't recall.

Q. Okay. So you indicated that you are currently a social worker and you were a union rep, correct?

A. Yes, ma'am.

Q. Okay. Are you familiar with the Synergy and MaxCapture system that is being utilized by Albuquerque Public Schools?

A. Yes, ma'am.

Q. Okay. And as a social worker are you to provide your schedules to the district and to the school?

A. Yes, ma'am.

Q. Are student minutes kept when you have meetings with students?

A. Yes, ma'am.

Q. And how are those schedules arranged with respect to meetings with the students and the provider, how often can you have those meetings?

A. My understanding it is at the discretion of the provider to ensure that those services are

met in compliance with the IEP.
Q. Okay. Can you please tell me about making up time with students and when time does not need to be made up?
How does that work? How is that arranged as part of this system that is being utilized?
MS. KILGORE: Objection to the form of the question.
Q (By Ms. Foghi) How is time made up with students who are unable to schedule -- attend their scheduled appointments?
A. It is dependent on whether or not they are absent, whether it is a holiday, whether there is some other reason, but all of those factors play into whether or not those minutes are made up or not.
Q. Got it.
So sometimes the minutes are not made up, correct?
A. We don't make up minutes on holidays.
Q. Okay. Would you be able to make up minutes, say, if the provider was ill?
A. You could.
Q. What about if the student was ill?
A. You could, but my understanding is that it

is not required because the student is absent.

Q. Okay. Do you recall having participated as a witness on behalf of my client when a grievance was filed against Bernadette Lucero-Turner back in 2019?

A. Yes. I spoke to process only.

Q. Okay. Can you tell me the nature of your involvement, what you recall about that incident?

A. All I recall was that I was asked about the transfer process at that time for social workers.

Q. Okay. So in 2019 I understand that you had worked at Volcano Vista; is that correct?

A. I don't think it was in 2019, no. In 2019 I was at Valley High School.

Q. Valley High School, okay. No problem.

So tell me a little bit about what your recollection is as far as what was the reason that you were listed as a witness to testify or, you know, give a statement on behalf of Tasha Lipe?

A. Today?

Q. Not today, back when you -- when there was a grievance against Bernadette Lucero-Turner.

A. Just what was the process, as I understood it, as the Instructional Council Chair for Social

Workers in the district.

Q. Okay. Can you tell me a little bit about the dynamics within the administration that you are able to testify to specifically as it relates to Michelle Tregembo-Allen.

Do you know who that is?

A. Yes, I do know who that is.

Q. Do you recall any dynamic, interesting dynamic that may have been happening when she was there?

A. Between who?

Q. Michelle Tregembo-Allen and the administration?

A. Oh, not really. I mean, I would need you to be more specific.

Q. Well, do you remember, is there anything that you can testify to today that would shed some light for me on the nature of the administration back in 2019 back at Valley High School?

A. Michelle was not an administrator at Valley.

Q. Okay. Who was she?

A. She was an administrator at Volcano Vista.

Q. Okay. Are you able to tell me a little bit about Volcano Vista and how things were

happening at the school while she was an administrator?

A. It is hard for me to recall without specifics.

Q. Okay. How was your relationship with my client, Tasha Lipe?

A. It was professional and positive, friendly.

Q. Okay. So how would you characterize Tasha, and I am speaking specifically as to her work. How was she as a social worker, from what you can tell me?

A. I never worked at the same school as Tasha, so we never really shared information about specific work.

Q. Okay. Do you know Justin Griego?

A. Yes.

Q. Okay. How do you know him?

A. He was a teacher when I was at Valley High School.

Q. Okay. Did you have any particular, I would say, negative encounters with Mr. Griego?

A. Not that I can recall that were addressed.

Q. Okay. No problem.

Now, as a union rep can you tell me the

dates when you were assigned as a union rep?
A. I would have to look, but I have been a union rep on and off for the last 15 years.
Q. Can you tell me a little bit about what that entails? What is your role as a union rep?
A. Yes, ma'am. Basically it is to understand the negotiated agreement to the best of my ability, to understand how it relates to social workers and to kind of collaborate and act as a support of both the social worker, the union, and the district to ensure that students are served.
Q. Got it.
Did Tasha Lipe ever come to you specifically as a union rep with any concerns that she might have had while working with APS?
A. I can't remember anything specifically while I was a rep, but probably. I am assuming that is why I was asked to speak at the grievance.
Q. Were you able to review any documents prior to your deposition today?
A. No, ma'am. I have no idea what documents.
Q. Sure.
Specifically I am speaking about in the past when we talk about the grievance if you were able to review any of the materials with respect to

that grievance in which you assisted Tasha as a witness?

A. No, ma'am, I don't believe I was ever a part of any documents. I was just asked to speak to my understanding of the transfer process.

Q. Okay. So that was only -- the nature of your involvement was just that, to speak as to the transfer process?

A. That is what I recall, yes, ma'am.

Q. Okay. I think you have answered this, already at the beginning. You said you are familiar with the systems used, Synergy and MaxCapture, correct?

A. Yes, ma'am.

Q. How do you use the system yourself?

A. Well, I was currently a provider at a school, at a high school, and we create a service schedule within MaxCapture, and we follow that schedule to the best of our ability. It changes often.

And Synergy is where all of the student information is housed for the district.

And MaxCapture is a software program that is, I think it was purchased by the district for us to ensure that our services are captured correctly

and that we can bill Medicaid for those individual and direct services.

Q. Okay. What is your understanding as to what can and cannot be accessed through Synergy by a social worker? Can you testify or talk to me about what your understanding is as to specifically social workers, what can and cannot be accessed?

A. We can access their schedule, their grades, their IEP historical documents, their team, absences, discipline. It is where all student information is housed and so as a school social worker, we have access to that information to best support our clients.

Q. Okay. Can you go back in time to look at information on Synergy?

A. Yes, ma'am. You can look at historical documents.

Q. Okay. Can you look at -- besides historical documents, can you also look at the entire district if you wanted to as a social worker?

A. We can look up students within the district that are -- that may not necessarily be in our school at that time.

Q. Okay.

A. But that is for the purpose of incoming

transfers, or transfers going out and to do -- to review IEPs. So we do have access to other students besides the site that we are servicing.

Q. Okay. All right. Thank you.

In terms of MaxCapture, what is your understanding with respect to that program?

A. It is a software program that was purchased to keep track of scheduling and service delivery.

Q. Okay. Can others, can a social worker who logs into Synergy see one another's caseloads? So can a social worker see another social worker's caseload, as far as you know?

A. I am trying to think of -- through MaxCapture, no. I think it was --

Q. Through Synergy.

A. Through Synergy, yes.

Q. Okay. So that is possible, okay.

What else can you tell me? What -- what -- are you aware of what is happening with Ms. Lipe and Albuquerque Public Schools as you are present here today to testify?

A. Not specifically, no.

Q. Okay. What did you do in preparation for appearing today for your deposition?

MS. KILGORE: Other than talking to me.
A. I read about it. I had no idea what a deposition consisted of.
Q (By Ms. Foghi) Okay. All right. Do you have any questions for me that I could help you with and answer questions for you that you might have about the deposition process?
A. No, ma'am, not at this time.
Q. Okay. All right.
MS. FOGHI: Well, I don't believe I have anything further for you. It was brief but to the point, and I appreciate you appearing today.
Thank you so much for your time.
THE WITNESS: Thank you.
MS. FOGHI: Thank you.
(Proceedings concluded at 1:17 p.m.)

WITNESS SIGNATURE/CORRECTION PAGE

If there are any typographical errors to your deposition, indicate them below:

PAGE/LINE

_____________ Change to ________________________________

_____________ Change to ________________________________

_____________ Change to ________________________________

_____________ Change to ________________________________

Any other changes to your deposition are to be listed below with a statement as to the reason for such change.

PAGE/LINE CORRECTION REASON FOR CHANGE

________________________________________________________

________________________________________________________

________________________________________________________

________________________________________________________

________________________________________________________

________________________________________________________

I, YVONNE GARCIA, do hereby certify that I have read the foregoing pages of my testimony as transcribed and that the same is a true and correct transcript of the testimony given by me in this deposition except for the changes made.

____________________________
YVONNE GARCIA

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

NATASHA LIPE,
Plaintiff,
vs. NO.
1:23-CV-00899-GBW-JMR
ALBUQUERQUE PUBLIC SCHOOLS, et al.,
Defendants.

CERTIFICATE OF COMPLETION

I, Paul Baca, CCR #112, DO HEREBY CERTIFY that on December 8, 2025, the Deposition of YVONNE GARCIA was taken before me at the request of Boglarka Foghi, and the sealed original thereof was retained by:

FOGHI LAW FIRM LLC
PO Box 944
Corrales, New Mexico 87048-0944
505-220-5691
BY: BOGLARKA FOGHI

I FURTHER CERTIFY that copies of this certificate have been mailed or delivered to the following counsel and parties not represented by counsel appearing at the taking of the deposition:

CUDDY & McCARTHY LLP
PO Box 4160
Santa Fe, New Mexico 87502-4160
505-988-4476 BY: MARY KAREN KILGORE

I FURTHER CERTIFY that examination of this transcript and signature of the witness was requested by the witness and all parties present.

I FURTHER CERTIFY that the cost of the original and one copy of the deposition to BOGLARKA FOGHI is $__________.

I FURTHER CERTIFY that I did administer the oath to the witness herein prior to the taking of this deposition; that I did thereafter report in stenographic shorthand the questions and answers set forth herein, and the foregoing is a true and correct transcript of the proceeding had upon the taking of this deposition to the best of my ability.

I FURTHER CERTIFY that I am neither employed by nor related to any of the parties or attorneys in this case and that I have no interest in the final disposition of this case in any court.

________________________

PAUL BACA, RPR, CCR
Certified Court Reporter #112
License Expires: 12-31-2025

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

TATIA LIPE,
Plaintiff,

v. No. 1:23-cv-00899-GBW-JMR

ALBUQUERQUE PUBLIC SCHOOLS et al.,
Defendants.

---

# APPENDIX A-10

## PLAINTIFF'S YELLOW-HIGHLIGHTED DEPOSITION DESIGNATIONS OF JUSTIN GRIEGO

Plaintiff submits this yellow-highlighted deposition-designation material as part of Plaintiff's corrective submission. Plaintiff preserves all designations, counter-designations, objections, completeness arguments, evidentiary positions, and rights under Doc. 256, the Federal Rules of Civil Procedure, and the Federal Rules of Evidence.



Attached deposition-designation PDF pages: 67

# Justin Griego

**Date:** September 5, 2025

**Case:** Lipe v. Albuquerque Public Schools, et al
**Case Number:** 1:23-CV-00899-GBW-JMR

Maricopa Reporting, Inc.
Phone: (480) 597-4744
scheduling@maricopareporting.com
https://www.maricopareporting.com/

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

NO: 1:23-CV-00899-GBW-JMR

TATIA LIPE,

Plaintiff,

-vs-

ALBUQUERQUE PUBLIC SCHOOLS and
NEW MEXICO DEPARTMENT OF PUBLIC EDUCATION,
Defendants.

DEPOSITION OF JUSTIN GRIEGO

FRIDAY, SEPTEMBER 5, 2025
9:00 a.m.
Gateway Financial Services,
6000 Uptown Blvd. NE,
Albuquerque, New Mexico 87110

PURSUANT TO THE NEW MEXICO RULES OF CIVIL PROCEDURE, this Deposition was:

TAKEN BY: BOGLARKA FOGHI, ESQ.
ATTORNEY FOR PLAINTIFF

REPORTED BY: CHRISTINE J. ROYBAL, CCR, RPR, CSR
CCR No. 50
Maricopa Reporting
Santa Fe, New Mexico 87501
480-597-4744

A P P E A R A N C E S

For the Plaintiff:

FOGHI LAW FIRM, LLC
5065 Corrales Rd., P.O. Box 944
Corrales, New Mexico 87048
(505) 220-5691
foghilaw@yahoo.com

BY: BOGLARKA FOGHI, ESQ.

For the Defendants:

CUDDY & McCARTHY, LLP
1701 Old Pecos Trail
Santa Fe, New Mexico 87502
(505) 888-1335
kkilgore@cuddymccarthy.com

BY: KAREN KILGORE, ESQ.

I N D E X

| WITNESS: | Page/Line |
|---|---|
| Justin Griego | |
| Deponent Signature/Correction Page | 64:1 |
| Certificate of Completion of Deposition | 65:1 |
| Exhibit 1 Email Exchange Griego/Lipe, 9/10/21 | 14:25 |
| Exhibit 2 EOS Interview | 24:24 |
| Exhibit 3 Albuquerque Public Schools Investigation Report | 43:11 |
| Exhibit 4 Transcript | 48:3 |
| Exhibit 10 Response to Lipe Complaint | 59:24 |

I N D E X

All Witnesses: Page

Examination by Ms. Foghi 4:14

Friday, September 5, 2025

(The deposition proceeded at 9:00 a.m. as follows:)

JUSTIN GRIEGO,

was called as a witness and, having been first duly sworn, was examined and testified as follows:

MS. FOGHI: Thank you, I'm attorney Boglarka, B-O-G-L-A-R-K-A, last name Foghi, F-O-G-H-I. I represent the plaintiff, Tatia Lipe, T-A-T-I-A, L-I-P-E. In case of Lipe versus Albuquerque Public Schools, 1:23-CV-00899-GBW-JMR.

MS. KILGORE: I'm Karen Kilgore, Cuddy & McCarthy, I represent defendant APS. I have with me Idely Soto, I-D-E-L-Y, S-O-T-O, she works at my office.

EXAMINATION

BY MS. FOGHI :

Q. Good morning, Mr. Griego.

A. Good morning.

Q. We're present today for your deposition. Have you ever had your deposition taken?

A. I have.

Q. Okay. So are you familiar with the process?

A. Somewhat, I have done it one time before.

Q. No problem. So I will go through with you just a very brief description of what happens we have a court reporter present with us today. There is a court reporter,

transcriptionist present with us today who is going to take everything down. Obviously, this is a process in preparation as part of our discovery in preparation for trial in this case. There will be questions asked of you, pertaining to the matter involving my client, Ms. Lipe. I expect you answer the questions. If you don't know the answer to the question then just simply state you do not know the answer to the question.

During questioning objections might be raised, those objections will be put on the record, at that point, just stop talking, let your counsel raise objections if she has any, and we'll continue to move on.

If you need a break at any point in time, please let us know so that we can, you know, take a brief recess. I will also be showing you, in the course of this deposition, certain documents. I'm going to have you identify them. That will also be put on the record. You'll be given copies and your counsel, as well, will be given copies of those documents that I will be referring to.

Are we ready to proceed? All right. So would you please state your full name for the record.

A. Yeah, Justin Leonard Jacob Griego.

Q. What is your current position?

A. Currently an assistant principal at Volcano Vista.

Q. How long have you been an assistant principal?

A. This is my fifth school year over there.
Q. And prior to being at Volcano Vista what school were you with?
A. I was most recently at Jimmy Carter right before Volcano Vista.
Q. Prior to that?
A. I was at Valley High School.
Q. What were the dates that you were at Valley High School?
A. That's a good question. Trying to think what year I started. I think it was 2014 at Valley High School.
Q. How many years did you stay there?
A. Through 2020.
Q. Is it there where you first met my client, Tatia Lipe?
A. It is.
Q. Do you see Tatia here?
A. I do.
Q. Let's go back to when you were in your prior employment at Valley High School. What were your responsibilities and your job title at that school?
A. I was a teacher there. And so when I started it was Paces program and it switched over and it became the SESS program, S-E-S-S-2 program.
Q. What does that stand for?

A. Social emotional support services level 2, district special education program.
Q. Okay. So how many years in total would you say you've been in education?
A. I have been in education, this is my 11th year.
Q. So you started, would it be fair for me to say you started at Valley High School?
A. Officially, yes.
Q. I'm dating back to 2014, so 11 years. You've stated just a moment ago that you have participated in a deposition in a prior occasion, correct?
A. Yes, ma'am.
Q. Can you tell me a little bit about that deposition? What was it regarding?
A. It was a separate case involving APS.
Q. So it was a lawsuit that APS was facing?
A. Yes, ma'am.
Q. Okay. In 2015, when you were employed as a special education, 2014 when were employed as a special education teacher, was that the same year that you had the opportunity to work with my client?
A. I will be honest, I honestly can't remember if she was there the first year I was there or if she came the second or third year.
Q. But at some point in the early years she obviously

came to Valley High School?
A. Yes.
Q. What was my client's role, do you remember what she did at Valley High School?
A. Yes. He was, she was a social worker there within the program.
Q. Okay. As a social worker can you identify or describe to me what her role would have been?
A. Providing social work services to the students within the program, so meeting with them, supporting them, talking to them, figuring out ways to give them some skills and strategies to kind of help them cope or deal with things they are working through so they can hopefully function and do well in the educational setting.
Q. Okay. And prior to that, that point in time, did you ever meet Tatia before?
A. No.
Q. I will refer to her as "Tatia," it is easier. You've never met her prior to that?
A. Not before we worked at Valley.
Q. When she worked at social work at Valley High School, who would she have reported to?
A. It probably would have been the assistant principal in the SESS program.
Q. Who was assistant principal?

A. At the time it was Arnold Cordova.
Q. Who was the principal?
A. The principal of the school?
Q. Uh-huh.
A. Was Anthony Griego.
Q. How are you related to Anthony Griego?
A. He's my father.
Q. Okay. So Valley High School operated the SESS program during that time period correct?
A. Yes, ma'am. They were one of the centers at the high school level for that program.
Q. Mr. Cordova, who would have been an assistant principal for the SESS program, would he be the person you would have reported to?
A. Yes. He was like my evaluator and oversaw the program.
Q. What would you say were his responsibilities?
A. I think overseeing the special education programs, because there was a couple different ones there at Valley High School I think there was an IGS program, as well, that was there.
Q. When you reported to him, what did that entail, when would you report to Mr. Cordova?
A. I mean -- can you kind of rephrase the question as far as "report"?

Q. Sure. So you're working as a teacher and there will come occasions as a teacher that you would have to meet with Mr. Cordova. What would be those circumstances that would require you to have to meet with Mr. Cordova?
A. It could be student situations, it could be follow-up on services, yeah, questions regarding any like parent interactions, those types of situations. If things came up we would discuss those situations and figure out how we could navigate them going forward.
Q. Did you ever have to report to your father?
A. No.
Q. Even if he was above Mr. Cordova, you did not have any interactions with your father?
A. No, not really. I mean, because we're -- it is a district program placed at the high school, it is kind of like a school within a school, so Mr. Cordova was my direct supervisor. That's who we worked through for most things.
Q. Was a gentleman by the name of Delano Encinias [phonetic] a student in the SESS program back then, if you recall?
A. Yes, I believe so.
Q. What do you recall about Delano Encinias?
A. I remember him being a student there within the program. A lot of our students were dealing with, you know, various trauma or emotional disturbance. A lot of students

were identified as ED, so we were working on different skills that would help them academically work toward graduation requirements, but also soft skills kind of to navigate real-world interactions between fellow students, colleagues, peers, those things post-secondary.

Q. What were the specific issues related to Delano Encinias, if you recall?

A. I don't remember a ton of specifics regarding his background. I do know he had started with us, I think, in the program and I think he left for a small time, then came back to the program like a year later maybe.

Q. Was Ms. Lipe, in your recollection and opinion, did she advocate for SESS students?

A. Yeah.

Q. Okay. Do you think that at that time -- do you have an opinion as to whether or not you felt that she was doing a good job on behalf of the students?

A. I mean, I felt like she was providing services and doing what she was there for the students.

Q. Okay. Would it be accurate for me to state you and my client butted heads over advocacy issues back in 2015 to '17?

A. I don't remember like specifics of butting heads. As far as like services or anything like that, I thought that we had a pretty good working relationship and that we

were on good terms, both trying to work with the students. I know we had different roles, me as a teacher, her as a social worker as far as what we were trying to accomplish with our students but I don't feel there was any contentious issues or things like that.

Q. You don't recall any contentious issues?

A. Not specifically.

Q. Did Ms. Lipe ever report SESS' program concerns that you're aware of with respect to this program to APS administration?

A. Not to my knowledge, no.

Q. So you have no recollection of it?

A. No.

Q. You never learned of any of these reports that would have been made as concerns raised by her?

A. No.

Q. Okay. Following -- let's see, were there personnel changes, significant personnel changes in that SESS program during the time that you were at Valley High School?

A. There was at one point, yes, ma'am.

Q. What were those changes that you recall?

A. So there was a change in administration, Mr. Cordova had left, they had brought in a new administrator who was not from the district and was new to

the state, and he was there for about a year, and then he had left. Then there was another assistant principal that was brought in to replace him after that.

Q. The new administrator that came in after Mr. Cordova left, do you know the person's name?

A. I think it was Mr. Brooks was his last name. I can't remember his first name to be honest with you.

Q. Do you know the reason why Mr. Cordova had to leave?

A. I honestly don't know.

Q. Okay. Were there any scheduling caseloads adjustments made in 2014 that you recall at Valley High School in that program that would have reduced my client's involvement with students?

A. Not that I recall, no.

Q. So you have no recollection of any adjustments or changes to her caseload?

A. Nothing that I know of. I wasn't really involved with the caseloads at that time.

Q. So is it your testimony today that you -- and I'm just, and correct me if I'm wrong, please, just going back to your previous statement, as you sit here today, you do not believe that there has been any negative interactions, feelings between you and my client at any point in time while you were at Valley High School?

A. Not at Valley High School no.
Q. Did you ever develop any kind of negative feelings toward my client subsequent to leaving Valley High School?
A. No. I thought we were on good terms, honestly. There was some frustrations at Volcano Vista High School the year we were there but it wasn't anything bad. Again, I think she was an advocate for the students and wanted to do her best and that's what I wanted to do, too. Our goal was to do right by our students.
Q. Okay. So you prepared in preparation, as you've been involved in this case. Certain discovery interrogatories and requests for production of documents were provided. Did you participate answering any of the interrogatories in this matter?
A. Yes, ma'am.
Q. Okay. Do you recall specifically what interrogatories you participated in answering?
A. I don't remember specifics, no.
Q. In your written responses you denied knowledge of complaints prior to the PED complaint that was initiated in this case; is that correct?
A. I believe so.
Q. Okay. Let me go ahead and show you what I have now marked as Exhibit 1.
(Exhibit 1 marked.)

Q. (BY MS. FOGHI) Can you please take a look at this document and tell me if you can identify this document for me -- let's start with the first page, first two pages of Exhibit 1.
A. It looks like an email exchange between me and Tatia.
Q. What are the dates of these exchanges?
A. September 10, 2021 at the top here, September 10th again.
Q. Let's start with the first two pages, September 10th, 2021 initial email at the top it looks like it was initiated by my client at 9:28 a.m.; is that correct?
A. That's what it looks like.
Q. On that email she was asking for a few minutes to sit and talk with you about pending S-P-E-D matter?
A. That's what it says.
Q. Did you respond to her?
A. I can't recall if I responded.
Q. Well, take a look at the same page at the bottom.
A. Okay. Yeah, looks like I responded later that date at 12:00.
Q. You indicated to her at 12:08 in that email, "If I'm unable to meet today, can we meet some time on Monday"; is that correct?
A. Yes, ma'am. That's what it says here.

Q. Did that meeting on Monday ever happen?
A. I do not recall.
Q. Go please now to Page 3 which consists, again -- it is one document, but it is an email on September 10, the same day. Could you please tell me if you see an email, once again, that would have been initiated by my client at the top of the page?
A. Looking at Page 2?
Q. We're done with Page 1 and 2. You're now going to Page 3, which is another email, February 10th, 2021. Do you see that?
A. Yes, I do.
Q. What is the time that email would have --
MS. KILGORE: Excuse me, I think it is September.
MS. FOGHI: What did I say?
MS. KILGORE: February.
Q. (BY MS. FOGHI) Thank you. September 10th, 2021.
A. No worries. Looks like it came in at 7:44 p.m.
Q. Could you tell what Tatia is discussing in that email that you were carbon copied on?
A. Yeah, so it looks like it says, "Per your request please find the email attached" -- response from Ms. Julie, [phonetic], "the actual whereabouts of the student was not being monitored, so for safety and accountability purposes, I asked the teacher to please notify me if JayLynn

[phonetic] was on her way to the office to ensure that she actually showed up where she was supposed to be."

Q. Okay. Did you respond to this email?

A. No, this wasn't sent to me, I was CC'd on it, but it looks like it was sent to our principal Ms. Sedillo.

Q. Okay. Please go to page -- so let me back up, all the students in the emails were listed in the PED complaint, correct?

A. All the students in the emails?

Q. Uh-huh.

A. Which emails are you referring to?

Q. We are referring to -- let's see, Page -- we're speaking of the students that are referenced in the September 10th, 2021 email that went out by her at 7:44, specifically she is talking about the one student that was of concern. The whereabouts of the student?

A. Yes, I see student JayLynn, it looks like.

Q. Do you know if that student was part of any complaint?

A. I believe so, yeah.

Q. Okay. The second page of this email chain, is dated October 15th, 2021. Do you see that?

A. I do.

Q. Who was that email initiated by?

A. It looks like it was sent by Ms. Tatia.

Q. Were you carbon copied on it as well?
A. I was.
Q. Could you please tell what she indicates in this email?
A. Yeah, so it says, "Hello, all. Please be mindful when working with special education students we cannot simply restrict the student. Plan, consequences, et cetera, need to be clearly communicated, defined, and documented. Behavior and intervention planned by the IEP team. Everyone working with JayLynn should have a copy of the plan to ensure consistency."
Q. So you were made aware of this email?
A. Yeah, I was CC'd on this.
Q. Did you have any involvement in any response, any action as per that email?
A. Not that I can recall.
Q. Okay. Did you ever deny knowledge of any of these issues that are referenced here, specifically in this email? Did you ever deny knowledge of these issues in your written responses to interrogatories?
A. When you say "issues," can you, I guess, kind of clarify the question?
Q. PED-related complaints.
A. Are we saying after the PED complaint?
Q. Yes.

A. I don't remember, no. I don't really remember.
Q. You don't remember if you denied those responses?
A. Yeah, I honestly can't remember if I denied any knowledge of those responses.
Q. Do you recall when Tatia left Valley High School?
A. I'm honestly not too sure on the year. I can't remember if it was, yeah, '17, '18, not too sure.
Q. But at some point the two of you began working together again?
A. When we were at Volcano Vista.
Q. Right. So the Volcano Vista, that's where we are in 2021 talking about Volcano Vista now. Were you involved in decisions to remove students from my client's caseload?
A. I was involved in conversations where we had made caseload adjustments, yes.
Q. Who did you have those conversations with?
A. Mainly the point of contacts were the special education district support people, Jessie Macfarland was helping out with caseloads at that time, Ms. Atler, who was the head of special education, I think Bernadette Lucero was helping out with some of that.
Q. Okay. What reasons did you give my clients as these changes were being made with respect to her caseload -- what was the reason for the adjustments?
A. I can't remember specifics as far as what I may

have communicated, but I know we said they were based off concerns that were brought forward by parents, staff members, and those kind of things.

Q. So you're indicating that concerns were raised by parents, and you're speaking of concerns that would have been directly raised about Tatia?

A. About services being provided for their students.

Q. So not about my client, but about the services.

A. Or lack thereof being provided by the students, yes, ma'am.

Q. Or lack thereof provided by who, by Tatia?

A. Yes.

Q. Okay. So you're saying that parents had complained about her not providing adequate service?

A. Yes, ma'am.

Q. Who would these people have been? Can you identify the people who would have complained?

A. Off the top of my head I can't remember specific names. But I know there were emails and they might be -- I think there were things that were shared out there. So there was emails where -- we had parents reach out with concerns. Some other ones were some staff members reached out with concerns regarding services for their students.

Q. You discussed changes to her caseloads as you mentioned with Annittra and Bernadette Lucero, correct?

A. Yeah, I was reaching out for guidance whenever we were looking at those things, because again, I was kind of newer to the position and wanted to make sure we were following the correct procedures.

Q. Let's talk about procedures, what were the procedures. So she had a caseload assigned to her. Do you remember what that caseload would have been?

A. I don't remember all the students off of the top of my head.

Q. Give me a rough number of how many students do you believe she was in charge of.

A. The first year there I'm honestly not 100 percent sure. Second year I want to say it was somewhere between 20 and 30 students.

Q. And was that typical for social workers to have 20 to 30 students?

A. I want to say I know that our numbers at Volcano Vista are larger than other comprehensive high schools in the district. So our numbers tend to be higher across the board in all kinds of areas. So my guess is the social workers there probably carry higher numbers than other social workers across the district.

Q. So, what I'm asking you is, did Tatia have more or less cases assigned to her than other social workers?

A. There on the campus?

Q. Yes.

A. I think that they were pretty balanced. I know Jessie Macfarland kind of worked through that to make sure the service minutes and number of students were pretty balanced.

Q. Okay. The complaints that you mentioned, you said that they came from parents. Do you recall approximately how many parents would have initiated a complaint? Specifically -- and I'm not talking about the school right now, specifically to Tatia.

A. I can think of, I can remember at least two, I think, that the parents reached out specifically with, concerned regarding services with their students with Tatia.

Q. What were the concerns, what services and what specifically as to services -- what was the complaint?

A. So again, not knowing for sure, I would have to look at the emails and see, I remember one parent was concerned they were not meeting the times, the minutes -- meetings were being rescheduled, maybe not followed through on. Another parent had some concern, I think, just regarding the interactions between Tatia and I think a middle school social worker, some conversations that may have been had. I know there was a meeting with that student and the parent. Tatia had logged on virtually and the parent I think was frustrated with what was kind of shared

out and said at the time. I think they had concerns overall, I think, with Tatia kind of working with her student and they had requested that that student be removed from her caseload moving forward.

Q. So with respect to when you say time and minutes not being met, there is a protocol in place is there not, for keeping track of your time in minutes that are spent with each respective student?

A. Yes, I believe so.

Q. Okay. Well, you believe so or you know so?

A. Well, so I don't have access to the MacCapture where the social workers are supposed to record those minutes at. I think that's something that, I don't know if it is the district person oversees social workers or head of special education, I'm not one hundred percent sure who kind of double-checks those, but the site assistant principals or principals don't have access to that information.

Q. So you have no access to MaxCapture. Did you have access to Synergy?

A. I did.

Q. Describe to me the difference between Synergy and MaxCapture and what each of the programs do.

A. I don't know much about MaxCapture. All I know is it was, I guess, a system or database where they would house their notes and document the time they were meeting with

students. Synergy is used more for a lot of the academics, communication, contact logs between parents and families, that's where the grade books are housed, it connects to StudentVUE and ParentVUE, which students and parents have an app and download that information from.

Q. Did you ever review, as part of the decision to alter her caseload, did you ever review any of the Synergy inputs that were done by her in the case involving the complaints?

A. I don't know if I remember specifics. I mean, I would check Synergy as needed for the contact log and those kinds of things, depending on certain situations. But again, I don't know if there's anything specific as far as services that are being provided for students that is documented within Synergy.

Q. Okay. Do you remember participating in an EOS interview?

A. Yes.

Q. Okay. Do you recall the date that you participated in that interview?

A. I do not.

Q. Let me go ahead and show you what I have marked as Exhibit 2.

(Exhibit 2 marked.)

A. Thank you.

Q. (BY MS. FOGHI) Do you see the cover of the document, Exhibit 2?
A. Yes, ma'am, I do.
Q. What is the date on that interview?
A. It looks like the date was February 7th of 2023.
Q. Okay. I'd like for you to go to Page 21. Who was this interview conducted by?
A. It is looks like it was Angie Barreras.
Q. And the claim made that resulted in having that interview was a discrimination and retaliation claim?
A. Sorry, can you repeat that?
Q. Was it a discrimination and retaliation claim, is that the reason that this interview was being conducted?
A. I believe it may have been, yeah. I believe so.
Q. And do you recall the interview being recorded?
A. It probably was.
Q. Okay. Your recorded interview begins and the summary of your recorded interview begins on Page 21, could you please, if you don't mind, take a few minutes and just read over your portion. Just glance over it as much as you're able with respect to what was stated by you during this interview. Let me know when you're ready.
A. Okay, thank you.
(Witness complies.)
A. Sorry about that. Thank you.

Q. Thank you, I appreciate it. So before we get to the questions, did you have an opportunity before you came in for the deposition today to review any documents?
A. Nothing -- none of these, no.
Q. What did you review in preparation for today?
A. I think I had looked over some emails.
Q. Okay.
A. And then I had been shared a recording.
Q. Do you recall the date of that recording?
A. I don't recall the exact date of the recording, but it was the interaction -- it was described here in this transcript an interaction between me and Ms. Tatia in the hallway.
Q. So as you had this interview conducted, prior to the interview, you were given a copy of the APS OEO and statement of rights and responsibilities to review, correct?
A. I believe so.
Q. Okay. So when you were interviewed in this matter as part of the investigation, you indicated that your supervision -- that the supervision of my client was taken over in 2022 by the principal and another principal due to complaints -- a complaint?
MS. KILGORE: What page are you looking at?
MS. FOGHI: I'm looking at Page 22, paragraph that begins with, "Justin Griego has worked..."

MS. KILGORE: Yeah, let me find it, one second. Thank you.

Q. (BY MS. FOGHI) So do you recall discussing with the investigator the issues pertaining to Tatia and the principal and assistant principal taking over in October of 2022?

A. Yes, ma'am.

Q. Okay. With respect to these complaints that were mentioned previously, was Ms. Lipe the only social worker that faced complaints by parents?

A. She was the only one, yeah, that was, that, brought to my attention, yes, ma'am.

Q. That was brought to your attention?

A. Uh-huh.

Q. So, if a complaint would have been made about another social worker would you have been out of the loop or informed of that complaint?

A. I should have been in the loop and informed of that complaint.

Q. Okay. As you sit here today, the only person that ever received a complaint, that time period, about students complaining about a social worker would have been only Tatia?

MS. KILGORE: Objection. What time period?

MS. FOGHI: Back from 2019 to 2022.

A. So 2019 I wasn't there at Volcano Vista.
Q. (BY MS. FOGHI) We're talking about Volcano Vista now, let's focus on the timeframe at Volcano Vista.
A. So, yeah I had gotten there in 2021, so from that time, no, I don't remember any specific complaints being brought to my attention regarding another social worker.
Q. Were you made aware of my client's accommodation request?
A. Yes, I was.
Q. When were you made aware of that?
A. I can't remember the specific date.
Q. Do you recall what the request was?
A. I believe the request was to work remotely at home at times.
Q. There was a meeting that was held, correct, in an effort to address that request.
A. Yes, there was a Google Meet meeting, ADA accommodation meeting that was held.
Q. Okay. And who was present at that meeting?
A. I can't recall for sure but I know Socorro Rodriguez, I think, was running the meeting. I think Bernadette Lucero may have also been at that meeting, but I can't recall if Ms. Sedillo, the principal, was there or any other representation from the APS special education department.

Q. According to the document, Bernadette Lucero was present, my client was present, Jerry Thorn was present, the union representative was present. And I assume you were present?

A. Yes.

Q. Okay.

MS. KILGORE: I think it says Jerry Thorn, a union representative. Mr. Thorn is the union representative.

MS. FOGHI: Thank you for that correction.

Q. (BY MS. FOGHI) So in that meeting a decision was made, correct, not to support Tatia?

A. So during that meeting, yeah, the request was made for the accommodations, and then my understanding is that Socorro and district are the ones that make that final decision as far as what the district is willing to support.

Q. Did you have any involvement in the decision not to support her request for accommodation?

A. They just asked for my input during the meeting as far as if there were any concerns about her working from home or working remotely. I do remember sharing the only concern would be just like when they have pull-outs, whenever the social workers kind of pull students from classes to have their meetings with them and kind of work with them, where the students report to, who would be responsible, I guess, for supervising that student, are we

putting them in a separate kind of space or a room? Do we need anybody to kind of -- I know they can't be in there, I guess, while they're logged on virtually with their therapist or social worker, but what are the -- what was the expectation is kind of one of my questions? And another one that I kind of brought up, I believe, is if there was a student in crisis and it was one of her students on her caseload, just what would be the protocol for that. Are we reaching out to another social worker, are we utilizing counseling staff? Just -- I was trying to get clarification from the district as far as what would this look like in these kinds of situations.

Q. Did you, yourself, support her request?

A. I didn't necessarily know a lot about what was being requested or what the parameters were. Those were my concerns, so those were some things I wanted to make sure those were ironed out if any decision was to allow her to work remote. I honestly didn't care either way, to be honest with you, I just wanted to make sure the students were being taken care of, and that if she was going to be working remote, that we had a plan in place so we knew who to contact or what the plan was going to be to support students.

Q. Were any leaves ever requested by other social workers of this nature?

A. Nothing that I remember, no.
Q. So no special accommodations requested by any other social worker at the school during this time period while you were employed at Volcano Vista?
MS. KILGORE: Different question, but --
Q. (BY MS. FOGHI) Were you aware of any other requests made by a social worker during this time period for accommodations?
A. No, nothing that I recall.
Q. Okay. So, again she was the only one?
A. The only one, yeah, that I was in the loop with.
Q. It is your understanding, your statement today that you do not know the parameters of that request, you did not know why she was requesting accommodations?
A. I think it was medical, but I'm not 100 percent sure. I can't recall exactly why.
Q. Okay. In this report, Paragraph 1, 2, 3, 4, fourth paragraph, Page 22, there is a discussion addressing what happens if a student was in crisis. Was this particular issue factored in as the decision was made not to provide her with an accommodation?
A. Sorry, can you rephrase the question?
Q. Sure. If a student was in crisis, obviously there is a protocol in place, correct?
A. Yes.

Q. How do you-all handle situations that involve a student in crisis?

A. It depends on the crisis and the type of situation. If we're looking like a suicide ideation type situation, there's protocol kind of for that. If we're looking at a student who may be having a bad day and is escalating in different ways it could be just check-ins. It can vary depending on the student.

Q. Okay. Are social workers responsible to handle threat assessments?

A. I'm not too sure of a specific policy within APS, but I do think they are usually involved if it is involving one of the students on their caseload, because they have the best rapport and know the student better, whenever we're looking at other types of things, counselors can be involved, administrators, just kind of depends on the situation.

Q. Okay. Please turn to Page 23. And go to Paragraph No. 3, which begins with "When asked." So if you'd take a look at that paragraph, which is Paragraph 3 on Page 23, you were asked if you knew anything about my client not completing the Medicaid notes because of her absence, were you aware of that conversation?

A. Sorry, can you repeat and rephrase that one more time?

Q. Medicaid notes, you had discussion, you were asked about completion of Medicaid notes. Who would be responsible for that or what would happen in her absence. Do you recall that conversation?
A. I don't know if I recall specifically that conversation. I mean, I'm looking at -- I think a paragraph where it is referencing Medicaid notes here --
Q. Uh-huh. In that paragraph you state that my client's absence created a hardship for APS; is that correct?
A. It does say that right here, yes, ma'am.
Q. Do you recall making that statement?
A. I don't recall, but if it is in here, I'm sure that's something I probably said. And I know that that was probably in reference to other social workers on campus kind of having to pick up the slack. And that was the responsibility, to make sure the kids were receiving services.
Q. Okay. And when you were asked if you had anything to do with the denial of the accommodation request you indicated to the interviewer that you had nothing to do with the denial, correct?
A. Yes, ma'am.
Q. In fact, you indicated that would be handled by Socorro Rodriguez from the ADA Extended Leave Office,

correct?

A. Yes. They are the ones that make the final determination and decision on that one.

Q. Okay. Let's talk about the practice of signing in and signing out, which is discussed on Page 23 Paragraph 5. Do you recall discussing the process and procedures for signing in and out with the interviewer?

A. I mean, not specifically but I do see it here in the document. So, yeah, I know that was something that had come up, because they were asking about like what is the practice there at the school. Since I have been it has been regular practice for staff members to sign in and out. We have converted to like a digital QR code, as well as physical sign-out sheets placed in different office spaces throughout campus.

Q. When did you convert to the digital QR code?

A. That was probably like 2 years ago. It was after.

Q. With respect to sign-in/sign-out, I'd like to ask you, are there specific sheets that are called "sign-in" and "sign-out"?

A. There are. They are staff sign-in and sign-out sheets.

Q. And those sheets were at that time utilized when my client was working?

A. Yes, I believe so.

Q. Do you have a record of those sign-in and sign-out sheets? Do you have them in your possession?
A. I do not, no.
Q. It is in the possession of your office, APS, as far you know?
A. Potentially. I'm not 100 percent sure how far back they go or keep those for. But they should be available hopefully somewhere.
Q. So the sign-in sign-out sheet would provide a date, name, reason, time in and time out, correct?
A. Yes, that sounds correct.
Q. Did you ever review any of the sign-in and sign-out sheets particularly as it pertains to Tatia as the complaint, one of the complaints that you indicated to the investigator had to do with her absences? Did you ever review her absentee log if there is such a thing as absentee log? I'm going to rely on sign-in sign-out sheets?
A. I don't remember reviewing sign-in and sign-out sheets. I do know it was shared by the person like that handles payroll and the leave for our staff members. This was, I think, a little bit later, but I was shared -- I don't know if it was FMLA leave or intermittent leave that was being used by Ms. Tatia, so that was something that I was shared prior to one of our meetings.
Q. Who would have been the person at payroll that

shared this with you?
A. So it was actually one of the clerical staff there at Volcano Vista.
Q. Do you know who it was?
A. Yes, it was Ms. Val Bumphrey, I believe.
Q. Val?
A. Yeah, Valerie Bumphrey.
Q. Bumphrey. So your statement to the investigator specifically as it pertains to your concern about her absences and not being there for the students, what did you make that claim based on? What did you rely upon to have that opinion that she had excessive absences?
A. Sorry, can you rephrase as far as where I said she had excessive absences.
Q. Page 23, if you go to paragraph 1, 2, 3, 4, 5, 6, it starts with, "Mr. Griego said." You indicated to the interviewer that her absences had increased the workload for their second social worker Antoinette Romero, and this increase occurred because parents reached out to the administrator, requested a change in social worker from Ms. Lipe to Ms. Romero. Ms. Romero's caseload got bigger, Ms. Lipe's caseload became smaller?
A. Yes, ma'am.
Q. So you're talking about her absence, increase in her absences. What documents did you rely upon when you

made the statement to the interviewer that her increase in absences resulted in a shift in caseload?

MS. KILGORE: Objection, form of the question. That's not the way I read the sentence you're referring to.

Q. (BY MS. FOGHI) Okay. Well, why don't we, instead I'm going to have you read that paragraph into the record.

A. It says here, "Mr. Griego said that Harris Lipe's absences have increased the workload for the second social worker, Antoinette Romero. The increase occurred because parents reached out to administration and requested a change in social worker from Harris Lipe to Ms. Romero, Ms. Romero's case got bigger, Harris Lipe's became smaller."

Q. Okay. So absences were an issue, would that be accurate?

A. As far as services for students, yes.

Q. What document did you rely upon in order to make that statement to the interviewer that her absences caused a problem?

A. So, again, that would have been the log that was shared as far as the FML Leave or the intermittent leave that was being used.

Q. Okay. Now, at one point in time, and I'm now on Page 24. And I'm sort of the jumping around with the interview here, but specifically I'm going to ask you about Ms. Lipe needing a mentor. Do you recall her request to

obtain a mentor at the school?

A. Yes, I do.

Q. Do you know the reason she wanted to obtain a mentor?

A. Yes. It was my understanding that she had got accepted into an administrative program to work on obtaining her administrative license, and I believe it was through the same program I had done through CES. And through that program you do like a -- you get partnered with a mentor and you do internship hours along with courses or coursework required for that.

Q. Did you tell the investigator you were not comfortable with being Tatia's mentor?

A. Yes.

Q. Why did you tell the investigator that?

A. Because it was my first year in an administrative role and I didn't feel comfortable, I was still kind of getting to know my own role and what was expected of me. I didn't feel comfortable really mentoring someone at that time.

Q. Did you also tell the investigator that other people in the district were also unable or unwilling to mentor Tatia?

A. Yeah. I know she had asked some other people, I believe, on campus, that wanted to be her mentor and that --

and I think at the district. Yeah, I don't think that she, at least to my knowledge, I don't know who she ended up finding to be her mentor. It might have been someone at another school site. But, yeah, I was made aware that there were a few people that were asked, I don't think anyone at our campus said yes.

Q. Do you know the reason for that?

A. That, I'm not 100 percent sure of their reasons, no.

Q. Okay. Now, there were several meetings, of course, that happened during this time period. Did you ever -- well, let me withdraw that question.

Is the policy of the department that if a meeting is held that involves a person requesting an accommodation, that that person be present for meetings that occur with respect to that request?

A. Sorry, can you --

Q. Would Tatia have been a part of meetings? Should she have been a part of meetings that were held that discussed her issues and requests?

A. I mean, I believe so. Like the ADA accommodation meeting and those kind of things you're referring to?

Q. Were there meetings held that Tatia was not invited to?

A. Not to my knowledge, no.

Q. The meetings that are held, are they recorded meetings?
A. No, not always. I guess I'm trying to figure out what kind of meetings.
Q. Any meeting held with administration that you would have been part of. Are those meetings recorded?
A. No.
Q. Okay. Anybody taking minutes?
A. Depending on like the administrative meeting we have the administrative agendas and like admin meetings every week. Yes, they are agendas that are kept and notes, but for every single meeting, I can't say there is like a specific or like formal agenda and minutes that are being kept for every meeting.
Q. Do you recall the March 11th, 2022 meeting?
A. I do not, no. You're going to have to --
Q. Let me draw your attention to Page 5, I'm on Paragraph No. 3.
A. It is actually Paragraphs 3 and 4.
MS. KILGORE: Sorry, what page?
MS. FOGHI: Twenty-five, Paragraph 3 and 4.
MS. KILGORE: Sorry.
Q. (BY MS. FOGHI) Do you recall having a conversation with my client in the hallway of the school?
A. Yes, I do.

Q. Can you please tell me what the nature of that conversation was?

A. Yeah, it was a conversation regarding a student who was in a -- we were calling it a smart ISS at the time. So the student was in a separate setting there at the school, and I was contacted by one of the teachers that was working at the time who had concerns they said the student had been gone for an extended period of time so I went over to, just try to and see what was going on, and see how I could try and help out. And there was interaction between me and Ms. Tatia there in the hallway.

Q. Were you aware that meeting was recorded?

A. I was not.

Q. In that meeting you express your concern in a raised voice as to why she is spending the amount of time she's spending with the student, correct?

A. I don't recall if it was a raised voice, but I did have some conversations about the time being spent with the student.

Q. So because we're dealing with special needs students, is there specific restriction on how much time a social worker can spend with a student with a need?

A. No. And I don't know if, I rarely referenced in saying that there is a specific time period that needs to be spent, but I do know there's also other service minutes as

far as educational minutes students they need to receive. I think that was the concern that I was trying to bring up and address at that time.

Q. In that meeting with Tatia in the hallway did you ever tell her you cannot keep the student for that long, did you make that statement?

A. That, I don't recall.

Q. Okay. Did your conversation with Tatia ever become escalated at any point in time?

A. I do feel like that conversation in the hallway was a little contentious. I tried to keep it professional, I know that it -- at one point another staff member that walked by, because we were in the doorway in front of another classroom, and I was trying to kind of shut down the conversation at that time saying we can talk about this a little later with more district representation, I think, or other people involved.

Q. Were you a part of any evaluations that may have been done as far as the work performance of Tatia?

A. Yes. I believe that first year I was involved with the evaluation.

Q. How is that valuation conducted?

A. So that year I was working withing Ms. Bernadette Lucero. She was helping with the social work evaluations at the time and so I think we had -- I can't

remember if it was a virtual meeting where we went through the evaluation paperwork and reviewed the information from that year and closed up an evaluation from that school year.

Q. Do you recall the evaluation as far as how her evaluation was, was it positive, was it negative, the one you participated in?

A. I don't recall specifics, but I don't recall it being a negative one, no.

Q. Let me go ahead and show you -- wait one second, please -- what I have marked as Exhibit No. 3.

(Exhibit 3 marked.)

Q. (BY MS. FOGHI) I don't have one but I will give you mine.

MS. KILGORE: Thank you.

MS. FOGHI: Thank you.

Q. (BY MS. FOGHI) Take a brief look at this document that I have it labeled Exhibit 3. And if you can, please identify the document for the record.

A. What it says on the, Albuquerque Public Schools Investigation Report. I believe that's a reference number 22233062, location, Volcano Vista High School, claim, retaliation/harassment. The investigator, Tim Gonterman, and the date was April 13th, 2023.

Q. Do you recall participating in this interview?

A. Yes, a little bit.

Q. Okay. Let me go ahead and draw your attention to Page 9 of the summary with the date April 6, 2023. Were you aware that this interview was recorded as well?

A. Yes, I think I was aware of it being recorded.

Q. Your current supervisor was Melissa Castillo, correct?

A. No. It was Melissa Sedillo, actually.

Q. So this would be a typo, it says "Melissa Castillo"?

A. Yeah, I'm guessing that's probably a typo.

Q. Did you have an opportunity to review the summary and make any changes to the summary when it was provided to you or emailed to you, because according to this document, everybody was sent a copy of this interview for possible corrections.

A. I don't specifically recall, to be honest with you.

Q. So, Melissa Sedillo was your supervisor?

A. Yes, ma'am. And it looks like in the second paragraph they have her name correct, so it might have been a typo.

Q. Were you asked to provide your recollection of your interactions with my client during this interview?

A. Yes, I believe so.

Q. Okay. Do you recall any statement that you may

have made to this interviewer that would have been different from the ones you provided in your interview in Exhibit 2?

A. Not that I can recall specifically, no.

Q. In this interview you continue to maintain that the decision to deny her request for accommodations you had nothing to do with, correct?

A. Yes, I believe so.

Q. Okay. What do you believe was the reason that my client filed a complaint?

A. Complaint was for retaliation, so I feel like she probably thought -- felt she was being retaliated against in some way.

Q. In some way. You don't know the specifics?

A. No, I'm not too sure.

Q. Please take a look at Page 11 very top paragraph of Page 11 when you were asked about the allegations of my client's caseload. Take a look at that paragraph, please. Let me know when you're done.

A. I finished that first paragraph.

Q. Thank you. Can you please explain to me what you meant when you stated to the interviewer that, quote, Ms. Lipe was absent more often than originally known. And that would be sentence 2 and 3.

MS. KILGORE: Okay, objection. It is not in quotations, right?

MS. FOGHI: Well, I'm stating it. Let's go ahead and read that paragraph into the record. That would be more helpful.

A. Want me to read it?

Q. Yes, please.

A. Yes, ma'am. "When asked about the allegation that Ms. Lipe's caseload was removed from her as retaliation Mr. Griego advised that Ms. Atler made this decision based on the fact that Ms. Lipe was absent more often than originally known. Another social worker was assigned Ms. Lipe's caseload. When asked if there was anything unusual in reassigning a student if their assigned social worker wasn't working, Mr. Griego advised, not to his knowledge, and he wanted the student to have a social worker available."

Q. Okay. The issue of her absence being more often than originally known, is that something you were aware of or is that a statement you're making about Ms. Atler?

A. So that was something that was brought to my attention because the amount of leave wasn't necessarily communicated on a daily basis. I think -- and again, I'm not 100 percent sure, but what I recall, there was supposed to be some kind of communication on days when she was going to be out so we knew kind of what the plan was. Again, I'm not 100 percent sure on the timeline, but I know at one

point, the district was providing a substitute social worker to be physically on our campus to provide services for students, and so I think this was probably referencing that the amount of leave that was being used was unknown to me at the time.

Q. Okay. Did you attend and participate in a September 21, 2022 ADA meeting?

A. Potentially, that the --

(Off the record.)

Q. (BY MS. FOGHI) So back on the record, we're speaking of the September 21, 2022 ADA meeting.

A. Okay.

Q. Do you recall participating in that meeting?

A. I believe so, yeah, if that's the one we were talking about a little while ago, yes, ma'am.

Q. That meeting, of course, was also recorded; were you aware of that?

A. I honestly wasn't too sure it was recorded.

Q. In that meeting and, again, if you recall, and if you can't recall then we'll locate the ADA minutes. But in that meeting, do you recall expressing concern that Volcano Vista was too large to support my client working from home?

A. I don't know if I specifically recall that statement.

Q. Okay, what we'll do is -- okay, so let me go ahead and show you what I have marked as Exhibit 4.
(Exhibit 4 marked.)
Q. (BY MS. FOGHI) And this would basically reflect the meeting minutes?
(Interrupted by cell phone.)
A. I apologize. It's linked into the phone and I can't control it going off. It looks like one of the other schools trigger something as well. So, I apologize for that.
Q. No problem. I'm going to try to go to specific paragraphs on this transcript. Let me go ahead and have you look at paragraph -- well Paragraph 3, starts with, what is extreme heat and extreme cold. Do you see that paragraph?
A. Yes, ma'am, I do.
Q. Okay. Did you ever tell -- well, let's read that paragraph into the record, please. I think that's the simpler way to do it.
MS. KILGORE: Could I just ask you, do we know who recorded this conversation or --
MS. LIPE: It is on the bottom, the back page.
MS. KILGORE: Can't see where he is talking about who -- I understand that's possible, I'm just asking.
MS. FOGHI: I'm just looking at the Bates stamps on the bottom, which is something you-all provided TL 39 to

42 -- sorry, 37, actually, is the back page, PL --

MS. LIPE: In the narrative it states --

MS. KILGORE: I do have 38.

MS. FOGHI: 37, 38, 39, 40 and 41.

MS. KILGORE: Oh, I see, it is sort of out of order, then, right?

MS. FOGHI: It seems to be out of order.

MS. KILGORE: Yeah, I gotcha, I gotcha.

MS. FOGHI: Let me know, Karen, when you're good.

MS. KILGORE: Yes, I am. I understand now.

MS. FOGHI: Okay, thank you.

Q. (BY MS. FOGHI) So, this is a document again provided by counsel for APS. Take a look at that paragraph and please read it into the record starting with "What is extreme heat and extreme cold."

What is extreme heat and extreme cold. Currently, temperatures have been okay. When it happens, and her system isn't operating, then she can't adjust the warmth and cold.

Justin, for Socorro's purposes, is she in an office or classroom. She is in a classroom. Justin said each classroom should have the ability to control the temperature of the classrooms. The overall AC system was not working at the return of the school. They wanted to look at and find out if she can control the temperature in the classroom,

unsure if it is a district control temperature or school controlled. Could we move her to an office in a classroom that has the ability to control temperature? Justin, reach out to the Mr. Alzaga, [phonetic]. Socorro recommended use of fans. Tatia says she has fans and heaters to help control the temp setting.

Q. Do you recall the temperatures in the classrooms?
A. Vaguely, this is kind of -- yeah.
Q. Sure. And do you recall whether or not the ability to control the temperature in the classroom had anything to do with my client's medical condition?
A. I mean, it sounded like she needed some control over the temperatures.
Q. Did you ever reach out to Mr. Alzaga with respect to that request?
A. Mr. Alzaga, yes, I did.
Q. And what happened?
A. I'm not too sure. I know he was going to look at it. Anything that dealt with buildings and grounds, he's a building and ground assistant principal he would follow up on those things.
Q. Now, go, please, down to the last paragraph on this page, Bates label TL 39 of Exhibit 4. Starting with "Bernadette." Did Bernadette tell you that time off is left up to you?

A. It says it here. I don't remember specifically Bernadette saying that.

Q. What I'd like for you to do is read into the record, I'd like for you to read into the record the paragraph and stop at the point that it says -- read the first five sentences into the record, please?

A. The first five sentences?

Q. Uh-huh.

A. "Bernadette told Justin time off is left up to you. Bernadette said that's what sick leave is for. They don't have social workers working remotely. Justin said because they are so large they cannot support work from home and provide the additional support to Tatia to take care of her students. Tatia said that's what ADA -- this ADA request is, she isn't asking for total remote work, she's asking for remote work when she is in pain."

Q. Okay. All right. Would you tell me, would you state, would you agree with me that the statement that you made in this particular ADA meeting would have been accurate? Are they true statements that you made?

A. Yes, I believe so.

Q. Okay. Who was ultimately responsible for the denial of the accommodation?

A. Again, I do think that goes through the offices -- I don't know if that goes through the offices. I don't know

if it was the ADA accommodation office or HR, but I do feel like that was left up to that department.
Q. Was the denial ever attributed to Ms. Atler as far as you're aware?
A. Not to my knowledge.
Q. Okay. Was there a written decision issued by the ADA office denying the remote work as far as you are aware?
A. I honestly don't know what specific paperwork may have been shared after the meeting.
Q. APS would have that, correct?
A. I would assume that, but I'm not one hundred percent sure.
Q. Who would be the person that would be able to answer the question of the ADA denial letter and its existence and location?
A. It would probably be a representative from the office, from the ADA office and the district.
Q. So, Mr. Griego, as you sit here today, is it your statement that you did in fact oppose the remote work request accommodation made by Tatia?
A. Yes, without a full plan in place as far as how we're going to handle students if the district was going to be providing additional support to make sure that we were going to have what we needed on our campus to support our students.

Q. But you told Ms. Lipe that crisis logistics made it unworkable, correct?
A. That was one of the things that was stated, but it was also the, I guess, confusion as far as how we would handle students when they were being pulled to have a session withs Ms. Lipe. Again, would it be to a separate room? Do we have to provide some kind of supervision for the student location? What did that look like as far as logistics.
Q. Okay. Can you identify any specific APS policy that designates school social workers as crisis team members required to be on campus at all times?
A. Nothing that I can recall off the top of my head, no.
Q. Is it because there is no such policy or protocol?
A. That, I'm not 100 percent sure of.
Q. Before the remote work request was opposed, did you ever review that APS approved Ms. Lipe for remote work back in April and May of 2021?
A. Not that I know of, no.
Q. Were you aware APS approved Ms. Lipe to work remotely on April 2022?
A. Not that I remember. Not that I recall.
Q. So, if I tell you that that approval exists, do you still maintain that working remotely was just not

possible?

MS. KILGORE: Objection; misstates his answer.

Q. (BY MS. FOGHI) Well, let's go back to his answer. I believe his answer was something had to be put in place in order to accommodate a request; is that correct?

A. That's what I was looking for. Again, this was this first time kind of going through that process for ADA accommodation and I was not as versed, I guess, as far as what the policies and procedures were with APS.

Q. Is it your job to know what the policies and procedures are?

A. Yes.

Q. Okay. So, but even though that's part of your job you have no idea what those policies and procedures are?

MS. KILGORE: Objection.

A. At times.

Q. (BY MS. FOGHI) At the time you were not aware? Okay. Were you aware that e-academy provided services remotely for students?

A. I was not aware of that.

Q. Can you point to any policy, again, that would forbid her from having remote work options if it is medically necessary? Do you have any policy that you are aware of?

A. Not a specific policy that I can think of at the

moment, no.

Q. Did you tell any investigator -- well, let's talk about the ADA interview of 9/21/2022. Did you tell the investigator as to when you learned of the ADA request?

A. Sorry, can you repeat or rephrase that question?

Q. I can withdraw that question.

Can you identify all of your pre meeting communications with Principal Sedillo that you might have had about denying remote work? Did you have any meetings with her prior to the final meeting that was held that resulted in a denial? Did you have any other meetings with Ms. Sedillo?

A. I mean, I have lots of meetings with Ms. Sedillo. I can't remember a specific meeting specifically reviewing ADA material or anything like that, no.

Q. Are you in possession -- are you able to produce text messages, emails, notes reflecting any meetings that you may have had with respect to my client's requests?

A. Sorry, can you rephrase the question?

Q. Do you have any emails, text messages, anything of that nature, available to you that you can provide me with that would show communication between you and other administrators about the request that was made by my client?

A. I'm honestly not too sure.

Q. In the EOS interview, you referenced also a

whistleblower complaint alleging that my client was soliciting clients. Do you recall that?
A. Yes, I think I do.
Q. Can you identify the individuals that she may have been soliciting?
A. I don't remember specific students, no. But it was brought to my attention by another counselor on campus.
Q. Who was the counselor?
A. I apologize, not remembering her name. I believe it was Ms. Scott. I can't remember if her first name was Rebecca Scott, but she was the Crossroads counselor there at the school, I believe.
Q. Do you have any documentation available to you? I know you don't have it here with you today, but back at work, in your, whatever recordkeeping you maintain, do you have any documentation that you can provide me through your attorney that would have to do with the name of the individuals that you believe my client was soliciting?
A. Potentially. But I don't know off the top of my head.
Q. Well, if that does exist I'd like for you to provide that to your attorney, please.
A. Okay.
Q. On January 11 --
MS. KILGORE: Excuse me. Evidence of soliciting

students?

MS. FOGHI: Soliciting clients basically for herself.

MS. KILGORE: Okay, got it.

MS. FOGHI: Yeah, because there is the whistleblower complaint and he mentioned that she's soliciting clients, so I am specifically asking about who those clients were.

MS. KILGORE: But the clients are the students?

MS. FOGHI: Yeah, correct.

MS. KILGORE: Thank you.

MS. FOGHI: Of course.

Q. (BY MS. FOGHI) On January 11th, 2023 you participated in a meeting about PTG, progress towards goals, while Ms. Lipe was on FMLA, correct?

A. I believe so, yes.

Q. And you knew at that time that she was on FMLA, correct?

A. Well, so I didn't know that she was on FMLA, I guess that day during the meeting. But I do know that there was leave that was being used throughout that school year, yes.

Q. Was she being contacted despite the fact that you were aware that she was on leave?

A. Can you rephrase or clarify as far as who was

contacting her?
Q. Well, did you ever contact Tatia while she was on FMLA leave, when she was on FMLA leave? Did you ever contact her and ask her to participate and attend meetings at the school?
A. I don't explicitly remember reaching out and asking her to attend meetings while she was on FMLA leave.
Q. If a recording existed of that nature, you'd be surprised to hear that?
A. Yes.
Q. Mr. Griego, have you produced all emails, notes, and communications to your counsel regarding my client's caseload?
A. I believe so.
Q. Performance?
A. I believe so.
Q. Are there any documents referenced in your interview or deposition that have not been produced besides what I have asked you to produce through your attorney?
A. Sorry, can you rephrase that?
Q. Are there any documents referenced in your interview that we've talked about Exhibit 1, 2, 3, 4, prior exhibits, that have not been produced?
A. Not to my knowledge.
Q. Did you search personal devices, any accounts for

responsive material after this litigation ensued?
A. Can you rephrase that?
Q. Did you go through your records when this lawsuit was filed, were you contacted and asked to preserve all evidence, all emails, messages, recordings, anything of that nature that pertained to Ms. Lipe?
A. I was asked to share emails.
Q. Who asked you to share them?
A. I think it might have been counsel.
Q. Okay. Have you changed your phone number since 2021?
A. No. My work number's been the same.
Q. Have you deleted emails or messages pertaining to this case since 2021?
A. Not that I recall, no.
Q. Okay. Is there anything else that you wish to add to this deposition at this time?
A. No. Nothing from me.
Q. So I'm going to mark this out of place because I have marked my previous exhibits, so I apologize. I'm going to jump up in number on this one. I'd like to go ahead and mark this exhibit, and this will be my final exhibit for Mr. Griego. This will be Exhibit 10.
(Exhibit 10 marked.)
Q. (BY MS. FOGHI) If you could please take a look at

this document, just review it, please.
Thank you. Have you ever seen this document?
A. Not that I recall, but potentially. I'm not too sure.
Q. Potentially?
A. I don't recall looking it.
Q. All right. This document consists of four pages, correct?
MS. KILGORE: All I have is three.
A. Yeah, I'm missing --
Q. (BY MS. FOGHI) You're missing Page 3, 2, you're right, I'm missing 3 as well.
A. The cover page, as well.
Q. I put the sticker on it, but I'm assuming it is not Page 3. Let me take the sticker off. Okay. So I will add in Page 3 in just a moment, but what I'd like to do is have you tell me, what is the date of the letter on Exhibit 10?
A. The cover letter here?
Q. Yeah.
A. Dated February 21, 2023.
Q. And this is pertaining to Tatia Lipe versus Albuquerque Public Schools complaint, correct?
A. Yeah, that's what it looks like.
Q. And is it the response and requested information

by APS to the allegations that are referenced?
A. I believe so.
Q. So I will --
MS. FOGHI: What I will do, Karen, I will have to get a copy of this somehow. What I will do, I will scan it really quickly. I will give you Page 3 so you have a complete version.
Tatia, can you take a picture of this and, and send that to Karen, please?
Q. (BY MS. FOGHI) I'd like to draw your attention to Page 1 of this exhibit, which begins with "Position statement." And if you could please go to Paragraph No. 3 with, starts with, "APS denies these allegations." And could you read that into the record?
A. Yeah. Here is says, "APS denies these allegations. APS acknowledges that charging party filed a complaint with the PED on behalf of special education students. The administrators of Volcano Vista High School were charging party -- were brand new to their positions at the time the PED complaint was filed. The administrators were not responsible for any noncompliance within the special education department related to the concerns charging party filed with PED because they were not employed at the location at that time."
Q. Okay. Do you have any specific comments you wish

to make with respect to that statement?

MS. KILGORE: Objection, in that this doesn't have any date span on it. Although it might be obvious to some people, it might not be obvious to Mr. Griego as a witness in this matter. And again, I'm missing the one page, but it still looks like --

MS. FOGHI: The cover page, yeah. Cover page is February 21, you read that into the record.

MS. KILGORE: I'm missing Page 3.

MS. FOGHI: I gave it to you to photograph and give it to Karen. I just gave it to you, it is right here. So this is Page 3, Karen. I'm going to hand it to you, do you have your phone with you?

MS. KILGORE: I can look at it for a second.

MS. FOGHI: That belongs to Exhibit 10. This makes this a full document.

MS. KILGORE: Yeah, not my concern other than it is -- it looks like, and this Page 3, certainly want it to be complete as far as -- are we marking this exhibit?

MS. FOGHI: Yeah, it is Exhibit 10. I'm giving Page 3, which will complete that exhibit.

MS. KILGORE: But still, it looks like it is a position statement that would have been composed by perhaps counsel for APS. And I'm not sure if the question was to Mr. Griego, have you ever seen it or are you aware of it.

MS. FOGHI: I asked him if you were aware of this document -- let me re-ask that question.

Q. (BY MS. FOGHI) Are you aware of the existence of the document that's labeled Exhibit 10?

A. This is the first time I can recall seeing this, yes.

Q. So that answers that question.

MS. FOGHI: Okay, I don't have anything further for Mr. Griego. I think that his deposition is concluded.

MS. KILGORE: Very good, thank you. And we're pretty much on time.

Read and sign.

(Deposition concluded at 10:31 a.m.)

TATIA LIPE V. APS, ET AL.,

DEPONENT SIGNATURE/CORRECTION PAGE

If there are any typographical errors to your deposition, indicate them below:

PAGE LINE
______________ Change to ______________________________________
______________ Change to ______________________________________
______________ Change to ______________________________________
______________ Change to ______________________________________

Any other changes to your deposition are to be listed below with a statement as to the reason for such change.

PAGE LINE CORRECTION REASON FOR CHANGE
_________________________________________________________________
_________________________________________________________________
_________________________________________________________________
_________________________________________________________________
_________________________________________________________________
_________________________________________________________________

I, JUSTIN GRIEGO, do hereby certify that I have read the foregoing pages of my testimony as transcribed and that the same is a true and correct transcript of the testimony given by me in this deposition on SEPTEMBER 5, 2025, except for the changes made.

_____________________________ _______________________________
Date signed JUSTIN GRIEGO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

NO: 1:23-CV-00899-GBW-JMR

TATIA LIPE,

Plaintiff,

-vs-

ALBUQUERQUE PUBLIC SCHOOLS and NEW MEXICO DEPARTMENT OF PUBLIC EDUCATION,

Defendants.

CERTIFICATE OF DEPOSITION

I, CHRISTINE J. ROYBAL, CCR, RPR, CSR, DO HEREBY CERTIFY that on SEPTEMBER 5, 2025, the Deposition of JUSTIN GRIEGO was taken before me at the request of, and sealed original thereof retained by:

FOGHI LAW FIRM, LLC
5065 Corrales Rd., P.O. Box 944
Corrales, New Mexico 87048
(505) 220-5691
foghilaw@yahoo.com

I FURTHER CERTIFY that copies of this Certificate have been mailed or delivered to all Counsel, and parties to the proceedings not represented by counsel, appearing at the taking of the deposition.

I FURTHER CERTIFY that examination of this transcript and signature of the witness REQUESTED by the witness and all parties present. On _____________, a letter was mailed or delivered to KAREN KILGORE, ESQ. regarding obtaining signature of the witness, and any corrections, if any, were appended to the original and each copy of the Deposition.

I FURTHER CERTIFY that the recoverable cost of the original and one copy of the deposition, including exhibits, to BOGLARKA FOGHI, ESQ. is $____________.

I FURTHER CERTIFY that I did administer the oath to the witness herein prior to the taking of this Deposition; that I did thereafter report in stenographic shorthand the questions and answers set forth herein, and the foregoing is a true and correct transcript of the proceeding had upon the taking of this Deposition to the best of my ability.

I FURTHER CERTIFY that I am neither employed by nor related to nor contracted with (unless excepted by the rules) any of the parties or attorneys in this case, and that I have no interest whatsoever in the final disposition of this case in any court.

________________________________________

CHRISTINE J. ROYBAL, CCR, RPR, CSR
CCR No. 50
License Expires: 12/31/25

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

TATIA LIPE,
Plaintiff,

v.

No. 1:23-cv-00899-GBW-JMR

ALBUQUERQUE PUBLIC SCHOOLS et al.,
Defendants.

---

# APPENDIX A-11

## PLAINTIFF'S YELLOW-HIGHLIGHTED DEPOSITION DESIGNATIONS OF BONNIE ANDERSON

Plaintiff submits this yellow-highlighted deposition-designation material as part of Plaintiff's corrective submission. Plaintiff preserves all designations, counter-designations, objections, completeness arguments, evidentiary positions, and rights under Doc. 256, the Federal Rules of Civil Procedure, and the Federal Rules of Evidence.



Attached deposition-designation PDF pages: 38

# Bonnie Anderson

**Date:** December 8, 2025

**Case:** Lipe v. Albuquergue Public Schools, et al.
**Case** #:1:23-CV-00899-GBW-JMR

Maricopa Reporting, Inc.
https://www.maricopareporting.com/
Phone: 1-844-667-8366
scheduling@maricopareporting.com

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

NATASHA LIPE,

Plaintiff,

vs. NO. 1:23-CV-00899-GBW-JMR

ALBUQUERQUE PUBLIC SCHOOLS, et al.,

Defendants.

ZOOM DEPOSITION
OF BONNIE ANDERSON
December 8, 2025
VIA ZOOM

9:10 a.m.

PURSUANT TO THE NEW MEXICO RULES OF CIVIL PROCEDURE, this deposition was:

TAKEN BY: BOGLARKA FOGHI
ATTORNEY FOR PLAINTIFF

REPORTED BY: PAUL BACA, CCR #112
MARICOPA COURT REPORTERS
SANTA FE, NM

A P P E A R A N C E S

For the Plaintiff:

FOGHI LAW FIRM LLC
PO Box 944
Corrales, New Mexico 87048-0944
505-220-5691
BY: BOGLARKA FOGHI
foghilaw@yahoo.com

For the Defendants:

CUDDY & McCARTHY LLP
PO Box 4160
Santa Fe, New Mexico 87502-4160
505-988-4476
BY: MARY KAREN KILGORE
kkilgore@cmc.com

Also Present:

Natasha Lipe

# I N D E X

Examination By:

| | Page |
|---|---|
| Ms. Foghi ------------------------------ | 4 |

## EXHIBITS

| Plaintiff's | Description | Page Introduced | Page Marked |
|---|---|---|---|
| Exhibit 1 | User Guide | 21 | 21 |
| Exhibit 2 | Portfolio List | 25 | 25 |
| Exhibit 3 | Services Fact Report | 26 | 26 |
| Exhibit 4 | Tutor List | 27 | 27 |
| Exhibit 5 | Job Detail List | 32 | 32 |

(Whereupon, the witness was sworn.)

BONNIE ANDERSON,

after having been first duly sworn under oath,
was questioned and testified as follows:

EXAMINATION

BY MS. FOGHI:

Q. Good morning.

A. Good morning.

Q. I am Attorney Boglarka Foghi, and I represent Tasha Lipe. And today you are here for your deposition.

Are you aware of what a deposition is?

A. Yes.

Q. Okay. Would you please state your full name for us?

A. Bonnie Anderson.

Q. Okay. And how are you currently employed, Ms. Anderson?

A. At Albuquerque Public Schools. I work in the special education department as the director for data and budget.

Q. Okay. And how long have you worked for APS?

A. About 20 years.

Q. Okay. And prior to working for APS where

did you work?
A. I worked at the -- what was then called the State Department of Education. It is now called the Public Education Department, but I worked there for 10 or 11 years.
Q. Okay. Have you ever been deposed?
A. I remember getting prepped for it, so I must have been deposed, yes, but it was years ago.
Q. Okay. But you don't remember?
A. No.
Q. Okay. So you don't recall the nature of the deposition?
A. Well, it was -- so I -- it was when I was -- let me just think now. I did not know you were going to ask me this. I think it was when I was working for the State Department and I think -- yes, it must have been, because it was concerning something in Las Cruces, because I remember I had to go to a trial. It had something to do with units related to funding for special education. That is all I can remember.
Q. Okay. How long ago was it?
A. Oh, more than 20 years when I was at the State Department, so probably, you know, 30 years ago.

Q. Okay. Yeah. Good reason why you would not remember.
A. Yeah, yeah, yeah.
Q. I would agree with you on that.
So, Ms. Anderson, do you know my client, Tasha Lipe?
A. I don't.
Q. Okay. You have never met her?
A. No.
Q. Okay. In this particular case you have been asked to assist Albuquerque Public Schools in providing data, correct?
A. Correct.
Q. And you're aware that there is a current lawsuit pending that is involving Albuquerque Public Schools and my client, Ms. Lipe?
A. Yes.
Q. Okay. Isn't it also accurate that you verified a lot of the information that has been provided by way of the discovery from APS in this case?
A. Yes.
Q. Can you please be specific as to what exactly you were in charge of as it pertained to your verification for those documents and

information that was provided?

A. We provided some data from STARS, which is the name of the -- it stands for Student Teacher Accountability Reporting System. The State had, prior to the current system, which is called Nova. But we provided from STARS the end of year surfaces fact template that had all of the detail about related services delivered to students at the end of year count. And then -- that was from '22, '23.

And then we used a query to find similar data, but in our internal system, Synergy. And that data covered the entirety of the year templates from 40 days through the end of year.

And then we also supplied -- although I was just a conduit for this piece -- from '22 to '23, notes made by social workers in MaxCapture which is the data collection system that feeds Medicaid reimbursement through Medicaid and schools data. So those notes were provided without reference to student names.

Q. Okay. No problem.

A. So those were the main three data documents that we provided. I think I also provided a list of the managers for related service for the -- some years that you specified that included

Bernadette Lucero-Turner and more recently Lisa Oliphant.
Q. Okay. Let's talk about the two different systems. I would like to ask you about MaxCapture as well as Synergy.
And what I would like to do is have you tell me about both of those programs, starting with Synergy, and how you are able to access information from Synergy and how you are able to access information from MaxCapture.
A. So I can't testify about MaxCapture, that would be JoAnn Sanchez.
Q. Okay.
A. I just made sure that you got the document. I went upstairs and talked to JoAnn, who works on the third floor, and she -- she is the keeper of that data?
What do you want to know about Synergy?
Q. How did you access the information that was requested by Ms. Lipe as part of this lawsuit?
A. Through queries that one of my techs designed.
Q. Okay. Let's talk about a couple of things. First, how savvy are you with computers?
A. Medium.

Q. Okay. And, again, I am not asking you this question to be rude by any means, okay? I am not -- I am doing my job. I just want you to be aware of that. So some of the questions I ask you are not meant to be disrespectful to you, it is just simply me doing my job.

If you are medium, as you describe your strength and your ability to work on a computer system, technology, general, did you feel that this was -- you were the right person to provide us with this information from Synergy?

A. So I don't do everything by myself. I have a little team that works with me.

Q. Okay.

A. And my job is to -- I am more aware of connections between data and funding, like, through the State Equalization Guarantee. And I am more aware of rules that apply to how funding and data relate.

I am also, because I have been doing that a long time. When I was at the State I was also doing data and budget for the special ed department. So I have been -- back when I started, we were still using green stripe printers, I don't know, you probably don't even know what that is. But before

we had computer-assisted data districts in around, the State would send us data and little diskettes and then we would plug it into a printer and would print out on these green stripe sheets.

So we -- everything was very manual. And then we migrated to a system where the State provided -- so at that point, everybody was using their own data system. Then we migrated to a system where the State would give each district a diskette and then they would put their data into that uniform template.

And then -- I mean, we have been through a variety. And I have lived through, I am old enough that I have lived through all of these advancements.

So my role right now is more of a kind of the guiding light on data and budget for the special ed department. I am not doing the queries myself, but I have got some very sharp people that do it for me. Now, they are not paid at a level where they should be subjected to the rigors of depositions and trials, and so on. So I am -- I am your -- I am your -- I am it when it comes to the legalities. But I can't tell you about the exact details.

Now, I can tell you about the ability of Synergy to store data, historically. And -- because

I know that was a question. And the data that -- that my tech was able to pull from '22, '23 are -- the data that she used for her queries were the templates that we sent to the State.

Back then in '22, 2023, we sent a set of data on a prescribed format that the State had. And so when we sent that data up, we had a copy of it in our data system. We do not maintain records that were originally requested of caseloads by teacher, and we don't keep records of who students were attached to every year as they move through the APS system. So that is -- I will be quiet now and let you talk.

Q. No problem.

I am a little concerned because I think documentation was provided and signed by you and you verified that this is what you have yourself provided. But now you are telling me that there is, in fact, people that work with you, a team who would have been in charge of accessing the requested information that we had for both MaxCapture related data and Synergy related data?

A. Not MaxCapture, Synergy.

Q. So let's talk about Synergy. So Synergy had a manual, correct? To operate Synergy, a manual

exists.

Are you aware of that?

A. I am thinking about that. We have manuals from the Nova system. We have -- well, so -- do we have one manual. I am not aware of one manual. The system is so huge and manages so much data, because we are a huge district that the -- the capa- -- the functionality of each of the various modules in Synergy evolve, almost monthly. As new needs occur, there are ongoing meetings between the Synergy vendor and APS where these needs are discussed, refined, tickets are submitted. It is -- so I think it would be inaccurate to say there is a manual.

Q. Okay. Let me go ahead and show you the Synergy manual that exists. And the reason I am going to show this to you, I don't know, Tasha is on the line with us and we are going to see if we can show it to you by video or screen share.

MS. FOGHI: And while she is pulling that up, Karen, I will move on to my next question. We will come back to the Synergy manual, okay?

Q. (By Ms. Foghi) So with respect to Synergy and the data that it stores, go ahead and tell me specifically what is the data that it stores? Like, give me all the information that I would be able to

see if I were logged into Synergy.
A. Well, users have access depending on their role, and that is another whole matrix. So when you say what could you see --
Q. Well, let me rephrase.
What could a social worker see if they logged into Synergy?
A. Okay. All right. I can answer that. So they can see the students that that have been assigned to them. And in the case of social workers, they assign themselves the kids.
We, I have another tech who processes requests from each role group, and -- well, let's just stick with social workers. So if social worker John Smith submits, says, Please add this student to my caseload, then we add it to their portfolio.
So they can see the students that are currently in the -- they are currently assigned to. Also, if they set their focus to show active and inactive, they can also see students who have either exited special ed or exited the district. Their names are shown in parentheses.
Q. Okay.
A. So -- and, they can look at the IEPs for those kids, and any historical documents that are

stored in the system. They have access to draft documents that are currently being created, such as an IEP, an invitation to the parent to attend the meeting, which includes if it is a re-eval consent for testing. I think there is a Medicaid approval document. It depends on what stage of the process the kid is in. But the social worker could see not only the portfolio, completed historical documents, they can also see draft documents that are currently in process.

Q. Okay. Tell me about the reports that can be generated by someone like you who is in a position of authority over data. What is the kind of report that you can generate for me through Synergy?

A. Well, it depends on what you want to know.

Q. Okay. Tell me what your understanding was in this particular case when you verified information, I would like to understand from you when you provided information to us in this case what was your understanding of what you were providing to me?

A. As I recall, you requested information about provider student connections from an historic year, not the current year, but going back to '22,

'23. And you wanted to know the name of the provider, the number of minutes per whatever month, week, semester.

And we redacted the student number. And the reason we were able to pull that information from the State is because the State publishes reports and we access the end-of-year report from the STARS historical record at the State.

And then from Synergy the reason we were able to pull anything from '22, '23, is because during that year we were under a different set of reporting requirements. The reporting requirements were that 40-day, 80-day, 120-day and end of year, we had to send up a prescribed template populated with the data that the State required. And that copy was stored in Synergy. We no longer -- we have now moved to a day-by-day reporting. Now we have to send up data every day.

Q. Okay.

A. That happens automatically. A connection between Synergy and Nova that that date goes daily.

But back in '22 or '23 we had a capability of storing it because we sent it up in a different manner. We only sent it up four times and it was in a prescribed format. So that is how it is saved in

Synergy.

Q. Who was the person that actually did the work that you verified? What was the name of the person who actually did the work?

A. If I give the name does that mean she is going to be questioned? In that case, I don't want to reveal the name because I don't -- she is not being paid at a level --

Q. Let me explain to you why this is not something that is subject to debate because I can depose whoever I choose to depose. My problem and concern is, Ms. Anderson, is that you verified a document and by verifying the document that you verified, you indicated that you were the one who actually did the work, compiling thousands and thousands of pages of reports, but yet you are here today to tell me that, in fact, that wasn't you. That is a problem.

MS. KILGORE: Objection. Mischaracterizing what Ms. Anderson testified to.

MS. FOGHI: Okay.

Q. (By Ms. Foghi) Well, correct me, please, as far as how I am wrong with what you have stated versus what I just told you.

A. I remember signing a document saying that

I verified that the data was accurate, and that is true.
Q. Okay. But you were not the one who actually generated and actually printed out the data?
A. No. But I am the one that directed the work.
Q. Did you review the work?
A. Oh, yes.
Q. You reviewed the work?
A. Yes.
Q. With Synergy getting back to dates, for example, any date can be put in. So I can be very clear as I do a search, I can type in and modify whatever dates I am looking to extract data for, correct? So if I want 2020, 2021 school year, I can go into Synergy and type in that information, could I not?
A. No. That is not how -- we don't have reports like that. In this case, in order to get the data you needed, we had to have a specific query that mined data from the historic record in Synergy that existed during the time of STARS.
That historic record does not exist after we switched to Nova. But in the time of STARS,

we -- we stored the data that was submitted at those four count dates and the query would access the data store.

Q. How long has Synergy been used as the system?

A. So Synergy has been used, let's see, we had Schoolnet and TIEnet, then we migrated to Synergy on the GenEx side -- I mean, the side that collects data on all students.

Then we migrated -- we stayed with TIEnet. So it wasn't until, I would say -- I am not sure, four, five years ago where Synergy was used on both sides, both the special ed side and the GenEx side. Before that we were using an independent special ed system called TIEnet that had -- that would pull data from Synergy but there was always, like, a time delay, like, a day time delay.

So when we moved to having Synergy also operate the special ed side, that made it so that the data links were faster. I mean, it was almost instantaneous that the data that flowed through the GenEx side to the special ed side would be updated instantly.

Q. Did you ever verify how many pages were produced by number in this case?

A. No.
Q. Okay. Is it true, Ms. Anderson, that this information that you provided from thousands and thousands of pages, isn't this something that could have been printed off easily as a report?
A. No.
Q. Let me go ahead and share with you what I am going to mark as Plaintiff's Exhibit Number 1. I e-mailed it to your -- I e-mailed this to Ms. Kilgore just a few moments ago. But I am going to show you on the screen.
MS. FOGHI: And then, of course, we can forward this also to Paul.
Q. (By Ms. Foghi) But I will show you on my screen and then your attorney has this information. But I just want her to know that we are looking at one in the same thing.
A. Just as a few minutes ago, right?
Q. Yes. I am showing it on my phone, but Ms. Kilgore will show it to you while you are sitting there because it will be easier for you to see. It is basically the user guide for Synergy.
MS. FOGHI: And, Karen, let me know if you have not received it.
MS. KILGORE: Yeah, I don't know if I

can -- I need to go back down to the reduced screen.

MS. FOGHI: I just e-mailed it to you, and I will e-mail you a second exhibit as well.

Did you get the one that I just marked as Exhibit Number 1?

MS. KILGORE: I am looking.

MS. FOGHI: Let me go back and make sure it went through to you. It did go through to you at 9:29 a.m. And it is titled Document Exhibit 1. And if you click on the Adobe, it should pop up, Karen.

MS. KILGORE: I see it, I see it.

MS. FOGHI: Okay. If you don't mind sharing and showing that to Ms. Anderson, that would be helpful.

A. Oh, okay. This is a User guide that we created just within the special ed department. I thought you meant a Synergy manual for the whole system. We created some user guides that we have even stopped updating them because they go out of -- they get revised so quickly. But, yeah, I recognize this.

Q (By Ms. Foghi) Okay. So this does exist?

A. Oh, yeah.

Q. I am going to label this, now of course as I have mentioned Plaintiff's Exhibit Number 1.

(Exhibit marked, 1.)

Q. (By Ms. Foghi) Were you aware, Ms. Anderson, that by looking at this document, The Guide to Using Synergy is the title of the document, that you can actually download reports by the click of a button as opposed to tens of thousands of pages being printed on individual wasted pieces of paper?

You do realize a button can give you the report that I asked for?

A. Well, so I don't agree with you that a button can give you the report you asked for. The reports that we describe in this manual that are still available, like the FTE report or a portfolio report, those are only -- those only work for present students.

Synergy does not keep these things going back in history. That, those buttons only work for current data, live data.

Q. So you are telling me that generating a report like what we asked for, what you are testifying to today is that the way in which you gave me those documents is the only way you could have accessed them and that you have no way of generating a simple report?

A. Correct.

Q. Who is the person that did the work, Ms. Anderson?

MS. KILGORE: I think you need to tell her your team names.

A. Danette Chavez.

Q (By Ms. Foghi) Okay. So Danette Chavez would have been the lady that generated these reports, correct?

A. Under my direction about what inputs to use, and, yes.

Q. And historical documentation is what Synergy can provide?

A. No.

Q. Okay. Go ahead and tell me.

A. So, again, I have said this before, but let me try to say it with different words. The only way we were able to capture the historic data you asked for from '22, '23 was due to the fact that at the time the State required templates of data to be submitted at the four count dates.

Those -- the data that was submitted and those four count dates was stored somewhere in Synergy and we were able to design, and I don't even know if it was one query or a series of queries that were able to mine that data from those four

reporting periods. And that is what we gave in the document from Synergy.
Q. Have you ever participated in an audit on behalf of the school system?
A. What type of audit are you talking about, financial?
Q. Any type of audit.
A. Any type of audit, yes.
Q. Okay. And as you participated in any type of audit, were reports requested by you to be provided as part of that audit?
A. Typically when we are auditing something, there are very specific data requests. And I work with my team to determine what -- a lot of times users come to us and they say, We want X, Y, Z.
And after talking with my team and what is actually possible, we sometimes say, Well, we can provide Y but we cannot provide X, and we can provide Z if and only if, you know, this parameter is put on it. So we get data query requests all the time that are related to -- as our function as the special ed department, part of our function is assuring that students are getting services that are required.
And so we are, I would not say daily, but

weekly my team is asked to provide data about a variety of situations. And it is a give and take when we get asked things. We can't always produce what people want, but we try to give them the closest we can get. And that is kind of what we did in your case. We gave you the closest we could get.

Q. Now, I got to start moving a little faster here, ma'am. We are on a time crutch, so I am just going to ask you to just answer the questions so that we can get through these because I have got somebody coming in again in 15 minutes.

A. Okay.

MS. KILGORE: I do think that the witness is entitled to complete her answers.

MS. FOGHI: I do agree with you, Karen, I just don't want additional elaboration that was not asked. That is all I am saying.

MS. KILGORE: Well, again, I think you did ask for the elaboration that Ms. Anderson just gave.

Q. (By Ms. Foghi) Okay. Ms. Anderson, take a look at what I sent over to Ms. Kilgore that is labeled as Exhibit Number 2, Plaintiff's Exhibit Number 2. Take a look at that generated document, please.

A. (Witness complies.)

(Exhibit marked, 2.)
Q. (By Ms. Foghi) Does this look familiar?
MS. KILGORE: We haven't pulled it up yet. Give me a second.
MS. FOGHI: Okay.
A. I don't think I provided this. Yeah. I don't know.
Q. (By Ms. Foghi) Do you recognize this report?
A. I don't believe I provided this.
Q. I am not asking you if you provided it?
A. Sorry.
Q. I am asking you if you recognize what type of report this is?
A. Yes.
Q. What is this type of report?
A. A portfolio list.
Q. Where did this come from?
A. Synergy. And it shows the active relationship.
Q. The day-to-day, correct?
A. Day-to-day. If you were talking about the present day, the answer is yes. If you were talking about a time in the past, the answer is no.
Q. Okay. Is this one type of report that can

be generated through Synergy?
A. Only for current data. It cannot be generated for historic data.
Q. Okay. Can the fields be edited to change the school year and any details desired?
A. No.
Q. Okay. Let me go ahead and now show you Exhibit Number 3.
And let me know when you have received it.
(Exhibit marked, 3.)
A. Got it.
Q. Okay. So please take a look at what I sent.
A. Yes.
Q. What does this report reflect to you?
A. It is a services fact record. And, again, it is available for current service, not historic service.
Q. Okay. And specifically if you take a look at this exhibit it talks about ID numbers belonging to the students, their grade, their service type and minutes spent either monthly or by semester, correct?
A. Yes.
Q. Okay. So this report in particular

contains all students in the school district that we see social work services, correct?

A. So I can't answer that for the year '21, '22, but if we were to run this now, yes.

Q. Thank you. No problem.

Let me show you what I have also sent over to your attorney that I've marked as Plaintiff's Exhibit Number 4 and let me know when you have received it.

(Exhibit marked, 4.)

A. Got it.

Q. (By Ms. Foghi) Okay. And could you take a look at this and tell me how you would characterize this document?

A. I am trying to think what she wants. It is a record that was generated at the time, when it was current, of students that were served. I am guessing by a particular -- here, notice the ones in parentheses are the ones that have been exited.

Q. We are on Exhibit 4. We are on Exhibit 4 right now.

MS. KILGORE: We are on Exhibit 4.

A. Can you scroll down to the bottom so I can see the footer? Okay. Hold on. It looks like she has run it for the whole district --

Q. Okay.

A. -- because I am seeing -- rather than just a particular school.

Q (By Ms. Foghi) Correct. So Synergy, once again, you can modify the fields to include the entire school system versus a particular school, correct?

A. Yeah. And just to let you know, that happens in the upper right-hand corner of the screen which is called the focus area.

THE WITNESS: You don't want me to elaborate.

MS. KILGORE: No.

A. So social workers have access to, as do all related service providers have access to all schools, because their assignments frequently overlap in a variety of schools. And rather than trying to -- so, yes, she has the ability, a social worker has the ability to run a report for the whole school. But, again, note that she ran this back in '21, '22. So the report only works for the current data. It does not work on historic data because Synergy does not maintain that data historically.

Q. (By Ms. Foghi) Okay. So what you are saying, and I want to make sure that you and I are

on the same understanding, the same page.
A. Sure.
Q. What you are saying is that Synergy system, you cannot edit the focus and that you cannot edit the date. If you are saying it is only current, not historical, current means I can put in the time currently for this year, right? Is that what current means for this school year, or does current mean for today?
MS. KILGORE: Objection. I think your question is very confusing.
MS. FOGHI: Okay.
A. Let me give her a little background.
So the focus area can be set to prior years, but the reporting tools don't work. The reason you can set it to prior years is because there -- we need to be able to check enrollment records which have to be maintained. So you can set -- you can -- you can -- if I were a social worker, I can change the focus to a variety of schools and I can also change the focus year, but that does not draw accurate data out of the system for those past years. The past years only work for enrollment records.
MS. KILGORE: Ms. Foghi, was this

Exhibit 4 a run currently by Ms. Lipe or was it run --
THE WITNESS: No. It says --
MS. KILGORE: I have to -- let me speak.
For the record let's do say who was it run by and when. It looks like it is printed by Tasha Harris Lipe 6-19-22 at 3:46 p.m.
MS. FOGHI: Correct.
MS. KILGORE: So it was run over three years ago.
MS. FOGHI: Correct.
A. The data was current then.
MS. KILGORE: The data was current at that time.
MS. FOGHI: Exactly.
MS. KILGORE: I am trying for clarify for me as well as for the record.
Q. (By Ms. Foghi) When the documents were produced to us that were requested and the person that you have identified as being the one who provided these documents did the actual work, what specifically did you do as their supervisor to validate and verify what, in fact, we were being given?
A. We reviewed the parameters of the query

and I looked at -- I skimmed over the report to see if it seemed reasonable, and I was satisfied in both respects.

Q. You skimmed and -- you looked at it, you skimmed it and it looked reasonable. That is your testimony?

A. Yes.

Q. Okay. As you can see from what I have shown you in various exhibits, 2, 3, and 4, it is very specific, as far as the data that is being shown, minutes per semester, the kind of service, the grade of the student, et cetera.

And you can see that this report is generated as one solid page-by-page report. Is this something that you're testifying today that could not be provided when we requested you to provide with us the parameters reflected in the discovery request?

A. Correct.

Q. Okay. You had read and you are familiar with the internal Synergy manual that you have seen in the exhibits?

A. I pretty much wrote those.

Q. Okay. Can the report itself, say, a social worker goes in, can she run a report or he

run a report by name?
A. Do you mean provider name or student name?
Q. Both.
A. What do you want to know about them? So a provider can run a list of portfolio or class list.
If you want to know information about a particular student, you would go to that student's record and the historic data that is saved, like, the IEP, the PWNs, the invitation to parents, consent for testing, and attached documents, those can be viewed by a social worker.
Q. Can a social worker input their respective name and generate a report through Synergy?
A. Her class list?
Q. Let me go ahead and show you an exhibit. I am going to go ahead and send you Exhibit Number 5. Take a look at this particular sheet that I am sending over to your counsel now.
(Exhibit marked, 5.)
MS. FOGHI: Karen, just let me know when you receive this.
MS. KILGORE: I have not received it.
MS. FOGHI: Let me make sure it has gone through. It has gone through. You should have it any second now.

MS. KILGORE: I just got it.
Q. (By Ms. Foghi) Once you are able to take a look at this, if you could just answer the question of whether or not this is something you would recognize as something that Synergy has the capability of doing.
A. Can this be generated by -- so I think this is class list so --
Q. Job detail is portfolio list. Do you see that in the job details? On the first white box there are two little dots.
A. Yeah.
Q. And one of -- the first one says Job Detail Portfolio List.
A. Right.
Q. And then the status says no data found for this report.
A. Right.
Q. If no data is found for this particular report, what would that mean?
A. That Synergy did not have any data.
Q. That there was no caseload, correct, for that social worker?
A. For that time period, yes.
Q. Okay. All right.

Okay. Well, Ms. Anderson, I don't believe I have anything further to ask of you.

MS. FOGHI: And, of course I will -- these are the documents that I will forward also to Mr. Baca labeled Exhibits 1, 2, 3, 4, and 5 for the plaintiff.

I don't have anything further, but I will give an opportunity, of course, to Ms. Kilgore to follow up with any questions that she might have.

MS. KILGORE: I don't have any questions at that point.

MS. FOGHI: Thank you very much, Ms. Anderson.

THE WITNESS: Sure.

MS. FOGHI: I appreciate your time.

THE WITNESS: Sure.

(Proceedings concluded at 10:00 a.m.)

WITNESS SIGNATURE/CORRECTION PAGE

If there are any typographical errors to your deposition, indicate them below:

PAGE/LINE

_____________ Change to ________________________________

_____________ Change to ________________________________

_____________ Change to ________________________________

_____________ Change to ________________________________

Any other changes to your deposition are to be listed below with a statement as to the reason for such change.

PAGE/LINE CORRECTION REASON FOR CHANGE

________________________________________________________

________________________________________________________

________________________________________________________

________________________________________________________

________________________________________________________

________________________________________________________

I, BONNIE ANDERSON, do hereby certify that I have read the foregoing pages of my testimony as transcribed and that the same is a true and correct transcript of the testimony given by me in this deposition except for the changes made.

____________________________
BONNIE ANDERSON

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

NATASHA LIPE,
Plaintiff,
vs. NO.
1:23-CV-00899-GBW-JMR
ALBUQUERQUE PUBLIC SCHOOLS, et al.,
Defendants.

CERTIFICATE OF COMPLETION

I, Paul Baca, CCR #112, DO HEREBY CERTIFY that on December 8, 2025, the Deposition of BONNIE ANDERSON was taken before me at the request of Boglarka Foghi, and the sealed original thereof was retained by:

FOGHI LAW FIRM LLC
PO Box 944
Corrales, New Mexico 87048-0944
505-220-5691
BY: BOGLARKA FOGHI

I FURTHER CERTIFY that copies of this certificate have been mailed or delivered to the following counsel and parties not represented by counsel appearing at the taking of the deposition:

CUDDY & McCARTHY LLP
PO Box 4160
Santa Fe, New Mexico 87502-4160
505-988-4476

I FURTHER CERTIFY that examination of this transcript and signature of the witness was requested by the witness and all parties present.

I FURTHER CERTIFY that the cost of the original and one copy of the deposition to BOGLARKA FOGHI is $__________.

I FURTHER CERTIFY that I did administer the oath to the witness herein prior to the taking of this deposition; that I did thereafter report in stenographic shorthand the questions and answers set forth herein, and the foregoing is a true and correct transcript of the proceeding had upon the taking of this deposition to the best of my ability.

I FURTHER CERTIFY that I am neither employed by nor related to any of the parties or attorneys in this case and that I have no interest in the final disposition of this case in any court.

________________________

PAUL BACA, RPR, CCR
Certified Court Reporter #112
License Expires: 12-31-2025